**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Alexander Sowa, Stephen V. Caggiano, Edward Michael Jacobs, Park C. Thomas, Raymond Robinson, Thomas Koby, Yauwen Lin, Giuseppe Garofalo, Mike Xie, and Samuel Ortiz, individually and on behalf of those similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>Mercedes-Benz Group AG; Mercedes-Benz USA, LLC,<br><br>        Defendants. | Case No. 1:23-cv-00636-SEG<br><br>**AMENDED COMPLAINT – CLASS ACTION FOR**:<br>1. Breach of Express Warranty<br>2. Breach of Implied Warranty<br>3. Breach of Express Warranty – Magnuson-Moss Warranty Act<br>4. Breach of Implied Warranty – Magnuson-Moss Warranty Act<br>5. Violations of Georgia Fair Business Practices Act<br>6. Violations of Georgia's Uniform Deceptive Trade Practices Act<br>7. Violations of New Jersey's Consumer Fraud Act<br>8. Fraud by Concealment<br>9. Unjust Enrichment<br>10. Violation of the Missouri Merchandising Practices Act<br>11. Violation of the Florida Deceptive and Unfair Trade Practices Act<br>12. Violation of the Connecticut Unlawful Trade Practices Act<br>13. Violations of the Rhode Island Unfair Trade Practice and Consumer Protection Act<br>14. Violation of the Michigan Consumer Protection Act<br>15. Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law<br>16. Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law<br>17. Violation of the Maryland Consumer Protection Act<br>18. Violation of the New York General Business Law N.Y. Gen. Bus. Law § 349<br>19. Violation of the New York General Business Law N.Y. Gen. Bus. Law § 350<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................1

II.     PARTIES ........................................................................7

    A.      Plaintiffs ...............................................................7

        1.      Plaintiff Alexander Sowa ...............................7

        2.      Plaintiff Stephen V. Caggiano ........................9

        3.      Plaintiff Edward Michael Jacobs ...................13

        4.      Plaintiff Park C. Thomas ...............................16

        5.      Plaintiff Raymond Robinson .........................19

        6.      Plaintiff Thomas Koby ..................................24

        7.      Plaintiff Yauwen Lin .....................................26

        8.      Plaintiff Giuseppe Garofalo ..........................30

        9.      Plaintiff Mike Xie .........................................32

        10.     Plaintiff Samuel Ortiz ...................................36

    B.      Defendants ............................................................40

        1.      Defendant Mercedes-Benz Group AG ...........40

        2.      Defendant Mercedes-Benz USA, LLC ...........42

III.    JURISDICTION ..............................................................42

    A.      Subject Matter Jurisdiction ...................................42

    B.      Personal Jurisdiction: MBG ..................................43

    C.      Personal Jurisdiction: MBUSA ..............................44

IV.     VENUE ...........................................................................45

V.      APPLICABLE LAW .........................................................45

VI.     FACTUAL ALLEGATIONS ...............................................46

    A.      Technical Details ...................................................46

        1.      Mechanical Purpose of a Vehicle Subframe ...........................46

# TABLE OF CONTENTS
## (continued)

Page

2.  Rust Formation and Corrosion..................................................50

3.  Mechanical Consequences of Subframe Corrosion.................51

B.  Mercedes' Knowledge of the Subframe Defect..................................56

1.  Mercedes' Knowledge of the Rear Subframe Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.....................................57

2.  Mercedes Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations ............................................60

3.  Mercedes Knew of the Rear Subframe Defect as Evidenced by its Own Technical Services Bulletins ................64

4.  Mercedes Knew of the Rear Subframe Defect Based on its Receipt of a Large Number of Orders for Replacement Subframes...................................................66

5.  Mercedes Was Made Directly Aware of the Rear Subframe Defect Based on a Large Number of Class Member Complaints to Mercedes...................................67

6.  Mercedes Knew of the Rear Subframe Defect Based on Class Member Complaints on Public Online Forums .............70

7.  Mercedes Has Publicly Acknowledged Premature Rear Subframe Corrosion in its European Markets and Has Committed to Remedying the Defect in Those Markets. .........74

C.  Mercedes' Inadequate Warranty Extension .......................................75

D.  Mercedes' Marketing and Concealment ............................................80

E.  Fraudulent Concealment Allegations................................................85

VII.  TOLLING OF THE STATUTE OF LIMITATIONS ...................................89

A.  Fraudulent Concealment Tolling........................................................89

B.  Estoppel ..............................................................................................89

2751274.4

**TABLE OF CONTENTS**
**(continued)**

Page

C.      Discovery Rule ..................................................................90

VIII.  CLASS ALLEGATIONS ..............................................................91

A.      Numerosity ......................................................................92

B.      Typicality.........................................................................93

C.      Adequate Representation...................................................93

D.      Predominance of Common Issues .....................................94

E.      Superiority .......................................................................96

IX.    CLAIMS FOR RELIEF: NATIONWIDE CLAIMS....................................97

FIRST CAUSE OF ACTION Breach of Express Warranty (this cause
        of action against MBUSA only)..........................................97

SECOND CAUSE OF ACTION Breach of Implied Warranty (this
        cause of action against MBUSA only)................................103

THIRD CAUSE OF ACTION Breach of Express Warranty –
        Magnuson-Moss Warranty Act (this cause of action against
        MBUSA only) ...................................................................105

FOURTH CAUSE OF ACTION Breach of Implied Warranty –
        Magnuson-Moss Warranty Act (this cause of action against
        MBUSA only) ...................................................................108

FIFTH CAUSE OF ACTION Violations of Georgia Fair Business
        Practices Act O.C.G.A. §§ 10-1-390, *et seq.* ....................109

SIXTH CAUSE OF ACTION Violations of Georgia's Uniform
        Deceptive Trade Practices Act O.C.G.A. §§ 10-1-370, *et seq.*..........115

SEVENTH CAUSE OF ACTION Violations of New Jersey's
        Consumer Fraud Act N.J. Stat. Ann. §§ 56:8-1, *et seq.* ....................120

EIGHTH CAUSE OF ACTION Fraud by Concealment ...........................125

NINTH CAUSE OF ACTION Unjust Enrichment....................................131

X.     CLAIMS FOR RELIEF: PLAINTIFFS' STATES OF RESIDENCE........133

# TABLE OF CONTENTS
## (continued)

**Page**

TENTH CAUSE OF ACTION Violation of the Missouri
Merchandising Practices Act Mo. Rev. Stat. §§ 407.010, *et seq.* .....133

ELEVENTH CAUSE OF ACTION Violation of the Florida
Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201,
*et seq.* .........................................................................................139

TWELFTH CAUSE OF ACTION Violation of the Connecticut
Unlawful Trade Practices Act Conn. Gen. Stat. Ann. §§ 42-
110a, *et seq.* .................................................................................145

THIRTEENTH CAUSE OF ACTION Violations of the Rhode Island
Unfair Trade Practice and Consumer Protection Act R.I. Gen.
Laws §§ 6-13.1-1, *et seq.* ..............................................................150

FOURTEENTH CAUSE OF ACTION Violation of the Michigan
Consumer Protection Act Mich. Comp. Laws §§ 445.901, *et
seq.* ...............................................................................................156

FIFTEENTH CAUSE OF ACTION Violation of the Deceptive Acts
or Practices Prohibited By Massachusetts Law Mass. Gen.
Laws ch. 93a, §§ 1, *et seq.* ............................................................163

SIXTEENTH CAUSE OF ACTION Violation of the Pennsylvania
Unfair Trade Practices and Consumer Protection Law 73 Pa.
Cons. Stat. §§ 201-1, *et seq.* .........................................................170

SEVENTEENTH CAUSE OF ACTION Violation of the Maryland
Consumer Protection Act Md. Code. Ann., Commercial Law,
§§ 13-101, *et seq.* .........................................................................175

EIGHTEENTH CAUSE OF ACTION Violation of the New York
General Business Law N.Y. Gen. Bus. Law § 349 ..........................181

NINETEENTH CAUSE OF ACTION Violation of the New York
General Business Law N.Y. Gen. Bus. Law § 350 ..........................188

XI.    RELIEF REQUESTED ................................................................190

XII.   DEMAND FOR JURY TRIAL .....................................................192

## I.    __INTRODUCTION__

1.      Plaintiffs Alexander Sowa, Stephen V. Caggiano, Edward Michael Jacobs, Park C. Thomas, Raymond Robinson, Thomas Koby, Yauwen Lin, Giuseppe Garofalo, Mike Xie, and Samuel Ortiz ("Plaintiffs") bring this action individually for themselves and on behalf of all persons who purchased certain vehicles equipped with uniform and uniformly defective rear subframes designed, manufactured, distributed, warranted, marketed, and sold by Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG ("MBG") (collectively, "Mercedes").

2.      The vehicles at issue include at least 2010-2022 Mercedes-Benz C-Class, 2010-2022 Mercedes-Benz E-Class, 2010-2015 Mercedes-Benz GLK-Class, 2010-2022 Mercedes-Benz CLS-Class, 2010-2020 Mercedes-Benz SLK/SLC-Class, 2016-2022 Mercedes-Benz GLC-Class, and 2010-2022 Mercedes-Benz SL-Class (together, the "Class Vehicles").

3.      The Class Vehicles' rear subframes have a dangerous safety defect ("Rear Subframe Defect") that causes the rear subframes, attached components, and nearby parts to prematurely rust or corrode, which (a) adversely affects the drivability of the Class Vehicles; (b) causes corrosion of other components on the underside of the Class Vehicles, including the brake lines, suspension springs,

exhaust system, gas lines, and rear axle; and (c) can cause the rear subframes to fail while the Class Vehicles are in motion, resulting in a sudden, unexpected loss of control for the driver.

4.     On information and belief, the subframes are substantially the same, from a mechanical engineering standpoint, in all Class Vehicles, in that the rear subframes in all Class Vehicles have a substantially similar design or manufacturing defect that causes water and salt to collect on the interior of the subframe, corroding it from the inside out and/or all the rear subframes in all the Class Vehicles have been treated with an inadequate type or amount of rust coating.

5.     Because of the faulty design or manufacturing, the rear subframes can prematurely experience severe corrosion, especially near the attachment points for the suspension components, including the control arms.  "Control arms" is a general term that refers to the components linking the rear subframe to other parts of the suspension and steering system, including the rear wheels.  The control arms, along with the subframe, are the main stabilizing force of a vehicle's suspension.  They are critical to vehicle handling and drivability.

6.     Corrosion on the rear subframe makes the component and its attached suspension parts structurally unstable and prone to failure.  When the rear

- 2 -

subframe of a Class Vehicle fails, the rear suspension of the vehicles becomes destabilized.  A corroded rear subframe is particularly likely to crack when the driver hits a pothole or when road conditions force the driver to brake suddenly.

7.      When a rear subframe fails when a Class Vehicle is in motion, it can cause: (a) the rear of the vehicle to fishtail, especially while braking; (b) the vehicle to suddenly veer to one side, potentially into a parallel lane of traffic; and/or (c) complete or partial loss of control for the driver.  Additionally, when the rear subframe fails at its connection to one of the control arms, the control arm can break loose and cause serious, hazardous damage to nearby components, including the gas tank, torsion bar (also called the "stabilizer bar"), and wheels.

8.      Class Vehicle owners can also experience corrosion of the rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle, all of which are located near the rear subframe in the back of the vehicle.  This corrosion can cause serious mechanical issues, for example, leaking in the rear brake lines, which can compromise the efficacy of a Class Vehicle's brakes.

9.      The defective subframes in the Class Vehicles pose a material safety risk, and therefore render the vehicles unfit for their intended purpose.  Because of this risk, Mercedes authorized dealers and independent mechanics often advise Class Vehicle owners with rear subframe corrosion not to drive their Class

- 3 -

Vehicles, especially at high speeds.  Many Class Vehicle owners are therefore left

with vehicles that are too dangerous to drive, especially at typical highway speeds.

10.     Upon information and belief, subframe corrosion in the Class

Vehicles happens "from the inside out," meaning that it is very difficult for even a

professional mechanic, much less a layperson, to diagnose the issue during a

routine inspection until the subframe is severely corroded and near the point of

failure.  Underbody shields also block portions of the subframe from view and

therefore create another barrier to corrosion detection.

11.     Mercedes is aware, and has been aware, or should have been aware

since at least 2009 of the risk of excessive rear subframe corrosion on the Class

Vehicles, based on the standard pre-sale design and testing information collected

by reasonably prudent vehicle manufacturers.

12.     Moreover, Mercedes has been aware of the Rear Subframe Defect for

at least five years based on consumer complaints alone.  For instance, there have

been dozens of complaints to the NHTSA about rear subframe corrosion on

Mercedes vehicles.  The earliest publicly available complaint was made on January

23, 2018.

13.     In the past, when customers who experienced the defect contacted

Mercedes, it disavowed all knowledge of the problem and refused to fully

reimburse owners for the repairs and subframe replacement, which typically cost anywhere from $2,500 to upwards of $7,000, depending on the extent of the corrosion.

14.     As a result of Mercedes' alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, in that the Class Vehicles have manifested, and continue to manifest, the Rear Subframe Defect and are rendered unsafe to drive.

15.     Despite having knowledge of the Rear Subframe Defect since at least 2009, Mercedes has not admitted to the Rear Subframe Defect.  Mercedes did not send notice to Class Vehicle owners regarding the possibility of rear subframe corrosion until February 10, 2023, two months after the delivery of Plaintiffs' notice of intent to sue pursuant to the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390.  Mercedes' notice of the defect, in the form of a warranty extension covering certain Class Vehicles (the "Extended Warranty"), is not adequate to warn Class Members about the serious safety risks posed by rear subframe corrosion, including the partial loss of control while driving, and does not give them notice of the need to have their vehicles inspected, or provide funding to do so.

16.     In addition, the Extended Warranty is insufficient to remedy Plaintiffs' and Class Members' economic damages, including for loss of resale value of the Class Vehicle, repair and/or replacement of adjacent vehicle parts damaged by the Rear Subframe Defect, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Rear Subframe Defect (i.e., towing costs, rental car fees, etc.).

17.     Plaintiffs and Class Members have suffered actual damages, in that they a) were deprived of the benefit of their bargain at point-of-sale by paying for one thing—vehicles without a Subframe Defect—and receiving another, and/or b) incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Subframe Defect, and/or c) were or will be forced to stop or limit using their vehicles prematurely or sell them at steep discounts.  Mercedes recently announced Extended Warranty does not adequately reimburse Plaintiffs and Class Members for their economic damages.

18.     On behalf of themselves and all others similarly situated, Plaintiffs seek: a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) declaratory relief, e) injunctive relief, f) pre-and post-judgment interest and g) attorneys' fees and costs.

2751274.4

II.    **PARTIES**

    A.    **Plaintiffs**

        1.    **Plaintiff Alexander Sowa**

    19.    Plaintiff Alexander Sowa resides in East Greenwich, Rhode Island.

    20.    Mr. Sowa and his wife co-own a 2014 Mercedes-Benz C 300 4Matic, which they purchased certified preowned in June of 2017 from Inskip Mercedes, a Mercedes dealership in Warwick, Rhode Island.

    21.    Mr. Sowa's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB5EA929958.

    22.    Mr. Sowa purchased the Class Vehicle for his personal, family, and household use.

    23.    Mr. Sowa expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

- 7 -

2751274.4

24.    Since purchasing the Class Vehicle, Mr. Sowa has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic.  Mr. Sowa has stored the vehicle primarily in an indoor garage when not in use.

25.    Mr. Sowa first became aware of the subframe defect on December 2, 2022, when he brought the Class Vehicle into International Motor Group, a Mercedes-certified mechanic, for the routine replacement of the vehicle's tires. The mechanic informed Mr. Sowa that the subframe was "rotting" near the control arms and that "it's only a matter of time before the subframe fails."  The mechanic further informed Mr. Sowa that such extensive corrosion should not be present in an otherwise mechanically sound, eight-year-old vehicle with relatively low mileage.  At the time the mechanic diagnosed the corrosion, the Class Vehicle had only 80,000 miles.

26.    As a result of the subframe defect, Mr. Sowa incurred $4,349.83 in costs, including $4,319.83 for the subframe replacement and related services and $30 in rental vehicle charges.  Additionally, Mr. Sowa was left without use of his vehicle for eight days while the subframe replacement was being completed.

27.    Mr. Sowa regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the

internet during the years before he purchased his Mercedes-Benz C 300 in 2017.

Although he does not recall the specifics of the many Mercedes advertisements he

saw before he purchased his Class Vehicle, he does recall that safety and reliability

were frequent themes.  Those advertisements about safety and reliability

influenced his decision to purchase his vehicle.  Had those advertisements or any

other Mercedes materials disclosed to Mr. Sowa that the Class Vehicles had

defective subframes that would render his vehicle unsafe and that he would be

required to pay $4,349.83 in repair costs to return his vehicle to a safe condition,

he would not have purchased his Class Vehicle, or would have paid less for it.

28.     On December 9, 2022, Mr. Sowa, through counsel, sent Mercedes a

letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390,

*et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for

Mr. Sowa and others similarly situated.  Exh. A.  In response to this letter,

Mercedes responded through counsel, with information about the Extended

Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in

§ VI.C.  Exhs. C & D.

### 2.     **Plaintiff Stephen V. Caggiano**

29.     Plaintiff Stephen V. Caggiano resides in Milford, Connecticut.

30.     Mr. Caggiano and his wife co-own a 2012 Mercedes-Benz C 300, which they purchased certified preowned in 2014 from Fairfield Mercedes-Benz, a Mercedes dealership located in Fairfield, Connecticut.

31.     Mr. Caggiano's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB6CR191083.

32.     Mr. Caggiano purchased the Class Vehicle for his personal, family, and household use.

33.     Mr. Caggiano expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to his purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

34.     Since purchasing the Class Vehicle, Mr. Caggiano has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes at his local dealership, Mercedes-Benz of Fairfield.

- 10 -

35.     Mr. Caggiano has stored the vehicle primarily in an indoor garage when not in use.

36.     Mr. Caggiano first became aware of the Rear Subframe Defect when he brought the Class Vehicle into Mercedes-Benz of Fairfield for routine yearly maintenance on August 31, 2022.  After an inspection, Mr. Caggiano was informed by the dealership that his subframe was significantly corroded and would need to be replaced "soon."  The dealership quoted him $4,170.04 to repair the subframe.  At the time the mechanic diagnosed the corrosion, the Class Vehicle had 97,547 miles.

37.     As a result of the subframe defect, Mr. Caggiano has been left with a vehicle that is not fit for its intended purpose.  Because the extensive subframe corrosion makes the vehicle hazardous to drive, particularly on the highway, Mr. Caggiano uses his Class Vehicle only when he is without another means of transportation and only for brief trips on low-speed roads.

38.     Mr. Caggiano reached out to MBUSA and MBAG about his defective subframe and initially received no response, despite attempting to contact both corporate entities through multiple channels.  After several attempts at contact by Mr. Caggiano, MBUSA responded to Mr. Caggiano and offered to pay half of the quoted repair cost.  Mr. Caggiano rejected that offer.

39.    Mr. Caggiano regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2014. Although he does not recall the specifics of the many Mercedes advertisements he saw before he purchased his class vehicle, he does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability influenced his decision to purchase his vehicle.  Had those advertisements or any other Mercedes materials disclosed to Mr. Caggiano that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to pay upwards of $4,000 to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

40.    On December 9, 2022, Mr. Caggiano, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Caggiano and others similarly situated.  Exh. A.  In response to this letter, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

2751274.4

### 3.    **Plaintiff Edward Michael Jacobs**

41.    Plaintiff Edward Michael Jacobs resides in St. Joseph, Michigan.

42.    Mr. Jacobs owns a 2010 Mercedes-Benz C 300, which he purchased new in 2010 from Orrin B. Hayes, a Mercedes dealership in Kalamazoo, Michigan.

43.    Mr. Jacobs' Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB8AR118777.

44.    Mr. Jacobs purchased the Class Vehicle for his personal, family, and household use.

45.    Mr. Jacobs expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

46.    While his Class Vehicle was under warranty, Mr. Jacobs had it serviced at a Mercedes dealership at the intervals recommended by Mercedes. After the expiration of the warranty, Mr. Jacobs serviced the vehicle himself at the

- 13 -

recommended intervals.  Mr. Jacobs has both the knowledge and the equipment to service his Class Vehicle to a professional standard.

47.     Since purchasing the Class Vehicle, Mr. Jacobs has stored the vehicle primarily in an indoor garage when not in use.

48.     Mr. Jacobs first became aware of the subframe defect May 10, 2022, when the subframe failed while his wife was driving, causing the backend of the vehicle to fishtail.  At the time of the subframe failure, the vehicle had approximately 125,000 miles.

49.     Following the failure of his subframe on the road, Mr. Jacobs called MBUSA, which represented that they had never seen this defect before, opened a case, and directed that the car be towed to the nearest Mercedes dealership for inspection before it would make a final determination.

50.     Mr. Jacobs had the Class Vehicle towed to Gurley Leep Motorwerks, a Mercedes dealership, which quoted approximately $5,966.96 to replace the subframe.  MBUSA refused to assist Mr. Jacobs after the dealer confirmed that the rear subframe had failed due to corrosion in a written report.  Mr. Jacobs declined to have his subframe replaced at the dealership.  Instead, he had the vehicle towed back to his residence and repaired it himself, which was only feasible due to

Mr. Jacobs' extensive experience with vehicle repairs and ownership of equipment similar to that available at a professional service center.

51.    As a result of the subframe defect, Mr. Jacobs incurred costs of $1,323.84, including: a diagnosis fee of $139.95 from the Mercedes dealership; a replacement subframe costing $1,022.89; and $161.00 in tow charges.  This amount does not include the approximately 40 hours of labor Mr. Jacobs dedicated to repairing his own vehicle.  In addition, Mr. Jacobs was without the use of his vehicle for approximately one month while it was being assessed by the Mercedes dealership and repaired by Mr. Jacobs.

52.    Mr. Jacobs regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2010.  Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability influenced his decision to purchase his vehicle.  Had those advertisements or any other Mercedes materials disclosed to Mr. Jacobs that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to spend $1,323.84 and commit forty hours of labor to return his vehicle

to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

53.     On December 9, 2022, Mr. Jacobs, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Jacobs and others similarly situated.  Exh. A.  In response to this letter, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

### 4.     **Plaintiff Park C. Thomas**

54.     Plaintiff Park C. Thomas resides in Sarasota, Florida.

55.     Mr. Thomas owns a 2013 Mercedes-Benz C 300 4Matic, which he purchased used from a private party in Tennessee in 2015.

56.     Mr. Thomas's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8A8XDA803965.

57.     Mr. Thomas purchased the Class Vehicle for his personal, family, and household use.

2751274.4

58.     Mr. Thomas expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

59.     Since purchasing the Class Vehicle, Mr. Thomas has stored the vehicle primarily in an indoor garage when not in use.

60.     Mr. Thomas first became aware of the subframe defect in November of 2022, when he began to notice the back of the Class Vehicle fishtail moderately when he braked.  Mr. Thomas brought the vehicle into Mercedes-Benz of Sarasota. After an inspection, the dealership informed him that one of the control arms on the rear subframe was severely corroded and it posed a safety risk.  At the time the subframe corrosion was diagnosed, the Class Vehicle had 57,217 miles.  The dealership quoted Mr. Thomas $3,633.08 to repair the subframe.  While Mr. Thomas wanted to have his subframe replaced immediately, the necessary parts were backordered, and the dealership was not able to complete the repair for over two months.

- 17 -

61.     As a result of the subframe defect, Mr. Thomas was left for more than two months with a vehicle that was not fit for its intended purpose.  Because the extensive subframe corrosion made the vehicle hazardous to drive, particularly on the highway, prior to the subframe replacement Mr. Thomas used his Class Vehicle only when he was without another means of transportation and only for brief trips on low-speed roads.

62.     Mr. Thomas had his subframe replaced on January 19, 2022 at a Mercedes dealership, which cost a total of $4,066.31.

63.     Mr. Thomas regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2015.  Although he does not recall the specifics of the many Mercedes advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability influenced his decision to purchase his vehicle.  Had those advertisements or any other Mercedes materials disclosed to Mr. Thomas that the Class Vehicles had defective subframes that would render the vehicles unsafe and that he would be required to spend upwards of $4,000 to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

64.     On December 22, 2022, Mr. Thomas, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Thomas and others similarly situated.  Exh. B.  In response to this letter, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

### 5.     Plaintiff Raymond Robinson

65.     Plaintiff Raymond Robinson resides in Marshfield, Massachusetts.

66.     Mr. Robinson owns a 2014 Mercedes-Benz E 350, which he purchased new in 2014 from Viti Mercedes-Benz in Tiverton, Rhode Island.

67.     Mr. Robinson's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB0EB010349.

68.     Mr. Robinson purchased the Class Vehicle for his personal, family, and household use.

69.     Since purchasing the Class Vehicle, Mr. Robinson has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes at a qualified independent mechanic.

70.    Mr. Robinson expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

71.    Mr. Robinson first became aware of the subframe defect on November 16, 2022, when he brought the Class Vehicle into an independent mechanic for an oil change.  The independent mechanic informed Mr. Robinson that the subframe was severely corroded.  At the time the subframe corrosion was diagnosed, the Class Vehicle had approximately 111,865 miles.

72.    On November 29, 2022, Mr. Robinson took the Class Vehicle to Mercedes-Benz Hanover, which confirmed the rear subframe corrosion and verbally quoted him a total of approximately $6,500 in total repair costs, including $4,300 to replace his subframe and an additional $2,200 to perform related services, including possible replacement of other parts impacted by corrosion, such as the brake lines, exhaust system, and suspension springs.

73.     On December 13, 2022, Mr. Robinson returned his vehicle to the independent mechanic, who performed a thorough inspection of the Class Vehicle's undercarriage and informed Mr. Robinson that the corrosion impacted other areas of the undercarriage in addition to the subframe, including the brake lines, which could potentially rupture at any time.  The independent mechanic advised Mr. Robinson that the Class Vehicle's safety was compromised and that he should drive the car minimally and with caution.

74.     On December 18, 2022, Mr. Robinson took the vehicle to a local Lexus dealership, which gave him a preliminary trade-in quote of $5,000 on a new 2023 Lexus.

75.     Later that same day, the brake fluid warning light illuminated on the Class Vehicle's dashboard and the vehicle began to fishtail when Mr. Robinson applied the brakes.

76.     As a result, on December 19, 2022, Mr. Robinson was forced to bring his car to the independent mechanic for a third time.  The independent mechanic confirmed that the Class Vehicle's brake lines were leaking and it was no longer safe to drive.  Given the extent of the damage to the brake lines, the independent mechanic opined that Mr. Robinson would likely have to pay well above the

$6,500 originally quoted by Mercedes-Benz Hanover to make the car drivable and return it to a safe condition.

77.     On December 21, 2022, following the independent mechanic's confirmation that the Class Vehicle's brake lines had ruptured, Mr. Robinson had the Class Vehicle towed back to his residence, as it was no longer safe to drive. On Tuesday, February 7, 2023, Mr. Robinson traded his vehicle in at a Mercedes dealership for $7,000.

78.     Mr. Robinson contacted customer service at MBUSA, which informed him that there was no recall on vehicles with defective subframes and offered him either a $2,000 discount on a new Mercedes E-Class, a $1,000 discount on a certified preowned vehicle or a discount of $750 on parts if his vehicle was repaired by a Mercedes dealership.  Mr. Robinson declined this offer.

79.     As a result of the Rear Subframe Defect, Mr. Robinson was without use of his vehicle between December 19, 2022 and February 7, 2023.  According to Kelley Blue Book, the trade-in value of Mr. Robinson's vehicle would have been $11,711 absent the Rear Subframe Defect, meaning that the loss of retail value at the time of sale amounted to $4,711.

80.     Mr. Robinson specifically purchased the Class Vehicle because of the reputation of Mercedes vehicles for safety.  Mr. Robinson regularly saw

- 22 -

advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz E 350 in 2014.  Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle.  Had those advertisements or any other Mercedes materials disclosed to Mr. Robinson that the Class Vehicles had defective subframe that would render the vehicle unsafe, or that he would be faced with the choice of either spending upwards of $6,500 to repair his vehicle, or selling it for $4,711 less than it would be worth without the defective subframe, he would not have purchased his Class Vehicle, or would have paid less for it.

81.     On December 22, 2022, Mr. Robinson, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Robinson and others similarly situated.  Exh. B.  In response to this letter, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

- 23 -

6.    **Plaintiff Thomas Koby**

82.    Plaintiff Thomas Koby resides in O'Fallon, Missouri.

83.    Mr. Koby owns a 2010 Mercedes-Benz E 350 4Matic AMG Sport, which he purchased in 2018 from his daughter in a private sale in Missouri. Mr. Koby's daughter originally purchased the Class Vehicle new at Plaza Mercedes-Benz in Creve Coeur, Missouri.

84.    Mr. Koby's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8HB8AA065976.

85.    Mr. Koby purchased the Class Vehicle for his personal, family, and household use.

86.    Mr. Koby expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.  Had he known these facts, he would not have purchased his Class Vehicle or would have paid less for it.

87.    Since purchasing the Class Vehicle, Mr. Koby has stored the vehicle primarily in an indoor garage when not in use.

88.    Mr. Koby first became aware of the subframe defect on November 18, 2022 when he brought the Class Vehicle into Mercedes-Benz of Chesterfield, an authorized Mercedes dealership, for a state-mandated annual safety inspection. The dealership informed him that his car had failed the safety inspection because the subframe was severely corroded and quoted him $4,899.41 to replace it.  The multi-point inspection report provided to Mr. Koby by Mercedes-Benz of Chesterfield states "[r]ear subframe has multiple holes in it from rust. Is not safe to drive."  At the time the dealership diagnosed the subframe corrosion, the Class Vehicle had approximately 135,000 miles.

89.    As a result of the subframe defect, Mr. Koby faces either thousands of dollars in costs to return his vehicle to a safe, drivable condition, or significant diminution in the retail value of his Class Vehicle should he choose to sell it without repairing the rear subframe.

90.    Mr. Koby regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz E 350 in 2018. Although he does not recall the specifics of the many Mercedes advertisements he

viewed before he purchased his Class Vehicle, he does recall that safety and

reliability were frequent themes.  Those advertisements about safety and reliability

influenced his decision to purchase his vehicle.  Had those advertisements or any

other Mercedes materials disclosed to Mr. Koby that the Class Vehicles had

defective subframe that would render the vehicle unsafe and that he would be

required to spend upwards of $4,000 to return his vehicle to a safe condition, he

would not have purchased his Class Vehicle, or would have paid less for it.

91.     On December 22, 2022, Mr. Koby, through counsel, sent Mercedes a

letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390,

*et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for

Mr. Koby and others similarly situated.  Exh. B.  In response to this letter,

Mercedes responded through counsel, with information about the Extended

Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in

§ VI.C. Exhs. C & D.

### 7.     **Plaintiff Yauwen Lin**

92.     Plaintiff Yauwen Lin resides in Woodbridge, New Jersey.

93.     Ms. Lin owns a 2011 Mercedes-Benz C 300, which she purchased

new in 2011 from Ray Catena Mercedes in Edison, New Jersey.

94.     Ms. Lin's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB3BR177494.

95.     Ms. Lin purchased the Class Vehicle for her personal, family, and household use.

96.     Since purchasing the Class Vehicle, Ms. Lin has brought her vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic.  Ms. Lin has stored the vehicle primarily in an indoor garage when not in use.

97.     Ms. Lin expected her Class Vehicle to be of good and merchantable quality and not defective.  She had no reason to know, or expect, that the rear subframe and the rear brake lines of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the immense expense she would incur should she choose to replace the defective subframe and corroded brake lines.  Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

98.     Ms. Lin first became aware of the subframe defect on August 4, 2022, when she brought in her vehicle to be serviced at Ray Catena Mercedes-Benz in

Edison, New Jersey.  The dealership informed Ms. Lin that the rear subframe and

the rear brake lines were severely corroded and would cost over $8,000 to repair.

Ms. Lin declined to have her subframe replaced at that time.  At the time the

subframe corrosion was diagnosed, the Class Vehicle had approximately 70,000

miles.

99.     In October of 2022, Ms. Lin took her vehicle to a local Firestone for

maintenance, where a mechanic told her the vehicle was dangerous to drive and

had it towed back to the Ray Catena Mercedes-Benz.  Given the extensive damage,

the dealership suggested that she sell the Class Vehicle to a junkyard if she was not

willing to repair it.

100.    Ms. Lin contacted customer service at MBUSA, but initially received

no response.  Ms. Lin heard back from Mercedes after the sale of her vehicle, at

which time a Mercedes representative said MBUSA may be able to offer her

$2,000 towards a new Mercedes vehicle, pending approval.  As of the filing of this

complaint, no final offer has been made by Ms. Lin from MBUSA.

101.    As a result of the subframe defect, Ms. Lin sold her vehicle for

approximately $2,000 to a junkyard at the suggestion of the Mercedes dealership.

According to Kelley Blue Book, absent the Rear Subframe Defect, Ms. Lin's Class

Vehicle would have been worth approximately $8,634 if sold in a private sale.

Therefore, the Rear Subframe Defect caused Ms. Lin's Class Vehicle to diminish in value by approximately $6,634.

102.   Ms. Lin regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her Mercedes-Benz C 300 in 2011. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her class vehicle, she does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability influenced her decision to purchase her vehicle.  Had those advertisements or any other Mercedes materials disclosed to Ms. Lin that the Class Vehicles had defective subframe that would render the vehicle unsafe, or that she would be faced with the choice of either spending upwards of $8,000 to repair the vehicle, or selling it for $6,634 less than it would be worth without the defective subframe, she would not have purchased her Class Vehicle, or would have paid less for it.

103.   The notice letters sent to Mercedes by Plaintiffs on December 9, 2022 and 22, 2022, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Lin's claims, as they are substantively identical to those of the Plaintiffs named in the letters.  Exhs. A & B.

- 29 -

In response to these letters, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

### 8.    Plaintiff Giuseppe Garofalo

104.   Plaintiff Giuseppe Garofalo resides in York, Pennsylvania.

105.   Mr. Garofalo owns a 2013 Mercedes-Benz C 300, which he purchased used in 2018 from Ricke Bros Auto Sales.

106.   Mr. Garofalo's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB4DA787410.

107.   Mr. Garofalo purchased the Class Vehicle for his personal, family, and household use.

108.   Since purchasing the Class Vehicle, Mr. Garofalo has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at a qualified independent mechanic.

109.   Mr. Garofalo expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase

- 30 -

of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

110.   Mr. Garofalo first became aware of the subframe defect on November 8, 2022, when the subframe failed as he was driving, causing the vehicle to veer sharply when he applied the brakes.  Realizing the vehicle was not safe to drive, Mr. Garofalo pulled over and had the Class Vehicle towed to an independent mechanic.  The mechanic informed Mr. Garofalo that his rear subframe was severely corroded and would need to be replaced to make the vehicle drivable.  Mr. Garofalo elected to have his rear subframe replaced by the independent mechanic with a used part.

111.   As a result of the Rear Subframe Defect, Mr. Garofalo incurred $2,613.20 in repair costs and was without the use of his vehicle for two days.

112.   Mr. Garofalo regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2018.  Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability

influenced his decision to purchase his vehicle.  Had those advertisements or any

other Mercedes materials disclosed to Mr. Garofalo that the Class Vehicles had a

defective rear subframe that would render the vehicle unsafe, or that he would be

required to spend $2,613.20 to return the vehicle to a safe, drivable condition, he

would not have purchased his Class Vehicle, or would have paid less for it.

113.    The notice letters sent to Mercedes by Plaintiffs on December 9, 2022

and 22, 2022, pursuant to the Georgia Fair Business Practices Act, O.C.G.A.

§§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class

Vehicles are sufficient to constitute notice of Mr. Garofalo's claims, as they are

substantively identical to those of the Plaintiffs named in the letters.  Exhs. A & B.

In response to these letters, Mercedes responded through counsel, with information

about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as

detailed below in § VI.C.  Exhs. C & D.

### 9.    **Plaintiff Mike Xie**

114.    Plaintiff Mike Xie resides in Rockville, Maryland.

115.    Mr. Xie owns a 2010 Mercedes-Benz GLK, which he purchased new

at Euro Motorcars Bethesda in Bethesda, Maryland.

116.   Mr. Xie's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDCGG8HB1AF324727.

117.   Mr. Xie purchased the Class Vehicle for his personal, family, and household use.

118.   Since purchasing the Class Vehicle, Mr. Xie has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at a either a qualified independent mechanic or at a Mercedes dealership.

119.   Mr. Xie has stored the vehicle primarily in an indoor garage when not in use.

120.   Mr. Xie expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

121.   Mr. Xie first became aware of the subframe defect on or about February 8, 2023, when his vehicle began fishtailing while he was driving.

- 33 -

Mr. Xie brought his Class Vehicle to an independent mechanic, who told him that the subframe was severely corroded on both sides of the vehicle and had come detached from one of the control arms on the right side.  The mechanic further told him that the vehicle was unsafe to drive.  At the time of the rear subframe failure the Class Vehicle had 74,000 miles.

122.   Mr. Xie then had the vehicle towed to his local Mercedes dealership for further inspection.  The Mercedes dealership quoted Mr. Xie over $7,000 to replace his rear subframe and the other parts damaged by the subframe failure, including the rear springs, which are composed of the shock absorbers and suspension rods.

123.   Mr. Xie has contacted MBUSA customer service six times to request reimbursement for the repair.  In each of these calls, a customer service representative has promised to follow up within 48 hours and has failed to do so.

124.   During his initial call with a MBUSA service representative, on February 8, 2023, Mr. Xie was told that there was no recall in place and that MBUSA was not aware of the Rear Subframe Defect, but that Mercedes may offer reimbursement for the subframe replacement as a gesture of goodwill on vehicles that are less than ten years old and have less than 75,000 miles.  MBUSA made no definitive offer to reimburse Mr. Xie in response to his direct communications.

2751274.4

125.   On February 10, 2023, Mercedes rolled out the Extended Warranty, discussed in more detail, § VI.C.  On February 16, 2023, the dealership informed Mr. Xie that Mercedes had agreed to reimburse the replacement of his rear subframe, but that they would not cover any other service or related expense, including the replacement of the rear springs, rental car fees, or the wheel alignment.  The dealership informed Mr. Xie that the rear subframe could not be replaced without replacing the rear springs and performing an alignment.

126.   Mr. Xie agreed to pay out of pocket for the additional necessary service related to the Rear Subframe Defect, which total approximately $2,000.  In addition, Mr. Xie will be without the use of his vehicle for at least three weeks while the repair is completed.

127.   Mr. Xie regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz GLK in 2010.  Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes.  Those advertisements about safety and reliability influenced his decision to purchase his vehicle.  Had those advertisements or any other Mercedes materials disclosed to Mr. Xie that the Class Vehicles had

2751274.4

defective subframe that would render the vehicle unsafe, or that he would be required to spend upwards of $2,000 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

128.   The notice letters sent to Mercedes by Plaintiffs on December 9, 2022 and 22, 2022, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Xie's claims, as they are substantively identical to those of the Plaintiffs named in the letters.  Exhs. A & B. In response to these letters, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C.  Exhs. C & D.

### 10.   Plaintiff Samuel Ortiz

129.   Plaintiff Samuel Ortiz resides in Locust Valley, New York.

130.   Mr. Ortiz owns a 2015 Mercedes-Benz E 350, which he purchased new in 2014 at Rallye Motors, a Mercedes-Benz dealership in Roslyn, New York.

131.   Mr. Ortiz's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB8FB126870.

132.   Mr. Ortiz purchased the Class Vehicle primarily for his personal, family, and household use.  The vehicle was also used occasionally for business purposes.

133.   Since purchasing the Class Vehicle, Mr. Ortiz has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at a either a qualified independent mechanic or at a Mercedes dealership.

134.   Mr. Ortiz expected his Class Vehicle to be of good and merchantable quality and not defective.  He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

135.   Mr. Ortiz first became aware of the subframe defect on or about November 19, 2022.  Mr. Ortiz was driving on the expressway when he applied the brakes in response to a sudden slowdown and heard a loud snapping noise, after which Mr. Ortiz momentarily lost control of the vehicle as the rear fishtailed.

136.   On December 7, 2022, Mr. Ortiz brought his Class Vehicle to Rallye Motors, which told him that the subframe had snapped at the mounting point for

one of the control arms.  The mechanic further told him that the vehicle was unsafe to drive, particularly because the detached control arm was pressing into the gas tank and could potentially cause it to rupture.  At the time of the rear subframe failure the Class Vehicle had approximately 88,000 miles.

137.   Rallye Motors quoted Mr. Ortiz approximately $7,000 to replace his Class Vehicle's subframe and perform related services, including replacing the gas lines, which were also corroded.

138.   On or about December 12, 2022, Rallye Motors informed Mr. Ortiz that it had contacted MBUSA customer service on his behalf and that it had refused to pay for the subframe replacement.

139.   Mr. Ortiz declined to have his rear subframe replaced and instead traded the vehicle in on December 20, 2022, for $7,000 at Rallye Motors. According to Kelley Blue Book, the trade-in value of Mr. Ortiz's vehicle absent the Rear Subframe Defect would have been approximately $13,627.  Therefore, the Rear Subframe Defect caused Mr. Ortiz's Class Vehicle to lose $6,627 in resale value.

140.   As a result of the Rear Subframe Defect, Mr. Ortiz traded in his vehicle for approximately $6,627 less than it would otherwise have been worth, was forced to drive an unsafe vehicle for three weeks while he waited for an

- 38 -

appointment at his local Mercedes dealership, and was without the use of his

vehicle for thirteen days prior to completing the trade-in.

141.   Mr. Ortiz regularly saw advertisements for Mercedes vehicles on

television, in magazines, on billboards, in brochures at the dealership, and on the

internet during the years before he purchased his Mercedes-Benz E 350 in 2014.

Although he does not recall the specifics of the many Mercedes advertisements he

viewed before he purchased his class vehicle, he does recall that safety and

reliability were frequent themes.  Those advertisements about safety and reliability

influenced his decision to purchase his vehicle.  Had those advertisements or any

other Mercedes materials disclosed to Mr. Ortiz that the Class Vehicles had

defective rear subframes that would render his vehicle unsafe, or that he would be

faced with the choice of either spending upwards of $7,000 to return the vehicle to

a safe, drivable condition or selling it for $6,627 less than it would have been

worth absent the Rear Subframe Defect, he would not have purchased his Class

Vehicle, or would have paid less for it.

142.   The notice letters sent to Mercedes by Plaintiffs on December 9, 2022

and 22, 2022, pursuant to the Georgia Fair Business Practices Act, O.C.G.A.

§§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class

Vehicles are sufficient to constitute notice of Mr. Ortiz's claims, as they are

substantively identical to those of the Plaintiffs named in the letters. Exhs. A & B. In response to these letters, Mercedes responded through counsel, with information about the Extended Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exhs. C & D.

**B.    Defendants**

**1.    Defendant Mercedes-Benz Group AG**

143.    Defendant Mercedes-Benz Group AG ("MBG") is a German corporation with its principal place of business in Stuttgart, Germany.

144.    Prior to February 1, 2022, MBG was named Daimler AG.

145.    At all times relevant herein, MBG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

146.    Upon information and belief, MBG was chiefly responsible for designing the Class Vehicles, including their defective rear subframes.

147.    Upon information and belief, MBG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and

facts withheld from consumers and the public about the Rear Subframe Defect. MBG has been directly involved in assisting, directing, and controlling MBUSA, and MBUSA's authorized dealers' handling of Class Member complaints regarding the rear subframe defect.

148.   MBG has held MBUSA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles.  It established MBUSA as its wholly-owned subsidiary company.  It named MBUSA with its official "Mercedes-Benz" title.  It provided MBUSA with marketing and technical materials avoiding any distinction between MBUSA and MBG, and instead representing MBUSA as nothing less than MBG's presence in the United States for purposes of selling and leasing "Mercedes-Benz" brand vehicles and providing related services.

149.   Based on the foregoing actions, Plaintiffs and Class Members justifiably relied on MBUSA's representations and omissions regarding the Class Vehicles that were the responsibility of MBG in, for example, MBG's design of the Class Vehicles, and were injured because of their purchase of defective Class Vehicles.

2751274.4

### 2.   **Defendant Mercedes-Benz USA, LLC**

150.   Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware corporation with its principal place of business in Sandy Springs, Georgia.

151.   Prior to July 2015, MBUSA's principal place of business was in Montvale, New Jersey.

152.   MBUSA is a wholly owned subsidiary of MBG.

153.   At all times relevant herein, MBUSA has been and has acted as an agent of MBG and subject to MBG's control.

154.   At all times relevant herein, MBUSA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## III.   **JURISDICTION**

### A.   **Subject Matter Jurisdiction**

155.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act because: the amount in controversy exceeds $5,000,000, and Defendant MBG is a citizen of a foreign country, and is thus diverse from all Plaintiffs and Class Members.  In addition, Defendant

- 42 -

2751274.4

MBUSA is a citizen of Georgia, and is therefore diverse from at least one Plaintiff. 28 U.S.C. § 1332(d)(2)(A).

**B.    Personal Jurisdiction: MBG**

156.    This Court has personal jurisdiction over MBG because MBG has sufficient contacts in this District that relate to the causes of action pleaded against MBG.

157.    By headquartering its wholly owned subsidiary MBUSA in this District, and using MBUSA as its channel for marketing, distributing, warranting, selling and leasing the MBG-designed Class Vehicles in the District and the United States, MBG itself has continuously and deliberately taken affirmative steps to make MBG-designed vehicles and replacement parts available to consumers in the District and the rest of Georgia, including Plaintiffs and Class Members; created continuing obligations between MBG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

158.    On information and belief, MBG employees and representatives regularly visit MBUSA, thereby continuously conducting business in this District.

159.    Further, MBG's wholly owned subsidiary MBUSA is at home in this District, and MBUSA's contacts in this District can be attributed to MBG.

- 43 -

160.   Plaintiffs' claims here arise out of MBG's contacts with this District, particularly in that Plaintiffs could not even have purchased their Class Vehicles if not for MBG's intentional acts of designing the Class Vehicles (including their defective rear subframes) and exporting them for sale to customers in this District and the United States as a whole, including Plaintiffs and Class Members.

161.   These constitute a strong relationship between MBG, this District, and the allegations herein, and create a sufficient basis to render the exercise of jurisdiction over MBG by this Court permissible under traditional notions of fair play and substantial justice.

C.    **Personal Jurisdiction: MBUSA**

162.   This Court has personal jurisdiction over MBUSA because MBUSA is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District.

163.   Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over MBUSA permissible under traditional notions of fair play and substantial justice.

- 44 -

IV.   **VENUE**

164.   Venue is proper in this District under 28 U.S.C. § 1391 because

Defendants, as corporations, are deemed to reside in any judicial district in which

they are subject to personal jurisdiction.

165.   Additionally, Defendants transact business within the District,

MBUSA has its principal place of business in this District, and some of the events

establishing the claims occurred in this District.

V.   **APPLICABLE LAW**

166.   Plaintiffs seek damages and equitable relief on behalf of themselves

and the Class Members as a nationwide class under Georgia law.  Georgia law

should govern the claims of the nationwide class because Mercedes' acts,

practices, and omissions regarding the Rear Subframe Defect were directed and

emanated from MBUSA's headquarters in Georgia since its relocation to the state

in July of 2015.  Moreover, Georgia has a significant interest in regulating the

conduct of a corporation whose principal place of business within the United States

is in Georgia.

167.   In the alternative, New Jersey law should govern the nationwide class,

because New Jersey has a significant relationship to both the misconduct at issue

here and the parties to this litigation, as MBUSA was headquartered in New Jersey

prior to 2015, Mercedes made many of the false representations as to the Rear Subframe Defect from MBUSA headquarters in New Jersey, as well as designed, tested, and sold many of the defective Class Vehicles during the time it was headquartered in New Jersey.

168.   In the alternative, Class Members seek damages and equitable relief under each Class Member's respective state's laws, which are substantially similar with respect to these facts and claims, or which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiffs' claims.

## VI.   FACTUAL ALLEGATIONS

### A.   Technical Details

#### 1.   Mechanical Purpose of a Vehicle Subframe

169.   Many vehicles, including the Class Vehicles, have a rear subframe that is located on the back undercarriage and that spans the width of the car in between the two rear wheels.  The rear subframe faces the exterior of the vehicle and is partially covered by a splash shield, but is otherwise exposed to the elements.

170.   The diagram below illustrates the rear subframe of a 2014 Mercedes-Benz C 300, along with the components mounted to it:

- 46 -



171.   A rear subframe (also called a "suspension cross-member" or "rear axle carrier") is an integral component of a vehicle's structure.  It attaches to the unibody of the vehicle and provides stiff mounting points for suspension and driveline components.  The rear subframe is essential to holding the rear suspension and rear wheels securely to the vehicle.

172.   The wheels of a vehicle encounter significant road forces, which they transfer to the suspension.  The subframe must be stiff and resilient because it stabilizes the vehicle's suspension when it encounters these transferred road forces.

- 47 -

The rear subframes of many vehicles, including the Class Vehicles, are therefore made out of steel.

173.   The rear subframe is attached to the wheels with control arms, which are also made out of steel.  These control arms ensure that the wheels and suspension components are adequately attached to the body of the vehicle, so that when the vehicle is in drive and the wheels are propelled forward, the body of the car moves with it in a smooth and stable fashion.

174.   The rear subframe of the Class Vehicles serves as an attachment point for the following control arms on both the left and right sides of the rear subframe:

a.      The strut rods (alternately called the "rear arm," "rear lateral arm," "upper control arm," "rear upper control arm," "front lateral arm," "suspension control arm," "camber arm," or "camber strut");

b.      The front lateral arms (alternately called the "front arms," "strut rods," "torque arms," "front upper control arms," "upper control arms," "suspension control arms," or "struts");

c.      The rear lateral arms (alternately called the "rear lateral arms," "front lateral arms," "radius arms," "rear lower control arms," or "suspension control arms");

d.     The track bars (alternately called the "lower links," "trailing arms," "ft lower control arms," "trailing arm bushings," "suspension control arms," or "pushing struts"); and

e.     The lower control arms (alternately called the "spring control arms").

175.   The control arms of the rear subframes on the Class Vehicles are in close proximity to a number of other essential vehicle components, including the rears wheels, gas tank, brake lines, suspension springs, rear axle and exhaust system.

176.   In addition to providing stability to the rear of the vehicle, the rear subframe plays an important role in crash safety, particularly in the case of an accident where there is impact on only one side of the vehicle's rear body.  In such a collision, the rear subframe partially absorbs the impact and channels the collision forces to the side of the vehicle not involved in the impact.  The rear subframe therefore helps to absorb some of the collision forces before they can reach the passenger cabin.

## 2.     Rust Formation and Corrosion

177.   Rust is an iron oxide produced in a process called corrosion, which occurs when iron or an iron alloy, such as steel, is exposed to oxygen and water. Road salt accelerates rust formation by acting as a catalyst.

178.   Rust can be mild (surface rust) or so extensive that it causes holes to form in the metal (rust-through).  The latter compromises the structural integrity of the metal, leading to perforation and breakage in metal vehicle components.

179.   Corrosion of the severity present in the rear subframes of the Class Vehicles can take many years to develop, and its initial stages begin when the vehicle is first exposed to normal environmental conditions like precipitation, humidity, salt air, road salt, and temperature fluctuations.

180.   Vehicles components, including rear subframes, are typically constructed using high-quality carbon steel, which is inherently susceptible to rust and corrosion.  Therefore, the steel must be adequately coated with a properly applied anti-corrosion agent in order to withstand normal environmental conditions without experiencing corrosion and perforation.  A properly designed rear subframe constructed of carbon steel must be coated with anti-corrosion agents sufficient to withstand normal environmental conditions.

181.   Vehicle components made of steel must also be designed with adequate drainage to prevent water from becoming trapped or pooling on or in the component, leading to premature corrosion.  A properly designed rear subframe constructed of carbon steel must have adequate drainage in order to prevent rust and corrosion.

182.   The rear subframes of the Class Vehicles are constructed of carbon steel and are therefore susceptible to corrosion if not properly coated and designed.

### 3.      Mechanical Consequences of Subframe Corrosion

183.   A non-defective rear subframe should last the life of a vehicle without needing replacement.  For instance, in its European markets, every Mercedes vehicle comes with a 30-year corrosion warranty, which guarantees that if the body of a Mercedes vehicle "is perforated due to corrosion from the inside out anytime within 30 years, Mercedes-Benz will repair the damage at one of its workshops, at no cost to the owner."  Mercedes has offered this warranty in Europe for the past 25 years.

184.   The rear subframe is mounted underneath the vehicle, making it difficult to see unless specifically inspected.  Even if inspected, the rear subframe is made of tubular carbon steel and, upon information and belief, rusts from the inside out, meaning a typical visual inspection of exterior rust will not reveal the

- 51 -

corrosion until the subframe is close to failure.  Therefore, the defect is difficult to

see, even in a meticulously maintained vehicle, and even by a trained mechanic.

As a result, the Class Vehicles provide little to no warning before becoming

dangerously unstable.

185.   A common failure point for the rear subframes of Class Vehicles is

the mounting point for the control arms or the track bar.  These points often

experience heavy corrosion, becoming weak and sometimes detaching from the

subframe.

186.   A failure of the rear subframe where it meets suspension components,

such as a control arm or track bar, is dangerous because the attached suspension

components hold the drive wheels in place and in proper alignment.  When a

suspension component becomes detached from the subframe, it can drastically

change the geometry of the suspension.

187.   A sudden failure of a subframe suspension attachment point is

particularly detrimental to drivability because without robust attachment points

from the vehicle to the wheel, the wheel moves forward separately from the body

of the vehicle.

188.   A failure of a suspension attachment point on the subframe is more

likely when the vehicle is in motion, because the component is exerting force on

the attachment point.  The higher the acceleration, the higher the force being exerted and, thus, greater likelihood of failure.

189.   If the vehicle is in motion when the subframe fails at the attachment point, the driver's ability to control the vehicle and bring it to a safe stop is compromised.  The steering, braking, acceleration of the vehicle becomes unpredictable.  In particular, vehicles with broken rear subframes tend to fishtail or veer to one side unexpectedly while being driven.  Of the Plaintiffs named in this complaint, Mr. Jacobs, Mr. Robinson, Ms. Lin, Mr. Garofalo, Mr. Xie, and Mr. Ortiz all experienced partial loss of control while driving due to the failure of their rear subframes.  In addition, Plaintiffs' attorneys have been contacted by at least 21 absent Class Members who experienced partial loss of control while driving due to rear subframe failure.

190.   A subframe failure while a Class Vehicle is in motion can also cause the tire adjacent to the detached control arm to jam and burst, rendering the vehicle suddenly uncontrollable.  Plaintiffs' attorneys have been contacted by at least one absent Class Member who had one of the rear tires of her Class Vehicle burst due to a rear subframe failure while the vehicle was in motion.

191.   In some cases, a detached control arm can strike the gas tank of the vehicle, damaging it.  At least four absent Class Members have contacted

- 53 -

Plaintiffs' attorneys with accounts of gas tank damage caused by detached control arms.

192.    Vehicles with subframe corrosion can also experience corrosion of the brake lines.  When a vehicle's brake lines corrode, they may crack and begin to leak brake fluid.  Compromised brake lines can cause driver to lose total or partial use of their brakes.  Of the Plaintiffs named in this complaint, Mr. Robinson and Ms. Lin experienced corroded rear brake lines that required replacement.  The corrosion on Mr. Robinson's rear brakes lines was so severe that they began to leak brake fluid.  In addition, at least 11 absent Class Members who have contacted Plaintiffs' attorneys have experienced corroded rear brake lines.

193.    Vehicles with subframe corrosion also experience corrosion of the rear suspension springs, a critical component of a vehicle's suspension system.  Of the Plaintiffs named in this complaint, Mr. Xie was forced to replace his rear springs along with his rear subframe due to corrosion.  At least three absent Class Members in contact with Plaintiffs' attorneys have had their rear suspension springs replaced due to corrosion.

194.    In addition, subframe corrosion can impact the exhaust system, gas lines, and/or rear axle, requiring the replacement of these components.  At least one absent Class Member in contact with Plaintiffs' attorneys has experienced

- 54 -

corrosion of her exhaust system.  Of the Plaintiffs named in this complaint, Mr.

Ortiz was forced to replace his gas lines along with his rear subframe due to

corrosion.  Corrosion of the rear axle in some of the Class Vehicles has been noted

by a German-language publication, and MBG has confirmed its receipt of

complaints regarding rear axle corrosion.  *See infra* ¶¶ 218-23.

195.   One of the most serious consequences of compromised subframe is

that, in the event of a crash, it is unable to absorb and evenly distribute the force

from the impact. When that force is not evenly distributed, it can cause the vehicle

to collapse.

196.   A vehicle with a perforated rear subframe cannot be safely driven

unless the subframe is replaced, a time-intensive process that involves removing

the rear suspension, rear drivetrain, and rear wheels from the vehicle, and then

assembling it all onto the new subframe.

197.   The cost of a rear subframe replacement, including parts and labor, is

between $2,500 and $7,000, although costs can easily exceed that threshold if the

Rear Subframe Defect has caused damage to other parts of the vehicle, such as the

rear brake lines, suspension components, exhaust system, rear axle, tires, gas lines,

or gas tank.

198.   Plaintiffs and Class Members were also injured at point of sale by not receiving the benefit of their bargain: vehicles without a Subframe Defect.

199.   Class Vehicles with corroded rear subframes experience significant diminution in resale value unless the rear subframe is repaired.

200.   No reasonable consumer would purchase a Class Vehicle, which cost a minimum of $44,000 new, if they knew that it was likely to become unsafe and/or inoperable due to corrosion of the rear subframe in less than 12 years, even when meticulously maintained.

## B.   Mercedes' Knowledge of the Subframe Defect

201.   As early as 2009, and likely earlier, Mercedes was aware of the Rear Subframe Defect, should have been aware of the Rear Subframe Defect through exercise of reasonable care, and/or was negligent in failing to be aware of the Rear Subframe Defect, based on, among others, the following sources:

> a.   Pre-release design, manufacturing, engineering, and testing data;

> b.   Detailed data gathered by Mercedes about large number of Rear Subframe Defect repairs by authorized Mercedes dealers;

> c.   Numerous and consistent consumer complaints collected by NHTSA about the Rear Subframe Defect;

- 56 -

d.      Service bulletins sent by Mercedes to its dealerships evincing knowledge o the Rear Subframe Defect in the Class Vehicles;

e.      Knowledge Mercedes had of the large number of replacement rear subframes ordered from Mercedes;

f.      Numerous and consistent consumer complaints made directly to Mercedes about the Rear Subframe Defect;

g.      Numerous and consistent consumer complaints made on online vehicle owner forums;

h.      Actions taken by MBG in foreign markets to remedy the Rear Subframe Defect; and

i.      Mercedes service center employees' familiarity with and knowledge of the Rear Subframe Defect.

    1.      **Mercedes' Knowledge of the Rear Subframe Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data**

202.   During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Mercedes necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's rear subframes, particularly the basic engineering principles behind the rear subframes'

construction and materials, as well as the expected conditions and uses the rear subframes would encounter in ordinary customer use.

203.   An adequate pre-release analysis of the design, engineering, and manufacture of the rear subframes in the Class Vehicles would have revealed to Mercedes that the rear subframes were defective and would experience severe, premature corrosion when exposed to normal road conditions.

204.   Due to the well-known threat of corrosion to the safety, stability, and longevity of vehicles, manufacturers conduct a wide variety of pre-sale tests to ensure that both component parts, and the vehicle as a whole, are able to stand up to corrosive road conditions.  These tests include:

a.      An initial "weathering test" of the anti-corrosion coatings to be used on the subframe, which involves putting a sample of coated metal into a "weathering chamber" and exposing it to a variety of simulated environmental conditions.  Engineers then assess the impact of those conditions on the integrity of the coatings.  Automakers typically test multiple coatings to determine which is most resistant to corrosion.  Mercedes did perform or should have performed such a test on the Class Vehicles.

b.      A corrosion test of individual vehicle components, during which engineers leave an individual component part in an enclosed booth and

cycle through the process of exposing the part to a corrosive agent, typically by spraying the part with the corrosive agent, letting it dry, and then repeating the process several times. Mercedes did perform or should have performed such a test on the rear subframes in the Class Vehicles.

       c.    A general corrosion test of the entire vehicle under driving conditions, in which engineers drive a vehicle through a corrosive environment (heavy salt, water, etc.) and monitor the vehicle for corrosion during a set time period following exposure. Mercedes did perform or should have performed such a test on the Class Vehicles.

       d.    A "soap test" in which engineers spray corrosive agent on the exterior of the vehicle, which has the effect of accelerating corrosion with the goal of simulating the long-term effects of exposure to corrosive agents on the vehicle. Mercedes did perform or should have performed such a test on the Class Vehicles.

       205.   A reasonably prudent vehicle manufacturer should have conducted the above tests, or a substantially similar battery of tests, to ensure that its vehicles' rear subframes were adequately protected against corrosion. Plaintiffs expect discovery to reveal whether Mercedes performed these tests and knew about the Rear Subframe Defect, but chose to sell the Class Vehicles in a defective state, or whether it was negligent in failing to perform these tests.

- 59 -

## 2. Mercedes Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations

206. In addition to complaints made directly to Mercedes, many Class Vehicle owners lodged complaints about the Rear Subframe Defect with NHTSA beginning as early as 2018.

207. Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, and imposes a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHSTA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

208. Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding automobiles as part of the automakers' on going obligation to identify potential defects in their vehicles, including safety-related defects, such as the severe, premature corrosion of essential structural components like the rear subframe. Indeed, many of the NHTSA complaints also expressly state that Mercedes was directly informed of the issue.

209. From its monitoring of the NHTSA database, Mercedes knew or should have known of the many complaints about the rear subframe rust, corrosion, and failure logged by NHTSA, and the content, consistency, and large

- 60 -

number of those complaints alerted, or should have alerted, Mercedes to the Rear Subframe Defect.

210.   NHTSA's complaint database is currently publicly available.  To the extent that it was not publicly available in previous years, Mercedes, as a vehicle manufacturer, had contemporaneous and on-going access to the NHSTA consumer complaint data.  A sampling of the publicly available complaints lodged with NHTSA to which Plaintiffs have been able to gain access includes both the complaint quoted above, as well as the following:[1]

　　　　a.　　"Right rear trailing arm mount became detached from sub frame. Sheet metal on rear suspension sub frame ripper / tore so that rear trailing arm is only attached to lower part of mount, and not attached to vehicle. No accident, but vehicle is extremely unstable to drive when heavy breaking could occur! Vehicle veers suddenly to the right! Concern besides instability is that loose trailing link could puncture fuel tank less than an inch away. First noticed while driving on I-4 when a vehicle changed into my lane abruptly, and I had to

_____

[1] For these and other customer complaints quoted in this Complaint, quotes are left as written, except complaints that were original in all caps have been changed to standard case.  Due to the number of typographical and grammatical errors, [sic] notation has not been used.  Any emphasis has been added, unless otherwise noted.

forcefully apply brakes."  NHTSA database, NHTSA ID No. 11064613, date of incident January 23, 2018.

      b.    "The rear 'K' suspension subframe assembly had to be replaced because of rust internally in the vehicle frame. There was no other rust, internally or externally visible, on the entire car. My mechanic indicated that the car would not pass inspection without major repairs at a cost of over $2800. If the subframe became disconnected, steering control would be lost resulting in a potentially serious injury due to loss of directional control at high speeds. My mechanic has already replaced parts to repair this issue on at least 4 other cars within a short period of time."  NHTSA database, NHTSA ID No. 11432196, date of incident September 8, 2021.

      c.    "This car has 63,792 miles on it and has been continuously garaged and well cared for. All maintenance has been done timely and by Mercedes-Benz of Tysons Corner (Virginia) since it was purchased there on 01/08/14. All required maintenance was completed as advised and the car was covered under a 7 year 75,000 mile warranty. At the recent regularly scheduled yearly maintenance service completed on 12/28/21 we were advised that the . . . 'rear sub-frame is beginning to rust through and has a hole on the right rear (RR) and the recommendation was the 'replacement of rear sub-frame soon' at an

estimated cost of $4,242.40. This car has never been in an accident. In speaking to the MB service representative about this issue, I was advised that this problem has happened to several C300's from the period 2009-2014 and that Mercedes Benz was not accepting any responsibility for the issue in the US but had issued recalls in other countries. He said Mercedes maintains that it is a 'wear and tear' issue. This car has not been abused and has been well maintained. This is not an area of the country where you would expect to see this type of corrosion unless the part was defective in some manner. In researching the problem on the internet, several people write about experiencing a failure of this part although the cars were older than ours and had more mileage on them. It appears to be a safety issue should the part rust through as it could puncture the gas tank or cause the rear wheels to buckle or cause a loss of control of the auto from the auto fishtailing. I have never seen this happen to a car before and I am 75 years old and have owned a number of automobiles over the years."  NHTSA database, NHTSA ID No. 11450424, date of incident December 28, 2021.

   d. "The car was brought in for scheduled maintenance and they told me that my rear sub frame rusted out and had snapped. Car is only 7 years old, always garaged, basically a main part rusted out. Mercedes prides itself on durability and safety. There were no warning lights, alarms, nothing. Whenever I

- 63 -

braked the rear end of the car would slide to the left and I had to try and adjust accordingly. Prior to bringing the car in for its maintenance I was reluctant to drive it on highways and at higher speeds. Now that I am aware of the problem, had the rear of the car given out while I was on a highway, I had the potential to roll over and possibly blown up had the gas tank been impacted. I researched the issue on Google and found many instances of others having the same issue, with the same part, luckily no one appears to have been killed as yet. As I mentioned this was never picked up during all the scheduled maintenance work, nor state inspections, all handled by this dealership. The dealership is in the process of replacing the part and all work associated with that replacement. I don't know if they kept the part or tossed it out, but will ask. No one else has seen the car or rusted part other than the dealership. I'm also sending you a copy of the letter I sent to he dealership and Mercedes-Benz Home Office."  NHTSA database, NHTSA ID No. 11456512, date of incident March 7, 2022.

### 3.    Mercedes Knew of the Rear Subframe Defect as Evidenced by its Own Technical Services Bulletins

211.   On May 11, 2018, Mercedes sent out a service bulletin to its dealers within the United States, advising service technicians to check the rear subframe of certain model years for corrosion as follows:

"As part of the maintenance procedure, the rear axle carrier is checked for corrosion (sheet metal perforation, hold formation, rust-through damage), in particular, in the area of the mounting supports for the suspension struts such as the tie rod … and thrust arm[.]"

212.   In Mercedes nomenclature "rear axle carrier" is another term for the rear subframe.

213.   The service bulletin further specifies that it is intended to augment existing guidance on subframe maintenance and was issued "[d]ue to recent events."  The maintenance document does not specify to which events Mercedes was responding with the bulletin.

214.   The bulletin lists model numbers 171, 172, 203, 204, 205, 207, 209, 212, 218, 231, and 253, which correspond to the following vehicles:

      a.     SLK-Class, model years 2004-2010

      b.     SLK/SLC-Class, model years 2011-2020

      c.     C-Class, model years 2001-2007

      d.     C-Class, model years 2008-2015

      e.     C-Class, model years 2015-2022

      f.     GLK-Class, model years 2010-2015

      g.     E-Class Coupe and Cabriolet, model years 2010-2017

      h.     CLK-Class, model years 2003-2009

      i.     E-Class Sedan and Wagon, model years 2010-2016

j.     CLS-Class, model years 2010-2018

k.     SL-Class, model years 2013-2020

l.     GLC-Class, model years 2016-2022

215.   The service bulletin shows that Mercedes was aware of the Rear

Subframe Defect in many of the Class Vehicles.  Rather than issuing a recall for

this dangerous safety defect, Mercedes instead did the bare minimum by merely

notifying its dealers to do a cursory check for subframe corrosion.

**4.     Mercedes Knew of the Rear Subframe Defect Based on its Receipt of a Large Number of Orders for Replacement Subframes**

216.   Upon information and belief, Mercedes also knew or should have

known about the Rear Subframe Defect because of the higher than expected

number of replacement rear subframes ordered from Mercedes, which should have

alerted Mercedes that this was a defect affecting a large number and wide range of

its vehicles.

217.   Upon information and belief, Mercedes service centers use Mercedes

replacement parts that they order directly from Mercedes.  Therefore, Mercedes

would have detailed and accurate data regarding the number and frequency of

replacement part orders, including replacement rear subframes.  The ongoing high

sales of rear subframes was (or should have been) known to Mercedes, and alerted

- 66 -

Mercedes that its rear subframes were defective and causing Class Vehicles' rear subframes to develop severe, premature corrosion.

218.   Upon information and belief, replacement rear subframes for some or all of the Class Vehicles are currently backordered or have been backordered, given the high volume of demand for replacement parts due to the Rear Subframe Defect.  For instance, Plaintiff Park C. Thomas had to wait several months to have his vehicle repaired at a Mercedes dealership due limited availability of replacement subframes.  Several absent Class Members in contact with Plaintiffs' attorneys also experienced long waiting times for repairs due to limited subframe availability.  For instance, one Class Member was told by a Mercedes dealership in late February 2023 that the replacement of the rear subframe of her Mercedes-Benz C 300 would likely be delayed because there were only 19 replacement rear subframes available in the entire United States.  This parts shortage further substantiates that Mercedes knows or should know about the existence of the defect.

**5.   Mercedes Was Made Directly Aware of the Rear Subframe Defect Based on a Large Number of Class Member Complaints to Mercedes**

219.   Mercedes also knew or should have known about the Rear Subframe Defect because numerous consumers complained directly to Mercedes about the

defect.  The large number of complaints, and the consistency of their descriptions of the Rear Subframe Defect, including the near-uniform corrosion points and incidents of sudden, unexpected loss of control for drivers, should have alerted Mercedes to this serious safety defect, which impacts a wide range of vehicles.

220.   The full universe of complaints made directly to Mercedes about the Rear Subframe Defect is information presently in the exclusive custody and control of Mercedes and is not yet available to Plaintiffs prior to discovery.  However, on information and belief, many Class Vehicle owners complained directly to Mercedes and Mercedes dealerships about the rear subframe failures their vehicles experienced.  For example, some instances of these direct-to-Mercedes complaints are described in Class Vehicle owners' complaints logged with NHTSA or posted on online vehicle owner forums:

a.      "I have a 2011 C class that I've owned and loved for several years—it was my first car and up until recently I was a huge fan of MB. After hearing clunking noises and experiencing strong leftward pull when braking—so strong that my car nearly swerved off the highway—I took it to my local dealer. They found that the rear subframe had rusted through and snapped, effectively detaching my left rear wheel from the car. It's not exactly an "old" car, has 87k miles on it, and has been diligently dealer-serviced and regularly washed

throughout its whole life with no accidents or bodywork. I don't live in the snow belt, but apparently there's a flat spot on the subframe where water + road salt can accumulate, causing rust. … After MBUSA refused to pay for my subframe replacement (quoted at $4,200 by the dealer), I was left with no choice but to engage a plaintiff's attorney and prepare to sue what had previously been my favorite car company ☹" Posted on Reddit in r/Mercedes_Benz on December 16, 2018.

b.     "The contact owns a 2010 Mercedes- Benz E 350. The contact stated that while driving there was an undetermined abnormal noise detected. The vehicle was taken to an independent mechanic where it was informed the sub frame was corroded The independent dealer was contacted. The vehicle was diagnosed or repaired. The manufacturer was notified electronically however no response was provided. The failure mileage was approximately 171,000."  NHTSA database, NHTSA ID No. 11436456, date of incident September 28, 2021.

c.     "The contact's wife owns a 2014 Mercedes-Benz E-350. The contact stated that while driving at various speeds, the rear of the vehicle was swerving. The contact stated while the brake pedal was depressed, the rear of the vehicle shifted. No warning light was illuminated. The vehicle was taken to the dealer where it was diagnosed that the rear subframe was rusted and needed to be

- 69 -

replaced. The vehicle was repaired. The manufacturer was notified of the failure, but no assistance was provided. The contact was awaiting a response. The failure mileage was approximately 72,000."  NHTSA database, NHTSA ID No. 11501098, date of incident December 10, 2022.

      d.    "Took my 2011 E350 4Matic to an independent shop recently for some work. When I went to pick up the car, I find out from the mechanic that the rear sub-frame is rotting (see pics). I am told that this is a fairly common problem in the the C-class (W204, I believe) but starting to show up in W212s. Anyways, I call MBUSA and ask if they have any recall program. Am told no. I then went to NHTSA website and filed a complaint. Understand that if issue is not fixed, the problem will continue to get worse and should the rear subframe detach from the wheel, can lead to shrapnel puncturing the gas tank. Wanted other W212 owners to know. Haven't heard anything from NHTSA yet, but will keep everyone posted. Next time, your car is up on the lift, have the tech check out your subframe condition - and file complaint with NHTSA if you car is experiencing a similar condition."  Posted on mbworld.org on December 19, 2022.

### 6.    Mercedes Knew of the Rear Subframe Defect Based on Class Member Complaints on Public Online Forums

    221.   In addition to complaint made directly to Mercedes and collected by the NHSTA, many Class Vehicle owners posted complaints about the Rear

- 70 -

Subframe Defect on public online forums.  The following is a small sampling of such complaints:

a.      "2011 c300 rear subframe rot. My car is currently at the dealer for service b, trans service and airbag recall. They called and told me the rear subframe is rotted and unsafe to drive. They quoted over $5000 to replace it, the brake lines which are also about to fail, motor and trans mounts and diff seals. The car is very clean and ive never seen any indication of rust so far but i did know about the diff seals."  Posted on mbworld.org on October 28, 2019.

b.      "I recently had the rear subframe on my wife's 2010 C300w4 fail and literally start to fall apart after a service visit to an authorized MB dealer. It started to exhibit some serious handling issues and when I jacked up the right rear and removed the tire, I found a crack next to one of the aluminum suspension struts mounting flange. Being out of warranty and with 94k I realized there was little MB would do. I'd worked for 2 Mercedes Benz dealers over 40 years and sold millions of dollars worth of cars, but I knew what the answer would probably be. I just didn't realize how bad the problem was. The dealer had the factory rep look at problem who said that MB would not cover it. I elected to have a friend's MB Certified body shop do the work at a cost of $4000.; the dealer wouldn't give me an exact cost but was suggesting somewhere around $5500-$6000. From just looking

- 71 -

at the subframe it was difficult to see the extent of the damage but upon removal of the old unit, it was surprising how much rust had taken place from the inside. The entire flange holding one of the links completely fell out!"  Posted on benzworld.org on Mar 24, 2020.

        c.    "I bought a Certified used 2011 E350 from a dealership in Maryland in 2014 and the car is a lemon. It has been serviced at the same dealership as purchased every 7-10k miles and currently has 80k. My brakes failed and I was just told the Subframe is Rusted Through. The car was serviced in November where the technician supposedly checked the entire car including brake lines and subframe. They claim that the Rust must have happened in the last 9 months because the tech would have noticed it! REALLY??? We had no snow last year, so no salt on the roads and the car is garage kept. Sounds to me like MB isn't making cars like they used to! I checked my Subaru and they offer a 10-year corrosion warranty STANDARD! And the extended warranty that MB sold me won't cover the brake lines because of rust(sounds like Continental knows more about MB then me) 'corrosion warranty' Now I am stuck with a car that is 'too dangerous to drive' and the dealership with its hand in my pocket. Any others out there with a similar problem?"  Posted on Benzworld.org on Aug 21, 2020.

- 72 -

d.     "I too have this issue. My 2010 model E350 have a cracked sub frame and the dealer in MD Germany quoted me 3600+ to fix it. Plus the rotors and brakes for all four wheels, I have to pay about 6K to get it fixed. The service manager I spoke to told me he have been seeing this issue pretty common on a lot of C and E series. I cannot believe MB will have a broken subframe due to corrision. This is not the expected MB quality."  Posted on Benzworld.org on January 25, 2022.

222.   "2014 C300 Sport. I've gotten my car regularly inspected by both Huntington Long Island Mercedes as well as a shop that only does Mercedes in Brooklyn - was told it was in great shape. Runs beautifully etc. After getting my usual NY state inspection last week, I was asked to follow the mechanic to look under the car at the rust under the rear chassis. It was insane. Pitted out- I wish I had added an extra coat of rust proofing as soon as I got the car. I do park outside, but I never expected this. I have had thorough inspections numerous times since buying the car in 2019, and nothing was seen or mentioned. Therefore it all must have occurred in the last few years - and was missed by both official Mercedes mechanics and mechanics that specialize in Mercedes."  Posted on mbworld.org on September 16, 2022.

- 73 -

223.   As shown by this small sampling of complaints from vehicle owner forums, consumers have been vocal in complaining about the Rear Subframe Defect and the serious safety risks it causes.  A multi-billion dollar automaker like Mercedes undoubtedly had and has a marketing department that tracks such sites and should reasonably have been aware of the Rear Subframe Defect in the Class Vehicles.

### 7.   Mercedes Has Publicly Acknowledged Premature Rear Subframe Corrosion in its European Markets and Has Committed to Remedying the Defect in Those Markets.

224.   In an article from the November 2022 edition of Auto Motor Sport, a German-language publication, Mercedes acknowledges that there have been "isolated complaints" regarding corrosion on the rear axles of certain Class Vehicles.

225.   The article states that Mercedes has "decided, as a gesture of goodwill, to assume the repair costs for replacing the rear axle due to corrosion."

226.   A statement from the Kraftfahrt-Bundesamt ("KBA"), Germany's regulatory body for motor vehicles, states that the corrosion issue impacts the rear axle and rear axle carrier (aka, the rear subframe).

- 74 -

227.    The following Class Vehicles are identified by the article as susceptible to corrosion of the rear axle or rear axle carrier (rear subframe): SLK (R171), GLK, E-Class W212 and the C-Class of the W205 series.

228.    Upon information and belief, the corrosion-related defect described in November 2022 Auto Motor Sports Article is the same as the Rear Subframe Defect.

229.    Moreover, the Rear Subframe Defect is a material, serious safety issue, as evinced by numerous accounts of the rear subframes of Class Vehicles failing while the vehicle in is motion, causing the driver to lose control of the vehicle; the failure of many Class Vehicles to pass mandatory state safety inspections; and the many accounts of experienced mechanics warning Class Members not to drive their Class Vehicles due to safety concerns.

## C.    **Mercedes' Inadequate Warranty Extension**

230.    On December 9 and 22, 2022 Plaintiffs, through counsel, sent letters to Mercedes pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles and informing Mercedes of their intention to sue absent an offer of such relief.

231.   Mercedes was obligated to respond to the initial letter within thirty days of receipt, by January 9, 2023.  *See* O.C.G.A. § 10-1-399(b).  Mercedes' counsel requested a 30-day extension of that deadline due to the holidays, which Plaintiffs' counsel granted as a professional courtesy.

232.   On February 9, 2023, Mercedes responded to both notice letters through counsel.  Exh. C.  In its response, Mercedes denied the existence of the defect.  *Id.*

233.   The letter indicates that Mercedes plans to roll out the Extended Warranty, which covers perforation and corrosion of the rear subframe in certain of its vehicles for a twenty-year period.  Mercedes also sent Plaintiffs the warranty extension notice issued in conjunction with this program (the "Extended Warranty Notice").  Exh. D.

234.   On information and belief, on February 10, 2023, Mercedes began disseminating the Extended Warranty Notice to its authorized dealerships.  For instance, on February 10, 2023 a copy of the Extended Warranty Notice dated February 10, 2023 was posted on a Mercedes' owner forum.

235.   Mercedes claims that they had planned to issue the Extended Warranty prior to the receipt of Plaintiffs' first notice letter on December 9, 2022, but it has provided no evidence of that claim.  Moreover, the Extended Warranty

- 76 -

Notice bears a copyright date of 2023, and the version posted online is dated February 10, 2023, indicating that it was created at least three weeks after Mercedes' receipt of Plaintiffs' first notice letter.

236.   Mercedes continued to deny reimbursement for rear subframe repairs until the day the Extended Warranty was released, nearly two months after Plaintiffs sent their first notice letter to Mercedes.  For instance, Mr. Xie was told by Mercedes on February 8, 2023 that they knew nothing about the Rear Subframe Defect and would not reimburse him for his rear subframe replacement.

237.   Prior to February 10, 2023, in response to complaints about the Rear Subframe Defect, Mercedes encouraged certain Class Members to forgo a repair by offering a rebate on a new vehicle.  Of the Plaintiffs named in this complaint, Ms. Lin and Mr. Robinson were offered rebates by Mercedes in response to their complaints about the Rear Subframe Defect.

238.   The Extended Warranty covers only a fraction of the Class Vehicles, and is therefore insufficient.

239.   The Extended Warranty provides insufficient notice to Class Members that their vehicles are at risk of dangerous corrosion.

2751274.4

240.   The Extended Warranty does not inform Class Members that they should have their vehicles inspected for corrosion, and does not provide any funding for those inspections.

241.   The Extended Warranty also fails to provide reimbursement for many, and in some cases all, of the costs incurred by Plaintiffs and Class Members as a result of the Rear Subframe Defect, including:

a.     rear subframe replacements completed by Mercedes-certified mechanics or independent mechanics and/or using non-Mercedes parts;

b.     replacement or repair of parts damaged as a result of rear subframe failures while in motion, including a Class Vehicles' gas tank, torsion bar, and wheels;

c.     ancillary costs incurred as a result of the Rear Subframe Defect, including towing costs, rental car fees, and inspection fees; and

d.     loss of resale value by Class Members and Plaintiffs who sold their Class Vehicles at a diminished value due to the Rear Subframe Defect prior to the release of the Extended Warranty on February 10, 2023.

242.   The Extended Warranty is also notably insufficient to remedy the serious safety concerns posed by the Rear Subframe Defect because it:

a.      covers only the replacement of rear subframes that are perforated due to corrosion.  By the time corrosion has caused the steel of a rear subframe to become perforated, the part is already dangerously unstable and close to failure.

b.      does not provide adequate warning to Class Members as to the safety implications of rear subframe corrosion or acknowledgment that a defect exists.  Therefore, many Class Members will likely continue unknowingly driving vehicles with dangerously corroded rear subframes until they are at the point of failure.

c.      does not establish an inspection program which would allow Class Members to have their Class Vehicles checked for corrosion at an authorized Mercedes dealership free of cost.  As detailed above, a standard yearly inspection is often not enough to detect even advanced subframe corrosion.

d.      does not reimburse Class Members for the replacement of their rear subframes before they pose a serious safety risk, and therefore puts drivers at risk.

e.      does not offer a program that allows Class Vehicle owners to have their non-corroded subframes coated with an anti-corrosion compound free of charge.

- 79 -

243. In addition, it is likely that Mercedes will not have the supply of parts necessary to promptly replace Class Members' defective subframes. Based on Class Member reports, there is already a shortage of replacement subframes for the Class Vehicles. For instance, one dealership representative told a class member that as of February of 2023, there were only 19 C 300-compatible replacement subframes available in the entire United States. This shortage has caused some Plaintiffs and Class Members to have to wait weeks, if not months, for a repair at their local authorized Mercedes dealership.

244. In sum, Mercedes' proposed Extended Warranty does not adequately remedy the serious safety risks of the Rear Subframe Defect or adequately reimburse Plaintiffs and Class Members for past or future economic injuries.

**D.** **Mercedes' Marketing and Concealment**

245. Mercedes manufactured and sold the Class Vehicles with the Rear Subframe Defect, while willfully concealing the serious safety and reliability impacts of the defect, as well as the inferior quality and limited longevity of the Class Vehicles' rear subframes.

246. Mercedes directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, and through other mass media.

247.    Mercedes regularly releases advertisements and marketing materials touting the reliability of its vehicles and the brand's commitment to safety.  The following are a few examples of such widely circulated advertisements and marketing materials:

a.      A 2010 advertisement for the Mercedes E-Class: "just like its predecessor, the new E-Class is an extremely safe vehicle."

b.      A 2012 advertisement for the Mercedes E-Class: "a world you can't predict demands a car you can trust."

c.      A July 28, 2014 press release for the Mercedes C-Class states "the Sedan complies not only with all current national laws but also with all rating requirements, as well as meeting the more stringent internal Mercedes-Benz safety standards based on what actually happens during accidents."

d.      In a 2015 promotional video for the Mercedes C-Class, the company emphasizes its commitment to "passive safety" stating that Mercedes "development engineers" are able to "detect and eliminate any possible weak points."  The video also touts a testing process intended to show that the "body and chassis" of the C-Class can endure "the most extreme loads."

e.      In a 2016 advertisement, Mercedes states that "for 130 years we have been doing everything possible to make your Mercedes even safer."

- 81 -

f.      On October 20, 2022, Mercedes published a press release stating "[t]he company is pursuing a clear goal: to achieve accident-free driving by 2050."

248.   Mercedes also regularly released marketing materials touting the quality and longevity of its materials, including its use of technology meant to prevent corrosion:

a.      In a 2010 advertisement for its C-Class vehicles, Mercedes touted the "strength of its steel," "the integrity of its design," and its ability to handle "extreme situations."

b.      In a press release published on April 13, 2010, Mercedes detailed the corrosion protection technology used on its vehicles' wheel rims.  In particular, Mercedes emphasized its use of "a very special paint structure which provides reliable protection against corrosion."  The press release goes on to state that "Mercedes-Benz has played a decisive role in developing reliable anti-corrosion systems for high-sheen wheels and is currently considered to be a pioneer in this area."  Mercedes details the testing process used to ensure that the wheel paintwork is resistant to corrosion, which includes no less than seven different laboratory tests which it considers "the toughest of test methods – a series of ultimate tests for wheel coatings."  Once the coatings have passed the laboratory

- 82 -

tests, they are then subjected to a variety of real-world corrosion tests before being approved for use in the production of Mercedes vehicles.

c.      In a press release published on March 7, 2011, Mercedes described the technology used to prevent corrosion on its vehicles: "Long-term corrosion prevention for the bodywork is based on fully galvanised sheet metal panels. Structure areas of the body which are subjected to high stresses are protected with cavity-fill preserving agent. Sheet metal panel laminations and beads are completely filled with adhesive, whilst systematic sealing of the weld seams and edges with a PVC joint prevents corrosion from occurring. Generous underbody panelling composed of plastic laminate protects the bodywork and engine against stone chipping, moisture and dirt. Axle components, which are also subjected to a great deal of stone chipping damage, are protected by plastic panelling."  Body, quality and production: Master of quality in the executive segment, published on March 7, 2011.

d.      In a press release published July 15, 2008, Mercedes details the corrosion protection on its GLK-Class vehicles in a section titled "Effective corrosion protection for a long vehicle life": "Effective corrosion protection is particularly crucial in the case of SUV models and off-roaders. This is exactly why all GLK models feature a series of precisely harmonised protective mechanisms[.]"

249.   None of Mercedes' advertisements warned customers that their vehicles were likely to experience severe, premature corrosion of the rear subframe that would impact their ability to safely drive the Class Vehicles.

250.   Plaintiffs and Class Members were exposed to Mercedes' long-term, national multimedia marketing campaign, which focused on the safety and reliability of Mercedes vehicles, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion-free.  Plaintiffs and Class Members justifiably chose to purchase their Class Vehicles based on Mercedes' misleading marketing, which concealed the true, defective nature of the Class Vehicles' rear subframes.

251.   Further, Mercedes knowingly misled Class Members about the defective, unsafe nature of the Class Vehicles.  As detailed above, upon information and belief, Mercedes has been aware of the Rear Subframe Defect since at least 2009 and likely earlier.

252.   Despite Mercedes' knowledge of the Rear Subframe Defect and up until the February 10, 2023 release of the Extended Warranty, it told Class Members who complained to customer service about the Rear Subframe Defect that it was not aware of any defect, was not responsible for the defect, and that, absent a warranty, it was not responsible for full reimbursement for the repair.

E.      **Fraudulent Concealment Allegations**

253.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Mercedes responsible for disseminating false and misleading marketing materials regarding the Class Vehicles.  Mercedes necessarily is in possession of all of this information.

254.   Plaintiffs' claims arise out of Mercedes' fraudulent concealment of the Rear Subframe Defect and the serious safety issues it causes, and its representations about the world-class quality and safety of the Class Vehicles.

255.   To the extent that Plaintiffs' claims arise from Mercedes' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically prior to and at the time they purchased their Class Vehicles, Mercedes knew, or was reckless in not knowing, of the Rear Subframe Defect; Mercedes was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its active concealment of it; and Mercedes never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

256.   Plaintiffs make the following specific fraud allegations with as much

specificity as possible absent access to the information necessarily available only

to Mercedes:

        a.      **Who:** Mercedes actively concealed the Rear Subframe Defect

from Plaintiffs and Class Members while simultaneously touting the safety and

world-class quality of the Class Vehicles, as alleged in § VI.D.  Plaintiffs are

unaware of, and therefore unable to identify, the true names and identities of those

specific individuals at Mercedes responsible for such decisions.  However, both

representatives of Mercedes customer service and various Mercedes-authorized

dealerships have denied the existence and wide prevalence of the Rear Subframe

Defect when specifically questioned by Class Vehicle owners, an experience

shared by Plaintiffs Edward Michael Jacobs, Raymond Robinson, and Mike Xie.

        b.      **What:** Mercedes knew, or was reckless or negligent in not

knowing, that the Class Vehicles contain the Rear Subframe Defect starting no

later than 2009, as alleged above in § VI.B.  Mercedes concealed the defect and

made representations about the safety, world-class quality, and other attributes of

the Class Vehicles, as specified above in § VI.D.

        c.      **When:** Mercedes concealed material information regarding the

Rear Subframe Defect at all times and made representations about the world-class

quality, sophistication and state-of-the-art safety of the Class Vehicles, starting no later than 2009, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above in § VI.D.  Mercedes still has not disclosed the truth about the defect in the Class Vehicles to anyone outside of Mercedes.  Mercedes has never taken any action to inform consumers about the true nature of the defect in Class Vehicles.  And when consumers brought their Vehicles to Mercedes with heavily corroded rear subframes, Mercedes denied any knowledge of or responsibility for the Rear Subframe Defect.  For example, when Plaintiff Edward Michael Jacobs contacted MBUSA regarding the failure of his rear subframe while he was driving, representatives told him they had not heard of other vehicles having this issue, despite the existence of many consumer complaints going back at least four years.

       d.    **Where:** Mercedes concealed material information regarding the true nature of the Rear Subframe Defect in every communication it had with Plaintiffs and Class Members and made representations about the world-class quality and state-of-the-art safety of the Class Vehicles.  Plaintiffs are aware of no document, communication, or other place or thing, in which Mercedes disclosed the truth about the Rear Subframe Defect in the Class Vehicles to anyone outside

- 87 -

of Mercedes.  Such information is not adequately disclosed in any sales

documents, displays, advertisements, warranties, owner's manuals, or on

Mercedes' website.

          e.     **How:** Mercedes concealed the Rear Subframe Defect from

Plaintiffs and Class Members and made representations about the world-class

quality and state-of-the-art safety of the Class Vehicles.  Mercedes actively

concealed the truth about the existence and nature of the Rear Subframe Defect

from Plaintiffs and Class Members at all times, even though it knew about the Rear

Subframe Defect and knew that information about the Rear Subframe Defect

would be important to a reasonable consumer, and Mercedes promised in its

marketing materials that Class Vehicles have qualities that they do not have.

          f.     **Why:** Mercedes actively concealed material information about

the Rear Subframe Defect in the Class Vehicles for the purpose of inducing

Plaintiffs and Class Members to purchase Class Vehicles, rather than purchasing or

leasing competitors' vehicles and made representations about the world-class

quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles.

Had Mercedes disclosed the truth, for example in its advertisements or other

materials or communications, Plaintiffs and Class Members (all reasonable

consumers) would have been aware of it, and would not have bought the Class

Vehicles or would have paid less for them.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment Tolling

257.   Mercedes has known of the Rear Subframe Defect in the Class

Vehicles since at least 2009, and certainly well before Plaintiffs and Class

Members purchased their Class Vehicles, and yet concealed from or failed to

disclose to Plaintiffs, Class Members, and the public of the full and complete

nature of the Rear Subframe Defect, even when directly asked about it by Class

Members during communications with Mercedes, Mercedes Customer Care,

Mercedes dealerships, and Mercedes service centers.  Mercedes continues to

conceal the defect to this day

258.   Any applicable statute of limitation has been tolled by Mercedes'

knowledge, active concealment, and denial of the facts alleged herein, which

behavior is ongoing.

### B.   Estoppel

259.   Mercedes was and is under a continuous duty to disclose to Plaintiffs

and Class Members the true character, quality, and nature of the Class Vehicles.

Mercedes actively concealed – and continues to conceal – the true character,

quality, and nature of the Class Vehicles and knowingly made misrepresentations about the world-class quality and state-of-the-art safety of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon Mercedes' knowing misrepresentations and active concealment of these facts.  Based on the foregoing, Mercedes is estopped from relying on any statutes of limitation in defense of this action.

### C.   <u>Discovery Rule</u>

260.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Rear Subframe Defect.

261.   However, Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after a professional inspection revealed significant corrosion of the rear subframe.  As alleged, because the corrosion occurs "from the inside out" the defect would not have been apparent even to a trained mechanic until the rear subframe was dangerously corroded, near total failure, and rendered the Class Vehicle unsafe to operate.  Even then, Plaintiffs and Class Members had no reason to know the corrosion in the rear subframes was caused by a defect in the Class Vehicles because of Mercedes' active concealment of the Rear Subframe Defect.  Not only

did Mercedes fail to notify Plaintiffs and Class Members about the Rear Subframe

Defect, Mercedes in fact denied any knowledge of or responsibility for the defect

when directly asked about it.  Thus Plaintiffs and Class Members were not

reasonably able to discover the Rear Subframe Defect until after they had

purchased their Class Vehicles, despite their exercise of due diligence, and their

causes of action did not accrue until they discovered that the Rear Subframe Defect

caused their rear subframes to corrode to the point where their vehicles were no

longer able to be operated safely and, in some cases, where they failed while the

vehicle was in motion, causing the driver to partially or fully lose control of the

vehicle.

## VIII.  <u>CLASS ALLEGATIONS</u>

262.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

and all other similarly situated individuals as a nationwide class pursuant to

Federal Rules of Civil Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4).  This

action satisfies the numerosity, commonality, typicality, adequacy, predominance,

and superiority requirements of those provisions.

263.   Plaintiffs bring this class action as a nationwide class on behalf of

themselves and all other similarly situated members of the proposed class (the

"Class Members"), defined as follows:

All residents of the United States and its territories who are current or former owners of a Class Vehicle. A "Class Vehicle" is a vehicle of any of the following models/model years:

> 2010-2022 Mercedes-Benz C-Class
>
> 2010-2022 Mercedes-Benz E-Class
>
> 2010-2015 Mercedes-Benz GLK-Class
>
> 2010-2022 Mercedes-Benz CLS-Class
>
> 2010-2020 Mercedes-Benz SLK/SLC-Class
>
> 2016-2022 Mercedes-Benz GLC-Class
>
> 2010-2022 Mercedes-Benz SL-Class

Excluded from the Class are: (1) employees of MBG and MBUSA; (3) any judge assigned to this case and their respective families; (4) government entities; and (5) claims for personal injuries.

**A.**     **<u>Numerosity</u>**

264.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  Indeed, to date counsel have been contacted by over 160 members of the proposed class reporting the Rear Subframe Defect.

265.   The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the court.  Class Members are readily identifiable from information and records in Mercedes' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

### B.   Typicality

266.   The claims of the Plaintiffs are typical of the claims of Class Members in that the Plaintiffs, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by Mercedes.  The Plaintiffs, like all Class Members, have been damaged by Mercedes' misconduct in that they have purchased a vehicle they would not have purchased, or for which they would have paid less, and incurred or will incur the cost of service relating to and caused by the Rear Subframe Defect and/or have experienced diminished ability to use their Class Vehicles for their intended purpose, and/or have experienced diminution in resale value as a result of the Rear Subframe Defect.  Furthermore, the factual bases of Mercedes' misconduct are common to the Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiffs and all Class Members.

### C.   Adequate Representation

267.   Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive vehicles.

- 93 -

268.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and they have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class.

### D.   **Predominance of Common Issues**

269.   There are numerous questions of law and fact common to Plaintiffs and Class Members, the answers to which will advance the resolution of the litigation as to all Class Members and which predominate over any individual question.  These common legal and factual issues include:

a.   whether the rear subframe in the Class Vehicles is defective;

b.   whether and when Mercedes knew or should have known about the Rear Subframe Defect, and, if so, how long Mercedes knew or should have known of the Defect;

c.   whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

d.   whether Mercedes had and/or has a duty to disclose the defective nature of the Class Vehicle to Plaintiffs and Class Members;

e.   whether Mercedes omitted and failed to disclose material facts about the Class Vehicles;

- 94 -

f.      whether Mercedes' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Class Vehicles;

g.      whether Mercedes represented, through its words and conduct, that the Class Vehicle had characteristics, uses, or benefits that they did not actually have;

h.      whether Mercedes represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

i.      whether Mercedes advertised the Class Vehicles with the intent not to sell them as advertised;

j.      whether Mercedes' affirmative misrepresentations about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding, and were therefore fraudulent;

k.      whether Mercedes' affirmative misrepresentations about the true defective nature of the Class Vehicles were and are deceptive;

l.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

- 95 -

m.     whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the rear subframes in Class Vehicles are defective and/or not merchantable;

n.     whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

o.     whether Mercedes should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Rear Subframe Defect in Class Vehicles; and

p.     whether Mercedes is obligated to inform Class Members of their right to seek full reimbursement for having paid to diagnose and repair the defective rear subframes at either a Mercedes dealership or independent mechanic, including corrosion to nearby vehicle components (suspension springs, brake lines, etc.) and damage to the Class Vehicles caused by subframe failure while in motion, or for those Class Members who did not retain their Class Vehicles, for the diminution in value of the Class Vehicles upon resale.

### E.     **Superiority**

270.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Mercedes' unlawful and wrongful conduct.

- 96 -

A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

271.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Mercedes' misconduct.  Absent a class action, Class Members will continue to incur damages, and Mercedes' misconduct will continue without remedy.

272.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the court and the litigants, and will promote consistency and efficiency of adjudication.

## IX.   CLAIMS FOR RELIEF: NATIONWIDE CLAIMS

### FIRST CAUSE OF ACTION
**Breach of Express Warranty**
**(this cause of action against MBUSA only)**

273.   MBUSA is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles under O.C.G.A. § 11-2-104(1),

and a "seller" of motor vehicles, and specifically the Class Vehicles under

O.C.G.A. § 11-2-103(1)(d).

274.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of O.C.G.A. §§ 11-2-105 and 11-9-102(a)(45).

275.   Plaintiffs and Class Members bought Class Vehicles manufactured,

marketed to them, and intended to be purchased by consumers such as them, by

MBUSA.

276.   MBUSA expressly warranted the Class Vehicles against defect,

including the Rear Subframe Defect within the meaning of O.C.G.A. § 11-2-

313(1).

277.   Specifically, Class Vehicles were sold to Plaintiffs and Class

Members with a new vehicle 48-month and 50,000-mile express warranty.

278.   Pursuant to Page 11 of the 2014 Service and Warranty Booklet for

CLS-Class and E-Class vehicles, MBUSA warranted to the original and each

subsequent owner that they "will make any repairs or replacements necessary, to

correct defects in material or workmanship arising during the warranty period."

The warranty further states that "[MBUSA's] intention is to repair under warranty,

without charge to you, anything that goes wrong with your vehicle during the

warranty period which is our fault." Upon information and belief, this language is substantively the same in all warranties covering the Class Vehicles.

279. In addition to any remaining portion of the new vehicle warranty, Class Vehicles that Plaintiffs and Class Members purchased certified pre-owned were covered by the standard Mercedes-Benz Certified Pre-Owned Limited Warranty, which runs for one year and unlimited miles. The Certified Pre-Owned Limited Warranty covers a vehicle's brake system and suspension (including "upper and lower control arms" and "coil springs").

280. MBUSA's express warranties formed a basis of the bargain that was reached when Class Members purchased their Class Vehicles.

281. As described above, the rear subframe in the Class Vehicles is defective.

282. As described above, the Rear Subframe Defect was manifest at the time the Class Vehicles were produced and results in the development of corrosion, the early stages of which begin prior to the expiration of the warranty period.

283. The Rear Subframe Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

2751274.4

284.   MBUSA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the Rear Subframe Defect.

285.   MBUSA knew of the Rear Subframe Defect, and that this defect poses a serious safety risk to consumers like Plaintiffs and Class Members, when it expressly warranted against the defect, wrongfully and fraudulently concealed material facts regarding the defect, and induced Plaintiffs and Class Members to purchase the Class Vehicles under false and/or fraudulent pretenses.

286.   MBUSA is obligated, under the terms of its express warranties, to make repairs and/or replacements to permanently correct the Rear Subframe Defect for Plaintiffs and Class Members.

287.   MBUSA breached the express warranty to repair the Rear Subframe Defect in the Class Vehicles, because it failed to repair the inadequately corrosion-proofed subframes on the Class Vehicles, such that the vehicles did not exhibit severe rust corrosion and perforation, and because it failed to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

288.   As more fully detailed above, MBUSA was provided with appropriate notice and has been on notice of the Rear Subframe Defect and of its breach of express written warranties from various sources.

289.   The Class Vehicles were under express warranty when they exhibited the Rear Subframe Defect.  Although many of Plaintiffs' and Class Members' Class Vehicles did not require a subframe replacement until after the expiration of the warranty period, the Class Vehicles were sold by Mercedes with the Rear Subframe Defect and should have been repaired under the express warranty.

290.   Plaintiffs gave MBUSA a reasonable opportunity to cure its failures with respect to its warranties, and MBUSA failed to do so in a manner that properly compensated all Class Members for the economic damages they have incurred or will incur as a result of the Rear Subframe Defect.

291.   Affording MBUSA a reasonable opportunity to cure its breach of written warranties was unnecessary and futile here.  When Plaintiffs and other Class Members provided such notice and sought relief under the warranty, MBUSA refused to provide it, representing that the vehicles were displaying normal "wear and tear," and charged them to replace the defective rear subframes, as well as other parts damaged due to corrosion.  While MBUSA did issue the Extended Warranty on February 10, 2023, the Extended Warranty fails to

- 101 -

reimburse many Class Members fully or at all for damages incurred as a result of the Rear Subframe Defect.

292.   To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiffs and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiffs and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

293.   Any attempt by MBUSA to limit or disclaim the express warranties in a manner that would exclude coverage of the Rear Subframe Defect is unconscionable as a matter of law because the relevant purchase transactions were tainted by MBUSA's concealment of material facts.  MBUSA knew when it first made these warranties and their limitations that the Rear Subframe Defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect.  Thus, any such effort by MBUSA to disclaim, or otherwise limit, its liability for the Rear Subframe Defect is null and void.

294.   As a direct and proximate result of MBUSA's breach of express warranties, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered

incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of needed present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

295.   Plaintiffs seek against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty
### (this cause of action against MBUSA only)

296.   When it sold the Class Vehicles, MBUSA extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold.

297.   Persons who purchased a Class Vehicle from MBUSA are entitled to the benefit of their bargain: a vehicle with a subframe that has been properly designed and manufactured to resist corrosion stemming from exposure to normal road conditions, and that does not render the vehicle too dangerous to operate.

298.   MBUSA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use; and (2) not of a merchantable quality.

299.   Had MBUSA disclosed the existence of the Rear Subframe Defect at the time of sale, it could not have sold the Class Vehicles, or could not have sold them at the same price.

300.   To the extent that Plaintiffs and Class Members lack privity of contract with MBUSA, no privity is required because:

a.   Plaintiffs and Class Members were intended third-party beneficiaries of the transactions between MBUSA and its network of authorized dealerships.  MBUSA's authorized dealers were not intended to be the ultimate consumers of the Class Vehicles.  Rather, the warranty agreements were designed for and intended to benefit the ultimate purchasers of the Class Vehicles; and

b.   The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, and passengers, as well as other drivers on road, and therefore renders the Class Vehicles a source of danger to several or many people.

301.   As a direct and proximate result of MBUSA's breach of the implied warranty of merchantability, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a

safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial..

302.   Plaintiffs seek against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages.

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Express Warranty – Magnuson-Moss Warranty Act**
**(this cause of action against MBUSA only)**

303.   Plaintiffs and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

304.   Defendant MBUSA is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

305.   The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

306.   MBUSA provides Plaintiffs and Class members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

307.   MBUSA breached the express warranty by refusing to replace or repair, free of charge, any defective vehicle component, including the defective rear subframe or other suspension components impacted by the Rear Subframe Defect.  The Extended Warranty does not cure MBUSA's breach because it fails to

reimburse Class Members for some or all of the economic damages incurred as a result of the Rear Subframe Defect.

308.   At the times MBUSA sold the Class Vehicles, it knew of the Rear Subframe Defect and offered an express warranty with no intention of honoring said warranty with respect to known defects.

309.   Additionally, pursuant to 15 U.S.C. § 2304(d)(1), "the warrantor may not assess the consumer for any costs the warrantor or his representatives incur in connection with the required remedy of a warranted consumer product. . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor."

310.   MBUSA refuses to acknowledge the existence of the Rear Subframe Defect or to reimburse Class Members for the repair of their defective rear subframes.  Despite repeated demands by Plaintiffs and Class Members that MBUSA pay for replacement rear subframes, other necessary repairs caused by the Rear Subframe Defect, and associated incidental costs, MBUSA refuses to do so.  Rather, MBUSA issued an insufficient Extended Warranty that covers only some

2751274.4

of the vehicles affected by the Rear Subframe Defect, fails to cover the

replacement of parts other than the rear subframe or necessary incidental expenses,

and does not guarantee reimbursement for individuals who had their rear

subframes replaced at independent mechanics.  MBUSA's refusal to pay for all

expenses incurred by Class Members as a result of the Rear Subframe Defect

violates 15 U.S.C. § 2304(d)(1).

311.   MBUSA was afforded a reasonable opportunity to cure its breach of

the express warranty, but failed to do so.

312.   As a direct and proximate result of MBUSA's breach of its express

written warranties, Plaintiffs and Class Members received goods that are

unreasonably dangerous and have substantially impaired value, and they have

suffered incidental, consequential, and other damages, including unreimbursed out-

of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a

safe condition, the costs of necessary present and future repairs, an inability to use

the Class Vehicles for their intended purpose, and diminution of resale value, in an

amount to be determine at trial.

313.   Plaintiffs seek against MBUSA equitable relief, declaratory relief,

actual damages, attorneys' fees and expenses, and punitive damages, as permitted

under the Magnuson Moss Warranty Act.  15 U.S.C. § 2310(d).

## FOURTH CAUSE OF ACTION
### Breach of Implied Warranty – Magnuson-Moss Warranty Act
### (this cause of action against MBUSA only)

314.   Plaintiffs and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

315.   Defendant MBUSA is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

316.   The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

317.   MBUSA extended an implied warranty to Plaintiffs and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in its Class Vehicles and its Class Vehicles' suspension systems, including the rear subframe.

318.   MBUSA breached this implied warranty by selling Class Vehicles with the Rear Subframe Defect, which were neither merchantable nor fit for their intended purpose.

319.   As a direct and proximate result of MBUSA's breach of the implied warranty under the Magnuson-Moss Act, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including

- 108 -

unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

320.   Plaintiffs seek against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages, as permitted under the Magnuson Moss Warranty Act.  15 U.S.C. § 2310(d).

## FIFTH CAUSE OF ACTION
### Violations of Georgia Fair Business Practices Act
### O.C.G.A. §§ 10-1-390, *et seq.*

321.   MBUSA and MBG are each a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA").  O.C.G.A. § 10-1-392(a)(24).

322.   Plaintiffs and Class Members are "consumers" within the meaning of the Georgia FBPA.  O.C.G.A. § 10-1-392(a)(6).

323.   The purchase of Class Vehicles by Plaintiffs and Class Members constituted "consumer transactions" as defined by the Georgia FBPA.  O.C.G.A. § 10-1-392(a)(10).

324.   The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, O.C.G.A. § 10-1-393(a), including but not limited to

"representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," *id.* § 10-1-393(b)(5), (7) & (9).

325.   By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members, Mercedes violated the Georgia FBPA, because Mercedes represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (i.e.. safe, high-quality, etc.) when they were of another. *See* O.C.G.A. § 10-1-393(b)(5) & (7).

326.   Mercedes advertised the Class Vehicles (as safe, high-quality, etc.) with the intent not to sell them as advertised, in violation of O.C.G.A. § 10-1-393(b)(9).

327.   Mercedes' unfair and deceptive acts or practices occurred repeatedly in Mercedes' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

- 110 -

328.   Mercedes knew, by 2009 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' rear subframes suffered from a material safety defect, which would cause them to prematurely corrode and render the Class Vehicles unsafe to operate and unsuitable for their intended use.

329.   By 2009 at the latest, Mercedes had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in its Class Vehicles. Furthermore, Mercedes actively concealed this defect from consumers by denying the existence of the defect to Class Members who contacted Mercedes about their defective subframes and failed to offer to reimburse Class Members for the cost of replacing their defective subframes.

330.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

- 111 -

331.    Mercedes was under a duty to Plaintiffs and Class Members to disclose the Rear Subframe Defect, as well as the costs of replacing the defective subframe and returning the Class Vehicles to a safe condition because Mercedes:

   a.    Knew the rear subframe defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

   b.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   c.    Intentionally concealed the foregoing from Plaintiffs; and/or

   d.    Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

330.    Mercedes knew or should have known that its conduct violated the Georgia FBPA.

331.    In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the severe subframe corrosion present in the Class Vehicles, Mercedes knowingly and intentionally concealed material facts and breached its duty not to do so.

332.   The facts Mercedes concealed from Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Class Vehicle.  Moreover, a reasonable consumer would consider the Rear Subframe Defect to be an undesirable quality, as Plaintiffs and Class Members did.  Had Plaintiffs and Class Members known that the Class Vehicles had the Rear Subframe Defect, they would not have purchased a Class Vehicle, or would have paid less for them.

333.   Plaintiffs and Class Members, like all objectively reasonable consumers, did not expect the rear subframes of their vehicles to become dangerously corroded, rendering their vehicles dangerous to drive.

334.   As a result of Mercedes' misconduct, Plaintiffs and Class Members have been harmed and suffered actual damages including in that the Class Vehicles have rear subframes that are or are likely to become dangerously corroded, rendering the suspension system of the Class Vehicles unstable and making the Class Vehicles unsuitable for their intended purpose.

335.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-

- 113 -

pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

336.   Mercedes' violations present a continuing risk to Plaintiffs and to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

337.   Plaintiffs and Class Members are entitled to equitable relief.

338.   Mercedes received proper notice of its alleged violations of the Georgia FBPA pursuant to O.C.G.A. § 10-1-399(b), via letters sent to MBUSA and MBG on December 9, 2022 and December 22, 2022.  Exhs. A & B.  Through counsel, Mercedes responded on February 9, 2023 with notice of the Extended Warranty.  Exhs. C & D.  As explained above, Plaintiffs believe the Extended Warranty to be inadequate to compensate Class Members for their injuries or to remedy the serious safety defect at issue in this case.

339.   Thus, pursuant to O.C.G.A. § 10-1-399, Plaintiffs and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and

treble damages as to both MBUSA and MBG and punitive damages as to MBUSA

only, as permitted under the Georgia FBPA.

## SIXTH CAUSE OF ACTION
### Violations of Georgia's Uniform Deceptive Trade Practices Act
### O.C.G.A. §§ 10-1-370, *et seq.*

339.    Mercedes, Plaintiffs, and Class Members are each a "person" within

the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia

UDTPA"). O.C.G.A. § 10-1-371(5).

340.    The UDTPA prohibits "deceptive trade practices" which include the

"misrepresentation of standard, quality, or grade of goods and services," "engaging

in any other conduct which similar creates a likelihood of confusion or

misunderstanding," and "representing that goods or services have sponsorship,

approval, characteristics, ingredients, uses, or benefits that they do not have," and

"[a]dvertising goods or services with intent not to sell them as advertised."

O.C.G.A. § 10-1-372.

341.    By failing to disclose the defective nature of the Class Vehicles to

Plaintiffs and Class Members, Mercedes engaged in deceptive trade practices in

violation of the Georgia UDTPA, because Mercedes represented that the Class

Vehicles had characteristics and benefits that they do not have, and represented

that the Class Vehicles were of a particular standard, quality, or grade (i.e., safe, reliable, etc.) when they were of another.  *See* O.C.G.A. § 10-1-372(5), (7), & (9).

342.   Mercedes advertised the Class Vehicles (as safe, reliable, etc.) with the intent not to sell them as advertised, in violation of the Georgia UDTPA.  *See* O.C.G.A. § 10-1-372(9).

343.   Mercedes' unfair and deceptive acts or practices occurred repeatedly in Mercedes' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

344.   Mercedes knew, by 2009 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' rear subframes suffered from a defect, would exhibit severe, premature corrosion and damage to nearby vehicle components, could collapse while a Class Vehicle was in motion, and were not safe or suitable for their intended use.

345.   By 2009 at the latest, Mercedes had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in its Class Vehicles. Furthermore, Mercedes actively concealed these defects from consumers by denying the existence of the defects to Class Members who contacted Mercedes

about corrosion in their rear subframes and failing to offer Class Members full

reimbursement for the replacement of their defective rear subframes.

346.   Mercedes did not address the Rear Subframe Defect until February

10, 2023, when it issued an insufficient Extended Warranty that covers only some

of the vehicles affected by the Rear Subframe Defect, fails to cover the

replacement of parts other than the rear subframe or necessary incidental expenses,

does not guarantee reimbursement for individuals who had their rear subframes

replaced at independent mechanics, does not provide for inspection of the Class

Vehicles, and does not adequately warn consumers about the dangers of Rear

Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses

to acknowledge the existence of the Rear Subframe Defect.

347.   Mercedes was under a duty to Plaintiffs and Class Members to

disclose the Rear Subframe Defect, as well as the dangers of driving a vehicle with

a corroded rear subframe and the associated costs that would have to be expended

in order to repair the Class Vehicles due to the Rear Subframe Defect, because

Mercedes:

a.      Knew the Rear Subframe Defect (and its safety risks) was a

material fact that would affect Plaintiffs' or Class members' decisions to buy or

lease Class Vehicles;

- 117 -

b.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.      Intentionally concealed the foregoing from Plaintiffs; and/or

d.      Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

348.   Despite possessing information to the contrary, Mercedes failed to disclose and actively concealed the Rear Subframe Defect while continuing to market the Class Vehicles as safe, world-class, and reliable.  The deception made reasonable consumers believe that Class Vehicles were of high-quality, built with top-of-the-line safety technology, and designed and made by a company that stood behind its vehicles once they were on the road.

349.   Mercedes knew or should have known that its conduct violated the Georgia UDTPA.  In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the severe, premature rear subframe corrosion in the Class Vehicles, Mercedes knowingly and intentionally concealed material facts and breached its duty not to do so.

350.   The facts Mercedes concealed from Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be

- 118 -

important in deciding whether or not to purchase a Class Vehicle.  Moreover, a reasonable consumer would consider the Rear Subframe Defect to be an undesirable quality, as Plaintiffs and Class Members did.  Had Plaintiffs and Class Members known that the Class Vehicles had the Rear Subframe Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

351.   Plaintiffs, like all objectively reasonable consumers, did not expect the rear subframes in their Class Vehicles to experience extreme corrosion, such that they became dangerous to operate, in some cases causing the rear suspension to collapse while in motion, and requiring significant, costly repairs.

352.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

353.   Mercedes' violations present a continuing risk to Plaintiffs and to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

354.   As a direct and proximate result of Mercedes' violations of the Georgia UDTPA, Plaintiffs and Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

355.   Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA.  *See* O.C.G.A. § 10-1-373.

**SEVENTH CAUSE OF ACTION**
**Violations of New Jersey's Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***

356.   Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).

357.   The Class Vehicles and the defective rear subframes installed in them are "merchandise" within the meaning of the New Jersey CFA.  *See* N.J. Stat. Ann. § 56:8-1(c).

358.   The New Jersey CFA prohibits unfair trade practices, encompassing "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement

- 120 -

of any merchandise." *See* N.J. Stat. Ann. § 56:8-2.  The New Jersey CFA also prohibits schemes not to sell items as advertised.  *See* N.J. Stat. Ann. § 56:8-2.2.

359.   At all relevant times material hereto, Mercedes conducted trade and commerce in New Jersey and elsewhere.

360.   The New Jersey CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.  *See* N.J. Stat. Ann. § 56:8-2.13.

361.   Mercedes has engaged in unlawful, deceptive practices in the sale of the defective rear subframes in the Class Vehicles as alleged in more detail elsewhere herein, including: (1) selling the Class Vehicles despite knowing that the rear subframes were prone to extreme, premature corrosion; (2) refusing to fully reimburse Plaintiff and Class Members for the replacement of their dangerously corroded rear subframes and related costs; and (3) failing to disclose and/or concealing this known defect.

362.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.

363.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some

- 121 -

of the vehicles affected by the Rear Subframe Defect, fails to cover the

replacement of parts other than the rear subframe or necessary incidental expenses,

does not guarantee reimbursement for individuals who had their rear subframes

replaced at independent mechanics, does not provide for inspection of the Class

Vehicles, and does not adequately warn consumers about the dangers of Rear

Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses

to acknowledge the existence of the Rear Subframe Defect.

364.   Mercedes knowingly and intentionally omitted and failed to disclose

material facts to Plaintiffs and Class Members with respect to the Rear Subframe

Defect, including the fact that, with normal use, the rear subframe would fail

and/or malfunction as described elsewhere herein, and/or denying and/or

misleading them as to the true cause of the Rear Subframe Defect.

365.   Mercedes intended to deceive Plaintiffs and Class Members and

intended that Plaintiffs and Class Members rely on Mercedes' misrepresentations,

omissions, and acts of concealment, so that Plaintiffs and Class Members would

purchase the Class Vehicles equipped with defective rear subframes at a substantial

out-of-pocket cost to them.

366.   Mercedes' conduct as described herein is unethical, oppressive, or

unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge,

- 122 -

responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the Rear Subframe Defect.

367.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

368.   Plaintiffs and Class Members, like all objectively reasonable consumers, did not expect the rear subframes in their vehicles to severely and prematurely corrode, even with regular maintenance, and to put them at risk of losing control of their vehicle if the subframe fails while the vehicle is in motion.

369.   Mercedes had a duty to disclose the Rear Subframe Defect to Plaintiffs and Class Members, as well as the associated costs to replace the defective rear subframes, because:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class members' decisions to buy or lease Class Vehicles;

b.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.   Intentionally concealed the foregoing from Plaintiffs; and/or

d.   Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and Class Members that contradicted these representations.

370.   Had Mercedes disclosed all material information regarding the defective rear subframes to Plaintiffs and Class Members, they would not have purchased their Class Vehicles or would have paid less for them.

371.   Plaintiffs provided any notice that could possibly have been required, as detailed more fully above, and Mercedes has long been on notice of the Rear Subframe Defect and of its violation of the New Jersey CFA from various sources.

- 124 -

372.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

373.   Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit.  *See* N.J. Stat. Ann. § 56:8-19.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## EIGHTH CAUSE OF ACTION
### Fraud by Concealment

374.   Mercedes concealed and suppressed material facts concerning the quality of the Class Vehicles.

375.   Mercedes is liable for both fraudulent concealment and non-disclosure.  *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

2751274.4

376.   Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions.

377.   Mercedes concealed and suppressed material facts concerning the Rear Subframe Defect, which causes the rear subframe on the Class Vehicles to experience severe and premature corrosion.  The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing.  Mercedes knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.  Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and Class Members.  When Plaintiffs and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

378.   Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles

- 126 -

that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase.  These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

379.   Plaintiffs and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles.  The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and Class Members' decisions to purchase or lease Class Vehicles.  If Mercedes had instead chosen to disclose the truth, Plaintiffs and Class Members would have seen those disclosures.  Indeed, Plaintiffs and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television

advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

380.   Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class Members.  Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability.  Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of.  As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

381.   The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and Class Members.  Whether a manufacturer's product is

- 128 -

as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

382.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and Class Members.

383.   On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles.  Although MBUSA released the Extended Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and Class Members, it continues to deny the existence of the Rear Subframe Defect.

384.   Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, i.e., they would not have purchased Class Vehicles, or would have paid less for them.  Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components.  Rather,

Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

385.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and paid out-of-pocket to replace the defective rear subframe or experienced significant diminution of their Class Vehicle's value.  Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

386.   As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

387.   Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being to enrich Mercedes.  Mercedes' conduct warrants an assessment of punitive damages against MBUSA in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

388.   Plaintiffs and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief.  In addition, Plaintiffs and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit.  Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

389.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, as there are no true conflicts among various states' laws of fraudulent concealment.  In the alternative, Plaintiffs bring this claim on behalf of the State Classes.

## NINTH CAUSE OF ACTION
### Unjust Enrichment

390.   Mercedes has been unjustly enriched by the Plaintiffs and Class Members through Plaintiffs' and Class Members' purchasing and/or leasing Class Vehicles from Mercedes and purchasing replacement parts and services from

- 131 -

Mercedes that Plaintiffs and Class Members would not have purchased but for the Rear Subframe Defect and Mercedes' concealment of the same.

391.   Specifically, Mercedes receives and appreciates a direct financial benefit from the sale of its Class Vehicles to end consumers, including Plaintiffs and Class Members.  Mercedes primarily sells the Class Vehicles to dealerships, which then sell them to end consumers.  The sale of Mercedes' Class Vehicles to end consumers results in revenues which are either paid directly to Mercedes or used by the intermediaries to pay Mercedes for its vehicles.

392.   Plaintiffs and Class Members unknowingly conferred a benefit on Mercedes of which Mercedes had knowledge, since Mercedes was aware of the defective nature of its Class Vehicles' rear subframes and the resultant severe, premature corrosion, but failed to disclose this knowledge and misled Plaintiffs and the Class Members regarding the nature, quality, and safety of the subject Class Vehicles while profiting from this deception.

393.   The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Mercedes to retain the benefit of revenue that it unfairly obtained from Plaintiffs and Class Members.  This revenue included the premium price Plaintiffs and Class Members paid for the Class Vehicles and the unreimbursed cost of the parts and services bought from Mercedes used to replace

the heavily corroded, defective rear subframes and to remedy other damage caused by the Rear Subframe Defect.

394.   Plaintiffs and the other members of the Class, having been damaged by Mercedes' conduct, are entitled to recover or recoup damages and/or restitution as a result of the unjust enrichment of Mercedes to their detriment.

395.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, as there are no true conflicts among various states' laws of fraudulent concealment.  In the alternative, Plaintiffs bring this claim on behalf of the State Classes.

## X.      CLAIMS FOR RELIEF: PLAINTIFFS' STATES OF RESIDENCE

### TENTH CAUSE OF ACTION
**Violation of the Missouri Merchandising Practices Act
Mo. Rev. Stat. §§ 407.010, *et seq.***

396.   Plaintiffs and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

397.   Mercedes engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

398.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or

- 133 -

omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

399.   Mercedes has known of the Rear Subframe Defect in Class Vehicles since at least 2009. In the course of its business, Mercedes failed to disclose and actively concealed the Rear Subframe Defect in Class Vehicles as described herein. By failing to disclose the Rear Subframe Defect or the dangers of operating a vehicle with the defect described herein known to them or that were available to Mercedes upon reasonable inquiry, Mercedes deprived consumers of all material facts about the safety, use, and functionality of their vehicle. By failing to release material facts about the Rear Subframe Defect, Mercedes curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or affirmatively operated to hide or keep those facts from consumers. *See* Mo. Code Regs. Ann. tit. 15 § 60-9.110.

400.   Mercedes made material statements about the safety, quality, and reliability of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite their knowledge of the Rear Subframe Defect or its failure to reasonably

- 134 -

investigate it.  By doing so, Mercedes engaged in unfair or deceptive business

practices in violation of the Missouri MPA.  Mercedes deliberately withheld the

information about the propensity of the rear subframes installed in the Class

Vehicles to develop severe, premature corrosion which causes the Class Vehicles

to become unsafe and unstable, in order to ensure that consumers would purchase

the Class Vehicles.

401.   Mercedes' unfair or deceptive acts or practices, including these

concealments, omissions, and suppressions of material facts, had a tendency or

capacity to mislead and create a false impression in consumers, and were likely to

and did in fact deceive reasonable consumers, including Plaintiffs, about the true

safety, longevity, and reliability of Class Vehicles equipped with the defective rear

subframes, the quality of Mercedes' brands, and the true value of the Class

Vehicles.  Consequently, Mercedes' failures to disclose the material facts of the

Rear Subframe Defect amount to misleading statements pursuant to Mo. Code

Regs. Ann. tit. 15 § 60-9.090.

402.   Because Mercedes knew or believed that its statements regarding

safety, longevity, and reliability of the Class Vehicles and/or the defective rear

subframes installed in them were not in accord with the facts and/or had no

reasonable basis for such statements in light of their knowledge of the Rear

Subframe Defect, Mercedes engaged in fraudulent misrepresentations pursuant to Mo. Code Regs. Ann. tit. 15 § 60-9.100.

403.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently misrepresented the Rear Subframe Defect as normal "wear and tear."  Mercedes also charged to replace a part it knew to be defective. Such acts are unfair practices in violation of Mo. Code Regs. Ann. tit. 15 § 60-8.020.

404.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect in continuing violation of the Missouri MPA.

2751274.4

405.   Mercedes knew or should have known that its conduct violated the Missouri MPA.

406.   Mercedes owed Plaintiffs and Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

d.   Made incomplete representations about the safety, quality, and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

407.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe, premature corrosion and failure while in motion makes the Class Vehicles less valuable and

- 137 -

attractive to potential purchasers in the used market, thereby further diminishing

Class Vehicles' value.

408.   Mercedes' failure to disclose and active concealment of the problems

and risks posed by the defective rear subframes in Class Vehicles were material to

Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of

safe, quality vehicles is worth more than an otherwise comparable vehicle made by

a disreputable manufacturer of unsafe, poor quality vehicles that conceals defects

rather than promptly remedying them.

409.   Plaintiffs and Class Members suffered ascertainable loss caused by

Mercedes' misrepresentations and their failure to disclose material information.

Had they been aware of the Rear Subframe Defect that existed in the Class

Vehicles, rendering their vehicles dangerous to drive and necessitating a large

expenditure to return their vehicles to a safe condition, Plaintiffs either would have

paid less for their vehicles or would not have purchased them at all. Plaintiffs did

not receive the benefit of their bargain as a result of Mercedes' misconduct.

410.   Mercedes' violations present a continuing risk to Plaintiffs, to Class

Members, as well as to the general public.  Mercedes' unlawful acts and practices

complained of herein affect the public interest.

411.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

412.   Mercedes is liable to Plaintiffs and Class Members for damages in amounts to be proven at trial, including attorneys' fees and costs, as well as injunctive relief enjoining Mercedes' unfair and deceptive practices, declaratory relief, and any other just and proper relief under Mo. Rev. Stat. § 407.025.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## ELEVENTH CAUSE OF ACTION
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, *et seq.*

413.   Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("Florida DUTPA"), Fla. Stat. § 501.203(7).

414.   Mercedes is engaged in "trade or commerce" within the meaning of the Florida DUTPA.  Fla. Stat. § 501.203(8).

415.   The Florida DUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."   Fla. Stat. § 501.204(1).  Mercedes participated in unfair and deceptive trade practices that violated the Florida DUTPA as described herein.

416.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.  Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicles' entire rear suspension.

417.   Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

- 140 -

418.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Florida DUTPA.  Mercedes deliberately withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion, in order to ensure that consumers would purchase the Class Vehicles.

419.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, quality, longevity, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.

420.   Mercedes intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

421.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge,

responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

422.   Mercedes knew or should have known that its conduct violated the Florida DUTPA.

423.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

424.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.      Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.      Intentionally concealed the foregoing from Plaintiffs; and/or

d.      Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

425.    Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

426.    Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

2751274.4

427.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Florida DUTPA, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

428.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

429.   Plaintiffs and Class Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

430.   Plaintiffs and Class Members also seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees and costs, and any other just and proper relief available under the Florida DUTPA.

Additionally Plaintiffs and Class Members seek punitive damages as to MBUSA only.

**TWELFTH CAUSE OF ACTION**
**Violation of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. Ann. §§ 42-110a, *et seq*.**

431.   Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of the Connecticut Unlawful Trade Practices Act ("Connecticut UTPA"). *See* Conn. Gen. Stat. § 42-110a(3).

432.   The purchase of Class Vehicles by Plaintiffs and Class Members constitutes "trade" and "commerce" within the meaning of the Connecticut UTPA. *See* Conn. Gen. Stat. § 42-110a(4).

433.   The Connecticut UTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

434.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.  Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class

- 145 -

Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicles' entire rear suspension.

435.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Connecticut UTPA and the regulations thereto.  *See* Conn. Gen. Stat. Ann. § 42-110b(a); Conn. Agencies Regs. § 42-110b018(b) & (e).

436.   As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

437.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

438.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

439.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

440.   Prior to February 10, 2023, Mercedes engaged in unfair trade practices by offering a warranty adjustment program to address the Rear Subframe Defect only to certain consumers within the state of Connecticut and by failing to

- 147 -

send notice of the warranty adjustment program all Class Vehicle owners within the state.  *See* Conn. Gen. Stat. Ann. §§ 42-110(a), 42-227.

441.   Mercedes knew or should have known that its conduct violated the Connecticut UTPA.

442.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.     Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.     Intentionally concealed the foregoing from Plaintiffs; and/or

d.     Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

443.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and

- 148 -

failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

444.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

445.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

446.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience

- 149 -

corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

447.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Connecticut UTPA, and these violations present a continuing risk to Plaintiffs and Class Members.

448.   Thus, pursuant to the Connecticut UTPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and costs, as permitted under Connecticut law.  *See* Conn. Gen. Stat. Ann. § 42-110g.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## THIRTEENTH CAUSE OF ACTION
### Violations of the Rhode Island Unfair Trade Practice and Consumer Protection Act
### R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

449.   Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of Rhode Island's Unfair Trade Practice and Consumer Protection Act ("Rhode Island UTPCPA").  *See* R.I. Gen. Laws § 6-13.1-1(3).

2751274.4

450.   The purchase of Class Vehicles by Plaintiffs and Class Members constitutes "trade" and "commerce" within the meaning of the Rhode Island UTPCPA.  *See* R.I. Gen. Laws § 6-13.1-1(5).

451.   The Rhode Island UTPCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  R.I. Gen. Laws § 6-13.1-2.  Mercedes participated in unfair or deceptive acts or practices that violated the Rhode Island UTPCPA as described herein.

452.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.  Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicles' entire rear suspension.

453.   As alleged above, Mercedes made material statements about the quality, reliability and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and

- 151 -

marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

454.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, by marketing them as more fully detailed above in § VI.D., Mercedes engaged in unfair or deceptive business practices in violation of the Rhode Island UTPCPA. *See* R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (ix), & (xii)-(xiv).  Mercedes deliberately withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion, in order to ensure that consumers would purchase the Class Vehicles.

455.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

456.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  Mercedes also

- 152 -

refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

457.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

458.   Mercedes knew or should have known that its conduct violated the Rhode Island UTPCPA.

459.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

- 153 -

b.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.     Intentionally concealed the foregoing from Plaintiffs; and/or

d.     Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

460.   Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

461.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

462. Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

463. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

464. Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Rhode Island UTPCPA, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

465.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

466.   Thus, pursuant to the Rhode Island UTPCPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and treble damages as permitted under Rhode Island law.  *See* R.I. Gen. Laws § 6-13.1-5-2. In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## FOURTEENTH CAUSE OF ACTION
### Violation of the Michigan Consumer Protection Act
### Mich. Comp. Laws §§ 445.901, *et seq.*

467.   Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of the Michigan Consumer Protection Act ("Michigan CPA"). *See* Mich. Comp. Laws § 445.902(d).

468.   The purchase of Class Vehicles by Plaintiffs and Class Members constitutes "trade or commerce" within the meaning of the Michigan CPA.  *See* Mich. Comp. Laws § 445.902(g).

469.   The Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]"  Mich. Comp. Laws § 445.903(1).  This prohibition includes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." *Id.* § 445.903(1)(c), (e) & (bb).  Mercedes participated in unfair and deceptive trade practices that violated the Michigan CPA as described herein.

470.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.  Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles were likely to fail as described herein, and denied and/or misled as to the tendency of the Class Vehicles

- 157 -

to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicles' entire rear suspension.

471.   As alleged above, Mercedes made material statements about the quality, reliability and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

472.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

473.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the

- 158 -

replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect. Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing its violation of the Michigan CPA.

474.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, by marketing them as more fully detailed above in § VI.D., Mercedes engaged in unfair or deceptive business practices in violation of the Michigan CPA. *See* Mich. Comp. Laws § 445.903(1)(c), (e), (s), (z), & (cc). Mercedes deliberately withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion, in order to ensure that consumers would purchase the Class Vehicles.

475.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true

safety, grade, quality, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.

476.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

477.   Mercedes knew or should have known that its conduct violated the Michigan CPA.

478.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

    a.    Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

    b.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    c.    Intentionally concealed the foregoing from Plaintiffs; and/or

d.    Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

479.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

480.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

481.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return

- 161 -

their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

482.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

483.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

484.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary

present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

485.    Thus, pursuant the Michigan CPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual damages, and attorneys' fees and expenses, as permitted under Michigan law.  *See* Mich. Comp. Laws § 445.911(5).  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## FIFTEENTH CAUSE OF ACTION
## Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law Mass. Gen. Laws ch. 93a, §§ 1, *et seq.*

486.    Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of Massachusetts General Laws, chapter 93a, § 1(a).

487.    The purchase of Class Vehicles by Plaintiffs and Class Members constitutes "trade" or "commerce" within the meaning of Massachusetts General Laws, chapter 93a, § 1(b).

488.    Massachusetts law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Mass. Gen Law ch. 93a, § 2(a).  Mercedes participated in unfair and deceptive trade practices that violated Massachusetts law as described herein.

489.   Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B.  Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicles' entire rear suspension.

490.   As alleged above, Mercedes made material statements about the quality, reliability and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

491.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Code of Massachusetts Regulations, §§ 3.02(2) and 3.05(1).

492.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, grade, quality, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.

493.   Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion, with the intent to ensure that consumers would purchase the Class Vehicles.

494.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

495.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing its violation of Massachusetts law.

496.   Mercedes knew or should have known that its conduct violated the Massachusetts law.

497.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

- 166 -

      b.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      c.    Intentionally concealed the foregoing from Plaintiffs; and/or

      d.    Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

498.  Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

499.  Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

- 167 -

500.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

501.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

502.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Massachusetts law, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

503.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

504.   Thus, pursuant Massachusetts General Laws, chapter 93a, § 9(1)-(3), Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and treble damages, as permitted under Massachusetts law.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

505.   Plaintiffs provided any notice that could possibly have been required, as detailed more fully above, and Mercedes has long been on notice of the Rear Subframe Defect and of its violation of Massachusetts General Laws, chapter 93a, § 2(a).  Therefore, the notice requirement of Massachusetts General Laws, chapter 93a, § 9(3) has been satisfied by Plaintiffs.

**SIXTEENTH CAUSE OF ACTION**
**Violation of the Pennsylvania Unfair Trade Practices**
**and Consumer Protection Law**
**73 Pa. Cons. Stat. §§ 201-1,** *et seq.*

506.   Plaintiffs, Class Members, MBUSA and MBG are "persons" within

the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection

Law ("Pennsylvania UTPCPL").  73 Pa. Cons. Stat. § 201-2(2).

507.   Mercedes engaged in "trade" or "commerce" in the State of

Pennsylvania within the meaning of the Pennsylvania UTPCPL.  73 Pa. Cons. Stat.

§ 201-2(3).

508.   The Pennsylvania UTPCL makes unlawful "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce…." 73 Pa. Cons. Stat. § 201-3(a).

509.   As alleged above, Mercedes made material statements about the

quality, reliability and safety of the Class Vehicles and/or the defective rear

subframes installed in them that were either false or misleading.  Mercedes'

representations, omissions, statements, and commentary have included selling and

marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art,"

and "sophisticated," despite its knowledge of the Rear Subframe Defect or its

failure to reasonably investigate it.  These material statements had the capacity,

tendency, or effect of misleading consumers in violation of the Pennsylvania UTPCL.  *See* 73 Pa. Cons. Stat. § 201-2(4)(v), (vii).

510.   Mercedes advertised the Class Vehicles (as safe, high-quality, etc.) with the intent not to sell them as advertised.  *See* 73 Pa. Cons. Stat. § 201-2(4)(ix).

511.   Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

512.   As detailed above, the Rear Subframe Defect manifests during the warranty period.  Mercedes failed to remedy or prevent the Rear Subframe Defect through measures taken within the Class Vehicles' warranty periods and failed to partially or fully reimburse Plaintiffs and Class Members for costs related to the Rear Subframe Defect.  Mercedes therefore failed to comply with the terms of the warranties it provided to Plaintiffs and Class Members upon purchase of the Class Vehicles.  *See* 73 Pa. Cons. Stat. § 201-2(4)(xiv).

513.   Mercedes failed to inform Plaintiffs and Class Members who purchased their vehicles new that the Class Vehicles had been rustproofed, if at all, and the nature and extent, if any, of the warranty applicable to that rustproofing. *See* 73 Pa. Cons. Stat. § 201-2(4)(xx)(b).

514.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to deceive consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, grade, quality, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.  *See* 73 Pa. Cons. Stat. § 201-2(4)(xxi).

515.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

516.   Mercedes knew or should have known that its conduct violated the Pennsylvania UTPCL.

517.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.     Intentionally concealed the foregoing from Plaintiffs; and/or

d.     Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

518.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

519.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

520.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

521.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

522.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Pennsylvania UTPCL, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

523.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have

substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

524.   Thus, pursuant the Pennsylvania UTPCL, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual damages or $100, whichever is greater, treble damages, and attorneys' fees and expenses, as permitted under Pennsylvania law.  *See* 73 Pa. Cons. Stat. § 201-9.2(a).

**SEVENTEENTH CAUSE OF ACTION**
**Violation of the Maryland Consumer Protection Act**
**Md. Code. Ann., Commercial Law, §§ 13-101, *et seq.***

525.   Plaintiffs, Class Members, MBUSA and MBG are "persons" within the meaning of the Maryland Consumer Protection Act ("Maryland CPA").  Md. Code. Ann., Com. Law, § 13-101(c)(1).

526.   Plaintiffs and Class Members are "consumers" within the meaning of the Maryland CPA.  Md. Code. Ann., Commercial Law, § 13-101(h).

527.   MBUSA and MBG are "merchants" with the meaning of the Maryland CPA.  Md. Code. Ann., Com. Law, § 13-101(g)(1).

528.    The Class Vehicles are "consumer goods" within the meaning of the Maryland CPA.  Md. Code. Ann., Com. Law, § 13-101(d)(1).

529.    The Maryland CPA makes unlawful "[u]nfair, abusive, or deceptive trade practices[.]"  Md. Code. Ann., Com. Law, § 13-301.

530.    As alleged above, Mercedes made material statements about the quality, reliability and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.  These material statements had the capacity, tendency, or effect of misleading consumers in violation of the Maryland CPA.  *See* Md. Code. Ann., Com. Law, § 13-301(1), (2)(i), & (2)(iv).

531.    Mercedes advertised the Class Vehicles (as safe, high-quality, etc.) with the intent not to sell them as advertised.  *See* Md. Code. Ann., Com. Law, § 13-301(5)(i).

532.    Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

- 176 -

533.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing its violation of the Maryland CPA.

534.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to deceive consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, grade, quality, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.  *See* Md. Code. Ann., Com. Law, §§ 13-301(3) & 13-301(9)(i).

535.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

536.   Mercedes knew or should have known that its conduct violated the Maryland CPA.

537.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.   Intentionally concealed the foregoing from Plaintiffs; and/or

d.   Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

538.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to

- 178 -

Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

539.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

540.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

541.   As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer

actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of upwards of $2,500.

542.   Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Maryland CPA, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

543.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

544.   Thus, pursuant the Maryland CPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual

damages, and attorneys' fees and expenses, as permitted under Maryland law.  *See*

Md. Code. Ann., Com. Law, § 13-408.

### EIGHTEENTH CAUSE OF ACTION
### Violation of the New York General Business Law
### N.Y. Gen. Bus. Law § 349

545.   Plaintiffs and Class Members are "persons" within the meaning of

New York General Business Law § 349 ("NYGBL § 349 ").  N.Y. Gen. Bus. Law

§ 349(h).

546.   Defendants are "persons," "firms," "corporations," or "associations"

within the meaning of NYGBL § 349.  N.Y. Gen. Bus. Law § 349(b).

547.   The NYGBL § 349 makes unlawful "[d]eceptive acts or practices in

the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349(a).

Mercedes' conduct directed toward consumers, as described above and below,

constitutes "deceptive acts or practices" within the meaning of the New York GBL.

548.   Mercedes' actions as set forth above occurred in the conduct of trade

or commerce.  *See* N.Y. Gen. Bus. Law § 349(a).

549.   In the course of their business, Mercedes failed to disclose and

actively concealed the problems, dangers and risks posed by the Class Vehicles

due to the Rear Subframe Defect as described herein and otherwise engaged in

activities with a tendency or capacity to deceive.

- 181 -

550.   Mercedes also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles due to the Rear Subframe Defect.

551.   Mercedes has known of the Rear Subframe Defect since at least 2009. Prior to installing the defective rear subframes in Class Vehicles, Mercedes knew or should have known of the Rear Subframe Defect, because of pre-release design, manufacturing, engineering, and testing data, as well as complaints made directly and indirectly to Mercedes.  Mercedes failed to disclose and actively concealed the problems, dangers and risks posed by the Class Vehicles due to the Rear Subframe Defect.

552.   By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles, by marketing them as safe, reliable, and of high-quality, and by presenting themselves as reputable manufacturers that value safety and quality, Mercedes engaged in unfair or deceptive business practices in violation of NYGBL § 349.  Mercedes deliberately withheld the information about the propensity of the Class Vehicles to develop severe, premature subframe

- 182 -

corrosion, which puts the vehicles at risk of rear suspension failure while in motion, in order to ensure that consumers would purchase the Class Vehicles.

553.   In the course of Mercedes' business, it willfully failed to disclose and actively concealed the risks posed by the many safety issues, quality issues, and serious defect discussed above.  Mercedes compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high-quality, state-of-the-art, and by claiming to be reputable manufacturers that value safety and quality.

554.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or their suspension and braking systems, the quality of Mercedes' brands, and the true value of the Class Vehicles.

555.   Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and Class Members.

556.   Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge,

- 183 -

responsibility, warranty obligations, and relief when complaints were made to them.  Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear."  And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

557.   Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect.  Despite issuing the Extended Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing its violation of NYGBL § 349.

558.   Mercedes knew or should have known that their conduct violated the NYGBL § 349.

559.   Mercedes owed Plaintiffs a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

b.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.   Intentionally concealed the foregoing from Plaintiffs; and/or

d.   Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

560.   Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

- 185 -

561.   Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and Class Members.  A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

562.   Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Vehicles Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return them to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

563.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

564.   As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and

other damages, including unreimbursed out-of-pocket costs of upwards of $2,500 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

565.   Plaintiffs and Class Members seek punitive damages against MBUSA because MBUSA's conduct was egregious.  MBUSA misrepresented the quality, safety and reliability of millions of Class Vehicles and/or their rear subframes, suspension systems, and braking systems, concealed the Rear Subframe Defect in millions of them, deceived Plaintiffs and Class Members as to the defect and remedies, and concealed material facts that only MBUSA and MBG knew, all to avoid the expense and public relations problems of correcting the material safety defect in millions of Class Vehicles.

566.   Because Mercedes' willful and knowing conduct caused injury to the Plaintiffs and Class Members, Plaintiffs and Class Members seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, reasonable attorneys' fees and costs, an order enjoining Mercedes' deceptive conduct, declaratory relief, and any other just and proper relief available under NYGBL § 349.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

2751274.4

## NINETEENTH CAUSE OF ACTION
### Violation of the New York General Business Law
### N.Y. Gen. Bus. Law § 350

567.   Mercedes was and is engaged in the "conduct of business, trade or commerce" within the meaning of New York General Business Law § 350 ("NYGBL § 350").

568.   NYGBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 350.  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a(1).

569.   Mercedes caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Mercedes to be untrue and misleading to consumers and Class Members.

570.   Mercedes has violated NYGBL § 350 because the misrepresentations and omissions regarding the Rear Subframe Defect, and Mercedes' failure to disclose and active concealing of the problems, dangers, and risks posed by the

- 188 -

Class Vehicles, as set forth above, were material and likely to deceive a reasonable consumer.

571.   Class Members have suffered an injury, including the loss of money or property, as a result of Mercedes' false advertising.  In purchasing or leasing Class Vehicles with the defective rear subframes installed in them, Plaintiffs and Class Members relied on the misrepresentations and/or omissions of Mercedes with respect to the quality, safety and reliability of the Class Vehicles.  Mercedes' representations were false and/or misleading because the concealed the Rear Subframe Defect and quality issues seriously undermine the value of the Class Vehicles.  Had Plaintiffs and Class Members known this, they would not have purchased their vehicles and/or they would have paid less for them.

572.   Pursuant to NYGBL § 350, Class Members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each Class Member.  N.Y. Gen. Bus. Law § 350-e(3).  Because Mercedes' conduct was committed willfully and knowingly, Class Members are entitled to recover three times actual damages, up to $10,000, for each Class Member.

573.   Plaintiffs and Class Members also seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees and

costs, and any other just and proper relief available under NYGBL § 350.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

## XI.    <u>RELIEF REQUESTED</u>

574.   Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Mercedes, as follows:

a.      an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

b.      a declaration that the rear subframes in Class Vehicles have a Defect that causes severe, premature corrosion and that poses a serious safety risk to consumers, and that this defect requires disclosure;

c.      a declaration that Mercedes must, at its own expense, notify owners of Class Vehicles of the Rear Subframe Defect;

d.      a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Rear Subframe Defect is void;

e.      an order enjoining Mercedes to reassess all prior claims, both in and out of warranty, related to rear subframe rust and corrosion and to reimburse Class Members for money spend out of pocket for replacement of their defective

rear subframes and associated costs, regardless of whether those costs fall within the limitations of the Extended Warranty;

       f.    an order enjoining Mercedes, upon a Class Member's request, to pay the cost of regular inspections to determine whether the Rear Subframe Defect is present, whether rust has compromised the safety of any other components in the rear underbody of the vehicle, with any coverage disputes adjudicated by a special master;

       g.    an order enjoining Mercedes from further deceptive distribution and sales practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the Rear Subframe Defect;

       h.    an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial against both MBUSA and MBG, and punitive damages as to MBUSA only;

       i.    an order requiring Mercedes to disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten revenue it received from the sale of the Class Vehicles, or make full restitution thereof to Plaintiffs and Class Members;

       j.    an award of attorneys' fees and costs, as allowed by law;

2751274.4

k.      an award of pre-judgment and post-judgment interest, as provided by law;

l.      leave to amend this Amended Complaint to conform to the evidence obtained in discovery or produced at trial; and

m.      such other relief as may be appropriate under the circumstances.

## XII.  <u>DEMAND FOR JURY TRIAL</u>

575.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

Dated: February 24, 2023

_____

Ketan A. Patel (State Bar Number 121099)
kp@corpus-law.com
CORPUS LAW PATEL, LLC
P.O. Box 724713 Atlanta, Georgia 31139
Telephone: (678) 597-8020

Jonathan D. Selbin (*pro hac vice* pending)
jselbin@lchb.com
Andrew Kaufman (*pro hac vice* approved)
akaufman@lchb.com
Muriel Kenfield-Kelleher (*pro hac vice* approved)
mkenfieldkelleher@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Plaintiffs and the Proposed Class*

- 193 -