**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Alexander Sowa, Tenika Neil, Stephen V. Caggiano, Catherine Harris, Meri New, Latoya Clay, Christian Kodom, Lisa Turner, Mike Xie, Christine Cooper, Pasquale Russolillo, Edward Michael Jacobs, Thomas Koby, Jack Powell, Monique Edwards, Yauwen Lin, Stanley King, Samuel Ortiz, Jack Simpson, Brian Laakso, Edward Bourne, Courtney Bourne, Giuseppe Garofalo, Anthony Russell, Raymond Robinson, Park C. Thomas, Curtis Willis, Alma Brown, ~~and~~ Owen Licht and Christos (Chris) Hines, individually and on behalf of those similarly situated,

Plaintiffs,

v.

Mercedes-Benz Group AG; Mercedes-Benz USA, LLC,

Defendants.

Case No. 1:23-cv-00636-SEG

**~~FIRST~~[PROPOSED] -SECOND AMENDED CONSOLIDATED COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. PARTIES .......... 7~~7~~

A. Plaintiffs .......... 7~~7~~

1. California Plaintiff .......... 7~~7~~
2. Connecticut Plaintiff .......... 10~~10~~
3. Florida Plaintiff .......... 13~~13~~
4. Georgia Plaintiffs .......... 16~~15~~
5. Illinois Plaintiff .......... 22~~19~~
6. Indiana Plaintiff .......... 25~~22~~
7. Kentucky Plaintiff .......... 27~~25~~
8. Maryland Plaintiff .......... 30~~28~~
9. Massachusetts Plaintiffs .......... 34~~32~~
10. Michigan Plaintiff .......... 40~~37~~
11. Missouri Plaintiffs .......... 44~~41~~
12. New Jersey Plaintiffs .......... 49~~46~~
13. New York Plaintiff .......... 56~~53~~
14. Ohio Plaintiffs .......... 60~~57~~
15. Pennsylvania Plaintiffs .......... 68~~65~~
16. Rhode Island Plaintiffs .......... 74~~71~~
17. Tennessee Plaintiff .......... 82~~78~~
18. Texas Plaintiffs .......... 85~~81~~
19. Virginia Plaintiff .......... 90~~86~~

B. Defendants .......... 93~~89~~

1. Defendant Mercedes-Benz Group AG .......... 93~~89~~
2. Defendant Mercedes-Benz USA, LLC .......... 95~~91~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

III. JURISDICTION .......... 95~~92~~

A. Subject Matter Jurisdiction .......... 95~~92~~

B. Personal Jurisdiction: MBG .......... 96~~92~~

C. Personal Jurisdiction: MBUSA .......... 97~~94~~

IV. VENUE .......... 98~~94~~

V. APPLICABLE LAW .......... 98~~95~~

VI. FACTUAL ALLEGATIONS .......... 99~~96~~

A. Technical Details .......... 99~~96~~

1. Mechanical Purpose of a Vehicle Subframe .......... 99~~96~~

2. Rust Formation and Corrosion .......... 103~~100~~

3. Mechanical Consequences of Subframe Corrosion .......... 104~~101~~

B. Mercedes' Knowledge of the Subframe Defect .......... 110~~106~~

1. Mercedes' Knowledge of the Rear Subframe Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data .......... 111~~108~~

2. Mercedes Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations .......... 113~~110~~

3. Mercedes Knew of the Rear Subframe Defect as Evidenced by its Own Technical Services Bulletins .......... 118~~115~~

4. Mercedes Knew of the Rear Subframe Defect Based on its Receipt of a Large Number of Orders for Replacement Subframes .......... 120~~117~~

5. Mercedes Was Made Directly Aware of the Rear Subframe Defect Based on a Large Number of Class Member Complaints to Mercedes .......... 122~~119~~

6. Mercedes Knew of the Rear Subframe Defect Based on Class Member Complaints on Public Online Forums .......... 125~~122~~

**TABLE OF CONTENTS**
**(continued)**

**Page**


7. Mercedes Has Publicly Acknowledged Premature Rear Subframe Corrosion in its European Markets and Has Committed to Remedying the Defect in Those Markets. .128~~125~~

C. Mercedes' Inadequate Warranty Extension ....129~~126~~

D. Mercedes' Marketing and Concealment ....135~~132~~

E. Fraudulent Concealment Allegations ....140~~137~~

VII. TOLLING OF THE STATUTE OF LIMITATIONS ....144~~141~~

A. Fraudulent Concealment Tolling....144~~141~~

B. Estoppel ....145~~142~~

C. Discovery Rule ....146~~142~~

VIII. CLASS ALLEGATIONS ....147~~144~~

A. Rule 23(b)(1) and (b)(2) Are Satisfied....150~~147~~

B. Numerosity ....151~~148~~

C. Typicality....152~~149~~

D. Adequate Representation....153~~149~~

E. Predominance of Common Issues ....153~~150~~

F. Superiority ....156~~153~~

IX. CLAIMS FOR RELIEF....158~~154~~

A. Claim Brought on Behalf of the Nationwide Class....158~~154~~

**FIRST CAUSE OF ACTION** FRAUDULENT OMISSION ....158~~154~~

B. Claims Brought on Behalf of the California Subclass ....164~~161~~

**SECOND CAUSE OF ACTION** VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT Cal. Civ. Code §§ 1750 *et seq.* ....164~~161~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

**THIRD CAUSE OF ACTION** VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Cal. Civ. Code §§ 1790 *et seq.* .......... 170~~167~~

**FOURTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 173~~170~~

**FIFTH CAUSE OF ACTION** VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW Cal. Bus. & Prof. Code §§ 17200 *et seq.* .......... 179~~176~~

C. Claims Brought on Behalf of the Connecticut Subclass .......... 181~~178~~

**SIXTH CAUSE OF ACTION** VIOLATION OF THE CONNECTICUT UNLAWFUL TRADE PRACTICES ACT Conn. Gen. Stat. Ann. §§ 42-110a *et seq.* .......... 181~~178~~

**SEVENTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Conn. Gen. Stat. § 42A-2-314 .......... 187~~184~~

**EIGHTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 191~~188~~

D. Claims Brought on Behalf of the Florida Subclass .......... 197~~194~~

**NINTH CAUSE OF ACTION** VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT Fla. Stat. §§ 501.201 *et seq.* .......... 197~~194~~

**TENTH CAUSE OF ACTION** BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY Fla. Stat. § 672.314 203~~200~~

**ELEVENTH CAUSE OF ACTION** FRAUDULENT OMISSION... 206~~203~~

E. Claims Brought on Behalf of the Georgia Class .......... 212~~209~~

**TWELFTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY O.C.G.A. § 84-2-314 (against MBUSA only) .......... 212~~209~~

**THIRTEENTH CAUSE OF ACTION** VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT O.C.G.A. §§ 10-1-390 *et seq.* .......... 215~~212~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

**FOURTEENTH CAUSE OF ACTION** VIOLATIONS OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT O.C.G.A. §§ 10-1-370, *et seq.* .......... 221~~218~~

F. Claims Brought on Behalf of the Illinois Subclass .......... 227~~223~~

**FIFTEENTH CAUSE OF ACTION** VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT 815 Ill. Comp. Stat. 505/1 *et seq.* .......... 227~~223~~

**SIXTEENTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 234~~230~~

G. Claims Brought on Behalf of the Indiana Subclass .......... 240~~236~~

**SEVENTEENTH CAUSE OF ACTION** .......... 240~~236~~

VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT ("IDCSA") (Ind. Code § 24-5-0.5-1, *et seq.*) .......... 240~~236~~

**EIGHTEENTH CAUSE OF ACTION** .......... 246~~242~~

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ind. Code § 26-1-2-314) .......... 246~~242~~

**NINETEENTH CAUSE OF ACTION** .......... 248~~244~~

FRAUDULENT OMISSION .......... 248~~244~~

H. Claims Brought on Behalf of the Kentucky Subclass .......... 254~~250~~

**TWENTIETH CAUSE OF ACTION** FRAUDULENT OMISSION 254~~250~~

I. Claims Brought on Behalf of the Maryland Subclass .......... 260~~256~~

**TWENTY-FIRST CAUSE OF ACTION** VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT Md. Code Ann., Commercial Law §§ 13-101 *et seq.* .......... 260~~256~~

**TWENTY-SECOND CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Md. Code Ann., Commercial Law § 2-314 .......... 266~~262~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

**TWENTY-THIRD CAUSE OF ACTION** FRAUDULENT OMISSION ........................................................................269~~265~~

J. Claims Brought on Behalf of the Massachusetts Subclass .........276~~271~~

**TWENTY-FOURTH CAUSE OF ACTION** VIOLATION OF THE DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW Mass. Gen. L. ch. 93a, §§ 1 *et seq*. 276~~271~~

**TWENTY-FIFTH CAUSE OF ACTION** BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY Mass. Gen. L. ch. 106, § 2-314..........................................................283~~278~~

**TWENTY-SIXTH CAUSE OF ACTION** FRAUDULENT OMISSION ........................................................................286~~281~~

K. Claims Brought on Behalf of the Michigan Subclass ................292~~287~~

**TWENTY-SEVENTH CAUSE OF ACTION** VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT M.C.L. § 445.901 *et seq*. ................................................................292~~287~~

**TWENTY-EIGHTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY M.C.L. § 440.2314 ..........................................................................299~~294~~

**TWENTY-NINTH CAUSE OF ACTION** FRAUDULENT OMISSION ........................................................................302~~297~~

L. Claims Brought on Behalf of the Missouri Subclass .................308~~303~~

**THIRTIETH CAUSE OF ACTION** VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT Mo. Rev. Stat. §§ 407.010 *et seq*. ..........................................................308~~303~~

**THIRTY-FIRST CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Mo. Rev. Stat. § 400.2-314..........................................................................314~~309~~

**THIRTY-SECOND CAUSE OF ACTION** FRAUDULENT OMISSION ........................................................................318~~313~~

M. Claims Brought on Behalf of the New Jersey Subclass.............324~~319~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

**THIRTY-THIRD CAUSE OF ACTION** VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT N.J. Stat. Ann. §§ 56:8-1 *et seq.* .......... 324~~319~~

**THIRTY-FOURTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY N.J. Stat. Ann. § 12A:2-314 .......... 329~~324~~

**THIRTY-FIFTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 334~~328~~

N. Claims Brought on Behalf of the New York Subclass .......... 340~~334~~

**THIRTY-SIXTH CAUSE OF ACTION** VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW, DECEPTIVE ACTS AND PRACTICES N.Y. Gen. Bus. Law § 349 .......... 340~~334~~

**THIRTY-SEVENTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY N.Y. U.C.C. § 2-314 .......... 345~~340~~

**THIRTY-EIGHTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 349~~343~~

O. Claims Brought on Behalf of the Ohio Subclass .......... 355~~349~~

**THIRTY-NINTH CAUSE OF ACTION** VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT Ohio Rev. Code Ann. §§ 1345.01 *et seq.* .......... 355~~349~~

**FORTIETH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY IN TORT .......... 361~~355~~

**FORTY-FIRST CAUSE OF ACTION** FRAUDULENT OMISSION .......... 362~~356~~

P. Claims Brought on Behalf of the Pennsylvania Subclass .......... 368~~362~~

**FORTY-SECOND CAUSE OF ACTION** VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 Pa. Cons. Stat. §§ 201-1 *et seq.* .......... 368~~362~~

**TABLE OF CONTENTS**
**(continued)**


**Page**

**FORTY-THIRD CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY 13 Pa. Cons. Stat. § 2314 .......... 374~~368~~

**FORTY-FOURTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 378~~372~~

Q. Claims Brought on Behalf of the Rhode Island Subclass .......... 384~~378~~

**FORTY-FIFTH CAUSE OF ACTION** VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT R.I. Gen. L. §§ 6-13.1-1 *et seq.* .......... 384~~378~~

**FORTY-SIXTH CAUSE OF ACTION** BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY R.I. Gen. L. § 6A-2-314 .......... 391~~384~~

**FORTY-SEVENTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 394~~387~~

R. Claims Brought on Behalf of the Tennessee Subclass .......... 400~~393~~

**FORTY-EIGHTH CAUSE OF ACTION** VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT Tenn. Code Ann. §§ 47-18-101 *et seq.* .......... 400~~393~~

**FORTY-NINTH CAUSE OF ACTION** FRAUDULENT OMISSION .......... 406~~398~~

S. Claims Brought on Behalf of the Texas Subclass .......... 412~~405~~

**FIFTIETH CAUSE OF ACTION** VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT Tex. Bus. & Com. Code §§ 17.41 *et seq.* .......... 412~~405~~

**FIFTY-FIRST CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Tex. Bus. & Com. Code Ann. § 2.314 .......... 417~~410~~

**FIFTY-SECOND CAUSE OF ACTION** FRAUDULENT OMISSION .......... 421~~414~~

**TABLE OF CONTENTS**
**(continued)**

**Page**

T. Claims Brought on Behalf of the Virginia Subclass .................. 427 ~~420~~

**FIFTY-THIRD CAUSE OF ACTION** VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT Va. Code Ann. §§ 59.1-196 *et seq.* .................. 427 ~~420~~

**FIFTY-FOURTH CAUSE OF ACTION** BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY Va. Code Ann. § 8.2-314 .................. 431 ~~424~~

**FIFTY-FIFTH CAUSE OF ACTION** FRAUDULENT OMISSION .................. 434 ~~427~~

X. RELIEF REQUESTED .................. 440 ~~433~~

XI. DEMAND FOR JURY TRIAL .................. 443 ~~436~~

## I. INTRODUCTION

1. Plaintiffs Alexander Sowa, Tenika Neil, Stephen V. Caggiano, Catherine Harris, Latoya Clay, Meri New, Christian Kodom, Lisa Turner, Mike Xie, Pasquale Russolillo, Christine Cooper, Edward Michael Jacobs, Thomas Koby, Jack Powell, Monique Edwards, Yauwen Lin, Stanley King, Samuel Ortiz, Jack Simpson, Brian Laakso, Edward Bourne, Courtney Bourne, Giuseppe Garofalo, Anthony Russell, Raymond Robinson, Park C. Thomas, Curtis Willis, Alma Brown, ~~and~~ Owen Licht, and Christos Hines (collectively, "Plaintiffs") bring this action individually and on behalf of all persons who purchased certain vehicles equipped with uniform and uniformly defective rear subframes designed, manufactured, distributed, warranted, marketed, and sold by Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG ("MBG") (collectively, "Mercedes").

2. The vehicles at issue include at least 2010-2022 Mercedes-Benz C-Class, 2010-2022 Mercedes-Benz E-Class, 2010-2015 Mercedes-Benz GLK-Class, 2010-2022 Mercedes-Benz CLS-Class, 2010-2020 Mercedes-Benz SLK/SLC-Class, 2016-2022 Mercedes-Benz GLC-Class, and 2010-2022 Mercedes-Benz SL-Class (together, the "Class Vehicles").

3. The Class Vehicles are all equipped with rear subframes that have a dangerous safety defect ("Rear Subframe Defect") that causes the rear subframes, attached components, and nearby parts to prematurely rust or corrode. On information and belief, that Defect results from a) a design that allows water and salt to collect on the interior of the subframe, leading to premature corrosion from the inside out, and/or b) an inadequate type or amount of rust coating to withstand ordinary and expected use.

4. On information and belief, the subframes in all Class Vehicles are substantially the same from an engineering standpoint, and all contain the Rear Subframe Defect.

5. The Rear Subframe Defect (a) adversely affects the drivability of the Class Vehicles; (b) causes corrosion of other components on the underside of the Class Vehicles, including the brake lines, suspension springs, exhaust system, gas lines, and rear axle; and (c) can and has caused the rear subframes to fail while the Class Vehicles are in motion, resulting in a sudden, unexpected loss of control for the driver and potential damage to nearby components.

6. The rear subframes in the Class Vehicles can and do prematurely experience severe corrosion, especially near the attachment points for the suspension components, including the control arms. "Control arms" is a general

term that refers to the components linking the rear subframe to other parts of the suspension and steering system, including the rear wheels. The control arms, along with the subframe, are the main stabilizing force of a vehicle's suspension. They are critical to vehicle handling and drivability.

7. Corrosion on the rear subframe makes the component and its attached suspension parts structurally unstable and prone to failure. When the rear subframe of a Class Vehicle fails, the rear suspension of the vehicles becomes destabilized. A corroded rear subframe is particularly likely to crack when the driver hits a pothole or when road conditions force the driver to brake suddenly.

8. When a rear subframe fails when a Class Vehicle is in motion, it can cause and has caused: (a) the rear of the vehicle to fishtail, especially while braking; (b) the vehicle to suddenly veer to one side, potentially into a parallel or oncoming lane of traffic; and/or (c) complete or partial loss of control for the driver. Additionally, when the rear subframe fails at its connection to one of the control arms, the control arm can break loose and cause serious, hazardous damage to nearby components, including the gas tank, torsion bar (also called the "stabilizer bar"), and wheels.

9. Class Vehicle owners have also experienced corrosion of the rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle, all

of which are located near the rear subframe in the back of the vehicle. This corrosion has caused serious mechanical issues in Class Vehicles such as, for example, leaking in the rear brake lines, which compromises the efficacy of a Class Vehicle's brakes.

10. The Rear Subframe Defect poses a material safety risk, and, therefore, renders the Class Vehicles unfit for their ordinary and intended purpose. Because of this risk, Mercedes-authorized dealers and independent mechanics often advise Class Vehicle owners with rear subframe corrosion not to drive their Class Vehicles, particularly at high speeds. Class Vehicle owners are therefore left with vehicles that are too dangerous to drive, especially at typical highway speeds.

11. Upon information and belief, subframe corrosion in the Class Vehicles happens "from the inside out," meaning that it is very difficult for even a professional mechanic, much less a layperson, to diagnose the issue during a routine inspection until the subframe is severely corroded and near the point of failure. Underbody shields also block portions of the subframe from view and therefore create another barrier to corrosion detection.

12. Mercedes is aware, and has been aware, or should have been aware since at least 2009, of the Rear Subframe Defect, based on the standard pre-sale design and testing information collected by reasonably prudent vehicle

manufacturers. Mercedes has certainly been aware of the possibility of premature corrosion in the Class Vehicles generally since at least 1999, when it began offering a 30-year anti-corrosion warranty on its vehicles in many European countries.

13. Moreover, Mercedes has been aware of the Rear Subframe Defect for at least five years based on consumer complaints alone. For instance, there have been dozens of complaints to the National Highway Traffic Safety Administration ("NHTSA") about rear subframe corrosion on Class Vehicles. The earliest publicly available complaint was made on January 23, 2018.

14. In the past, when customers who experienced the Rear Subframe Defect contacted Mercedes, it disavowed any knowledge of the problem and refused to fully reimburse owners for the repairs and subframe replacement, which typically cost anywhere from $2,000 to upwards of $7,000, depending on the extent of the corrosion and whether the repair was made with a new or used part.

15. Despite its knowledge of the Rear Subframe Defect since at least 2009, Mercedes has not admitted to the Rear Subframe Defect. Mercedes did not provide any notice to Class Vehicle owners regarding the possibility of rear subframe corrosion until February 10, 2023, two months after the delivery of Plaintiffs' first notice of intent to sue pursuant to the Georgia Fair Business

Practices Act, O.C.G.A. § 10-1-390. Mercedes' notice of the defect, in the form of a warranty extension covering certain Class Vehicles (the "Limited Subframe Warranty"), is not adequate to warn Class Members about the serious safety risks posed by the Rear Subframe Defect, including the partial loss of control while driving, and does not give them notice of the need to have their vehicles regularly inspected, or provide funding to do so.

16. In addition, the Limited Subframe Warranty is insufficient to remedy Plaintiffs' and Class Members' economic damages, including for overpayment at the point of sale, repair and/or replacement of adjacent vehicle parts damaged by the Rear Subframe Defect, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Rear Subframe Defect (*i.e.*, towing costs, rental car fees, etc.).

17. Plaintiffs and the other Class Members have suffered actual damages, in that they: (a) were deprived of the benefit of their bargain at point-of-sale by paying for one thing—vehicles without a Rear Subframe Defect—and receiving another; (b) incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Rear Subframe Defect; and/or (c) were or will be forced to stop or limit using their vehicles prematurely or sell them at steep

discounts. Mercedes' Limited Subframe Warranty does not adequately reimburse Plaintiffs and the other Class Members for their economic damages.

18. On behalf of themselves and all others similarly situated, Plaintiffs seek: (a) actual damages; (b) statutory damages; (c) exemplary and/or punitive damages; (d) a declaration that the rear subframes in Class Vehicles have a defect that causes severe, premature corrosion and that poses a serious safety risk to consumers; (e) a declaration that Mercedes must, at its own expense, notify owners of Class Vehicles of the Rear Subframe Defect; (f) a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Rear Subframe Defect is void; (g) injunctive relief requiring Mercedes to issue notice of the Rear Subframe Defect to consumers and provide free, regular inspections to screen for rear subframe corrosion in the Class Vehicles; (h) pre-and post-judgment interest; and (i) attorneys' fees and costs.

## II. PARTIES

### A. Plaintiffs

#### 1. California Plaintiff

##### a. Plaintiff Tenika Neil

19. Plaintiff Tenika Neil resides in Vacaville, California.

20. Ms. Neil owns a 2012 Mercedes-Benz GLK 350, which she purchased certified preowned on February 17, 2014 at Mercedes-Benz of Fairfield in Fairfield, California.

21. Ms. Neil's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN WDCGG5GBXCF779692.

22. Ms. Neil purchased the Class Vehicle for her personal, family, and household use.

23. Ms. Neil expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the subframe of the Class Vehicle would be at risk of premature corrosion, which could make the vehicle dangerous to operate. Nor was she aware that Mercedes would not provide regular, free inspections to ensure that her vehicle remained drivable and free of corrosion that could impact the functioning of her vehicle's suspension. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

24. Ms. Neil regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2012 Mercedes-Benz GLK 350

in 2014. Although she does not recall the specifics of the many Mercedes-Benz advertisements she saw before she purchased her Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Neil that the Class Vehicles had defective subframes that could render her vehicle unsafe, and that she would have to pay out of pocket for inspections to ensure that her vehicle is road-worthy, she would not have purchased her Class Vehicle, or would have paid less for it.

25. Ms. Neil, through counsel, sent Mercedes a notice letter (Ex. 6) on April 28, 2023, stating her intent to bring claims under various California consumer protection statutes, including a claim for damages under the Consumer Legal Remedies Act ("CLRA").

26. Additionally, the notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Neil's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In

response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5.

**2. Connecticut Plaintiff**

**a. Plaintiff Stephen V. Caggiano**

27. Plaintiff Stephen V. Caggiano resides in Milford, Connecticut.

28. Mr. Caggiano and his wife co-own a 2012 Mercedes-Benz C 300, which they purchased certified preowned in 2014 from Mercedes-Benz of Fairfield, a Mercedes dealership located in Fairfield, Connecticut.

29. Mr. Caggiano's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB6CR191083.

30. Mr. Caggiano purchased the Class Vehicle for his personal, family, and household use.

31. Mr. Caggiano expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to his purchase of the Class Vehicle of the immense expense he would incur should he choose to

replace the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

32. Since purchasing the Class Vehicle, Mr. Caggiano has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes at his local dealership, Mercedes-Benz of Fairfield.

33. Mr. Caggiano has stored the vehicle primarily in an indoor garage when not in use.

34. Mr. Caggiano first became aware of the Rear Subframe Defect when he brought the Class Vehicle into Mercedes-Benz of Fairfield for routine yearly maintenance on August 31, 2022. After an inspection, Mr. Caggiano was informed by the dealership that his subframe was significantly corroded and would need to be replaced "soon." The dealership quoted him $4,170.04 to repair the subframe. At the time the mechanic diagnosed the corrosion, the Class Vehicle had 97,547 miles.

35. As a result of the subframe defect, Mr. Caggiano has been left with a vehicle that is not fit for its ordinary and intended purpose. Because the extensive subframe corrosion makes the vehicle hazardous to drive, particularly on the highway, Mr. Caggiano uses his Class Vehicle only when he is without another means of transportation and only for brief trips on low-speed roads.

36. Mr. Caggiano reached out to MBUSA and MBG about his defective subframe and initially received no response, despite attempting to contact both corporate entities through multiple channels. After several attempts at contact by Mr. Caggiano, MBUSA responded to Mr. Caggiano and offered to pay half of the quoted repair cost. Mr. Caggiano rejected that offer.

37. Mr. Caggiano regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2014. Although he does not recall the specifics of the many Mercedes advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Caggiano that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to pay upwards of $4,000 to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

38. On December 9, 2022, Mr. Caggiano, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for

Mr. Caggiano and others similarly situated. Exh. 1. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**3. Florida Plaintiff**

**a. Plaintiff Catherine Harris**

39. Plaintiff Catherine Harris resides in Panama City Beach, Florida.

40. Ms. Harris owns a 2014 Mercedes-Benz SLK 350, which she purchased certified pre-owned from Mercedes-Benz of Orange Park in Jacksonville, Florida in 2017.

41. Ms. Harris's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the Vehicle Identification No. WDDPK5HA8EF092374.

42. Ms. Harris purchased the Class Vehicle for her personal, family, and household use.

43. Ms. Harris expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the subframe and other rear suspension components of the Class Vehicle might prematurely

corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the immense expense she would incur in replacing the defective rear suspension components. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

44. Ms. Harris first became aware of the subframe defect in or around September of 2023 when her vehicle's control arms broke while a friend was driving the vehicle, making it suddenly difficult to operate. Due to the drivability issues, the driver pulled over on the side of the road and Ms. Harris had the vehicle towed to Mercedes-Benz of Fort Walton Beach in Fort Walton Beach, Florida.

45. At the time of failure, Ms. Harris's vehicle had approximately 80,000 miles.

46. Mercedes-Benz of Fort Walton Beach inspected the vehicle and told Ms. Harris that her rear suspension had failed due to corrosion. The dealership informed Ms. Harris that her model was not covered under the Limited Subframe Warranty and quoted her $8,194.00 for the repair.

47. Given the high price of repair quoted by the authorized Mercedes dealership, Ms. Harris took the vehicle to an independent mechanic, Beach Auto Care, which repaired Ms. Harris's suspension, including the control arms and rear springs, for approximately $3,530.

48. Ms. Harris regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, and on the internet during the years before she purchased her Mercedes-Benz SLK 350. Although she does not recall the specifics of the many Mercedes advertisements she saw before she purchased her Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Harris that the Class Vehicles had defective subframes and nearby components that would render the vehicles unsafe and that she would be required to spend approximately $3,500 to return her vehicle to a safe condition, she would not have purchased her Class Vehicle, or would have paid less for it.

49. The notice letter sent to Mercedes by Plaintiffs on May 3, 2024, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq*., and other similar consumer protection statutes in other states, requesting relief and repair of the defects exhibited in Class Vehicles (Exh. 7) is sufficient to constitute notice of Ms. Harris's claims, as they are substantively identical to those of the Plaintiffs named in the letters.

### 4. <u>Georgia Plaintiffs</u>

#### a. <u>Plaintiff Meri New</u>

50. Plaintiff Meri New resides in Savannah, Georgia.

51. Ms. New owns a 2018 Mercedes-Benz C 300, which she purchased in February of 2022 at a CarMax in Savannah, Georgia.

52. Ms. New's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN WDDWJ4KB1JF744921.

53. Ms. New purchased the Class Vehicle for her personal, family, and household use.

54. Ms. New expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the subframe of the Class Vehicle would be at risk of premature corrosion, which could make the vehicle dangerous to operate. Nor was she aware that Mercedes would not provide regular, free inspections to ensure that her vehicle remained safe and free of corrosion that could impact the functioning of her vehicle's suspension. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

55. Ms. New regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2018 Mercedes-Benz C 300 in February of 2022. Although she does not recall the specifics of the many Mercedes-Benz advertisements she saw before she purchased his Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes-Benz materials disclosed to Ms. New that the Class Vehicles had defective subframes that could render her vehicle unsafe, and that she would have to pay out of pocket for inspections to ensure that her vehicle was road-worthy, she would not have purchased her Class Vehicle, or would have paid less for it.

56. On May 3, 2024, Ms. New, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for herself and others similarly situated. Exh. 7. Mercedes did not respond to this notice.

**b. Plaintiff Latoya Clay**

57. Plaintiff Latoya Clay resides in Powder Springs, Georgia.

58. Ms. Clay owns a 2015 Mercedes-Benz C 300, which she purchased in March of 2022 at Grand Motorcars Kennesaw in Kennesaw, Georgia.

59. Ms. Clay's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN 55SWF4KB5FU018386.

60. Ms. Clay purchased the Class Vehicle for her personal, family, and household use.

61. Ms. Clay expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the subframe and adjacent parts of the Class Vehicle would be at risk of premature corrosion, which could make the vehicle dangerous to operate. Nor was she aware that Mercedes would not provide regular, free inspections to ensure that her vehicle remained safe and free of corrosion that could impact the functioning of her vehicle's suspension. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

62. Ms. Clay regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2015 Mercedes-Benz C 300 in 2022. Although she does not recall the specifics of the many Mercedes-Benz

advertisements she saw before she purchased his Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes-Benz materials disclosed to Ms. Clay that the Class Vehicles had defective subframes that could render her vehicle unsafe, and that she would have to pay out of pocket for inspections to ensure that her vehicle was road-worthy, she would not have purchased her Class Vehicle, or would have paid less for it.

63. On May 3, 2024, Ms. Clay, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for herself and others similarly situated. Exh. 7. Mercedes did not respond to this notice.

**c. Plaintiff Christos Hines**

64. Plaintiff Christos Hines resides in Athens, Georgia.

65. Mr. Hines owns a 2012 Mercedes-Benz E 350, which he purchased in August of 2015 at the authorized Mercedes dealership, Mercedes-Benz of Athens in Athens, Georgia. Mr. Hines purchased his Class Vehicle while under the remaining new vehicle warranty.

66. Mr. Hines's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN WDDHF8JB7CA641635.

67. Mr. Hines purchased the Class Vehicle for his personal, family, and household use.

68. Mr. Hines expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe and adjacent parts of the Class Vehicle would be at risk of premature corrosion, which could make the vehicle dangerous to operate. Nor was he aware that Mercedes would not provide regular, free inspections to ensure that his vehicle remained safe and free of corrosion that could impact the functioning of his vehicle's suspension. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

69. Mr. Hines regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2012 Mercedes-Benz E 350 in 2015. Although he does not recall the specifics of the many Mercedes-Benz advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and

reliability influenced his decision to purchase her vehicle. Had those advertisements or any other Mercedes-Benz materials disclosed to Mr. Hines that the Class Vehicles had defective subframes that could render his vehicle unsafe, and that he would have to pay out of pocket for inspections to ensure that his vehicle was road-worthy, he would not have purchased her Class Vehicle, or would have paid less for it.

70. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Hines's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exh. 6 & 7.

### 5. Illinois Plaintiff

#### a. Plaintiff Christian Kodom

~~63.~~71. Plaintiff Christian Kodom resides in Chicago, Illinois.

~~64.~~72. Mr. Kodom owns a 2014 Mercedes-Benz E 350, which he purchased certified pre-owned from Mercedes-Benz of Westmont in Westmont, Illinois in August of 2021.

~~65.~~73. Mr. Kodom's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB8EB006744.

~~66.~~74. Mr. Kodom purchased the Class Vehicle primarily for his personal, family, and household use.

~~67.~~75. Mr. Kodom first became aware of the subframe defect in September of 2022, when he began to notice the vehicle leaning to the left and shaking heavily when he drove over 60 mph. He took the vehicle to a Mercedes-certified mechanic, who inspected the vehicle and informed Mr. Kodom that the subframe was severely corroded and would need to be replaced. They informed him that it would take at least two weeks to acquire a new Mercedes part and then several more weeks for the installation.

~~68.~~76. Mr. Kodom opted not to have his subframe replaced, given the high cost quoted by the Mercedes-certified mechanic. As a result of the Rear Subframe Defect, Mr. Kodom has been left with a vehicle that is not safe to drive and cannot be used for its ordinary and intended purpose.

~~69.~~77. Mr. Kodom paid $500 to have his vehicle inspected.

~~70.~~78. At the time the Rear Subframe Defect was diagnosed in Mr. Kodom's vehicle, it had approximately 115,000 miles.

~~71.~~79. Mr. Kodom expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~72.~~80. Mr. Kodom regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2014 Mercedes-Benz E 350. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and

reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Kodom that the Class Vehicles had defective rear subframes that would render his vehicle unsafe and that he would be faced with spending a large amount to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~73.~~81. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Kodom's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exh. 6 & 7.

**6. <u>Indiana Plaintiff</u>**

**a. <u>Plaintiff Jack Powell</u>**

~~74.~~<u>82.</u> Plaintiff Jack Powell resides in Carmel, Indiana.

~~75.~~<u>83.</u> Mr. Powell owns a 2010 Mercedes-Benz E 350, which he purchased in 2009 from Mercedes-Benz of Indianapolis in Indianapolis, Indiana

~~76.~~<u>84.</u> Mr. Powell's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8HBXAA112943.

~~77.~~<u>85.</u> Mr. Powell purchased the Class Vehicle for his personal, family, and household use.

~~78.~~<u>86.</u> Since purchasing the Class Vehicle, Mr. Powell has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic. Mr. Powell has stored the vehicle primarily in an indoor garage when not in use.

~~79.~~<u>87.</u> Mr. Powell expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe and the rear brake lines of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would

incur should he choose to replace the corroded brake lines. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~80.~~88. Mr. Powell first discovered his subframe was dangerously corroded in October of 2022, when he started hearing noises from the rear of the vehicle and had the vehicle inspected by Euro Motorworks in Indianapolis, Indiana. The mechanic informed Mr. Powell that his subframe was highly corroded and the vehicle was no longer safe to drive. At the time the subframe corrosion was diagnosed, the Class Vehicle had approximately 155,000 miles.

~~81.~~89. Following the diagnosis of the subframe corrosion, Mr. Powell took his vehicle to Mercedes-Benz of Indianapolis, which replaced his subframe for a cost of $4,095. The cost for the subframe replacement was ultimately reimbursed by Mercedes under the extended warranty almost two years later.

~~82.~~90. In August of 2024, an inspection revealed that Mr. Powell's brake lines were dangerously corroded and leaking fluid. The brake lines were replaced at Mercedes-Benz of Indianapolis for a cost of over $4,500. This cost was not reimbursed by Mercedes.

~~83.~~91. Mr. Powell regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz E 350. Although

he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Powell that the Class Vehicles had defective subframes and brake lines that would render the vehicle unsafe, or that he would be faced with spending upwards of $8,500 to repair the vehicle, he would not have purchased his Class Vehicle, or would have paid less for it.

~~84.~~92. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 22, 2022, April 28, 2023, and May 3, 2024, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.*, and various other state consumer protection statutes, requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Powell's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**7. Kentucky Plaintiff**

**a. Plaintiff Lisa Turner**

~~85.~~93. Plaintiff Lisa Turner resides in Lexington, Kentucky.

~~86.~~94. Ms. Turner owns a 2012 Mercedes-Benz C 300, which she purchased used from Montgomery Chrysler Dodge Jeep Ram in Nicholasville, Kentucky in December of 2021.

~~87.~~95. Ms. Turner's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB8CR239893.

~~88.~~96. Ms. Turner purchased the Class Vehicle primarily for her personal, family, and household use.

~~89.~~97. Ms. Turner first became aware of the Rear Subframe Defect in October of 2022, when her son began experiencing issues with the drivability of the vehicle. Ms. Turner's husband inspected the underside of the vehicle. He found that the rear subframe was perforated due to corrosion and that one of the lower control arms had severed from the rear subframe, rendering it undrivable. Ms. Turner's husband welded the control arm back onto the subframe. Ms. Turner has opted not to have the rear subframe replaced due to the high cost. However, the welding work done by Ms. Turner's husband is at best a temporary fix, and the vehicle remains dangerously unstable.

~~90.~~98. At the time the Rear Subframe Defect was diagnosed in Ms. Turner's vehicle, it had approximately 120,000 miles.

~~91.~~99. Ms. Turner expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the expense she would incur in returning her vehicle to a safe, drivable condition. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

~~92.~~100. Ms. Turner regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2012 Mercedes-Benz C 300. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her class vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Turner that the Class Vehicles had defective rear subframes that would render her vehicle unsafe and that she would be faced with spending a large amount to return the vehicle to a safe, drivable condition, she would not have purchased her Class Vehicle, or would have paid less for it.

~~93.~~101. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023 pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Turner's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**8. Maryland Plaintiff**

**a. Plaintiff Mike Xie**

~~94.~~102. Plaintiff Mike Xie resides in Rockville, Maryland.

~~95.~~103. Mr. Xie owns a 2010 Mercedes-Benz GLK, which he purchased new at Euro Motorcars Bethesda in Bethesda, Maryland.

~~96.~~104. Mr. Xie's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDCGG8HB1AF324727.

~~97.~~105. Mr. Xie purchased the Class Vehicle for his personal, family, and household use.

~~98.~~106. Since purchasing the Class Vehicle, Mr. Xie has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a qualified independent mechanic or at a Mercedes dealership.

~~99.~~107. Mr. Xie has stored the vehicle primarily in an indoor garage when not in use.

~~100.~~108. Mr. Xie expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~101.~~109. Mr. Xie first became aware of the Rear Subframe Defect on or about February 8, 2023, when his vehicle began fishtailing while he was driving. Mr. Xie brought his Class Vehicle to an independent mechanic, who told him that the subframe was severely corroded on both sides of the vehicle and had come detached from one of the control arms on the right side. The mechanic further told

him that the vehicle was unsafe to drive. At the time of the rear subframe failure the Class Vehicle had 74,000 miles.

~~102.~~110. Mr. Xie then had the vehicle towed to his local Mercedes dealership for further inspection. The Mercedes dealership quoted Mr. Xie over $7,000 to replace his rear subframe and the other parts damaged by the Rear Subframe Defect, including the rear springs, which are composed of the shock absorbers and suspension rods.

~~103.~~111. Mr. Xie has contacted MBUSA customer service six times to request reimbursement for the repair. In each of these calls, a customer service representative has promised to follow up within 48 hours and has failed to do so.

~~104.~~112. During his initial call with a MBUSA service representative, on February 8, 2023, Mr. Xie was told that there was no recall in place and that MBUSA was not aware of the Rear Subframe Defect, but that Mercedes may offer reimbursement for the subframe replacement as a gesture of goodwill on vehicles that are less than ten years old and have less than 75,000 miles. MBUSA made no definitive offer to reimburse Mr. Xie in response to his direct communications.

~~105.~~113. On February 10, 2023, Mercedes rolled out the Limited Subframe Warranty, discussed in more detail in § VI.C. On February 16, 2023, the dealership informed Mr. Xie that Mercedes had agreed to reimburse the

replacement of his rear subframe, but that they would not cover any other service or related expense, including the replacement of the rear springs, rental car fees, or the wheel alignment. The dealership informed Mr. Xie that the rear subframe could not be replaced without replacing the rear springs and performing an alignment.

~~106.~~114. Mr. Xie agreed to pay out of pocket for the additional necessary service related to the Rear Subframe Defect, which total approximately $2,000. As of April 2023, Mr. Xie has not yet had his vehicle repaired. Due to part shortages, the dealership represented that they will not be able to complete his repair until August or September of 2023. Both the dealership and MBUSA have refused to compensate Mr. Xie for a rental car while he waits to have his car repaired, which will leave him without reliable transportation for over six months.

~~107.~~115. Mr. Xie regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz GLK in 2010. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any

other Mercedes materials disclosed to Mr. Xie that the Class Vehicles had defective subframe that would render the vehicle unsafe, or that he would be required to spend upwards of $2,000 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~108.~~116. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Xie's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**9. Massachusetts Plaintiffs**

**a. Christine Cooper**

~~109.~~117. Plaintiff Christine Cooper resides in Peterborough, New Hampshire.

~~110.~~118. Ms. Cooper owned a 2014 Mercedes-Benz E 350, which she purchased in March 2015 from Flagship Motor Cars of Lynnfield in Lynnfield, Massachusetts.

~~111.~~119. Ms. Cooper's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB0EA916667.

~~112.~~120. Ms. Cooper purchased the Class Vehicle for her personal, family, and household use.

~~113.~~121. After purchasing the Class Vehicle, Ms. Cooper brought her vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic. Ms. Cooper stored the vehicle primarily in an indoor garage when not in use.

~~114.~~122. Ms. Cooper expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the rear subframe, rear brake lines, and tie rods of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the immense expense she would incur should she choose to replace the corroded brake lines and tie rods.

Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

~~115.~~123. Ms. Cooper first became aware of the subframe defect in October of 2023, when a routine inspection and oil change revealed extensive corrosion on her subframe, tie rods, and brake lines. At the time the corrosion was diagnosed, the Class Vehicle had approximately 125,000 miles.

~~116.~~124. Ms. Cooper ultimately spent upwards of $4,500 to have her brake lines and tie rods repaired by an independent mechanic, as Mercedes refused to repair these components under warranty

~~117.~~125. Ms. Cooper regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her Mercedes-Benz E 350. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Cooper that the Class Vehicles had defective subframes and brake lines that would render the vehicle unsafe, or that

she would be faced with spending upwards of $4,500 to repair the vehicle, she would not have purchased her Class Vehicle, or would have paid less for it.

~~118.~~126. Ms. Cooper sent a notice letter to Mercedes on May 3, 2024, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.*, and other similar consumer protection statutes in other states, requesting relief and repair of the defects exhibited in the Class Vehicles. Exh. 7.

**b. Plaintiff Pasquale Russolillo**

~~119.~~127. Plaintiff Pasquale Russolillo resides in Georgetown, Massachusetts.

~~120.~~128. Mr. Russolillo owns a 2010 Mercedes-Benz C 300, which he purchased used in a private party sale in Massachusetts in 2022.

~~121.~~129. Mr. Russolillo's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB3AR105550.

~~122.~~130. Mr. Russolillo purchased the Class Vehicle primarily for his personal, family, and household use.

~~123.~~131. Mr. Russolillo first became aware of the subframe defect on or about November 21, 2022. Mr. Russolillo was driving at a low speed on a residential street when his subframe failed and he suddenly veered to the left,

momentarily losing control of his vehicle. The vehicle had approximately 127,000 miles at the time of failure.

~~124.~~132. Mr. Russolillo's vehicle had passed a state inspection earlier that year with no observed signs of rear subframe corrosion.

~~125.~~133. On November 28, 2022, Mr. Russolillo brought his Class Vehicle to an independent mechanic, who diagnosed the vehicle with subframe failure. Several components of the vehicle's rear axle were also corroded and needed to be replaced, including the right drive axle and the U drive shaft. Mr. Russolillo paid an independent mechanic approximately $4,400 to replace the rear subframe and the rear axle components with used or aftermarket parts.

~~126.~~134. Mr. Russolillo contacted both MBUSA and MBG on multiple occasions about the failure of his rear subframe and the cost he incurred to fix it. Mr. Russolillo reached out to MBUSA over the phone and MBUSA customer service represented that they would call him back within 24 hours. They never did so. Mr. Russolillo reached out to MBG over email and likewise never received a response.

~~127.~~135. Mr. Russolillo expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe and rear axle components of the Class Vehicle would

prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~128.~~136. Mr. Russolillo regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2010 Mercedes-Benz C 300. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Russolillo that the Class Vehicles had defective rear subframes that would render his vehicle unsafe and that he would be faced with spending upwards of $4,400 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~129.~~137. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting

relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Russolillo's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in a letter from Plaintiffs dated April 28, 2023. Exh. 6.

**10. Michigan Plaintiff**

**a. Plaintiff Edward Michael Jacobs**

~~130.~~138. Plaintiff Edward Michael Jacobs resides in St. Joseph, Michigan.

~~131.~~139. Mr. Jacobs owns a 2010 Mercedes-Benz C 300, which he purchased new in 2010 from Orrin B. Hayes, a Mercedes dealership in Kalamazoo, Michigan.

~~132.~~140. Mr. Jacobs' Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB8AR118777.

~~133.~~141. Mr. Jacobs purchased the Class Vehicle for his personal, family, and household use.

~~134.~~142. Mr. Jacobs expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~135.~~143. While his Class Vehicle was under warranty, Mr. Jacobs had it serviced at a Mercedes dealership at the intervals recommended by Mercedes. After the expiration of the warranty, Mr. Jacobs serviced the vehicle himself at the recommended intervals. Mr. Jacobs has both the knowledge and the equipment to service his Class Vehicle to a professional standard.

~~136.~~144. Since purchasing the Class Vehicle, Mr. Jacobs has stored the vehicle primarily in an indoor garage when not in use.

~~137.~~145. Mr. Jacobs first became aware of the Rear Subframe Defect May 10, 2022, when the subframe failed while his wife was driving, causing the backend of the vehicle to fishtail. At the time of the subframe failure, the vehicle had approximately 125,000 miles.

~~138.~~146. Following the failure of his subframe on the road, Mr. Jacobs called MBUSA, which represented that they had never seen this defect before, opened a case, and directed that the car be towed to the nearest Mercedes dealership for inspection before it would make a final determination.

~~139.~~147. Mr. Jacobs had the Class Vehicle towed to Gurley Leep Motorwerks, a Mercedes dealership, which quoted approximately $5,966.96 to replace the subframe. MBUSA refused to assist Mr. Jacobs after the dealer confirmed that the rear subframe had failed due to corrosion in a written report. Mr. Jacobs declined to have his subframe replaced at the dealership. Instead, he had the vehicle towed back to his residence and repaired it himself, which was only feasible due to Mr. Jacobs' extensive experience with vehicle repairs and ownership of equipment similar to that available at a professional service center.

~~140.~~148. As a result of the subframe defect, Mr. Jacobs incurred costs of $1,323.84, including: a diagnosis fee of $139.95 from the Mercedes dealership; a replacement subframe costing $1,022.89; and $161.00 in tow charges. This amount does not include the approximately 40 hours of labor Mr. Jacobs dedicated to repairing his own vehicle. In addition, Mr. Jacobs was without the use of his vehicle for approximately one month while it was being assessed by the Mercedes dealership and repaired by Mr. Jacobs.

~~141.~~149. Mr. Jacobs regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2010. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Jacobs that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to spend $1,323.84 and commit forty hours of labor to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~142.~~150. On December 9, 2022, Mr. Jacobs, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Jacobs and others similarly situated. Exh. 1. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed

below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

### 11. Missouri Plaintiffs

#### a. Plaintiff Thomas Koby

~~143.~~151. Plaintiff Thomas Koby resides in O'Fallon, Missouri.

~~144.~~152. Mr. Koby owns a 2010 Mercedes-Benz E 350 4Matic AMG Sport, which he purchased in 2018 from his daughter in a private sale in Missouri. Mr. Koby's daughter originally purchased the Class Vehicle new at Plaza Mercedes-Benz in Creve Coeur, Missouri.

~~145.~~153. Mr. Koby's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8HB8AA065976.

~~146.~~154. Mr. Koby purchased the Class Vehicle for his personal, family, and household use.

~~147.~~155. Mr. Koby expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur should he choose to replace

the defective subframe. Had he known these facts, he would not have purchased his Class Vehicle or would have paid less for it.

~~148.~~156. Since purchasing the Class Vehicle, Mr. Koby has stored the vehicle primarily in an indoor garage when not in use.

~~149.~~157. Mr. Koby first became aware of the Rear Subframe Defect on November 18, 2022 when he brought the Class Vehicle into Mercedes-Benz of Chesterfield, an authorized Mercedes dealership, for a state-mandated annual safety inspection. The dealership informed him that his car had failed the safety inspection because the subframe was severely corroded and quoted him $4,899.41 to replace it. The multi-point inspection report provided to Mr. Koby by Mercedes-Benz of Chesterfield states "[r]ear subframe has multiple holes in it from rust. Is not safe to drive." At the time the dealership diagnosed the subframe corrosion, the Class Vehicle had approximately 135,000 miles.

~~150.~~158. As a result of the Rear Subframe Defect, Mr. Koby faces either thousands of dollars in costs to return his vehicle to a safe, drivable condition, or significant decline in the retail value of his Class Vehicle should he choose to sell it without repairing the rear subframe.

~~151.~~159. Mr. Koby regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on

the internet during the years before he purchased his Mercedes-Benz E 350 in 2018. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Koby that the Class Vehicles had defective subframe that would render the vehicle unsafe and that he would be required to spend upwards of $4,000 to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~152.~~160. On December 21, 2022, Mr. Koby, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Koby and others similarly situated. Exh. 2. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**b. Plaintiff Monique Edwards**

~~153.~~161. Plaintiff Monique Edwards resides in Illinois.

~~154.~~162. Ms. Edwards owns a 2014 Mercedes-Benz C 300, which she purchased in April of 2015 from Mercedes-Benz of St. Louis in St. Louis, Missouri.

~~155.~~163. Ms. Edwards' Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB3ER306274.

~~156.~~164. Ms. Edwards purchased the Class Vehicle primarily for her personal, family, and household use.

~~157.~~165. Ms. Edwards expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the expense she would incur in returning her vehicle to a safe, drivable condition. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

~~158.~~166. Ms. Edwards first became aware of the Rear Subframe Defect in August of 2022 when she brought her Class Vehicle to Plaza Mercedes-Benz in

Creve Coeur, Missouri, which diagnosed the vehicle with subframe failure and quoted her approximately $3,700 to repair the damaged subframe. Ms. Edwards has not yet had her subframe repaired.

~~159.~~167. The class vehicle had approximately 100,000 miles at the time of failure.

~~160.~~168. Ms. Edwards received a notice of Limited Subframe Warranty from Mercedes but has not sought reimbursement for the repair of her Class Vehicle.

~~161.~~169. Ms. Edwards regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2014 Mercedes-Benz C 300. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her Class Vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Edwards that the Class Vehicles had defective rear subframes that would render her vehicle unsafe and that she would be faced with spending upwards of $3,700 to return the vehicle

to a safe, drivable condition, she would not have purchased her Class Vehicle, or would have paid less for it.

~~162.~~170. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Edward's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

### 12. New Jersey Plaintiffs

#### a. Plaintiff Yauwen Lin

~~163.~~171. Plaintiff Yauwen Lin resides in Woodbridge, New Jersey.

~~164.~~172. Ms. Lin owned a 2011 Mercedes-Benz C 300, which she purchased new in 2011 from Ray Catena Mercedes in Edison, New Jersey.

~~165.~~173. Ms. Lin's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB3BR177494.

~~166.~~174. Ms. Lin purchased the Class Vehicle for her personal, family, and household use.

~~167.~~175. Since purchasing the Class Vehicle, Ms. Lin has brought her vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic. Ms. Lin has stored the vehicle primarily in an indoor garage when not in use.

~~168.~~176. Ms. Lin expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the rear subframe and the rear brake lines of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the immense expense she would incur should she choose to replace the defective subframe and corroded brake lines. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

~~169.~~177. Ms. Lin first became aware of the Rear Subframe Defect on August 4, 2022, when she brought in her vehicle to be serviced at Ray Catena

Mercedes-Benz in Edison, New Jersey. The dealership informed Ms. Lin that the rear subframe and the rear brake lines of her vehicle were severely corroded and would cost over $8,000 to repair. Ms. Lin declined to have her subframe replaced at that time. At the time the subframe corrosion was diagnosed, the Class Vehicle had approximately 70,000 miles.

~~170.~~178. In October of 2022, Ms. Lin took her vehicle to a local Firestone for maintenance, where a mechanic told her the vehicle was dangerous to drive and had it towed back to the Ray Catena Mercedes-Benz. Given the extensive damage, the dealership suggested that she sell the Class Vehicle to a junkyard if she was not willing to repair it.

~~171.~~179. Ms. Lin contacted customer service at MBUSA, but initially received no response. Ms. Lin heard back from Mercedes after the sale of her vehicle, at which time a Mercedes representative said MBUSA may be able to offer her $2,000 towards a new Mercedes vehicle, pending approval. As of the filing of this complaint, no final offer has been made by Ms. Lin from MBUSA.

~~172.~~180. As a result of the Rear Subframe Defect, Ms. Lin sold her vehicle for approximately $2,000 to a junkyard at the suggestion of the Mercedes dealership. According to Kelley Blue Book, absent the Rear Subframe Defect, Ms. Lin's Class Vehicle would have been worth approximately $8,634 if sold in a

private sale. Therefore, the Rear Subframe Defect caused Ms. Lin's Class Vehicle to diminish in value by approximately $6,634.

~~173.~~181. Ms. Lin regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her Mercedes-Benz C 300 in 2011. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her class vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Lin that the Class Vehicles had defective subframe that would render the vehicle unsafe, or that she would be faced with the choice of either spending upwards of $8,000 to repair the vehicle, or selling it for $6,634 less than it would be worth without the defective subframe, she would not have purchased her Class Vehicle, or would have paid less for it.

~~174.~~182. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Lin's claims, as they are substantively identical to those of

the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5.

**b. Plaintiff Stanley King**

~~175.~~183. Plaintiff Stanley King resides in Sewell, New Jersey.

~~176.~~184. Mr. King owns a 2010 Mercedes-Benz E 350, which he purchased in 2012 from DZ Motors in Rahway, New Jersey.

~~177.~~185. Mr. King's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN WDDHF8HB6AA104449.

~~178.~~186. Mr. King purchased the Class Vehicle for his personal, family, and household use.

~~179.~~187. Mr. King expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective

subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~180.~~188. Since purchasing the Class Vehicle, Mr. King has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes-Benz. Mr. King has stored the vehicle primarily in an indoor garage when not in use.

~~181.~~189. Mr. King first became aware of the Rear Subframe Defect in October of 2022, when he brought the Class Vehicle into his mechanic because it was not braking properly, and the rear of the vehicle felt like it was not under control. The mechanic informed Mr. King that the rear subframe was heavily corroded and not safe to drive. The mechanic quoted Mr. King a price of over $3,000 to make the necessary repairs and suggested Mr. King call his Mercedes dealer for more information and see if it might be under warranty.

~~182.~~190. Mr. King called three separate Mercedes Benz dealerships and explained the problem to the service manager. At each location he was told someone would call him back with more information, and to date, none of the dealerships have called Mr. King back with any further information.

~~183.~~191. Ultimately, Mr. King paid out-of-pocket for his subframe replacement, incurring a cost of $2,914.99.

~~184.~~192. At the time of the subframe failure, Mr. King's vehicle had approximately 145,000 miles.

~~185.~~193. Mr. King regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz E 350 in 2012. Although he does not recall the specifics of the many Mercedes-Benz advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes-Benz materials disclosed to Mr. King that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to pay nearly $3,000.00 in repair costs to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~186.~~194. On March 27, 2023, Mr. King, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., notifying Mercedes Benz of the defects exhibited in the Subframe and breach of warranty for Class Vehicles for Mr. King and others similarly situated. Exh. D. Mercedes responded on April 28, 2023 with information about the

Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**13. New York Plaintiff**

**a. Plaintiff Samuel Ortiz**

~~187.~~195. Plaintiff Samuel Ortiz resides in Locust Valley, New York.

~~188.~~196. Mr. Ortiz owned a 2015 Mercedes-Benz E 350, which he purchased new in 2014 at Rallye Motors, a Mercedes-Benz dealership in Roslyn, New York.

~~189.~~197. Mr. Ortiz's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB8FB126870.

~~190.~~198. Mr. Ortiz purchased the Class Vehicle primarily for his personal, family, and household use. The vehicle was also used occasionally for business purposes.

~~191.~~199. Since purchasing the Class Vehicle, Mr. Ortiz has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a qualified independent mechanic or at a Mercedes dealership.

~~192.~~200. Mr. Ortiz expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~193.~~201. Mr. Ortiz first became aware of the Rear Subframe Defect on or about November 19, 2022. Mr. Ortiz was driving on the expressway when he applied the brakes in response to a sudden slowdown and heard a loud snapping noise, after which Mr. Ortiz momentarily lost control of the vehicle as the rear fishtailed.

~~194.~~202. On December 7, 2022, Mr. Ortiz brought his Class Vehicle to Rallye Motors, which told him that the subframe had snapped at the mounting point for one of the control arms. The mechanic further told him that the vehicle was unsafe to drive, particularly because the detached control arm was pressing into the gas tank and could potentially cause it to rupture. At the time of the rear subframe failure the Class Vehicle had approximately 88,000 miles.

~~195.~~203. Rallye Motors quoted Mr. Ortiz approximately $7,000 to replace his Class Vehicle's subframe and perform related services, including replacing the gas lines, which were also corroded.

~~196.~~204. On or about December 12, 2022, Rallye Motors informed Mr. Ortiz that it had contacted MBUSA customer service on his behalf and that it had refused to pay for the subframe replacement.

~~197.~~205. Mr. Ortiz declined to have his rear subframe replaced and instead traded the vehicle in on December 20, 2022, for $7,000 at Rallye Motors. According to Kelley Blue Book, the trade-in value of Mr. Ortiz's vehicle absent the Rear Subframe Defect would have been approximately $13,627. Therefore, the Rear Subframe Defect caused Mr. Ortiz's Class Vehicle to lose $6,627 in resale value.

~~198.~~206. As a result of the Rear Subframe Defect, Mr. Ortiz traded in his vehicle for approximately $6,627 less than it would otherwise have been worth, was forced to drive an unsafe vehicle for three weeks while he waited for an appointment at his local Mercedes dealership, and was without the use of his vehicle for thirteen days prior to completing the trade-in.

~~199.~~207. Mr. Ortiz regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on

the internet during the years before he purchased his Mercedes-Benz E 350 in 2014. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Ortiz that the Class Vehicles had defective rear subframes that would render his vehicle unsafe, or that he would be faced with the choice of either spending upwards of $7,000 to return the vehicle to a safe, drivable condition or selling it for $6,627 less than it would have been worth absent the Rear Subframe Defect, he would not have purchased his Class Vehicle, or would have paid less for it.

~~200.~~208. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Ortiz's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed

below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

### 14. Ohio Plaintiffs

#### a. Plaintiff Jack Simpson

~~201.~~209. Plaintiff Jack Simpson resides in Waynesville, Ohio.

~~202.~~210. Mr. Simpson owns a 2013 Mercedes-Benz C 300, which he purchased used in a private party sale in Ohio in 2020.

~~203.~~211. Mr. Simpson's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB0DA802680.

~~204.~~212. Mr. Simpson purchased the Class Vehicle primarily for his personal, family, and household use.

~~205.~~213. Mr. Simpson first became aware of the Rear Subframe Defect when he noticed that his car was driving in an unusual way. Partway through the trip, his vehicle's low brake fluid light came on. In response, Mr. Simpson took the vehicle into an independent mechanic, who informed him that his rear subframe had failed and had nicked one of the brake lines, causing it to leak. The vehicle had approximately 75,000 miles at the time of failure.

~~206.~~214. Mr. Simpson had his rear subframe and brake lines repaired by an independent mechanic with used or aftermarket parts. The total cost of the repair was $1,900.

~~207.~~215. Mr. Simpson expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~208.~~216. Mr. Simpson regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2013 Mercedes-Benz C 300. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Simpson that the Class Vehicles had defective rear subframes that would render his vehicle unsafe

and that he would be faced with spending upwards of $1,900 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~209.~~217. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Simpson's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**b. Plaintiff Brian Laakso**

~~210.~~218. Plaintiff Brian Laakso resides in Akron, Ohio.

~~211.~~219. Mr. Laakso owns a 2011 Mercedes-Benz E 350, which he purchased used from Logic Auto Sales in Warrenville Heights, Ohio in September of 2022.

~~212.~~220. Mr. Laakso's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8HB8BA291792.

~~213.~~221. Mr. Laakso purchased the Class Vehicle primarily for his personal, family, and household use.

~~214.~~222. Mr. Laakso first became aware of the subframe defect on or about March 23, 2023, when he took his vehicle to Mercedes-Benz of Akron in Akron, Ohio for routine maintenance. After an inspection, the dealership told him his vehicle's rear subframe was so corroded that it needed to be replaced.

~~215.~~223. At the time the Rear Subframe Defect was diagnosed in Mr. Laakso's vehicle, it had approximately 125,000 miles.

~~216.~~224. Mr. Laakso expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~217.~~225. Mr. Laakso regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2011 Mercedes-Benz E 350. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Laakso that the Class Vehicles had defective rear subframes that would render his vehicle unsafe and that he would be faced with spending a large sum to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~218.~~226. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Laakso's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed

below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

c. **Plaintiffs Edward and Courtney Bourne**

~~219.~~227. Plaintiffs Edward and Courtney Bourne ("Plaintiffs Bourne") reside in Owenton, Kentucky.

~~220.~~228. Plaintiffs Bourne own a 2012 Mercedes-Benz CLS 550, which they purchased in December of 2012 at Mercedes-Benz of Cincinnati in Cincinnati, Ohio.

~~221.~~229. Mr. and Mrs. Bourne's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes-Benz and bears the VIN WDDLJ9BB6CA048877.

~~222.~~230. Plaintiffs Bourne purchased the Class Vehicle for their personal, family, and household use.

~~223.~~231. After purchasing the Class Vehicle, Plaintiffs Bourne brought their vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic.

~~224.~~232. Plaintiffs Bourne stored the vehicle primarily in an indoor garage when not in use.

~~225.~~233. Plaintiffs Bourne expected their Class Vehicle to be of good and merchantable quality and not defective. They had no reason to know, or expect, that the subframe of the Class Vehicle would be at risk of premature corrosion, which could make the vehicle dangerous to operate. Nor were they aware that Mercedes would not provide regular, free inspections to ensure that their vehicle remained safe and free of corrosion that could impact the functioning of their vehicle's suspension. Had they known these facts, they would not have bought their Class Vehicle or would have paid less for it.

~~226.~~234. In early December of 2023, Plaintiffs Bourne began to notice that their Vehicle would veer to one direction when they applied the brakes.

~~227.~~235. On December 14, 2023, Plaintiffs Bourne brought their vehicle in to Mercedes-Benz of Fort Mitchell to address the issue. The dealership inspected the vehicle and found extensive corrosion and perforation on the rear subframe.

~~228.~~236. Mercedes-Benz of Fort Mitchell recommended that the subframe be replaced. However, the repair was not complete until January 8, 2024, leaving Plaintiffs Bourne without the use of their vehicle for almost a month.

~~229.~~237. Plaintiffs Bourne regularly saw advertisements for Mercedes-Benz vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before they purchased their 2012

Mercedes-Benz CLS 550 in December of 2012. Although they do not recall the specifics of the many Mercedes-Benz advertisements they saw before they purchased their Class Vehicle, they do recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced their decision to purchase their vehicle. Had those advertisements or any other Mercedes-Benz materials disclosed to Plaintiffs Bourne that the Class Vehicles had defective subframes that could render their vehicle unsafe, and that they would have to pay out of pocket for inspections to ensure that their vehicle was road-worthy, they would not have purchased their Class Vehicle, or would have paid less for it.

~~230.~~238. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, et seq., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Plaintiffs Bourne's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed

below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

### 15. Pennsylvania Plaintiffs

#### a. Plaintiff Giuseppe Garofalo

~~231.~~239. Plaintiff Giuseppe Garofalo resides in York, Pennsylvania.

~~232.~~240. Mr. Garofalo owns a 2013 Mercedes-Benz C 300, which he purchased used in 2018 from Ricke Bros Auto Sales in Yorkana, Pennsylvania.

~~233.~~241. Mr. Garofalo's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB4DA787410.

~~234.~~242. Mr. Garofalo purchased the Class Vehicle for his personal, family, and household use.

~~235.~~243. Since purchasing the Class Vehicle, Mr. Garofalo has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at a qualified independent mechanic.

~~236.~~244. Mr. Garofalo expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase

of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~237.~~245. Mr. Garofalo first became aware of the Rear Subframe Defect on November 8, 2022, when his subframe failed as he was driving, causing the vehicle to veer sharply when he applied the brakes. Realizing the vehicle was not safe to drive, Mr. Garofalo pulled over and had the Class Vehicle towed to an independent mechanic. The mechanic informed Mr. Garofalo that his rear subframe was severely corroded and would need to be replaced to make the vehicle drivable. Mr. Garofalo elected to have his rear subframe replaced by the independent mechanic with a used part.

~~238.~~246. As a result of the Rear Subframe Defect, Mr. Garofalo incurred $2,613.20 in repair costs and was without the use of his vehicle for two days.

~~239.~~247. Mr. Garofalo regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2018. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety

and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Garofalo that the Class Vehicles had a defective rear subframe that would render the vehicle unsafe, or that he would be required to spend $2,613.20 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~240.~~248. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Garofalo's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**b. Plaintiff Anthony Russell**

~~241.~~249. Plaintiff Anthony Russell resides in Philadelphia, Pennsylvania.

~~242.~~250. Mr. Russell owns a 2013 Mercedes Benz C 300 4Matic, which he leased in 2012 from Mercedes-Benz of West Chester, a Mercedes-Benz dealership in West Chester, Pennsylvania. Mr. Russell later purchased his vehicle in 2015 from Mercedes-Benz of Fort Washington, a Mercedes-Benz dealership in Fort Washington, Pennsylvania.

~~243.~~251. Mr. Russell's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB2DR245949.

~~244.~~252. Mr. Russell purchased the Class Vehicle for his personal, family, and household use.

~~245.~~253. Mr. Russell expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate. Nor was Mr. Russell aware from any source prior to his purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.

~~246.~~254. Since purchasing the Class Vehicle, Mr. Russell has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes at his local dealership, Mercedes-Benz of Fort Washington.

~~247.~~255. Mr. Russell has stored his Class Vehicle primarily in an indoor garage when not in use.

~~248.~~256. Mr. Russell first became aware of the Rear Subframe Defect in mid-November 2022, when the subframe of his Class Vehicle failed as he was driving, causing the vehicle to pull left when he applied the brakes. At that time, Mr. Russell also began to hear a noise that sounded like his brakes were crunching. At the time of failure, Mr. Russell's vehicle had approximately 91,000 miles.

~~249.~~257. These issues arose only a week after Mr. Russell had his Class Vehicle inspected at a Pep Boys in Philadelphia, Pennsylvania. This inspection did not reveal any signs of rear subframe corrosion.

~~250.~~258. Roughly a week after first experiencing the Rear Subframe Defect related issues with his Class Vehicle, Mr. Russell brought his vehicle to Mercedes-Benz of Fort Washington. After an inspection, the dealership informed Mr. Russell that his subframe was significantly corroded and starting to crack. In addition, the rear springs were significantly corroded and required replacement. At the time the mechanic diagnosed the corrosion, the Class Vehicle had 91,322 miles. Mr. Russell ultimately paid $5,810.81 for the replacement of his rear subframe and rear springs, as well as a wheel alignment.

~~251.~~259. Although Mercedes-Benz of Fort Washington reached out to Mercedes on Mr. Russell's behalf, Mr. Russell has not yet been reimbursed for his subframe replacement.

~~252.~~260. Mr. Russell regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he leased and purchased his Mercedes-Benz C 300 in 2012 and 2015, respectively. Based on these advertisements, Mr. Russell purchased his Class Vehicle expecting it to be durable and long-lasting. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his class vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Russell that the Class Vehicles had defective rear subframes that would render his vehicle unsafe, or that he would be required to spend upwards of $5,800 to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~253.~~261. On March 8, 2023, Mr. Russell, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for

Mr. Russell and others similarly situated. Exh. 3. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**16. Rhode Island Plaintiffs**

**a. Plaintiff Alexander Sowa**

~~254.~~262. Plaintiff Alexander Sowa resides in East Greenwich, Rhode Island.

~~255.~~263. Mr. Sowa and his wife co-own a 2014 Mercedes-Benz C 300 4Matic, which they purchased certified preowned in June of 2017 from Inskip Mercedes, a Mercedes dealership in Warwick, Rhode Island.

~~256.~~264. Mr. Sowa's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB5EA929958.

~~257.~~265. Mr. Sowa purchased the Class Vehicle for his personal, family, and household use.

~~258.~~266. Mr. Sowa expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that

the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~259.~~267. Since purchasing the Class Vehicle, Mr. Sowa has brought his vehicle in to be serviced and inspected at least as often as recommended by Mercedes at either a Mercedes dealership or a Mercedes-certified mechanic. Mr. Sowa has stored the vehicle primarily in an indoor garage when not in use.

~~260.~~268. Mr. Sowa first became aware of the subframe defect on December 2, 2022, when he brought the Class Vehicle into International Motor Group, a Mercedes-certified mechanic, for the routine replacement of the vehicle's tires. The mechanic informed Mr. Sowa that the subframe was "rotting" near the control arms and that "it's only a matter of time before the subframe fails." The mechanic further informed Mr. Sowa that such extensive corrosion should not be present in an otherwise mechanically sound, eight-year-old vehicle with relatively low mileage. At the time the mechanic diagnosed the corrosion, the Class Vehicle had only 80,000 miles.

~~261.~~269. As a result of the subframe defect, Mr. Sowa incurred $4,349.83 in costs, including $4,319.83 for the subframe replacement and related services and $30 in rental vehicle charges. Additionally, Mr. Sowa was left without use of his vehicle for eight days while the subframe replacement was being completed.

~~262.~~270. Mr. Sowa regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2017. Although he does not recall the specifics of the many Mercedes advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Sowa that the Class Vehicles had defective subframes that would render his vehicle unsafe and that he would be required to pay $4,349.83 in repair costs to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~263.~~271. On December 9, 2022, Mr. Sowa, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A.

§§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Sowa and others similarly situated. Exh. 1. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**b. Plaintiff Raymond Robinson**

~~264.~~272. Plaintiff Raymond Robinson resides in Marshfield, Massachusetts.

~~265.~~273. Mr. Robinson owned a 2014 Mercedes-Benz E 350, which he purchased new in 2014 from Viti Mercedes-Benz in Tiverton, Rhode Island.

~~266.~~274. Mr. Robinson's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDHF8JB0EB010349.

~~267.~~275. Mr. Robinson purchased the Class Vehicle for his personal, family, and household use.

~~268.~~276. Since purchasing the Class Vehicle, Mr. Robinson has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes at a qualified independent mechanic.

~~269.~~277. Mr. Robinson expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~270.~~278. Mr. Robinson first became aware of the Rear Subframe Defect on November 16, 2022, when he brought the Class Vehicle into an independent mechanic for an oil change. The independent mechanic informed Mr. Robinson that the subframe was severely corroded. At the time the subframe corrosion was diagnosed, the Class Vehicle had approximately 111,865 miles.

~~271.~~279. On November 29, 2022, Mr. Robinson took the Class Vehicle to Mercedes-Benz Hanover, which confirmed the rear subframe corrosion and verbally quoted him approximately $6,500 in total repair costs, including $4,300 to replace his subframe and an additional $2,200 to perform related services, including possible replacement of other parts impacted by corrosion, such as the brake lines, exhaust system, and suspension springs.

~~272.~~280. On December 13, 2022, Mr. Robinson returned his vehicle to the independent mechanic, who performed a thorough inspection of the Class Vehicle's undercarriage and informed Mr. Robinson that the corrosion impacted other areas of the undercarriage in addition to the subframe, including the brake lines, which could potentially rupture at any time. The independent mechanic advised Mr. Robinson that the Class Vehicle's safety was compromised and that he should drive the vehicle minimally and with caution.

~~273.~~281. On December 18, 2022, Mr. Robinson took the vehicle to a local Lexus dealership, which gave him a preliminary trade-in quote of $5,000 on a new 2023 Lexus.

~~274.~~282. Later that same day, the brake fluid warning light illuminated on the Class Vehicle's dashboard and the vehicle began to fishtail when Mr. Robinson applied the brakes.

~~275.~~283. As a result, on December 19, 2022, Mr. Robinson was forced to bring his car to the independent mechanic for a third time. The independent mechanic confirmed that the Class Vehicle's brake lines were leaking and it was no longer safe to drive. Given the extent of the damage to the brake lines, the independent mechanic opined that Mr. Robinson would likely have to pay well

above the $6,500 originally quoted by Mercedes-Benz Hanover to make the car drivable and return it to a safe condition.

~~276.~~284. On December 21, 2022, following the independent mechanic's confirmation that the Class Vehicle's brake lines had ruptured, Mr. Robinson had the Class Vehicle towed back to his residence, as it was no longer safe to drive. On Tuesday, February 7, 2023, Mr. Robinson traded his vehicle in at a Lexus dealership for $7,000.

~~277.~~285. Mr. Robinson contacted customer service at MBUSA, which informed him that there was no recall on vehicles with defective subframes and offered him either a $2,000 discount on a new Mercedes E-Class, a $1,000 discount on a certified preowned vehicle or a discount of $750 on parts if his vehicle was repaired by a Mercedes dealership. Mr. Robinson declined this offer.

~~278.~~286. As a result of the Rear Subframe Defect, Mr. Robinson was without use of his vehicle between December 19, 2022 and February 7, 2023. According to Kelley Blue Book, the trade-in value of Mr. Robinson's vehicle would have been $11,711 absent the Rear Subframe Defect, meaning that the loss of retail value at the time of sale amounted to $4,711.

~~279.~~287. Mr. Robinson specifically purchased the Class Vehicle because of the reputation of Mercedes vehicles for safety. Mr. Robinson regularly saw

advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his Mercedes-Benz E 350 in 2014. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Robinson that the Class Vehicles had defective subframes that would render his vehicle unsafe, or that he would be faced with the choice of either spending upwards of $6,500 to repair his vehicle, or selling it for $4,711 less than it would be worth without the defective subframe, he would not have purchased his Class Vehicle, or would have paid less for it.

~~280.~~288. On December 21, 2022, Mr. Robinson, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Robinson and others similarly situated. Exh. 2. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as

detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

### 17. Tennessee Plaintiff

#### a. Plaintiff Park C. Thomas

~~281.~~289. Plaintiff Park C. Thomas resides in Sarasota, Florida.

~~282.~~290. Mr. Thomas owns a 2013 Mercedes-Benz C 300 4Matic, which he purchased used from a private party in Tennessee in 2015.

~~283.~~291. Mr. Thomas's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8A8XDA803965.

~~284.~~292. Mr. Thomas purchased the Class Vehicle for his personal, family, and household use.

~~285.~~293. Mr. Thomas expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the immense expense he would incur in replacing the defective subframe. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~286.~~294. Since purchasing the Class Vehicle, Mr. Thomas has stored the vehicle primarily in an indoor garage when not in use.

~~287.~~295. Mr. Thomas first became aware of the subframe defect in November of 2022, when he began to notice the back of the Class Vehicle fishtail moderately when he braked. Mr. Thomas brought the vehicle into Mercedes-Benz of Sarasota. After an inspection, the dealership informed him that one of the control arms on the rear subframe was severely corroded and it posed a safety risk. At the time the subframe corrosion was diagnosed, the Class Vehicle had 57,217 miles. The dealership quoted Mr. Thomas $3,633.08 to repair the subframe. While Mr. Thomas wanted to have his subframe replaced immediately, the necessary parts were backordered, and the dealership was not able to complete the repair for over two months.

~~288.~~296. As a result of the subframe defect, Mr. Thomas was left for more than two months with a vehicle that was not fit for its ordinary and intended purpose. Because the extensive subframe corrosion made the vehicle hazardous to drive, particularly on the highway, prior to the subframe replacement Mr. Thomas used his Class Vehicle only when he was without another means of transportation and only for brief trips on low-speed roads.

~~289.~~297. Mr. Thomas had his subframe replaced on January 19, 2022 at a Mercedes dealership, which cost a total of $4,066.31.

~~290.~~298. Mr. Thomas regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, and on the internet during the years before he purchased his Mercedes-Benz C 300 in 2015. Although he does not recall the specifics of the many Mercedes advertisements he saw before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Thomas that the Class Vehicles had defective subframes that would render the vehicles unsafe and that he would be required to spend upwards of $4,000 to return his vehicle to a safe condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~291.~~299. On December 21, 2022, Mr. Thomas, through counsel, sent Mercedes a letter pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Thomas and others similarly situated. Exh. 2. In response to this letter, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed

below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**18. Texas Plaintiffs**

**a. Plaintiff Curtis Willis**

~~292.~~300. Plaintiff Curtis Willis resides in Lewisville, Texas.

~~293.~~301. Mr. Willis owns a 2013 E 550, which he purchased used in June of 2019 from a non-Mercedes dealership in Garland, Texas.

~~294.~~302. Mr. Willis's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDKK7DF4DF190176.

~~295.~~303. Mr. Willis purchased the Class Vehicle primarily for his personal, family, and household use.

~~296.~~304. Mr. Willis first became aware of the subframe defect in 2022, when he took the vehicle in for a routine state inspection. Mr. Willis was quoted a minimum of price of $8,000 for the replacement of his subframe and the repair of related parts.

~~297.~~305. Mr. Willis opted not to have his subframe replaced, given the high cost of repair. As a result of the Rear Subframe Defect, Mr. Willis has been

left with a vehicle that is not safe to drive and cannot be used for its ordinary and intended purpose.

~~298.~~306. At the time the Rear Subframe Defect was diagnosed in Mr. Willis's vehicle, it had approximately 72,000 miles.

~~299.~~307. Mr. Willis expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would incur in returning his vehicle to a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~300.~~308. Mr. Willis regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2013 E 550. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Willis that the Class Vehicles had

defective rear subframes that would render his vehicle unsafe and that he would be faced with spending a large amount to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~301.~~309. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Willis's claims, as they are substantively identical to those of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**b. Plaintiff Alma Brown**

~~302.~~310. Plaintiff Alma Brown resides in Houston, Texas.

~~303.~~311. Ms. Brown owns a 2011 Mercedes-Benz E 350, which she purchased used from Sewell Mercedes Benz of West Houston in July of 2015.

~~304.~~312. Ms. Brown's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDKK5GF8BF098677.

~~305.~~313. Ms. Brown purchased the Class Vehicle primarily for her personal, family, and household use.

~~306.~~314. Ms. Brown first became aware of the Rear Subframe Defect on or about July 2020, when she began to have problems with the drivability of her vehicle. As a result, she had the vehicle towed to Mercedes-Benz of Houston Greenway. After an inspection the dealership told her that her rear subframe and rear springs were corroded and needed to be replaced. Ms. Brown paid approximately $6,000 for these repairs.

~~307.~~315. At the time the Rear Subframe Defect was diagnosed in Ms. Brown's vehicle, it had approximately 70,000 miles.

~~308.~~316. Ms. Brown expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the rear subframe and rear springs of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was she aware from any source prior to purchase of the Class Vehicle of the expense she would incur in returning her

vehicle to a safe, drivable condition. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

~~309.~~317. Ms. Brown regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her 2011 Mercedes-Benz E 350. Although she does not recall the specifics of the many Mercedes advertisements she viewed before she purchased her class vehicle, she does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced her decision to purchase her vehicle. Had those advertisements or any other Mercedes materials disclosed to Ms. Brown that the Class Vehicles had defective rear subframes that would render her vehicle unsafe and that she would be faced with spending upwards of $6,000 to return the vehicle to a safe, drivable condition, she would not have purchased her Class Vehicle, or would have paid less for it.

~~310.~~318. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Ms. Brown's claims, as they are substantively identical to those

of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

**19. <u>Virginia Plaintiff</u>**

**a. <u>Plaintiff Owen Licht</u>**

~~311.~~319. Plaintiff Owen Licht resides in Ransomville, New York.

~~312.~~320. Mr. Licht owns a 2012 C 300, which he purchased used in June of 2020 from Mercedes-Benz of Fredericksburg of Fredericksburg, Virginia.

~~313.~~321. Mr. Licht's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8BB8CA641749.

~~314.~~322. Mr. Licht purchased the Class Vehicle primarily for his personal, family, and household use.

~~315.~~323. Mr. Licht first became aware of the Rear Subframe Defect the summer of 2021, when the vehicle began to shake and pull to the one side while he was driving. Mr. Licht brought the vehicle into Mercedes-Benz of Lehigh Valley in Allentown, Pennsylvania, which informed him that there were large perforated

areas near lower control arms on the rear subframe. Mr. Licht did not have his rear subframe repaired at that time, due to the significant cost.

~~316.~~324. By the summer of 2022, the rear control arms had completely detached from the rear subframe and the vehicle was making loud groaning noises. Mr. Licht opted not to have his rear subframe replaced because of the high price quoted by the Mercedes dealership. Instead, he had the control arms welded back on by an independent garage, which cost approximately $1,700. However, given the advanced state of the corrosion on Mr. Licht's rear subframe, the welding was only a temporary fix at best and the vehicle remains in a highly unstable condition. The Class Vehicle's mileage at the time of the rear subframe failure was approximately 98,000.

~~317.~~325. Prior to the diagnosis of the Rear Subframe Defect in Mr. Licht's vehicle, he had paid for several inspections in an attempt to determine why the car was not driving normally. These inspections cost hundreds of dollars.

~~318.~~326. Mr. Licht expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the rear subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate, nor was he aware from any source prior to purchase of the Class Vehicle of the expense he would have to incur to return his vehicle to

a safe, drivable condition. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

~~319.~~327. Mr. Licht regularly saw advertisements for Mercedes vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his 2012 Mercedes-Benz C 300. Although he does not recall the specifics of the many Mercedes advertisements he viewed before he purchased his Class Vehicle, he does recall that safety and reliability were frequent themes. Those advertisements about safety and reliability influenced his decision to purchase his vehicle. Had those advertisements or any other Mercedes materials disclosed to Mr. Licht that the Class Vehicles had defective rear subframes that would render his vehicle unsafe and that he would be faced with spending a large amount to return the vehicle to a safe, drivable condition, he would not have purchased his Class Vehicle, or would have paid less for it.

~~320.~~328. The notice letters sent to Mercedes by Plaintiffs on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023, pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*., requesting relief and repair of the defects exhibited in Class Vehicles are sufficient to constitute notice of Mr. Licht's claims, as they are substantively identical to those

of the Plaintiffs named in the letters. Exhs. 1, 2, 3, & 4. In response to these letters, Mercedes responded through counsel, with information about the Limited Subframe Warranty, which is inadequate to remedy Plaintiffs' injuries, as detailed below in § VI.C. Exh. 5. Mercedes received notice of additional claims in letters from Plaintiffs dated April 28, 2023 and May 3, 2024. Exhs. 6 & 7.

## B. Defendants

### 1. Defendant Mercedes-Benz Group AG

~~321.~~329. Defendant Mercedes-Benz Group AG ("MBG") is a German corporation, with its principal place of business in Stuttgart, Germany.

~~322.~~330. Prior to February 1, 2022, MBG was named Daimler AG.

~~323.~~331. At all times relevant herein, MBG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

~~324.~~332. Upon information and belief, MBG was chiefly responsible for designing the Class Vehicles, including their defective rear subframes.

~~325.~~333. Upon information and belief, MBG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of

repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Rear Subframe Defect. MBG has been directly involved in assisting, directing, and controlling MBUSA, and MBUSA's authorized dealers' handling of Class Member complaints regarding the Rear Subframe Defect.

~~326.~~334. MBG has held MBUSA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles. It established MBUSA as its wholly-owned subsidiary company. It named MBUSA with its official "Mercedes-Benz" title. It provided MBUSA with marketing and technical materials avoiding any distinction between MBUSA and MBG, and instead representing MBUSA as nothing less than MBG's presence in the United States for purposes of selling and leasing "Mercedes-Benz" brand vehicles and providing related services.

~~327.~~335. Based on the foregoing actions, Plaintiffs and the other Class Members justifiably relied on MBUSA's representations and omissions regarding the Class Vehicles that were the responsibility of MBG in, for example, MBG's design of the Class Vehicles, and were injured because of their purchase of defective Class Vehicles.

### 2. Defendant Mercedes-Benz USA, LLC

~~328.~~336. Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware corporation, with its principal place of business in Sandy Springs, Georgia.

~~329.~~337. Prior to July 2015, MBUSA's principal place of business was in Montvale, New Jersey.

~~330.~~338. MBUSA is a wholly owned subsidiary of MBG.

~~331.~~339. At all times relevant herein, MBUSA has been and has acted as an agent of MBG and subject to MBG's control.

~~332.~~340. At all times relevant herein, MBUSA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## III. JURISDICTION

### A. Subject Matter Jurisdiction

~~333.~~341. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act because: the amount in controversy exceeds $5,000,000, and Defendant MBG is a citizen of a foreign country, and is thus diverse from all Plaintiffs and the other Class Members. In addition,

Defendant MBUSA is a citizen of Georgia, and is therefore diverse from at least one Plaintiff. 28 U.S.C. § 1332(d)(2)(A).

**B. Personal Jurisdiction: MBG**

~~334.~~342. This Court has personal jurisdiction over MBG because MBG has sufficient contacts in this District that relate to the causes of action pleaded against MBG.

~~335.~~343. By headquartering its wholly-owned subsidiary MBUSA in this District, and using MBUSA as its channel for marketing, distributing, warranting, selling and leasing the MBG-designed Class Vehicles in the District and the United States, MBG itself has continuously and deliberately taken affirmative steps to make MBG-designed vehicles and replacement parts available to consumers in the District and the rest of Georgia, including Plaintiffs and the other Class Members; created continuing obligations between MBG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

~~336.~~344. On information and belief, MBG employees and representatives regularly visit MBUSA, thereby continuously conducting business in this District.

~~337.~~345. Further, MBG's wholly owned subsidiary MBUSA is at home in this District, and MBUSA's contacts in this District can be attributed to MBG.

~~338.~~346. Plaintiffs' claims here arise out of MBG's contacts with this District, particularly in that Plaintiffs could not have purchased their Class Vehicles if not for MBG's intentional acts of designing the Class Vehicles (including their defective rear subframes) and exporting them for sale to customers in this District and the United States as a whole, including Plaintiffs and the other Class Members.

~~339.~~347. These facts constitute a strong relationship between MBG, this District, and the allegations herein, and create a sufficient basis to render the exercise of jurisdiction over MBG by this Court permissible under traditional notions of fair play and substantial justice.

### C. Personal Jurisdiction: MBUSA

~~340.~~348. This Court has personal jurisdiction over MBUSA because MBUSA is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and many of the actions giving rise to the complaint took place in the District. On information and belief, since 2015, MBUSA has made major decisions regarding the marketing, warranting, and selling of Class Vehicles within this District.

~~341.~~349. Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over MBUSA permissible under traditional notions of fair play and substantial justice.

## IV. VENUE

~~342.~~350. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

~~343.~~351. Additionally, Defendants transact business within the District, MBUSA has its principal place of business in this District, and many of the events establishing the claims occurred in this District.

## V. APPLICABLE LAW

~~344.~~352. Plaintiffs seek damages and equitable relief on behalf of themselves and the other Class Members as a nationwide class under Georgia law. Georgia law should govern the claims of the nationwide class because Mercedes' acts, practices, and omissions regarding the Rear Subframe Defect were directed and emanated from MBUSA's headquarters in Georgia since its relocation to the state in July of 2015. Moreover, Georgia has a significant interest in regulating the conduct of a corporation whose principal place of business within the United States is in Georgia.

~~345.~~353. In the alternative, New Jersey law should govern the nationwide class, because New Jersey has a significant relationship to both the misconduct at issue here and the parties to this litigation, as MBUSA was headquartered in New Jersey prior to 2015, Mercedes made many of the false representations as to the Rear Subframe Defect from MBUSA headquarters in New Jersey, as well as designed, tested, and sold many of the defective Class Vehicles during the time it was headquartered in New Jersey.

~~346.~~354. In the alternative, Class Members seek damages and equitable relief under each Class Member's respective state's laws, which are substantially similar with respect to these facts and claims, and which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiffs' claims.

## VI. FACTUAL ALLEGATIONS

### A. Technical Details

#### 1. Mechanical Purpose of a Vehicle Subframe

~~347.~~355. Many vehicles, including the Class Vehicles, have a rear subframe that is located on the back undercarriage and that spans the width of the car in between the two rear wheels. The rear subframe faces the exterior of the

vehicle and is partially covered by a splash shield, but is otherwise exposed to the elements.

~~348.~~356. The diagram below illustrates the rear subframe of a 2014 Mercedes-Benz C 300, along with the components mounted to it:




~~349.~~357. A rear subframe (also called a "suspension cross-member" or "rear axle carrier") is an integral component of a vehicle's structure. It attaches to the unibody of the vehicle and provides stiff mounting points for suspension and driveline components. The rear subframe is essential to holding the rear suspension and rear wheels securely to the vehicle.

~~350.~~358. The wheels of a vehicle encounter significant road forces, which they transfer to the suspension. The subframe must be stiff and resilient because it stabilizes the vehicle's suspension when it encounters these transferred road forces. The rear subframes of many vehicles, including the Class Vehicles, are therefore made out of steel.

~~351.~~359. The rear subframe is attached to the wheels with control arms, which are also made out of steel. These control arms ensure that the wheels and suspension components are adequately attached to the body of the vehicle, so that when the vehicle is in drive and the wheels are propelled forward, the body of the car moves with it in a smooth and stable fashion.

~~352.~~360. The rear subframe of the Class Vehicles serves as an attachment point for the following control arms on both the left and right sides of the rear subframe:

a. The strut rods (alternately called the "rear arm," "rear lateral arm," "upper control arm," "rear upper control arm," "front lateral arm," "suspension control arm," "camber arm," or "camber strut");

b. The front lateral arms (alternately called the "front arms," "strut rods," "torque arms," "front upper control arms," "upper control arms," "suspension control arms," or "struts");

c. The rear lateral arms (alternately called the "rear lateral arms," "front lateral arms," "radius arms," "rear lower control arms," or "suspension control arms");

d. The track bars (alternately called the "lower links," "trailing arms," "ft lower control arms," "trailing arm bushings," "suspension control arms," or "pushing struts"); and

e. The lower control arms (alternately called the "spring control arms").

~~353.~~361. The control arms of the rear subframes on the Class Vehicles are in close proximity to a number of other essential vehicle components, including the rears wheels, gas lines, gas tank, brake lines, suspension springs, rear axle and exhaust system.

~~354.~~362. In addition to providing stability to the rear of the vehicle, the rear subframe plays an important role in crash safety, particularly in the case of an accident where there is impact on only one side of the vehicle's rear body. In such a collision, the rear subframe partially absorbs the impact and channels the collision forces to the side of the vehicle not involved in the impact. The rear subframe therefore helps to absorb some of the collision forces before they can reach the passenger cabin.

**2. Rust Formation and Corrosion**

~~355.~~363. Rust is an iron oxide produced in a process called corrosion, which occurs when iron or an iron alloy, such as steel, is exposed to oxygen and water. Road salt accelerates rust formation by acting as a catalyst.

~~356.~~364. Rust can be mild ("surface rust") or so extensive that it causes holes to form in the metal ("perforation"). The latter compromises the structural integrity of the metal, leading to perforation and breakage in metal vehicle components.

~~357.~~365. Corrosion of the severity present in the rear subframes of the Class Vehicles can take many years to develop, and its initial stages begin when the vehicle is first exposed to normal environmental conditions like precipitation, humidity, salt air, road salt, and temperature fluctuations.

~~358.~~366. Vehicle components, including rear subframes, are typically constructed using high-quality carbon steel, which is inherently susceptible to rust and corrosion. Therefore, the steel must be adequately coated with a properly applied anti-corrosion agent in order to withstand normal environmental conditions without experiencing corrosion and perforation. A properly designed rear subframe constructed of carbon steel must be coated with anti-corrosion agents sufficient to withstand normal environmental conditions.

~~359.~~367. Vehicle components made of steel must also be designed with adequate drainage to prevent water from becoming trapped or pooling on or in the component, leading to premature corrosion. A properly designed rear subframe constructed of carbon steel must have adequate drainage in order to prevent rust and corrosion.

~~360.~~368. The rear subframes of the Class Vehicles are constructed of carbon steel and are therefore susceptible to corrosion if not properly coated and designed.

~~361.~~369. The vehicle components adjacent to the rear subframe that also tend to experience corrosion (*i.e.*, brake lines, rear springs, exhaust system, gas lines, and rear axle), are made of metals susceptible to corrosion, and are likewise not properly coated and designed to resist corrosion in ordinary and expected use.

### 3. Mechanical Consequences of Subframe Corrosion

~~362.~~370. A non-defective rear subframe should last the life of a vehicle without needing replacement. For instance, in its European markets, every Mercedes vehicle comes with a 30-year "Mobilo Life" corrosion warranty, which guarantees that if the body of a Mercedes vehicle "is perforated due to corrosion from the inside out anytime within 30 years, Mercedes-Benz will repair the

damage at one of its workshops, at no cost to the owner." Mercedes has offered this warranty in Europe for the past 25 years.

~~363.~~371. The rear subframe is mounted underneath the vehicle, making it difficult to see unless specifically inspected. Even if inspected, the rear subframe is made of tubular carbon steel and, upon information and belief, rusts from the inside out, meaning a typical visual inspection of exterior rust will not reveal the corrosion until the subframe is close to failure. Therefore, the defect is difficult to see, even in a meticulously maintained vehicle, and even by a trained mechanic. As a result, the Class Vehicles provide little to no warning before becoming dangerously unstable.

~~364.~~372. A common failure point for the rear subframes of Class Vehicles is the mounting point for the control arms or the track bar. These points often experience heavy corrosion, becoming weak and sometimes detaching from the subframe.

~~365.~~373. A failure of the rear subframe where it meets suspension components, such as a control arm or track bar, is dangerous because the attached suspension components hold the drive wheels in place and in proper alignment. When a suspension component becomes detached from the subframe, it can drastically change the geometry of the suspension.

~~366.~~374. A sudden failure of a subframe suspension attachment point is particularly detrimental to drivability because without robust attachment points from the vehicle to the wheel, the wheel moves forward separately from the body of the vehicle.

~~367.~~375. A failure of a suspension attachment point on the subframe is more likely when the vehicle is in motion, because the component is exerting force on the attachment point. The higher the acceleration, the higher the force being exerted and, thus, greater likelihood of failure.

~~368.~~376. If the vehicle is in motion when the subframe fails at the attachment point, the driver's ability to control the vehicle and bring it to a safe stop is compromised. The steering, braking, acceleration of the vehicle becomes unpredictable. In particular, vehicles with broken rear subframes tend to fishtail or veer to one side unexpectedly while being driven. Of the Plaintiffs named in this complaint, Mr. Jacobs, Mr. Robinson, Ms. Lin, Mr. Garofalo, Mr. Xie, Mr. Ortiz, Mr. King, Mr. Russell, Mr. Russolillo, Mr. Simpson, and Mr. Licht all experienced partial loss of control while driving due to the failure of their rear subframes. In addition, Plaintiffs' attorneys have been contacted by more than 100 absent Class Members who experienced partial loss of control or difficulty braking while driving due to rear subframe failure.

~~369.~~377. Subframe failures while a Class Vehicle is in motion have also caused the tire adjacent to the detached control arm to jam and burst, rendering the vehicle suddenly uncontrollable. Plaintiffs' attorneys have been contacted by at least one absent Class Member who had one of the rear tires of her Class Vehicle burst due to a rear subframe failure while the vehicle was in motion.

~~370.~~378. In some cases, a detached control arm has struck the gas tank of the vehicle, damaging it. At least four absent Class Members have contacted Plaintiffs' attorneys with accounts of gas tank damage caused by detached control arms.

~~371.~~379. Vehicles with subframe corrosion have also experienced corrosion of the brake lines. When a vehicle's brake lines corrode, they may crack and begin to leak brake fluid. Compromised brake lines can cause driver to lose total or partial use of their brakes. Of the Plaintiffs named in this complaint, Mr. Robinson, Ms. Lin, Ms. Cooper, Mr. Powell, and Mr. Simpson, experienced corroded rear brake lines that required replacement. The corrosion on Mr. Robinson's rear brakes lines was so severe that they began to leak brake fluid. In addition, more than 30 absent Class Members who contacted Plaintiffs' attorneys experienced corroded rear brake lines.

~~372.~~380. Vehicles with subframe corrosion also experience corrosion of the rear suspension springs, a critical component of a vehicle's suspension system. Of the Plaintiffs named in this complaint, Mr. Robinson, Mr. Xie, Mr. Russell, Ms. Harris, and Ms. Brown were forced to replace their rear springs along with their rear subframes due to corrosion. More than 15 absent Class Members in contact with Plaintiffs' attorneys have had their rear suspension springs replaced due to corrosion.

~~373.~~381. In addition, the Rear Subframe Defect has impacted the exhaust systems of Class Vehicles, the gas lines, and/or the rear axles, requiring the replacement of these components due to severe corrosion. At least one absent Class Member in contact with Plaintiffs' attorneys has experienced corrosion of her exhaust system. Of the Plaintiffs named in this complaint, Mr. Ortiz was forced to replace his gas lines along with his rear subframe due to corrosion. Mr. Russolillo was forced to replace several rear axle components in addition to the rear subframe. Additionally, corrosion of the rear axle in certain Class Vehicles has been noted by a German-language publication, and MBG has confirmed its receipt of complaints regarding rear axle corrosion. *See infra* ¶¶ 355-60.

~~374.~~382. One of the most serious consequences of compromised subframe is that, in the event of a crash, it is unable to absorb and evenly distribute

the force from the impact. When that force is not evenly distributed, it can cause the vehicle to collapse.

~~375.~~383. A vehicle with a perforated rear subframe cannot be safely driven unless the subframe is replaced, a time-intensive process that involves removing the rear suspension, rear drivetrain, and rear wheels from the vehicle, and then assembling it all onto the new subframe.

~~376.~~384. The cost of a rear subframe replacement, including parts and labor, is typically between $2,000 and $7,000, although costs easily exceed that threshold if the Rear Subframe Defect has caused damage or corrosion to other parts of the vehicle, such as the rear brake lines, suspension components, exhaust system, rear axle, tires, gas lines, or gas tank.

~~377.~~385. Plaintiffs and the other Class Members were injured at the point of sale by not receiving the benefit of their bargain: vehicles without a Rear Subframe Defect.

~~378.~~386. No reasonable consumer would purchase a Class Vehicle, which cost a minimum of $44,000 new, if they knew that it was likely to become unsafe and/or inoperable due to corrosion of the rear subframe in less than 12 years, even when meticulously maintained.

**B. Mercedes' Knowledge of the Subframe Defect**

~~379.~~387. As early as 2009, and likely earlier, Mercedes was aware of the Rear Subframe Defect, should have been aware of the Rear Subframe Defect through exercise of reasonable care, and/or was negligent in failing to be aware of the Rear Subframe Defect, based on, among others, the following sources:

a. Pre-release design, manufacturing, engineering, and testing data;

b. Detailed data gathered by Mercedes about large number of Rear Subframe Defect repairs by authorized Mercedes dealers;

c. Numerous and consistent consumer complaints collected by NHTSA about the Rear Subframe Defect;

d. Service bulletins sent by Mercedes to its dealerships evincing knowledge of the Rear Subframe Defect in the Class Vehicles;

e. Knowledge Mercedes had of the large number of replacement rear subframes ordered from Mercedes;

f. Numerous and consistent consumer complaints made directly to Mercedes about the Rear Subframe Defect;

g. Numerous and consistent consumer complaints made on online vehicle owner forums;

h. Actions taken by MBG in foreign markets to remedy the Rear Subframe Defect; and

i. Mercedes service center employees' familiarity with and knowledge of the Rear Subframe Defect.

**1. Mercedes' Knowledge of the Rear Subframe Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data**

~~380.~~388. During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Mercedes necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' rear subframes and adjacent components, particularly the basic engineering principles behind the rear subframes' construction and materials, as well as the expected conditions and uses the rear subframes would encounter in ordinary customer use.

~~381.~~389. An adequate pre-release analysis of the design, engineering, and manufacture of the rear subframes in the Class Vehicles would have revealed to Mercedes that the rear subframes were defective and would experience severe, premature corrosion when exposed to normal road conditions.

~~382.~~390. Due to the well-known threat of corrosion to the safety, stability, and longevity of vehicles, manufacturers conduct a wide variety of pre-

sale tests to ensure that both component parts, and the vehicle as a whole, are able to stand up to corrosive road conditions. These tests include:

a. An initial "weathering test" of the anti-corrosion coatings to be used on the subframe and adjacent components, which involves putting a sample of coated metal into a "weathering chamber" and exposing it to a variety of simulated environmental conditions. Engineers then assess the impact of those conditions on the integrity of the coatings. Automakers typically test multiple coatings to determine which is most resistant to corrosion. Mercedes did perform or should have performed such a test on the Class Vehicles.

b. A corrosion test of individual vehicle components, during which engineers leave an individual component part in an enclosed booth and cycle through the process of exposing the part to a corrosive agent, typically by spraying the part with the corrosive agent, letting it dry, and then repeating the process several times. Mercedes did perform or should have performed such a test on the rear subframes and adjacent components of the Class Vehicles.

c. A general corrosion test of the entire vehicle under driving conditions, in which engineers drive a vehicle through a corrosive environment (heavy salt, water, etc.) and monitor the vehicle for corrosion during a set time

period following exposure. Mercedes did perform or should have performed such a test on the Class Vehicles.

d. A "soap test" in which engineers spray corrosive agent on the exterior of the vehicle, which has the effect of accelerating corrosion with the goal of simulating the long-term effects of exposure to corrosive agents on the vehicle. Mercedes did perform or should have performed such a test on the Class Vehicles.

~~383.~~391. A reasonably prudent vehicle manufacturer should have conducted the above tests, or a substantially similar battery of tests, to ensure that its vehicles' rear subframes and adjacent components were adequately protected against corrosion. Plaintiffs expect discovery to reveal whether Mercedes performed these tests and knew about the Rear Subframe Defect, but chose to sell the Class Vehicles in a defective state, or whether it was negligent in failing to perform these tests.

**2. Mercedes Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations**

~~384.~~392. In addition to complaints made directly to Mercedes, many Class Vehicle owners lodged complaints about the Rear Subframe Defect with NHTSA beginning as early as 2018.

~~385.~~393. Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, and imposes a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

~~386.~~394. Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, including safety-related defects, such as the severe, premature corrosion of essential structural components like the rear subframe. Indeed, many of the NHTSA complaints also expressly state that Mercedes was directly informed of the issue.

~~387.~~395. From its monitoring of the NHTSA database, Mercedes knew or should have known of the many complaints about the rear subframe rust, corrosion, and failure logged by NHTSA, and the content, consistency, and large number of those complaints alerted, or should have alerted, Mercedes to the Rear Subframe Defect.

~~388.~~396. NHTSA's complaint database is currently publicly available. To the extent that it was not publicly available in previous years, Mercedes, as a vehicle manufacturer, had contemporaneous and ongoing access to the NHTSA

consumer complaint data. A sampling of the publicly available complaints lodged with NHTSA to which Plaintiffs have been able to gain access includes both the complaint quoted above, as well as the following:[1]

a. "Right rear trailing arm mount became detached from sub frame. Sheet metal on rear suspension sub frame ripper / tore so that rear trailing arm is only attached to lower part of mount, and not attached to vehicle. No accident, but vehicle is extremely unstable to drive when heavy breaking could occur! Vehicle veers suddenly to the right! Concern besides instability is that loose trailing link could puncture fuel tank less than an inch away. First noticed while driving on I-4 when a vehicle changed into my lane abruptly, and I had to forcefully apply brakes." NHTSA database, NHTSA ID No. 11064613, date of incident January 23, 2018.

b. "The rear 'K' suspension subframe assembly had to be replaced because of rust internally in the vehicle frame. There was no other rust, internally or externally visible, on the entire car. My mechanic indicated that the car would not pass inspection without major repairs at a cost of over $2800. If the subframe

[1] For these and other customer complaints quoted in this Complaint, quotes are left as written, except complaints that were original in all caps have been changed to standard case. Due to the number of typographical and grammatical errors, [sic] notation has not been used. Any emphasis has been added, unless otherwise noted.

became disconnected, steering control would be lost resulting in a potentially serious injury due to loss of directional control at high speeds. My mechanic has already replaced parts to repair this issue on at least 4 other cars within a short period of time." NHTSA database, NHTSA ID No. 11432196, date of incident September 8, 2021.

c. "This car has 63,792 miles on it and has been continuously garaged and well cared for. All maintenance has been done timely and by Mercedes-Benz of Tysons Corner (Virginia) since it was purchased there on 01/08/14. All required maintenance was completed as advised and the car was covered under a 7 year 75,000 mile warranty. At the recent regularly scheduled yearly maintenance service completed on 12/28/21 we were advised that the . . . 'rear sub-frame is beginning to rust through and has a hole on the right rear (RR) and the recommendation was the 'replacement of rear sub-frame soon' at an estimated cost of $4,242.40. This car has never been in an accident. In speaking to the MB service representative about this issue, I was advised that this problem has happened to several C300's from the period 2009-2014 and that Mercedes Benz was not accepting any responsibility for the issue in the US but had issued recalls in other countries. He said Mercedes maintains that it is a 'wear and tear' issue. This car has not been abused and has been well maintained. This is not an area of

the country where you would expect to see this type of corrosion unless the part was defective in some manner. In researching the problem on the internet, several people write about experiencing a failure of this part although the cars were older than ours and had more mileage on them. It appears to be a safety issue should the part rust through as it could puncture the gas tank or cause the rear wheels to buckle or cause a loss of control of the auto from the auto fishtailing. I have never seen this happen to a car before and I am 75 years old and have owned a number of automobiles over the years." NHTSA database, NHTSA ID No. 11450424, date of incident December 28, 2021.

d. "The car was brought in for scheduled maintenance and they told me that my rear sub frame rusted out and had snapped. Car is only 7 years old, always garaged, basically a main part rusted out. Mercedes prides itself on durability and safety. There were no warning lights, alarms, nothing. Whenever I braked the rear end of the car would slide to the left and I had to try and adjust accordingly. Prior to bringing the car in for its maintenance I was reluctant to drive it on highways and at higher speeds. Now that I am aware of the problem, had the rear of the car given out while I was on a highway, I had the potential to roll over and possibly blown up had the gas tank been impacted. I researched the issue on Google and found many instances of others having the same issue, with the same

part, luckily no one appears to have been killed as yet. As I mentioned this was never picked up during all the scheduled maintenance work, nor state inspections, all handled by this dealership. The dealership is in the process of replacing the part and all work associated with that replacement. I don't know if they kept the part or tossed it out, but will ask. No one else has seen the car or rusted part other than the dealership. I'm also sending you a copy of the letter I sent to he dealership and Mercedes-Benz Home Office." NHTSA database, NHTSA ID No. 11456512, date of incident March 7, 2022.

### 3. Mercedes Knew of the Rear Subframe Defect as Evidenced by its Own Technical Services Bulletins

~~389.~~397. On May 11, 2018, Mercedes sent out a service bulletin to its dealers within the United States, advising service technicians to check the rear subframe of certain model years for corrosion as follows:

> "As part of the maintenance procedure, the rear axle carrier is checked for corrosion (sheet metal perforation, hold formation, rust-through damage), in particular, in the area of the mounting supports for the suspension struts such as the tie rod … and thrust arm[.]"

~~390.~~398. In Mercedes nomenclature "rear axle carrier" is another term for the rear subframe.

~~391.~~399. The service bulletin further specifies that it is intended to augment existing guidance on subframe maintenance and was issued "[d]ue to recent events." The maintenance document does not specify to which events Mercedes was responding with the bulletin.

~~392.~~400. The bulletin lists model numbers 171, 172, 203, 204, 205, 207, 209, 212, 218, 231, and 253, which correspond to the following vehicles:

a. SLK-Class, model years 2004-2010

b. SLK/SLC-Class, model years 2011-2020

c. C-Class, model years 2001-2007

d. C-Class, model years 2008-2015

e. C-Class, model years 2015-2022

f. GLK-Class, model years 2010-2015

g. E-Class Coupe and Cabriolet, model years 2010-2017

h. CLK-Class, model years 2003-2009

i. E-Class Sedan and Wagon, model years 2010-2016

j. CLS-Class, model years 2010-2018

k. SL-Class, model years 2013-2020

l. GLC-Class, model years 2016-2022

~~393.~~401. The service bulletin shows that Mercedes was aware of the Rear Subframe Defect in many of the Class Vehicles. Rather than issuing a recall for this dangerous safety defect, Mercedes instead did the bare minimum by merely notifying its dealers to do a cursory check for subframe corrosion.

### 4. Mercedes Knew of the Rear Subframe Defect Based on its Receipt of a Large Number of Orders for Replacement Subframes

~~394.~~402. Upon information and belief, Mercedes also knew or should have known about the Rear Subframe Defect because of the higher than expected number of replacement rear subframes ordered from Mercedes, which should have alerted Mercedes that this was a defect affecting a large number and wide range of its vehicles.

~~395.~~403. Upon information and belief, Mercedes service centers use Mercedes replacement parts that they order directly from Mercedes. Therefore, Mercedes would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes. The ongoing high sales of rear subframes was (or should have been) known to Mercedes, and alerted Mercedes that its rear subframes were defective and causing Class Vehicles' rear subframes to develop severe, premature corrosion.

~~396.~~404. Upon information and belief, replacement rear subframes for some or all of the Class Vehicles are currently backordered or have been backordered, given the high volume of demand for replacement parts due to the Rear Subframe Defect. For instance, Plaintiff Park C. Thomas had to wait several months to have his vehicle repaired at a Mercedes dealership due limited availability of replacement subframes. Additionally, Plaintiff Mike Xie has been waiting for his rear subframe to be repaired since February of 2023 and his dealership has informed him that due to shortages they will likely not be able to perform the repair until August or September of 2023. Many absent Class Members in contact with Plaintiffs' attorneys also experienced long waiting times for repairs due to limited subframe availability. For instance, one Class Member was told by a Mercedes dealership in late February 2023 that the replacement of the rear subframe of her Mercedes-Benz C 300 would likely be delayed because there were only 19 replacement rear subframes available in the entire United States. This parts shortage further substantiates that Mercedes knows or should know about the existence of the defect.

5. **Mercedes Was Made Directly Aware of the Rear Subframe Defect Based on a Large Number of Class Member Complaints to Mercedes**

~~397.~~405. Mercedes also knew or should have known about the Rear Subframe Defect because numerous consumers complained directly to Mercedes about the defect. The large number of complaints, and the consistency of their descriptions of the Rear Subframe Defect, including the near-uniform corrosion points and incidents of sudden, unexpected loss of control for drivers, should have alerted Mercedes to this serious safety defect, which impacts a wide range of vehicles.

~~398.~~406. The full universe of complaints made directly to Mercedes about the Rear Subframe Defect is information presently in the exclusive custody and control of Mercedes and is not yet available to Plaintiffs prior to discovery. However, on information and belief, many Class Vehicle owners complained directly to Mercedes and Mercedes dealerships about the rear subframe failures their vehicles experienced. For example, some instances of these direct-to-Mercedes complaints are described in Class Vehicle owners' complaints logged with NHTSA or posted on online vehicle owner forums:

a. "I have a 2011 C class that I've owned and loved for several years—it was my first car and up until recently I was a huge fan of MB. After

hearing clunking noises and experiencing strong leftward pull when braking—so strong that my car nearly swerved off the highway—I took it to my local dealer. They found that the rear subframe had rusted through and snapped, effectively detaching my left rear wheel from the car. It's not exactly an "old" car, has 87k miles on it, and has been diligently dealer-serviced and regularly washed throughout its whole life with no accidents or bodywork. I don't live in the snow belt, but apparently there's a flat spot on the subframe where water + road salt can accumulate, causing rust. … After MBUSA refused to pay for my subframe replacement (quoted at $4,200 by the dealer), I was left with no choice but to engage a plaintiff's attorney and prepare to sue what had previously been my favorite car company ☹" Posted on Reddit in r/Mercedes_Benz on December 16, 2018.

b. "The contact owns a 2010 Mercedes- Benz E 350. The contact stated that while driving there was an undetermined abnormal noise detected. The vehicle was taken to an independent mechanic where it was informed the sub frame was corroded The independent dealer was contacted. The vehicle was diagnosed or repaired. The manufacturer was notified electronically however no response was provided. The failure mileage was approximately 171,000." NHTSA database, NHTSA ID No. 11436456, date of incident September 28, 2021.

c. "The contact's wife owns a 2014 Mercedes-Benz E-350. The contact stated that while driving at various speeds, the rear of the vehicle was swerving. The contact stated while the brake pedal was depressed, the rear of the vehicle shifted. No warning light was illuminated. The vehicle was taken to the dealer where it was diagnosed that the rear subframe was rusted and needed to be replaced. The vehicle was repaired. The manufacturer was notified of the failure, but no assistance was provided. The contact was awaiting a response. The failure mileage was approximately 72,000." NHTSA database, NHTSA ID No. 11501098, date of incident December 10, 2022.

d. "Took my 2011 E350 4Matic to an independent shop recently for some work. When I went to pick up the car, I find out from the mechanic that the rear sub-frame is rotting (see pics). I am told that this is a fairly common problem in the the C-class (W204, I believe) but starting to show up in W212s. Anyways, I call MBUSA and ask if they have any recall program. Am told no. I then went to NHTSA website and filed a complaint. Understand that if issue is not fixed, the problem will continue to get worse and should the rear subframe detach from the wheel, can lead to shrapnel puncturing the gas tank. Wanted other W212 owners to know. Haven't heard anything from NHTSA yet, but will keep everyone posted. Next time, your car is up on the lift, have the tech check out your subframe

condition - and file complaint with NHTSA if you car is experiencing a similar condition." Posted on mbworld.org on December 19, 2022.

### 6. Mercedes Knew of the Rear Subframe Defect Based on Class Member Complaints on Public Online Forums

~~399.~~407. In addition to complaint made directly to Mercedes and collected by the NHTSA, many Class Vehicle owners posted complaints about the Rear Subframe Defect on public online forums. The following is a small sampling of such complaints:

a. "2011 c300 rear subframe rot. My car is currently at the dealer for service b, trans service and airbag recall. They called and told me the rear subframe is rotted and unsafe to drive. They quoted over $5000 to replace it, the brake lines which are also about to fail, motor and trans mounts and diff seals. The car is very clean and ive never seen any indication of rust so far but i did know about the diff seals." Posted on mbworld.org on October 28, 2019.

b. "I recently had the rear subframe on my wife's 2010 C300w4 fail and literally start to fall apart after a service visit to an authorized MB dealer. It started to exhibit some serious handling issues and when I jacked up the right rear and removed the tire, I found a crack next to one of the aluminum suspension struts mounting flange. Being out of warranty and with 94k I realized there was little MB

would do. I'd worked for 2 Mercedes Benz dealers over 40 years and sold millions of dollars worth of cars, but I knew what the answer would probably be. I just didn't realize how bad the problem was. The dealer had the factory rep look at problem who said that MB would not cover it. I elected to have a friend's MB Certified body shop do the work at a cost of $4000.; the dealer wouldn't give me an exact cost but was suggesting somewhere around $5500-$6000. From just looking at the subframe it was difficult to see the extent of the damage but upon removal of the old unit, it was surprising how much rust had taken place from the inside. The entire flange holding one of the links completely fell out!" Posted on benzworld.org on Mar 24, 2020.

c. "I bought a Certified used 2011 E350 from a dealership in Maryland in 2014 and the car is a lemon. It has been serviced at the same dealership as purchased every 7-10k miles and currently has 80k. My brakes failed and I was just told the Subframe is Rusted Through. The car was serviced in November where the technician supposedly checked the entire car including brake lines and subframe. They claim that the Rust must have happened in the last 9 months because the tech would have noticed it! REALLY??? We had no snow last year, so no salt on the roads and the car is garage kept. Sounds to me like MB isn't making cars like they used to! I checked my Subaru and they offer a 10-year

corrosion warranty STANDARD! And the extended warranty that MB sold me won't cover the brake lines because of rust(sounds like Continental knows more about MB then me) ‘corrosion warranty’ Now I am stuck with a car that is ‘too dangerous to drive’ and the dealership with its hand in my pocket. Any others out there with a similar problem?” Posted on Benzworld.org on Aug 21, 2020.

d. “I too have this issue. My 2010 model E350 have a cracked sub frame and the dealer in MD Germany quoted me 3600+ to fix it. Plus the rotors and brakes for all four wheels, I have to pay about 6K to get it fixed. The service manager I spoke to told me he have been seeing this issue pretty common on a lot of C and E series. I cannot believe MB will have a broken subframe due to corrision. This is not the expected MB quality.” Posted on Benzworld.org on January 25, 2022.

e. “2014 C300 Sport. I’ve gotten my car regularly inspected by both Huntington Long Island Mercedes as well as a shop that only does Mercedes in Brooklyn - was told it was in great shape. Runs beautifully etc. After getting my usual NY state inspection last week, I was asked to follow the mechanic to look under the car at the rust under the rear chassis. It was insane. Pitted out- I wish I had added an extra coat of rust proofing as soon as I got the car. I do park outside, but I never expected this. I have had thorough inspections numerous times since

buying the car in 2019, and nothing was seen or mentioned. Therefore it all must have occurred in the last few years - and was missed by both official Mercedes mechanics and mechanics that specialize in Mercedes." Posted on mbworld.org on September 16, 2022.

~~400.~~408. As shown by this small sampling of complaints from vehicle owner forums, consumers have been vocal in complaining about the Rear Subframe Defect and the serious safety risks it causes. A multi-billion dollar automaker like Mercedes undoubtedly had and has a marketing department that tracks such sites and should reasonably have been aware of the Rear Subframe Defect in the Class Vehicles.

**7. Mercedes Has Publicly Acknowledged Premature Rear Subframe Corrosion in its European Markets and Has Committed to Remedying the Defect in Those Markets.**

~~401.~~409. In an article from the November 2022 edition of Auto Motor Sport, a German-language publication, Mercedes acknowledges that there have been "isolated complaints" regarding corrosion on the rear axles of certain Class Vehicles.

~~402.~~410. The article states that Mercedes has "decided, as a gesture of goodwill, to assume the repair costs for replacing the rear axle due to corrosion."

~~403.~~411. A statement from the Kraftfahrt-Bundesamt ("KBA"), Germany's regulatory body for motor vehicles, states that the corrosion issue impacts the rear axle and rear axle carrier (aka, the rear subframe).

~~404.~~412. The following Class Vehicles are identified by the article as susceptible to corrosion of the rear axle and rear axle carrier (rear subframe): SLK (R171), GLK, E-Class W212 and the C-Class of the W205 series.

~~405.~~413. Upon information and belief, the corrosion-related defect described in November 2022 Auto Motor Sports Article is the same as the Rear Subframe Defect.

~~406.~~414. Moreover, the Rear Subframe Defect is a material, serious safety issue, as evinced by numerous accounts of the rear subframes of Class Vehicles failing while the vehicle in is motion, causing the driver to lose control of the vehicle; the failure of many Class Vehicles to pass mandatory state safety inspections; and the many accounts of experienced mechanics warning Class Members not to drive their Class Vehicles due to safety concerns.

**C. Mercedes' Inadequate Warranty Extension**

~~407.~~415. On December 9 and 21, 2022 Plaintiffs, through counsel, sent letters to Mercedes pursuant to the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*, requesting relief and repair of the defects exhibited in Class

Vehicles and informing Mercedes of their intention to sue absent an offer of such relief.

~~408.~~416. Mercedes was obligated to respond to the initial letter within thirty days of receipt, by January 9, 2023. *See* O.C.G.A. § 10-1-399(b). Mercedes' counsel requested a 30-day extension of that deadline due to the holidays, which Plaintiffs' counsel granted as a professional courtesy.

~~409.~~417. On February 9, 2023, Mercedes responded to both notice letters through counsel. In its response, Mercedes denied the existence of the defect. *Id.*

~~410.~~418. The letter indicates that Mercedes plans to roll out the Limited Subframe Warranty, which covers perforation and corrosion of the rear subframe in certain of its vehicles for a twenty-year period. Mercedes also sent Plaintiffs the warranty extension notice issued in conjunction with this program (the "Limited Subframe Warranty Notice"). Exh. 5.

~~411.~~419. On information and belief, on February 10, 2023, Mercedes began disseminating the Limited Subframe Warranty Notice to its authorized dealerships. For instance, on February 10, 2023 a copy of the Limited Subframe Warranty Notice dated February 10, 2023 was posted on a Mercedes' owner forum.

~~412.~~420. Mercedes claims that they had planned to issue the Limited Subframe Warranty prior to the receipt of Plaintiffs' first notice letter on December 9, 2022, but it has provided no evidence of that claim. Moreover, the Limited Subframe Warranty Notice bears a copyright date of 2023, and the version posted online is dated February 10, 2023, indicating that it was created at least three weeks after Mercedes' receipt of Plaintiffs' first notice letter.

~~413.~~421. Mercedes continued to deny reimbursement for rear subframe repairs until the day the Limited Subframe Warranty was released, nearly two months after Plaintiffs sent their first notice letter to Mercedes. For instance, Mr. Xie was told by Mercedes on February 8, 2023 that they knew nothing about the Rear Subframe Defect and would not reimburse him for his rear subframe replacement.

~~414.~~422. Prior to February 10, 2023, in response to complaints about the Rear Subframe Defect, Mercedes encouraged certain Class Members to forgo a repair by offering a rebate on a new vehicle. Of the Plaintiffs named in this complaint, Ms. Lin and Mr. Robinson were offered rebates by Mercedes in response to their complaints about the Rear Subframe Defect.

~~415.~~423. The Limited Subframe Warranty covers only a fraction of the Class Vehicles, and is therefore insufficient.

~~416.~~424. The Limited Subframe Warranty provides insufficient notice to Class Members that their vehicles are at risk of dangerous corrosion.

~~417.~~425. The Limited Subframe Warranty does not inform Class Members that they should have their vehicles inspected for corrosion, and does not provide any funding for those inspections.

~~418.~~426. The Limited Subframe Warranty also fails to guarantee reimbursement for many, and in some cases all, of the costs incurred by Plaintiffs and the other Class Members as a result of the Rear Subframe Defect, including:

a. rear subframe replacements completed by Mercedes-certified mechanics or independent mechanics and/or using non-Mercedes parts or used parts;

b. replacement or repair of parts damaged as a result of rear subframe failures while in motion, including a Class Vehicles' gas tank, torsion bar, and wheels;

c. premature corrosion of components adjacent to the subframe, such as brake lines, gas lines, rear suspension springs, and exhaust system;

d. ancillary costs incurred as a result of the Rear Subframe Defect, including towing costs, rental car fees, and inspection fees; and

e. overpayment at the point of sale by Class Members and Plaintiffs who believed that they were buying a vehicle without the Rear Subframe Defect.

~~419.~~427. Class Members report being denied reimbursement from Mercedes for all of the above costs.

~~420.~~428. The Limited Subframe Warranty is also notably insufficient to remedy the serious safety concerns posed by the Rear Subframe Defect because it:

a. covers only the replacement of rear subframes that are perforated due to corrosion. By the time corrosion has caused the steel of a rear subframe to become perforated, the part is already dangerously unstable and close to failure.

b. does not provide adequate warning to Class Members as to the safety implications of rear subframe corrosion or acknowledgment that a defect exists. Therefore, many Class Members will likely continue unknowingly driving vehicles with dangerously corroded rear subframes until they are at the point of failure.

c. does not establish an inspection program which would allow Class Members to have their Class Vehicles checked for corrosion at an authorized

Mercedes dealership free of cost. As detailed above, a standard yearly inspection is often not enough to detect even advanced subframe corrosion.

d. does not reimburse Class Members for the replacement of their rear subframes before they pose a serious safety risk, and therefore puts drivers at risk.

e. does not offer a program that allows Class Vehicle owners to have their non-corroded subframes coated with an anti-corrosion compound free of charge.

~~421.~~429. In addition, it is likely that Mercedes will not have the supply of parts necessary to promptly replace Class Members' defective subframes. Based on Class Member reports, there is already a shortage of replacement subframes for the Class Vehicles. For instance, one dealership representative told a Class Member that as of February of 2023, there were only 19 C 300-compatible replacement subframes available in the entire United States. This shortage has caused some Plaintiffs and the other Class Members to have to wait weeks, if not months, for a repair at their local authorized Mercedes dealership. Several Class Members have reported a wait of up to six months to have their subframe repaired, leading them to either sell the vehicle for diminished value or to have the repair completed by an independent mechanic with a used and/or aftermarket part, a

service which Mercedes will generally decline to reimburse. Counsel have been contacted by several Class Members who have been forced to buy another vehicle in order to have transportation while they wait to have their subframe repaired.

~~422.~~430. In sum, Mercedes' proposed Limited Subframe Warranty does not adequately remedy the serious safety risks of the Rear Subframe Defect or adequately reimburse Plaintiffs and the other Class Members for past or future economic injuries.

### D. Mercedes' Marketing and Concealment

~~423.~~431. Mercedes manufactured and sold the Class Vehicles with the Rear Subframe Defect, while willfully concealing the serious safety and reliability impacts of the defect, as well as the inferior quality and limited longevity of the Class Vehicles' rear subframes.

~~424.~~432. Mercedes directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, and through other mass media.

~~425.~~433. Mercedes regularly releases advertisements and marketing materials touting the reliability of its vehicles and the brand's commitment to safety. The following are a few examples of such widely circulated advertisements and marketing materials:

a. A 2010 advertisement for the Mercedes E-Class: "just like its predecessor, the new E-Class is an extremely safe vehicle."

b. A 2012 advertisement for the Mercedes E-Class: "a world you can't predict demands a car you can trust."

c. A July 28, 2014 press release for the Mercedes C-Class states "the Sedan complies not only with all current national laws but also with all rating requirements, as well as meeting the more stringent internal Mercedes-Benz safety standards based on what actually happens during accidents."

d. In a 2015 promotional video for the Mercedes C-Class, the company emphasizes its commitment to "passive safety" stating that Mercedes "development engineers" are able to "detect and eliminate any possible weak points." The video also touts a testing process intended to show that the "body and chassis" of the C-Class can endure "the most extreme loads."

e. In a 2016 advertisement, Mercedes states that "for 130 years we have been doing everything possible to make your Mercedes even safer."

f. On October 20, 2022, Mercedes published a press release stating "[t]he company is pursuing a clear goal: to achieve accident-free driving by 2050."

~~426.~~434. Mercedes also regularly released marketing materials touting the quality and longevity of its materials, including its use of technology meant to prevent corrosion:

a. In a 2010 advertisement for its C-Class vehicles, Mercedes touted the "strength of its steel," "the integrity of its design," and its ability to handle "extreme situations."

b. In a press release published on April 13, 2010, Mercedes detailed the corrosion protection technology used on its vehicles' wheel rims. In particular, Mercedes emphasized its use of "a very special paint structure which provides reliable protection against corrosion." The press release goes on to state that "Mercedes-Benz has played a decisive role in developing reliable anti-corrosion systems for high-sheen wheels and is currently considered to be a pioneer in this area." Mercedes details the testing process used to ensure that the wheel paintwork is resistant to corrosion, which includes no less than seven different laboratory tests which it considers "the toughest of test methods – a series of ultimate tests for wheel coatings." Once the coatings have passed the laboratory tests, they are then subjected to a variety of real-world corrosion tests before being approved for use in the production of Mercedes vehicles.

c. In a press release published on March 7, 2011, Mercedes described the technology used to prevent corrosion on its vehicles: “Long-term corrosion prevention for the bodywork is based on fully galvanised sheet metal panels. Structure areas of the body which are subjected to high stresses are protected with cavity-fill preserving agent. Sheet metal panel laminations and beads are completely filled with adhesive, whilst systematic sealing of the weld seams and edges with a PVC joint prevents corrosion from occurring. Generous underbody panelling composed of plastic laminate protects the bodywork and engine against stone chipping, moisture and dirt. Axle components, which are also subjected to a great deal of stone chipping damage, are protected by plastic panelling.” Body, quality and production: Master of quality in the executive segment, published on March 7, 2011.

d. In a press release published July 15, 2008, Mercedes details the corrosion protection on its GLK-Class vehicles in a section titled “Effective corrosion protection for a long vehicle life”: “Effective corrosion protection is particularly crucial in the case of SUV models and off-roaders. This is exactly why all GLK models feature a series of precisely harmonised protective mechanisms[.]”

~~427.~~435. None of Mercedes' advertisements warned customers that their vehicles were likely to experience severe, premature corrosion of the rear subframe that would impact their ability to safely drive the Class Vehicles.

~~428.~~436. Plaintiffs and the other Class Members were exposed to Mercedes' long-term, national multimedia marketing campaign, which focused on the safety and reliability of Mercedes vehicles, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion-free. Plaintiffs and the other Class Members justifiably chose to purchase their Class Vehicles based on Mercedes' misleading marketing, which concealed the true, defective nature of the Class Vehicles' rear subframes.

~~429.~~437. Further, Mercedes knowingly misled Class Members about the defective, unsafe nature of the Class Vehicles. As detailed above, upon information and belief, Mercedes has been aware of the Rear Subframe Defect since at least 2009 and likely earlier. However, Mercedes consistently promoted the Class Vehicles as safe, while knowingly omitting and concealing information about the Rear Subframe Defect in the Class Vehicles from Plaintiffs and the other Class Members.

~~430.~~438. Had Mercedes disclosed the Rear Subframe Defect in its marketing or otherwise, Plaintiffs and the other Class members would not have purchased their Class Vehicles, or would have paid less for them.

~~431.~~439. Despite Mercedes' knowledge of the Rear Subframe Defect and up until the February 10, 2023 release of the Limited Subframe Warranty, it told Class Members who complained to customer service about the Rear Subframe Defect that it was not aware of any defect, was not responsible for the defect, and that, absent a warranty, it was not responsible for full reimbursement for the repair.

**E. Fraudulent Concealment Allegations**

~~432.~~440. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Mercedes responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. Mercedes necessarily is in possession of all of this information.

~~433.~~441. Plaintiffs' claims arise out of Mercedes' fraudulent concealment of the Rear Subframe Defect and the serious safety issues it causes, and its representations about the world-class quality and safety of the Class Vehicles.

~~434.~~442. To the extent that Plaintiffs' claims arise from Mercedes' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically prior to and at the time they purchased their Class Vehicles, Mercedes knew, or was reckless in not knowing, of the Rear Subframe Defect; Mercedes was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its active concealment of it; and Mercedes never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

~~435.~~443. Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Mercedes:

a. **Who:** Mercedes actively concealed the Rear Subframe Defect from Plaintiffs and the other Class Members while simultaneously touting the safety and world-class quality of the Class Vehicles, as alleged in § VI.D. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mercedes responsible for such decisions. However, both representatives of Mercedes customer service and various Mercedes-authorized dealerships have denied the existence and wide prevalence of

the Rear Subframe Defect when specifically questioned by Class Vehicle owners, an experience shared by Plaintiffs Edward Michael Jacobs, Raymond Robinson, and Mike Xie.

b. **What:** Mercedes knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Rear Subframe Defect starting no later than 2009, as alleged above in § VI.B. Mercedes concealed the defect and made representations about the safety, world-class quality, and other attributes of the Class Vehicles, as specified above in § VI.D.

c. **When:** Mercedes concealed material information regarding the Rear Subframe Defect at all times and made representations about the world-class quality, sophistication and state-of-the-art safety of the Class Vehicles, starting no later than 2009, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above in § VI.D. Mercedes still has not disclosed the truth about the defect in the Class Vehicles to anyone outside of Mercedes. Mercedes has never taken any action to inform consumers about the true nature of the defect in Class Vehicles. And when consumers brought their Vehicles to Mercedes with heavily corroded rear subframes, Mercedes denied any knowledge of or responsibility for the Rear Subframe Defect. For example, when

Plaintiff Edward Michael Jacobs contacted MBUSA regarding the failure of his rear subframe while he was driving, representatives told him they had not heard of other vehicles having this issue, despite the existence of many consumer complaints going back at least four years.

d. **Where:** Mercedes concealed material information regarding the true nature of the Rear Subframe Defect in every communication it had with Plaintiffs and the other Class Members and made representations about the world-class quality and state-of-the-art safety of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Mercedes disclosed the truth about the Rear Subframe Defect in the Class Vehicles to anyone outside of Mercedes. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Mercedes' website.

e. **How:** Mercedes concealed the Rear Subframe Defect from Plaintiffs and the other Class Members and made representations about the world-class quality and state-of-the-art safety of the Class Vehicles. Mercedes actively concealed the truth about the existence and nature of the Rear Subframe Defect from Plaintiffs and the other Class Members at all times, even though it knew about the Rear Subframe Defect and knew that information about the Rear

Subframe Defect would be important to a reasonable consumer, and Mercedes promised in its marketing materials that Class Vehicles have qualities that they do not have.

f. **Why:** Mercedes actively concealed material information about the Rear Subframe Defect in the Class Vehicles for the purpose of inducing Plaintiffs and the other Class Members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the world-class quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Had Mercedes disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and the other Class Members (all reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment Tolling

~~436.~~444. Mercedes has known of the Rear Subframe Defect in the Class Vehicles since at least 2009, and certainly well before Plaintiffs and the other Class Members purchased their Class Vehicles, and yet concealed from or failed to disclose to Plaintiffs, Class Members, and the public of the full and complete nature of the Rear Subframe Defect, even when directly asked about it by Class

Members during communications with Mercedes, Mercedes Customer Care, Mercedes dealerships, and Mercedes service centers. Mercedes continues to conceal the defect to this day.

~~437.~~445. Any applicable statute of limitation has been tolled by Mercedes' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B. Estoppel**

~~438.~~446. Mercedes was and is under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the Class Vehicles. Mercedes actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the world-class quality and state-of-the-art safety of the Class Vehicles. Plaintiffs and the other Class Members reasonably relied upon Mercedes' knowing misrepresentations and active concealment of these facts. Based on the foregoing, Mercedes is estopped from relying on any statutes of limitation in defense of this action.

**C. Discovery Rule**

~~439.~~447. The causes of action alleged herein did not accrue until Plaintiffs and the other Class Members discovered that their Class Vehicles contained the Rear Subframe Defect.

~~440.~~448. However, Plaintiffs and the other Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after a professional inspection revealed significant corrosion of the rear subframe. As alleged, because the corrosion occurs "from the inside out" the defect would not have been apparent even to a trained mechanic until the rear subframe was dangerously corroded, near total failure, and rendered the Class Vehicle unsafe to operate. Even then, Plaintiffs and the other Class Members had no reason to know the corrosion in the rear subframes was caused by a defect in the Class Vehicles because of Mercedes' active concealment of the Rear Subframe Defect. Not only did Mercedes fail to notify Plaintiffs and the other Class Members about the Rear Subframe Defect, Mercedes in fact denied any knowledge of or responsibility for the defect when directly asked about it. Thus Plaintiffs and the other Class Members were not reasonably able to discover the Rear Subframe Defect until after they had purchased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that

the Rear Subframe Defect caused their rear subframes to corrode to the point where their vehicles were no longer able to be operated safely and, in some cases, where they failed while the vehicle was in motion, causing the driver to partially or fully lose control of the vehicle.

## VIII. CLASS ALLEGATIONS

~~441.~~449. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated individuals as a nationwide class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

~~442.~~450. Plaintiffs bring this class action as a nationwide class ("Nationwide Class") on behalf of themselves and all other similarly situated individuals (the "Class Members"), defined as follows:

> All residents of the United States and its territories who are current or former owners of a Class Vehicle. A "Class Vehicle" is a vehicle of any of the following models/model years:
>
> 2010-2022 Mercedes-Benz C-Class
>
> 2010-2022 Mercedes-Benz E-Class
>
> 2010-2015 Mercedes-Benz GLK-Class
>
> 2010-2022 Mercedes-Benz CLS-Class
>
> 2010-2020 Mercedes-Benz SLK/SLC-Class

2016-2022 Mercedes-Benz GLC-Class

2010-2022 Mercedes-Benz SL-Class

Excluded from the Class are: (1) employees of MBG and MBUSA; (3) any judge assigned to this case and their respective families; (4) government entities; and (5) claims for personal injuries.

~~443.~~451. In the alternative, on behalf of themselves and all other similarly situated individuals, Plaintiffs seek to represent subclasses grouped by states with materially identical legal claims on these facts.

~~444.~~452. In the alternative, on behalf of themselves and all other similarly situated individuals, Plaintiffs respectively seek to represent individual statewide subclasses, defined as follows (the "State Subclasses"):

- All current and former owners who purchased Class Vehicles (as defined herein) in the State of California (the "California Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Connecticut (the "Connecticut Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Florida (the "Florida Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Georgia (the "Georgia Subclass");

- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Illinois (the "Illinois Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Indiana (the "Indiana Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Kentucky (the "Kentucky Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Maryland (the "Maryland Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Massachusetts (the "Massachusetts Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Michigan (the "Michigan Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Missouri (the "Missouri Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of New Jersey (the "New Jersey Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of New York (the "New York Subclass");

- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Ohio (the "Ohio Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Pennsylvania (the "Pennsylvania Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Rhode Island (the "Rhode Island Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Tennessee (the "Tennessee Subclass");
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Texas (the "Texas Subclass"); and
- All current and former owners who purchased Class Vehicles (as defined herein) in the State of Virginia (the "Virginia Subclass").

**A. Rule 23(b)(1) and (b)(2) Are Satisfied**

~~445.~~453. Rule 23(b)(1) is satisfied because individual litigation of the claims of all Class Members would create a risk of inconsistent or varying adjudications that would, in turn, establish incompatible standards of conduct for Mercedes. For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal. Similarly, inconsistent rulings regarding the issue of whether the

Rear Subframe Defect is present in all of the Class Vehicles would cause Mercedes to respond to warranty claims in an inconsistent manner.

~~446.~~454. Class members seek declarations that there is an inherent design and/or manufacturing flaw in the rear subframes of the Class Vehicles, that the warranties extend to them, and that they are entitled to final equitable relief in the form of a program providing notice to Class Members of the defect and free, regular inspections. The requirements of Rule 23(b)(2) are satisfied since the claim for declaratory relief is based upon Mercedes' systemic policies and practices, making final declaratory relief with respect to the class as a whole appropriate.

~~447.~~455. Mercedes' actions are generally applicable to the Class as a whole, and Plaintiffs seek, among other things, equitable remedies with respect to the Class as a whole.

**B. Numerosity**

~~448.~~456. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. Plaintiffs' current research indicates that there are at least one million Class Members. Indeed, to date counsel have been

contacted by hundreds of members of the proposed class reporting the Rear Subframe Defect.

~~449.~~457. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Mercedes' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles, and can readily self-identify.

**C. Typicality**

~~450.~~458. The claims of the Plaintiffs are typical of the claims of Class Members in that the Plaintiffs, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by Mercedes. The Plaintiffs, like all Class Members, have been damaged by Mercedes' misconduct in that they have purchased a vehicle they would not have purchased, or for which they would have paid less, and incurred or will incur the cost of service relating to and caused by the Rear Subframe Defect and/or have experienced diminished ability to use their Class Vehicles for their ordinary and intended purpose. Furthermore, the factual bases of Mercedes' misconduct are common to the Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiffs and all Class Members.

**D. Adequate Representation**

~~451.~~459. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Each Plaintiff owns or has owned a Class Vehicle and has therefore been injured by the Rear Subframe Defect. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive vehicles.

~~452.~~460. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and they have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class.

**E. Predominance of Common Issues**

~~453.~~461. There are numerous questions of law and fact common to Plaintiffs and the other Class Members, the answers to which will advance the resolution of the litigation as to all Class Members and which predominate over any individual questions. These common legal and factual issues include:

a. whether the rear subframe in the Class Vehicles is defective;

b. whether and when Mercedes knew or should have known about the Rear Subframe Defect, and, if so, how long Mercedes knew or should have known of the Defect;

c. whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

d. whether Mercedes had and/or has a duty to disclose the defective nature of the Class Vehicle to Plaintiffs and the other Class Members;

e. whether Mercedes omitted and failed to disclose material facts about the Class Vehicles;

f. whether Mercedes' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and the other Class Members to act to their detriment by purchasing Class Vehicles;

g. whether Mercedes represented, through its words and conduct, that the Class Vehicle had characteristics, uses, or benefits that they did not actually have;

h. whether Mercedes represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

i. whether Mercedes advertised the Class Vehicles with the intent not to sell them as advertised;

j. whether Mercedes' affirmative misrepresentations about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding, and were therefore fraudulent;

k. whether Mercedes' affirmative misrepresentations about the true defective nature of the Class Vehicles were and are deceptive;

l. whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m. whether Plaintiffs and the other Class Members were damaged at the point of sale by overpaying for vehicles they believed to be safe, durable, and not defective;

n. whether Plaintiffs and the other Class Members are entitled to a declaration that the rear subframes in Class Vehicles have a Defect that causes severe, premature corrosion and that poses a serious safety risk to consumers, and that this defect requires disclosure;

o. whether Plaintiffs and the other Class Members are entitled to a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Rear Subframe Defect is void;

p. whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent

injunction that requires Mercedes to notify Class Members of the Rear Subframe Defect and its serious safety risks, as well as a program providing regular, free inspections of the Class Vehicles for damage caused by the Rear Subframe Defect;

q. whether Mercedes should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Rear Subframe Defect in Class Vehicles; and

r. whether Mercedes is obligated to inform Class Members of their right to seek full reimbursement for having paid to diagnose and repair the defective rear subframes at either a Mercedes dealership or independent mechanic, including corrosion to nearby vehicle components (suspension springs, brake lines, etc.) and damage to the Class Vehicles caused by subframe failure while in motion.

**F. Superiority**

~~454.~~462. This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2), because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final relief with respect to each Class as a whole.

~~455.~~463. Plaintiffs and the other Class Members have all suffered and will continue to suffer harm and damages as a result of Mercedes' unlawful and

wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

~~456.~~464. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Mercedes' misconduct. Absent a class action, Class Members will continue to incur damages, and Mercedes' misconduct will continue without remedy.

~~457.~~465. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the court and the litigants, and will promote consistency and efficiency of adjudication.

~~458.~~466. In the alternative, there are many particular claims, issues, and common questions of law and fact appropriate for certification for classwide adjudication under Rule 23(c)(4).

# IX. CLAIMS FOR RELIEF

## A. Claim Brought on Behalf of the Nationwide Class

### FIRST CAUSE OF ACTION
### FRAUDULENT OMISSION

~~459.~~467. Plaintiffs repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~460.~~468. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, both because Georgia choice-of-law rules apply Georgia common law to all Plaintiffs and Class Members, and because there are no true conflicts among various states' laws of fraudulent concealment and/or fraudulent omission. In the alternative, Plaintiffs bring this claim on behalf of the State Subclasses, which can be readily grouped for trial.

~~461.~~469. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~462.~~470. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to

collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~463.~~471. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~464.~~472. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the

representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~465.~~473. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~466.~~474. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes

knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~467.~~475. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~468.~~476. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~469.~~477. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~470.~~478. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~471.~~479. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~472.~~480. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and paid out-of-pocket to replace the defective rear subframe. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

~~473.~~481. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of $2,000 required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determine at trial.

~~474.~~482. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~475.~~483. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

## B. Claims Brought on Behalf of the California Subclass

### SECOND CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1750 *et seq.*

~~476.~~484. Plaintiff Tenika Neil ("Plaintiff," for purposes of the California Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~477.~~485. Plaintiff brings this Count individually and on behalf of the other members of the California Subclass (the "Class," for purposes of this Count).

~~478.~~486. Plaintiff, Class Members, MBUSA, and MBG are each a "person" within the meaning of the California Consumer Legal Remedies Act ("CLRA"). *See* Cal. Civ. Code § 1761(c).

~~479.~~487. The purchase of Class Vehicles by Plaintiff and Class Members constitutes a "transaction" within the meaning of the CLRA. *See* Cal. Civ. Code § 1761(e).

~~480.~~488. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . ." Cal. Civ. Code § 1770(a).

~~481.~~489. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts—such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein—and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe and adjacent parts, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~482.~~490. By failing to disclose and actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the CLRA. *See* Cal. Civ. Code § 1770(a).

~~483.~~491. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate the defect.

~~484.~~492. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~485.~~493. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiff and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the defect.

~~486.~~494. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that

covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

487.495. Mercedes knew or should have known that its conduct violated the CLRA.

488.496. Mercedes owed Plaintiff a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~489.~~497. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~490.~~498. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~491.~~499. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and its failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to

return their vehicles to a safe condition, Plaintiff and Class Members either would have paid less for their vehicles or would not have purchased them at all. Plaintiff and Class Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~492.~~500. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~493.~~501. Plaintiff and Class Members risk irreparable injury, including economic damage, as a result of Mercedes' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiff and Class Members.

~~494.~~502. On April 28, 2023, Plaintiff sent a letter via Certified Mail and email to Mercedes' counsel putting Mercedes on notice that Plaintiff intended to bring a claim for damages under the CLRA. Exh. 6. Plaintiffs' First Amended Consolidated Class Action Complaint sought only injunctive relief, which

Mercedes did not provide. Accordingly, Plaintiff and Class Members now seek damages under Cal. Civ. Code § 1780(a) & (b).

~~495.~~503. Mercedes was aware that many Class Members are considered senior citizens or disabled persons under Cal. Civ. Code § 1761(f) & (g). Therefore, pursuant to Cal. Civ. Code § 1780(b)(1), Plaintiff seeks an additional $5,000 in damages for Class Members who qualifies as a senior citizen and/or disabled person under the CLRA.

~~496.~~504. Thus, pursuant to the CLRA, Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, actual damages, and attorneys' fees and costs, as permitted under California law. *See* Cal. Civ. Code § 1780(a), (b) & (e).

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Cal. Civ. Code §§ 1790 *et seq.***

~~497.~~505. Plaintiff Tenika Neil ("Plaintiff," for purposes of the California Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~498.~~506. Plaintiff brings this Count individually and on behalf of the other members of the California Subclass (the "Class," for purposes of this Count).

~~499.~~507. Plaintiff and Class Members are "buyers" within the meaning of California Civil Code § 1791(b) and (h).

~~500.~~508. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~501.~~509. The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

~~502.~~510. Mercedes is a "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

~~503.~~511. Mercedes impliedly warranted to Plaintiffs and the other Class Members that the Class Vehicles were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) and 1792.

~~504.~~512. California Civil Code § 1791.1(a) provides that consumer goods must meet the following requirements in order to fulfill the implied warranty of merchantability: "(1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label."

~~505.~~513. The Class Vehicles would not pass without objection in the automotive trade because they share a common design defect (*i.e.*, the Rear Subframe Defect), which causes the vehicles to, suddenly and without notice, become unsafe to operate.

~~506.~~514. Because of the Rear Subframe Defect, the Class Vehicles are not fit for their ordinary purposes.

~~507.~~515. The Class Vehicles were not adequately labeled because the labeling failed to disclose the Rear Subframe Defect.

~~508.~~516. Plaintiff, individually and on behalf of Class Members, notified Mercedes of the Rear Subframe Defect—and Mercedes' corresponding breach of warranty—through a notice letter dated April 28, 2023 and sent by United States Certified Mail to Mercedes through its counsel. Mercedes was also provided notice of the Rear Subframe Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

~~509.~~517. Mercedes has had the opportunity to cure the defect in the Class Vehicles, but it has chosen not to do so. Giving Mercedes a chance to cure the defect is not practicable in this case and would serve only to delay this litigation unnecessarily.

~~510.~~518. As a result of Mercedes' breach of the implied warranty of merchantability, Plaintiff and Class Members received goods with substantially impaired value. Plaintiff and Class Members have been damaged as a result of the diminished value of the Class Vehicles.

~~511.~~519. Under California Civil Code §§ 1791.1(d) and 1794, Plaintiff and Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles or the amount of overpayment for the vehicles.

~~512.~~520. Pursuant to California Civil Code § 1794, Plaintiff and Class Members are also entitled to costs and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~513.~~521. Plaintiff Tenika Neil ("Plaintiff," for purposes of the California Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~514.~~522. Plaintiff brings this Count individually and on behalf of the other members of the California Subclass (the "Class," for purposes of this Count).

~~515.~~523. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~516.~~524. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~517.~~525. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~518.~~526. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted,

and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~519.~~527. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in

radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~520.~~528. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~521.~~529. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~522.~~530. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class

Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~523.~~531. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~524.~~532. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~525.~~533. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were

susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~526.~~534. Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes and/or paid out-of-pocket to replace the defective rear subframe. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~527.~~535. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of up to $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~528.~~536. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes.

~~529.~~537. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***

~~530.~~538. Plaintiff Tenika Neil ("Plaintiff," for purposes of the California Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~531.~~539. Plaintiff brings this Count individually and on behalf of the other members of the California Subclass (the "Class," for purposes of this Count).

~~532.~~540. California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

~~533.~~541. Mercedes' conduct as alleged herein violated multiple statutes and the common law.

~~534.~~542. Mercedes has violated § 17200 by knowingly selling and leasing Class Vehicles that include the Rear Subframe Defect and omitting disclosure of this defect to consumers, including Plaintiff and Class Members.

~~535.~~543. Mercedes' conduct was unscrupulous, offensive to established public policy, and fraudulent.

~~536.~~544. The harm caused by Mercedes' misconduct greatly outweighs any benefit to consumers.

~~537.~~545. Plaintiff relied on Mercedes' omissions with respect to the quality and reliability of the Class Vehicles. Plaintiff and Class Members would not have purchased their Class Vehicles or would not have paid as much for them but for Mercedes' omissions.

~~538.~~546. Mercedes failed to disclose material information about the Class Vehicles in a manner that is likely to—and did—deceive consumers and the public.

~~539.~~547. All of the misconduct alleged herein occurred in the conduct of Mercedes' business.

~~540.~~548. Plaintiff, individually and on behalf of Class Members, requests that this Court restore to them any money acquired by Mercedes via unfair competition, including restitution and/or restitutionary disgorgement.

### C. Claims Brought on Behalf of the Connecticut Subclass

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
**Conn. Gen. Stat. Ann. §§ 42-110a *et seq.***

~~541.~~549. Plaintiff Stephen Caggiano ("Plaintiff," for purposes of the Connecticut Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~542.~~550. Plaintiff Caggiano brings this Count individually and on behalf of the other members of the Connecticut Subclass (the "Class," for purposes of this Count).

~~543.~~551. Plaintiff, Class Members, MBUSA, and MBG are each a "person" within the meaning of the Connecticut Unlawful Trade Practices Act ("Connecticut UTPA"). *See* Conn. Gen. Stat. § 42-110a(3).

~~544.~~552. The purchase of Class Vehicles by Plaintiff and Class Members constitutes "trade" and "commerce" within the meaning of the Connecticut UTPA. *See* Conn. Gen. Stat. 42-110a(4).

~~545.~~553. The Connecticut UTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

~~546.~~554. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts—such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein—and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~547.~~555. By failing to disclose and actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Connecticut UTPA and the regulations thereto. *See* Conn. Gen. Stat. Ann. § 42-110b(a); Conn. Agencies Regs. § 42-110b018(b) & (e).

~~548.~~556. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear

subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate the defect.

~~549.~~557. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~550.~~558. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiff and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the defect.

~~551.~~559. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental

expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

~~552.~~560. Prior to February 10, 2023, Mercedes engaged in unfair trade practices by offering a warranty adjustment program to address the Rear Subframe Defect only to certain consumers in the State of Connecticut and by failing to send notice of the warranty adjustment program to all Class Vehicle owners in the State. *See* Conn. Gen. Stat. Ann. §§ 42-110(a) & 42-227.

~~553.~~561. Mercedes knew or should have known that its conduct violated the Connecticut UTPA.

~~554.~~562. Mercedes owed Plaintiff a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~555.~~563. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~556.~~564. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~557.~~565. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and its failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessities a large expenditure to return their vehicles to a safe condition, Plaintiff either would have paid less for their vehicles or would not have purchased them at all. Plaintiff did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~558.~~566. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~559.~~567. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Connecticut UTPA, and these violations present a continuing risk to Plaintiff and Class Members.

~~560.~~568. Thus, pursuant to the Connecticut UTPA, Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and costs, as permitted

under Connecticut law. *See* Conn. Gen. Stat. Ann. § 42-110g. In addition, Plaintiff seeks an award of punitive damages as to MBUSA only.

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Conn. Gen. Stat. § 42A-2-314**

~~561.~~569. Plaintiff Stephen Caggiano ("Plaintiff," for purposes of the Connecticut Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~562.~~570. Plaintiff brings this Count individually and on behalf of the other members of the Connecticut Subclass (the "Class," for purposes of this Count).

~~563.~~571. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~564.~~572. Mercedes is a "merchant" with respect to motor vehicles under Conn. Gen. Stat. § 42a-2-104.

~~565.~~573. Under Conn. Gen. Stat. § 42a-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and Class Members purchased their Class Vehicles from Mercedes.

~~566.~~574. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which mother vehicles are used.

~~567.~~575. Mercedes marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Class Members' decisions to purchase the Class Vehicles.

~~568.~~576. Plaintiff and Class Members purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~569.~~577. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate

consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~570.~~578. Additionally, there is privity because Plaintiff and Class Members purchased the Class Vehicles from Mercedes, or through Mercedes' authorized agents for retail sales. At all relevant times, Mercedes manufactured, distributed, warranted, and sold the Class Vehicles.

~~571.~~579. Mercedes knew or had reason to know of the specific use for which the Class Vehicles were purchased.

~~572.~~580. Because of the Rear Subframe Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

~~573.~~581. Mercedes knew about the defect in the Class Vehicles, allowing Mercedes to cure their breach of warranty if it chose to do so.

~~574.~~582. Mercedes' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitations are unenforceable because it

knowingly sold a defective product without informing consumers about the defect. The time limits contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power existed between Mercedes and Plaintiff and Class Members, and Mercedes knew of the defect at the time of sale.

~~575.~~583. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Mercedes' misconduct described herein. Affording Mercedes a reasonable opportunity to cure the breach of written warranties, therefore, would be unnecessary and futile.

~~576.~~584. Mercedes was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

~~577.~~585. As a direct and proximate result of Mercedes' breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
## FRAUDULENT OMISSION

~~578.~~586. Plaintiff Stephen Caggiano ("Plaintiff," for purposes of the Connecticut Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~579.~~587. Plaintiff brings this Count individually and on behalf of the other members of the Connecticut Subclass (the "Class," for purposes of this Count).

~~580.~~588. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~581.~~589. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~582.~~590. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~583.~~591. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~584.~~592. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~585.~~593. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~586.~~594. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~587.~~595. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~588.~~596. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~589.~~597. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~590.~~598. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~591.~~599. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent

components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~592.~~600. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~593.~~601. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~594.~~602. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages,

attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

**D. Claims Brought on Behalf of the Florida Subclass**

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201 *et seq.***

~~595.~~603. Plaintiff Catherine Harris ("Plaintiff," for purposes of the Florida Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~596.~~604. Plaintiff brings this Count individually and on behalf of the other members of the Florida Subclass (the "Class," for purposes of this Count).

~~597.~~605. Plaintiff and Class Members are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("Florida DUTPA"), Fla. Stat. § 501.203(7).

~~598.~~606. Mercedes is engaged in "trade or commerce" within the meaning of the Florida DUTPA. Fla. Stat. § 501.203(8).

~~599.~~607. The Florida DUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

Mercedes participated in unfair and deceptive trade practices that violated Florida DUTPA as described herein.

~~600.~~608. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts—such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein—and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~601.~~609. Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate the defect.

~~602.~~610. By failing to disclose and actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes

installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Florida DUTPA. Mercedes deliberately withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion to ensure that consumers would purchase the Class Vehicles.

~~603.~~611. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~604.~~612. Mercedes knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~605.~~613. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiff and Class Members for the Rear

Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the defect.

~~606.~~614. Mercedes knew or should have known that its conduct violated the Florida DUTPA.

~~607.~~615. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~608.~~616. Mercedes owed Plaintiff a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~609.~~617. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~610.~~618. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and their failure to disclose material information. Had they been aware of the Rear Subframe Defect in Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiff and Class Members either would have paid less for their vehicles or would not have purchased the vehicles at all. Plaintiff did not receive the benefit of his bargain as a result of Mercedes' misconduct.

~~611.~~619. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Florida DUTPA, and these violations present a continuing risk to Plaintiff, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~612.~~620. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~613.~~621. Plaintiff and Class Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

~~614.~~622. Plaintiff and Class Members also seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees and costs, and any other just and proper relief available under the

Florida DUTPA. Additionally, Plaintiff and Class Members seek punitive damages as to MBUSA only.

**TENTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**Fla. Stat. § 672.314**

~~615.~~623. Plaintiff Catherine Harris ("Plaintiff," for purposes of the Florida Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~616.~~624. Plaintiff brings this Count individually and on behalf of the other members of the Florida Subclass (the "Class," for purposes of this Count).

~~617.~~625. Mercedes is a "merchant" with respect to the Class Vehicles under Fla. Stat. § 672.104.

~~618.~~626. The Class Vehicles are "goods" under Fla. Stat. § 672.105.

~~619.~~627. Plaintiff and Class Members are "buyers" under Fla. Stat. § 672.103, and Mercedes is a "seller" under Fla. Stat. § 672.103.

~~620.~~628. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~621.~~629. When Plaintiff purchased their Class Vehicles from Mercedes, an implied warranty that the goods were merchantable arose by operation of law as part of the sales.

~~622.~~630. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~623.~~631. Additionally, there is privity because the dealerships from which Plaintiff and Class Members purchased their Class Vehicles were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled

any dealership incentives which may have been available, the dealerships executed the purchase agreements on behalf of Mercedes, the dealerships acted as Mercedes' agents in connection with the sales, and the dealerships bound Mercedes to contractual obligations with respect to the sale of the Class Vehicles.

~~624.~~632. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~625.~~633. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~626.~~634. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~627.~~635. As a direct and proximate result of the Rear Subframe Defect, Plaintiff and Class Members have not appreciated the benefit of their bargain and

have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
## FRAUDULENT OMISSION

~~628.~~636. Plaintiff Catherine Harris ("Plaintiff," for purposes of the Florida Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~629.~~637. Plaintiff brings this Count individually and on behalf of the other members of the Florida Subclass (the "Class," for purposes of this Count).

~~630.~~638. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~631.~~639. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~632.~~640. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~633.~~641. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~634.~~642. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~635.~~643. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~636.~~644. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~637.~~645. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~638.~~646. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~639.~~647. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~640.~~648. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~641.~~649. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective

rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~642.~~650. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~643.~~651. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~644.~~652. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages,

attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### E. Claims Brought on Behalf of the Georgia Class

**TWELFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**O.C.G.A. § 84-2-314**
**(against MBUSA only)**

~~645.~~653. Plaintiffs repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~646.~~654. Plaintiffs Latoya Clay, ~~and~~ Meri New and Christos Hines ("Plaintiffs" for purposes of this Count) brings this Count individually and on behalf of the other members of the Georgia subclass (the "Class," for purposes of this Count).

~~647.~~655. MBUSA is and was at all relevant times a "merchant" with respect to motor vehicles generally and the Class Vehicles specifically under O.C.G.A. § 11-2-104(1) and a "seller" of motor vehicles generally and the Class Vehicles specifically under O.C.G.A. § 11-2-103(1)(d).

~~648.~~656. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~649.~~657. Pursuant to O.C.G.A. § 11-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

~~650.~~658. When it sold the Class Vehicles, MBUSA extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which such goods were sold and that they would pass without objection in the trade.

~~651.~~659. Plaintiffs and the other Class Members who purchased a Class Vehicle from MBUSA are entitled to the benefit of their bargain: a vehicle with a rear subframe and adjacent components that have been properly designed and manufactured to resist corrosion stemming from exposure to ordinary and expected use and road conditions, and that does not render the vehicle too dangerous to operate.

~~652.~~660. MBUSA breached this implied warranty in that the Class Vehicles are (1) not fit for ordinary use; (2) not of a merchantable quality; and (3) would not pass without objection in the trade.

~~653.~~661. Had MBUSA disclosed the existence of the Rear Subframe Defect at the time of sale, Plaintiffs and the other Class Members would not have purchased the Class Vehicles or would have purchased them at a lower price.

~~654.~~662. To the extent that Plaintiffs and the other Class Members lack privity of contract with MBUSA, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class Members.

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between MBUSA and its network of authorized dealers. MBUSA's authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~655.~~663. As a direct and proximate result of MBUSA's breach of the implied warranty of merchantability, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of needed present and

future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determined at trial.

~~656.~~664. Plaintiffs seek against MBUSA equitable relief, declaratory relief, actual damages, and attorneys' fees and expenses.

**THIRTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**O.C.G.A. §§ 10-1-390 *et seq.***

~~657.~~665. Plaintiffs repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~658.~~666. Plaintiffs Latoya Clay, ~~and~~ Meri New and Christos Hines ("Plaintiffs" for purposes of this Count) brings this Count individually and on behalf of the other members of the Georgia subclass (the "Class," for purposes of this Count).

~~659.~~667. MBUSA and MBG are each a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"), O.C.G.A. § 10-1-392(a)(24).

~~660.~~668. Plaintiffs and the other Class Members are "consumers" within the meaning of the Georgia FBPA. *See* O.C.G.A. § 10-1-392(a)(6).

~~661.~~669. The purchases of Class Vehicles by Plaintiffs and the other Class Members constituted "consumer transactions" as defined by the Georgia FBPA. *See* O.C.G.A. § 10-1-392(a)(10).

~~662.~~670. The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce [to be] unlawful." O.C.G.A. § 10-1-393(a). Such unfair or deceptive acts or practices include but are not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-393(b)(5), (7), & (9).

~~663.~~671. By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members, Mercedes violated the Georgia FBPA because Mercedes represented that the Class Vehicles had characteristics and benefits that they do not have and that the Class Vehicles were of a particular standard, quality, or grade (*i.e.*, safe, high-quality, etc.) when they were of another. *See* O.C.G.A. § 10-1-393(b)(5) & (7).

~~664.~~672. Mercedes advertised the Class Vehicles (*i.e.*, as safe, high-quality, etc.) with the intent not to sell them as advertised in violation of O.C.G.A. § 10-1-393(b)(9)

~~665.~~673. Mercedes' unfair and deceptive acts or practices occurred repeatedly in Mercedes' course of trade or business, were material, and were capable of deceiving a substantial portion of the consuming public. As a result, such acts and practices caused economic harm to owners and purchasers of the Class Vehicles.

~~666.~~674. Mercedes knew by 2009 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' rear subframes and adjacent components suffered from a material safety defect which would cause them to prematurely corrode and render the Class Vehicles unsafe to operate and unsuitable for their intended use.

~~667.~~675. By 2009 at the latest, Mercedes had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in its Class Vehicles. Furthermore, Mercedes actively concealed the defect from consumers by denying the existence of the defect to Class Members who contacted Mercedes about their defective subframes and failed to offer to reimburse Class Members for

the cost of replacing their defective subframes and adjacent components damaged due to the defect.

~~668.~~676. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

~~669.~~677. Mercedes owed Plaintiffs and the other Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs and the other Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiffs that contradicted these representations

~~670.~~678. Mercedes knew or should have known that its conduct violated the Georgia FBPA.

~~671.~~679. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.

~~672.~~680. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~673.~~681. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and its failure to disclose material

information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~674.~~682. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and the other Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~675.~~683. Mercedes' acts and omissions in violation of the Georgia FBPA present a continuing risk to Plaintiffs and the other Class Members.

~~676.~~684. Mercedes received proper notice of its alleged violations of the Georgia FBPA pursuant to O.C.G.A. § 10-1-399(b) via letters sent to MBUSA and MBG through their counsel on December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023. Exhs. 1, 2, 3, & 4. Through counsel, Mercedes responded to each of these letters with notice of the Limited Subframe Warranty. Exh. 5. Mercedes received further notice of its violations of the Georgia FBPA

through a notice letter sent on May 3, 2024 on behalf of Plaintiffs. Exh. 7. As explained above, the Limited Subframe Warranty is inadequate to compensate Plaintiffs and the other Class Members for their injuries or to remedy the Rear Subframe Defect.

~~677.~~685. Thus, pursuant to the Georgia FBPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and costs, and treble damages as permitted under Georgia law. *See* O.C.G.A. § 10-1-399. In addition, Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**FOURTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**O.C.G.A. §§ 10-1-370, *et seq.***

~~678.~~686. Plaintiffs repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~679.~~687. Plaintiffs Latoya Clay, ~~and~~ Meri New and Christos Hines ("Plaintiffs" for purposes of this Count) brings this Count individually and on behalf of the other members of the Georgia subclass (the "Class," for purposes of this Count).

~~680.~~688. Mercedes, Plaintiffs, and Class Members are each a "person" as defined by the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), O.C.G.A. § 10-1-371(5).

~~681.~~689. The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which creates a likelihood of confusion or misunderstanding," "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

~~682.~~690. By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members, Mercedes violated the Georgia UDTPA because Mercedes represented that the Class Vehicles had characteristics and benefits that they do not have and that the Class Vehicles were of a particular standard, quality, or grade (*i.e.*, safe, high-quality, reliable, etc.) when they were of another. *See* O.C.G.A. § 10-1-372(5), (7), & (9).

~~683.~~691. Mercedes advertised the Class Vehicles (*i.e.*, as safe, high-quality, reliable, etc.) with the intent not to sell them as advertised in violation of O.C.G.A. § 10-1-372(9).

~~684.~~692. Mercedes' unfair and deceptive acts or practices occurred repeatedly in Mercedes' course of trade or business, were material, and were capable of deceiving a substantial portion of the consuming public. As a result, such acts and practices caused economic harm to owners and purchasers of the Class Vehicles.

~~685.~~693. Mercedes knew by 2009 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' rear subframes and adjacent components suffered from a material safety defect which would cause them to prematurely corrode and render the Class Vehicles unsafe to operate and unsuitable for their intended use.

~~686.~~694. By 2009 at the latest, Mercedes had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in its Class Vehicles. Furthermore, Mercedes actively concealed the defect from consumers by denying the existence of the defect to Class Members who contacted Mercedes about their defective subframes and failed to offer to reimburse Class Members for the cost of replacing their defective subframes and adjacent components, and for related costs such as towing, rental car, and inspection fees.

~~687.~~695. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that

covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

~~688.~~696. Mercedes owed Plaintiffs and the other Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs and the other Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiffs that contradicted these representations

~~689.~~697. Mercedes knew or should have known that its conduct violated the Georgia FBPA.

~~690.~~698. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.

~~691.~~699. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~692.~~700. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and its failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have

paid less for their vehicles or would not have purchased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~693.~~701. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and the other Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~694.~~702. As a direct and proximate result of Mercedes' violations of the Georgia UDTPA, Plaintiffs and the other Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

~~695.~~703. Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and costs as permitted under the Georgia UDTPA. *See* O.C.G.A. § 10-1-373.

F. **Claims Brought on Behalf of the Illinois Subclass**

**FIFTEENTH CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 Ill. Comp. Stat. 505/1 *et seq.***

~~696.~~704. Plaintiff Christian Kodom ("Plaintiff," for purposes of the Illinois Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~697.~~705. Plaintiff brings this Count individually and on behalf of the other members of the Illinois Subclass (the "Class," for purposes of this Count).

~~698.~~706. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA"), 815 Ill. Comp. Stat. 505/2, states, "Unfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." Mercedes participated in unfair and deceptive trade practices that violated the Illinois CFA as described herein.

~~699.~~707. Plaintiff, Class Members, MBUSA, and MBG are each a "person" within the meaning of 815 Ill. Comp. Stat. 505/1(c).

~~700.~~708. The purchase of Class Vehicles by Plaintiff and Class Members constitutes "trade" or "commerce" within the meaning of 815 Ill. Comp. Stat. 505/1(f).

~~701.~~709. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~702.~~710. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' misrepresentations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

~~703.~~711. By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes

installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Illinois CFA.

~~704.~~712. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~705.~~713. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion with the intent to ensure that consumers would purchase the Class Vehicles.

~~706.~~714. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiff and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes

refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the defect.

~~707.~~715. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of the Illinois CFA.

~~708.~~716. Mercedes knew or should have known that its conduct violated the Illinois CFA.

~~709.~~717. Mercedes owed Plaintiff and Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~710.~~718. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe, premature corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~711.~~719. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable

manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~712.~~720. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiff been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs and Class Members either would have paid less for their vehicles or would not have purchased them at all. Plaintiff did not receive the benefit of his bargain as a result of Mercedes' misconduct.

~~713.~~721. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs as much as $7,000 or more.

~~714.~~722. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Illinois CFA, and these violations present a continuing risk to Plaintiff, Class Members, and the general

public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~715.~~723. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~716.~~724. Thus, pursuant to 815 Ill. Comp. Stat. 505/10a(c), Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and expenses. Additionally, Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

~~717.~~725. Plaintiff provided any notice that could possibly have been required as detailed more fully above, and Mercedes has long been on notice of the Rear Subframe Defect and its violation of 815 Ill. Comp. Stat. 505/2. Therefore, Plaintiff has satisfied any notice requirement of the Illinois CFA.

## SIXTEENTH CAUSE OF ACTIONFRAUDULENT OMISSION

~~718.~~726. Plaintiff Christian Kodom ("Plaintiff," for purposes of the Illinois Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~719.~~727. Plaintiff brings this Count individually and on behalf of the other members of the Illinois Subclass (the "Class," for purposes of this Count).

~~720.~~728. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~721.~~729. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~722.~~730. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the

result of normal “wear and tear,” all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~723.~~731. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes’ and its products’ reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~724.~~732. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes’ advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles’ safety and reliability, as well as the advanced technology used by

Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~725.~~733. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~726.~~734. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with

complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~727.~~735. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~728.~~736. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~729.~~737. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by

Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~730.~~738. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~731.~~739. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~732.~~740. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that

are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~733.~~741. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~734.~~742. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### G. Claims Brought on Behalf of the Indiana Subclass

## SEVENTEENTH CAUSE OF ACTION

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT ("IDCSA") (Ind. Code § 24-5-0.5-1, *et seq.*)

~~735.~~743. Plaintiff Jack Powell ("Plaintiff," for purposes of the Indiana Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~736.~~744. Plaintiff brings this Count individually and on behalf of the other members of the Indiana Subclass (the "Class," for purposes of this Count).

~~737.~~745. Mercedes is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

~~738.~~746. Mercedes is a "supplier" as defined by Ind. Code § 24-5-0.5-2(a)(3)(A) and regularly engages in or solicits "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

~~739.~~747. Mercedes received notice from Plaintiffs pursuant to Ind. Code § 24-5-0.5-5 concerning its wrongful conduct as alleged herein through numerous pre-suit notice letter sent by Plaintiffs stating that it had violated substantively identical consumer protection statutes in at least twenty other states. *See* Exhs. 1, 2, 3, 4, 6, & 7. Additionally, Mercedes was provided notice by the numerous

consumer class action complaints filed against it. Therefore, sending pre-suit notice pursuant to Ind. Code § 24-5-0.5-5 is an exercise in futility for Indiana Plaintiff because Mercedes has not cured its unfair, abusive, and deceptive acts and practices.

~~740.~~748. Because Mercedes's deceptive acts were carried out as part of a scheme with the intent to defraud Plaintiffs and the other Class members, its actions with regard to the Rear Subframe Defect represent incurable deceptive acts. *See* Ind. Code § 24-5-0.5- 2(a)(8). Therefore, Plaintiffs are not required to give pre-suit notice pursuant to Ind. Code § 24-5-0.5-5

~~741.~~749. Mercedes engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3.

~~742.~~750. Prohibited deceptive acts in violation of Indiana Code § 24-5-0.5-3, include, but are not limited to: (a) misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (b) misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

~~743.~~751. Mercedes engaged in deceptive practices that violated the IDCSA by knowingly making misleading statements about the quality of the Class Vehicle's rear subframes and adjacent parts and knowingly failing to disclose the safety risks posed by the Rear Subframe Defect.

~~744.~~752. Mercedes' acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

~~745.~~753. Consumers could not have reasonably avoided injury because Mercedes's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about safety and quality of the Class Vehicles, Mercedes created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

~~746.~~754. Mercedes's business practices, in concealing material information or misrepresenting the qualities, characteristics, and performance of the Class Vehicles had no countervailing benefit to consumers or to competition.

~~747.~~755. Mercedes's acts and practices were also "abusive" for numerous reasons, including: (a) because they materially interfered with

consumers' ability to understand a term or condition in a consumer transaction, interfering with consumers' decision-making; (b) because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction; (c) because they took unreasonable advantage of consumers' inability to protect their own interests; and (d) because Mercedes took unreasonable advantage of consumers' reasonable reliance that it was providing truthful and accurate information.

~~748.~~756. Mercedes intentionally and knowingly misrepresented and failed to disclose material facts it had a duty to disclose regarding the Class Vehicles with intent to mislead Plaintiff.

~~749.~~757. Mercedes's omissions and/or misrepresentations about the safety of the Class Vehicles were material to Plaintiff because they were likely to deceive reasonable consumers. Plaintiff relied on Mercedes's material misrepresentations and omissions regarding the safety and reliability of the Class Vehicles.

~~750.~~758. Mercedes owed Plaintiff a duty to disclose material facts about the safety risks posed by the Class Vehicles, because Mercedes:

~~751.~~759. Possessed exclusive knowledge about its testing the rear subframe and adjacent components;

~~752.~~760. Intentionally concealed the foregoing from Plaintiff; and/or

~~753.~~761. Made incomplete and misleading representations that its Class Vehicles were safe, high quality, and reliable, while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~754.~~762. Indiana Plaintiff could not have discovered through the exercise of reasonable diligence that the Rear Subframe Defect exists and poses a serious safety risk. Plaintiff acted reasonably in relying on Mercedes's misrepresentations and omissions, the truth of which they could not have discovered.

~~755.~~763. Mercedes's deceptive, unfair, and abusive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety risks posed by the Rear Subframe Defect.

~~756.~~764. Mercedes had an ongoing duty to all Mercedes customers to refrain from deceptive, unfair, and abusive acts and practices under the IDCSA.

~~757.~~765. Mercedes acted intentionally, knowingly, and maliciously to violate IDCSA, and recklessly disregarded Plaintiff's rights. Mercedes's knowledge about the true safety risks posed by the Rear Subframe Defect put it on notice that the Class Vehicles were not as it advertised.

~~758.~~766. Mercedes's conduct includes incurable deceptive acts that Mercedes engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

~~759.~~767. As a direct and proximate result of Mercedes's uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of his bargain in purchasing his Class Vehicle.

~~760.~~768. Mercedes's violations present a continuing safety risk Plaintiff, the Class Members, and the general public. Mercedes's unlawful acts and practices complained of herein affect the public interest.

~~761.~~769. Plaintiff seeks all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

**EIGHTEENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ind. Code § 26-1-2-314)**

~~762.~~770. Plaintiff Jack Powell ("Plaintiff," for purposes of the Indiana Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~763.~~771. Plaintiff brings this Count individually and on behalf of the other members of the Indiana Subclass (the "Class," for purposes of this Count).

~~764.~~772. Mercedes is and was at all relevant times a merchant as defined by Ind. Code § 26-1-2-104.

~~765.~~773. The Class Vehicles are and were at all relevant times goods as defined by Ind. Code § 26-1-2-105.

~~766.~~774. A warranty that the Class Vehicles were in merchantable condition is implied in a contract for their sale pursuant to Ind. Code § 26-1-2-314.

~~767.~~775. Indiana law states that "goods to be merchantable must … [be] fit for the ordinary purposes for which such goods are used." Ind. Code § 26-1-2-314(2)(c).

~~768.~~776. Plaintiff purchased his Mercedes Class Vehicle by and through Mercedes's authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Mercedes's contracts with

authorized sellers, or eventual purchasers when bought from a third party. At all relevant times, Mercedes was the manufacturer, marketer, warrantor, and/or seller of the Class Vehicles.

~~769.~~777. Mercedes impliedly warranted that the Class Vehicles were in merchantable condition and fit. The Class Vehicles when sold and at all times thereafter were not in merchantable condition and were not fit for the ordinary purpose of providing safe, reliable transportation. Thus, Mercedes breached its implied warranty of merchantability for the ordinary purpose for which the Class Vehicles are purchased and used.

~~770.~~778. Mercedes cannot disclaim its implied warranty as it knowingly sold unsafe and defective Class Vehicles.

~~771.~~779. Mercedes was provided notice by the numerous consumer class action complaints filed against it, as well as various pre-suit notice letters sent by Plaintiffs. Affording Mercedes a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Mercedes has known of and concealed the safety risks caused by the Rear Subframe Defect.

~~772.~~780. As a direct and proximate result of Mercedes's breach of the implied warranty of merchantability, Plaintiff and Class Members been damaged in an amount to be proven at trial.

~~773.~~781. Plaintiff and Class Members have been excused from performance of any warranty obligations as a result of Mercedes's conduct described herein.

**NINETEENTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~774.~~782. Plaintiff Jack Powell ("Plaintiff," for purposes of the Indiana Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~775.~~783. Plaintiff brings this Count individually and on behalf of the other members of the Indiana Subclass (the "Class," for purposes of this Count).

~~776.~~784. Plaintiff brings this Count individually and on behalf of the other members of the Indiana Subclass (the "Class," for purposes of this Count).

~~777.~~785. Mercedes was aware of the Rear Subframe Defect when it marketed and sold the Class Vehicles to Plaintiff and Class Members.

~~778.~~786. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~779.~~787. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental

conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~780.~~788. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~781.~~789. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their

purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~782.~~790. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~783.~~791. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to

Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~784.~~792. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~785.~~793. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~786.~~794. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~787.~~795. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~788.~~796. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, i.e., they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~789.~~797. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~790.~~798. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~791.~~799. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive

practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

## H. Claims Brought on Behalf of the Kentucky Subclass

### TWENTIETH CAUSE OF ACTION
### FRAUDULENT OMISSION

~~792.~~800. Plaintiff Lisa Turner ("Plaintiff," for purposes of the Kentucky Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~793.~~801. Plaintiff brings this Count individually and on behalf of the other members of the Kentucky Subclass (the "Class," for purposes of this Count).

~~794.~~802. Mercedes was aware of the Rear Subframe Defect when it marketed and sold the Class Vehicles to Plaintiff and Class Members.

~~795.~~803. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~796.~~804. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear

subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~797.~~805. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~798.~~806. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent

consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~799.~~807. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~800.~~808. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~801.~~809. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~802.~~810. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's

product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~803.~~811. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~804.~~812. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~805.~~813. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby

components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~806.~~814. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~807.~~815. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~808.~~816. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~809.~~817. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### I. Claims Brought on Behalf of the Maryland Subclass

## TWENTY-FIRST CAUSE OF ACTION
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
## Md. Code Ann., Commercial Law §§ 13-101 *et seq.*

~~810.~~818. Plaintiff Mike Xie ("Plaintiff," for purposes of the Maryland Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~811.~~819. Plaintiff brings this Count individually and on behalf of the other members of the Maryland Subclass (the "Class," for purposes of this Count).

~~812.~~820. Plaintiff, Class Members, MBUSA, and MBG are "persons" within the meaning of the Maryland Consumer Protection Act ("Maryland CPA"). *See* Md. Code. Ann., Commercial Law § 13-101(c)(1).

~~813.~~821. Plaintiff and Class Members are "consumers" within the meaning of the Maryland CPA. *See* Md. Code Ann., Commercial Law § 13-101(h).

~~814.~~822. MBUSA and MBG are "merchants" within the meaning of the Maryland CPA. *See* Md. Code Ann., Commercial Law § 13-101(g)(1).

~~815.~~823. The Class Vehicles are "consumer goods" within the meaning of the Maryland CPA. *See* Md. Code Ann., Commercial Law § 13-101(d)(1).

~~816.~~824. The Maryland CPA prohibits "[u]nfair, abusive, or deceptive trade practices . . . ." Md. Code Ann., Commercial Law § 13-301.

~~817.~~825. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' misrepresentations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. These material statements had the capacity,

tendency, or effect of misleading consumers in violation of the Maryland CPA. *See* Md. Code Ann., Commercial Law § 13-301(1), (2)(i), & (2)(iv).

~~818.~~826. Mercedes advertised the Class Vehicles (*i.e.*, as safe, high-quality, reliable, etc.) with the intent not to sell them as advertised. *See* Md. Code Ann., Commercial Law § 13-301(5)(i).

~~819.~~827. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

~~820.~~828. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of Maryland law.

~~821.~~829. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles. *See* Md. Code Ann., Commercial Law § 13-301(3) & (9)(i).

~~822.~~830. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~823.~~831. Mercedes knew or should have known that its conduct violated the Maryland CPA.

~~824.~~832. Mercedes owed Plaintiff a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~825.~~833. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~826.~~834. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiffs been aware of the Rear Subframe Defect in the Class Vehicles, thereby rendering their vehicles dangerous to drive and necessitating a large expenditure to return their vehicles to a safe condition, Plaintiff either would have paid less for their vehicles or would not have purchased them at all. Plaintiff and Class

Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~827.~~835. Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchased in the used market, thereby further diminishing the Class Vehicles' value.

~~828.~~836. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs as much as $7,000 or more.

~~829.~~837. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Maryland CPA, and these violations present a continuing risk to Plaintiff, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~830.~~838. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~831.~~839. Thus, pursuant to the Maryland CPA, Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and expenses as permitted under Maryland law. *See* Md. Code Ann., Commercial Law § 13-408.

**TWENTY-SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Md. Code Ann., Commercial Law § 2-314**

~~832.~~840. Plaintiff Mike Xie ("Plaintiff," for purposes of the Maryland Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~833.~~841. Plaintiff brings this Count individually and on behalf of the other members of the Maryland Subclass (the "Class," for purposes of this Count).

~~834.~~842. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Ann., Commercial Law § 2-314.

~~835.~~843. Mercedes was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Ann., Commercial Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

~~836.~~844. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~837.~~845. Plaintiff and Class Members purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~838.~~846. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate

consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~839.~~847. Additionally, there is privity because Plaintiff's and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~840.~~848. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~841.~~849. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~842.~~850. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

~~843.~~851. As a direct and proximate result of the Rear Subframe Defect, Plaintiff and Class Members have not received the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## TWENTY-THIRD CAUSE OF ACTION
## FRAUDULENT OMISSION

~~844.~~852. Plaintiff Mike Xie ("Plaintiff," for purposes of the Maryland Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~845.~~853. Plaintiff brings this Count individually and on behalf of the other members of the Maryland Subclass (the "Class," for purposes of this Count).

~~846.~~854. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~847.~~855. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~848.~~856. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear

Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~849.~~857. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~850.~~858. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If

Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~851.~~859. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~852.~~860. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class

Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~853.~~861. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~854.~~862. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~855.~~863. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~856.~~864. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~857.~~865. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~858.~~866. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-

of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~859.~~867. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~860.~~868. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### J. Claims Brought on Behalf of the Massachusetts Subclass

**TWENTY-FOURTH CAUSE OF ACTION**
**VIOLATION OF THE DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW**
**Mass. Gen. L. ch. 93a, §§ 1 *et seq.***

~~861.~~869. Plaintiffs Pasquale Russolillo and Christine Cooper ("Plaintiffs," for purposes of the Massachusetts Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~862.~~870. Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Subclass (the "Class," for purposes of this Count).

~~863.~~871. Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of Mass. Gen. L. ch. 93a, § 1(a).

~~864.~~872. The purchase of Class Vehicles by Plaintiffs and Class Members constitutes "trade" or "commerce" within the meaning of Mass. Gen. L. ch. 93a, § 1(b).

~~865.~~873. Massachusetts law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Mass. Gen. L. ch. 93a, § 2(a). Mercedes participated in unfair and deceptive trade practices that violated Massachusetts law as described herein.

~~866.~~874. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~867.~~875. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' misrepresentations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

~~868.~~876. By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above, Mercedes engaged in unfair or deceptive business practices in violation of the Code of Massachusetts Regulations, §§ 3.02(2) and 3.05(1).

~~869.~~877. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiffs, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~870.~~878. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion with the intent to ensure that consumers would purchase the Class Vehicles.

~~871.~~879. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiffs and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

~~872.~~880. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of Massachusetts law.

~~873.~~881. Mercedes knew or should have known that its conduct violated Massachusetts law.

~~874.~~882. Mercedes owed Plaintiffs and Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~875.~~883. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe, premature corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~876.~~884. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiffs and Class Members. A vehicle made by a reputable manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~877.~~885. Plaintiffs and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiffs been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~878.~~886. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~879.~~887. Plaintiffs and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of Massachusetts law, and these violations present a continuing risk to Plaintiffs, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~880.~~888. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiffs and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~881.~~889. Thus, pursuant to Mass. Gen. L. ch. 93a, § 9(1)–(3), Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and treble damages. Additionally, Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

~~882.~~890. Plaintiff provided any notice that could possibly have been required as detailed more fully above, and Mercedes has long been on notice of the Rear Subframe Defect and its violation of Mass. Gen. L. ch. 93a, § 2(a). Therefore, Plaintiffs have satisfied the notice requirement of Mass. Gen. L. ch. 93a, § 9(3).

**TWENTY-FIFTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**Mass. Gen. L. ch. 106, § 2-314**

~~883.~~891. Plaintiffs Christine Cooper and Pasquale Russolillo ("Plaintiffs," for purposes of the Massachusetts Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~884.~~892. Plaintiffs brings this Count individually and on behalf of the other members of the Massachusetts Subclass (the "Class," for purposes of this Count).

~~885.~~893. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~886.~~894. Mercedes is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. L. ch. 106, § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d). 103(1)(p).

~~887.~~895. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. L. ch. 106, § 2-105(1).

~~888.~~896. Plaintiffs and Class Members are buyers as that term is used in Mass. Gen. L. ch. 106, § 2-103(a)(1), and Mercedes is a seller as that term is used in § 2-103(a)(4).

~~889.~~897. Plaintiffs and Class Members purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~890.~~898. To the extent that Plaintiffs and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~891.~~899. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been

available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~892.~~900. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~893.~~901. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~894.~~902. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~895.~~903. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs and Class Members have not received the benefit of their bargain and

have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**TWENTY-SIXTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~896.~~904. Plaintiffs Christine Cooper and Pasquale Russolillo ("Plaintiffs," for purposes of the Massachusetts Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~897.~~905. Plaintiffs brings this Count individually and on behalf of the other members of the Massachusetts Subclass (the "Class," for purposes of this Count).

~~898.~~906. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~899.~~907. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and Class Members would not be able to

inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~900.~~908. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and Class Members. When Plaintiffs and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~901.~~909. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the

representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~902.~~910. Plaintiffs and Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and Class Members would have seen those disclosures. Indeed, Plaintiffs and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~903.~~911. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes

knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class Members.

~~904.~~912. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~905.~~913. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~906.~~914. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy,

and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and Class Members.

~~907.~~915. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~908.~~916. Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~909.~~917. Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they negotiated and paid

value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~910.~~918. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~911.~~919. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~912.~~920. Plaintiffs and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and Class Members are entitled to recover actual

damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and Class Members seek an award of punitive damages as to MBUSA only.

### K. Claims Brought on Behalf of the Michigan Subclass

### TWENTY-SEVENTH CAUSE OF ACTION VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT M.C.L. § 445.901 *et seq.*

~~913.~~921. Plaintiff Edward Michael Jacobs ("Plaintiff," for purposes of the Michigan Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~914.~~922. Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

~~915.~~923. Plaintiff, Class Members, MBUSA, and MBG are each a "person" within the meaning of the Michigan Consumer Protection Act ("Michigan CPA"). *See* M.C.L. § 445.902(d).

~~916.~~924. The purchase of Class Vehicles by Plaintiff and Class Members constitutes "trade or commerce" within the meaning of M.C.L. § 445.902(g).

~~917.~~925. The Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." M.C.L. § 445.903(1). This prohibition includes "[r]epresenting that goods or

services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." M.C.L. § 445.903(1)(c), (e), & (bb). Mercedes participated in unfair and deceptive trade practices that violated the Michigan CPA as described herein.

~~918.~~926. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~919.~~927. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' misrepresentations, omissions, statements, and commentary have included selling

and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

~~920.~~928. By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above in § VI.D., Mercedes engaged in unfair or deceptive business practices in violation of the Michigan CPA. *See* M.C.L. §§ 445.903(1)(c), (e), (s), (z), & (cc).

~~921.~~929. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~922.~~930. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion with the intent to ensure that consumers would purchase the Class Vehicles.

~~923.~~931. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiff and Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the defect.

~~924.~~932. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of the Michigan CPA.

~~925.~~933. Mercedes knew or should have known that its conduct violated the Michigan CPA.

~~926.~~934. Mercedes owed Plaintiff and Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~927.~~935. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe, premature corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~928.~~936. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~929.~~937. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiff been aware of the Rear Subframe Defect in the Class Vehicles, which renders the vehicles dangerous to drive and necessitates a large expenditure to return the vehicles to a safe condition, Plaintiff either would have paid less for his vehicle or would not have purchased it at all. Plaintiff did not receive the benefit of his bargain as a result of Mercedes' misconduct.

~~930.~~938. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~931.~~939. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to Plaintiff, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~932.~~940. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~933.~~941. Thus, pursuant to M.C.L. § 445.911(5), Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, and attorneys' fees and expenses. Additionally, Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

**TWENTY-EIGHTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**M.C.L. § 440.2314**

~~934.~~942. Plaintiff Edward Michael Jacobs ("Plaintiff," for purposes of the Michigan Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~935.~~943. Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

~~936.~~944. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~937.~~945. Mercedes is and was at all relevant times a "merchant" with respect to motor vehicles under M.C.L. 440.2104(1) and is a "seller" of motor vehicles under M.C.L. 440.2103(1)(c).

~~938.~~946. The Class Vehicles are and were at all relevant times "goods" within the meaning of M.C.L. 440.2105(1).

~~939.~~947. Plaintiff and Class Members purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~940.~~948. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~941.~~949. Additionally, there is privity because Plaintiff's and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the

dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~942.~~950. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~943.~~951. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~944.~~952. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

~~945.~~953. As a direct and proximate result of the Rear Subframe Defect, Plaintiff and Class Members have not received the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## TWENTY-NINTH CAUSE OF ACTION
## FRAUDULENT OMISSION

~~946.~~954. Plaintiff Edward Michael Jacobs ("Plaintiff," for purposes of the Michigan Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~947.~~955. Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

~~948.~~956. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~949.~~957. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~950.~~958. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their

defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~951.~~959. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~952.~~960. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class

Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~953.~~961. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~954.~~962. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding

their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~955.~~963. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~956.~~964. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~957.~~965. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on

February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~958.~~966. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~959.~~967. Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~960.~~968. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~961.~~969. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes.

~~962.~~970. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### L. Claims Brought on Behalf of the Missouri Subclass

**THIRTIETH CAUSE OF ACTION**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. §§ 407.010 *et seq.***

~~963.~~971. Plaintiffs Thomas Koby and Monique Edwards ("Plaintiffs," for purposes of the Missouri Subclass's claims) repeat and reallege paragraphs 1-412408 as if fully set forth herein.

~~964.~~972. Plaintiffs bring this Count individually and on behalf of the other members of the Missouri Subclass (the "Class," for purposes of this Count).

~~965.~~973. Plaintiffs and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

~~966.~~974. Mercedes engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

~~967.~~975. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

~~968.~~976. Mercedes has known of the Rear Subframe Defect in Class Vehicles since at least 2009. In the course of its business, Mercedes failed to

disclose and actively concealed the Rear Subframe Defect in Class Vehicles as described herein. By failing to disclose the Rear Subframe Defect or the dangers of operating a vehicle with the defect described herein—dangers that were known to Mercedes or available to Mercedes upon reasonable inquiry—Mercedes deprived consumers of all material facts about the safety, use, and functionality of their vehicles. By failing to release or disclose material facts about the Rear Subframe Defect, Mercedes curtailed or reduced the ability of consumers to take notice of material facts about their vehicles and/or affirmatively operated to hide or keep those facts from consumers. *See* Mo. Code Regs. Ann., tit. 15 § 60-9.110.

~~969.~~977. Mercedes made false or misleading material statements about the safety, quality, and reliability of the Class Vehicles and/or the defective rear subframes installed in them. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite Mercedes' knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. Mercedes thus engaged in unfair or deceptive business practices in violation of the Missouri MPA. Mercedes deliberately withheld the information about the propensity of the rear subframes installed in the Class Vehicles to become unsafe and unstable to ensure that consumers would purchase the Class Vehicles.

~~970.~~978. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiffs, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles. Consequently, Mercedes' failures to disclose the material facts of the Rear Subframe Defect amount to misleading statements pursuant to Mo. Code Regs. Ann., tit. 15 § 60-9.090.

~~971.~~979. Because Mercedes knew or believed that its statements regarding safety, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the Rear Subframe Defect, Mercedes engaged in fraudulent misrepresentations pursuant to Mo. Code Regs. Ann., tit. 15 § 60-9.100.

~~972.~~980. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes misrepresented the Rear Subframe Defect as normal "wear and

tear." Mercedes also charged money to replace a part it knew to be defective. Such acts are in violation of Mo. Code Regs. Ann., tit. 15 § 60-8.020.

~~973.~~981. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of the Missouri MPA.

~~974.~~982. Mercedes knew or should have known that its conduct violated the Missouri MPA.

~~975.~~983. Mercedes owed Plaintiffs and the other Class Members a duty to disclose the true safety, quality, longevity, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs and the other Class Members; and/or

d. Made incomplete representations about the safety, quality, and reliability of the foregoing generally while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~976.~~984. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe, premature corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~977.~~985. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable

manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor quality vehicles that conceals defects rather than promptly remedying them.

~~978.~~986. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiffs been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~979.~~987. Mercedes' violations present a continuing risk to Plaintiffs, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~980.~~988. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including but not limited to unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future

repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~981.~~989. Mercedes is liable to Plaintiffs and the other Class Members for damages in an amount to be proven at trial, including attorneys' fees and costs, as well as injunctive relief enjoining Mercedes' unfair and deceptive practices, declaratory relief, and any other just and proper relief under Mo. Rev. Stat. § 407.025. In addition, Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**THIRTY-FIRST CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Mo. Rev. Stat. § 400.2-314**

~~982.~~990. Plaintiffs Thomas Koby and Monique Edwards ("Plaintiffs," for purposes of the Missouri Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~983.~~991. Plaintiffs bring this claim individually and on behalf of the other members of the Missouri Subclass (the "Class," for purposes of this Count).

~~984.~~992. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~985.~~993. Mercedes is and was at all relevant time a "seller" of motor vehicles under Mo. Rev. Stat. § 400.2-103(1)(d) and a "merchant" with respect to motor vehicles within the meaning of Mo. Rev. Stat. § 2.104(1).

~~986.~~994. Plaintiffs and the other Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under Mo. Rev. Stat. § 400.2-103(1)(a).

~~987.~~995. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 400.2-105.

~~988.~~996. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mo. Rev. Stat. §§ 100.2-314.

~~989.~~997. Plaintiffs purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~990.~~998. To the extent that Plaintiffs and the other Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~991.~~999. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available.

~~992.~~1000. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~993.~~1001. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~994.~~1002. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~995.~~1003. Any attempt by Mercedes to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Rear Subframe Defect. The limits contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Class Members. Among other things, Plaintiffs and the other Class Members did not determine these limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power existed between Mercedes and Class Members, and Mercedes knew or should have known that the Class Vehicles

were defective at the time of sale and that the Rear Subframe Defect posed a safety hazard.

~~996.~~1004. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs did not receive the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**THIRTY-SECOND CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~997.~~1005. Plaintiffs Thomas Koby and Monique Edwards ("Plaintiffs," for purposes of the Missouri Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~998.~~1006. Plaintiffs bring this claim individually and on behalf of the other members of the Missouri Subclass (the "Class," for purposes of this Count).

~~999.~~1007. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1000.~~1008. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior

of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1001.~~1009. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1002.~~1010. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers,

both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1003.~~1011. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1004.~~1012. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes

knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1005.~~1013. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1006.~~1014. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1007.~~1015. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1008.~~1016. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1009.~~1017. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1010.~~1018. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1011.~~1019. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1012.~~1020. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1013.~~1021. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

## M. Claims Brought on Behalf of the New Jersey Subclass

### THIRTY-THIRD CAUSE OF ACTION
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. §§ 56:8-1 *et seq.*

~~1014.~~1022. Plaintiffs Stanley King and Yauwen Lin ("Plaintiffs," for purposes of the New Jersey Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1015.~~1023. Plaintiffs bring this claim individually and on behalf of the other members of the New Jersey Subclass (the "Class," for purposes of this Count).

~~1016.~~1024. Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).

~~1017.~~1025. The Class Vehicles and the defective rear subframes installed in them are "merchandise" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(c).

~~1018.~~1026. The New Jersey CFA prohibits unfair trade practices, including "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2. The New Jersey CFA also prohibits schemes not to sell items as advertised. N.J. Stat. Ann. § 56:8-2.2.

~~1019.~~1027. At all relevant times, Mercedes conducted trade and commerce in New Jersey.

~~1020.~~1028. The New Jersey CFA is a cumulative remedy such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes. N.J. Stat. Ann. § 56:8-2.13.

~~1021.~~1029. Mercedes has engaged in unlawful, deceptive practices in the sale of the defective rear subframes in the Class Vehicles as alleged in more detail herein, including: (1) selling the Class Vehicles despite knowing that the rear subframes were prone to extreme, premature corrosion; (2) refusing to fully

reimburse Plaintiffs and the other Class Members for the replacement of their dangerously corroded rear subframes and related costs; and (3) failing to disclose and/or concealing this known defect.

~~1022.~~1030. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, likely as early as 2009, through sources such as those identified in § VI.B.

~~1023.~~1031. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

~~1024.~~1032. Mercedes knowingly and intentionally omitted and failed to disclose material facts to Plaintiffs and the other Class Members regarding the Rear Subframe Defect, including that, with normal use, the rear subframe would

fail and/or malfunction as described herein, and/or denying or misleading Plaintiffs and the other Class Members as to the true cause of the Rear Subframe Defect.

~~1025.~~1033. Mercedes intended to deceive Plaintiffs and the other Class Members and intended that Plaintiffs and the other Class Members would rely on Mercedes' misrepresentations, omissions, and acts of concealment, such that Plaintiffs and the other Class Members would purchase the Class Vehicles with defective rear subframes at a substantial out-of-pocket cost.

~~1026.~~1034. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiffs and the other Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." And Mercedes refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

~~1027.~~1035. Plaintiffs and the other Class Members, like all objectively reasonable consumers, did not expect the rear subframes in their vehicles to severely and prematurely corrode, even with regular maintenance, and to put them at risk of losing control of their vehicles upon rear subframe failure.

~~1028.~~1036. Mercedes owed Plaintiffs a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~1029.~~1037. Had Mercedes disclosed all material information regarding the defective rear subframes, Plaintiffs and the other Class Members would not have purchased their Class Vehicles or would have paid less for them.

~~1030.~~1038. Plaintiffs provided any notice that could possibly have been required as detailed more fully above, and Mercedes has long been on notice of the Rear Subframe Defect and its violation of the New Jersey CFA from various sources.

~~1031.~~1039. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiffs and the other Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~1032.~~1040. Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, along with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. *See* N.J. Stat. Ann. § 56:8-19. In addition, Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**THIRTY-FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**N.J. Stat. Ann. § 12A:2-314**

~~1033.~~1041. Plaintiffs Stanley King and Yauwen Lin ("Plaintiffs," for purposes of the New Jersey Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1034.~~1042. Plaintiffs bring this claim individually and on behalf of the other members of the New Jersey Subclass (the "Class," for purposes of this Count).

~~1035.~~1043. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1036.~~1044. Mercedes is and was at all relevant times a "seller" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d) and a "merchant" with respect to motor vehicles within the meaning of N.J. Stat. Ann. § 12A:2-104(1).

~~1037.~~1045. Plaintiffs and the other Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under N.J. Stat. Ann. § 12A:2-103(1)(a).

~~1038.~~1046. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-105.

~~1039.~~1047. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

~~1040.~~1048. Plaintiffs purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~1041.~~1049. To the extent that Plaintiffs and the other Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1042.~~1050. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes

set the MSRP and controlled any dealership incentives which may have been available.

~~1043.~~1051. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1044.~~1052. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile. Nonetheless, Plaintiffs, on behalf of the Missouri Subclass, provided Mercedes with notice of its breaches of implied warranties by a letter to its counsel dated April 28, 2023.

~~1045.~~1053. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~1046.~~1054. Any attempt by Mercedes to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Rear Subframe Defect. The limits contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Class Members. Among other things, Plaintiffs and the other Class Members did not determine these limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power existed between Mercedes and Class Members, and Mercedes knew or should have known that the Class Vehicles were defective at the time of sale and that the Rear Subframe Defect posed a safety hazard.

~~1047.~~1055. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs did not receive the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**THIRTY-FIFTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~1048.~~1056. Plaintiffs Stanley King and Yauwen Lin ("Plaintiffs," for purposes of the New Jersey Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1049.~~1057. Plaintiffs bring this claim individually and on behalf of the other members of the New Jersey Subclass (the "Class," for purposes of this Count).

~~1050.~~1058. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1051.~~1059. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1052.~~1060. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1053.~~1061. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1054.~~1062. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1055.~~1063. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1056.~~1064. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1057.~~1065. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1058.~~1066. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy,

and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1059.~~1067. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1060.~~1068. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1061.~~1069. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated

and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1062.~~1070. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1063.~~1071. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1064.~~1072. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover

actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

### N. Claims Brought on Behalf of the New York Subclass

## THIRTY-SIXTH CAUSE OF ACTION
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW, DECEPTIVE ACTS AND PRACTICES
## N.Y. Gen. Bus. Law § 349

~~1065.~~1073. Plaintiff Samuel Ortiz ("Plaintiff," for purposes of the New York Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1066.~~1074. Plaintiff brings this claim individually and on behalf of the other members of the New York Subclass (the "Class," for purposes of this Count).

~~1067.~~1075. The New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ." N.Y. Gen. Bus. Law § 349(a).

~~1068.~~1076. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' misrepresentations, omissions, statements, and commentary have included selling

and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. These material statements had the capacity, tendency, or effect of misleading consumers in violation of New York law.

~~1069.~~1077. Mercedes advertised the Class Vehicles (*i.e.*, as safe, high-quality, reliable, etc.) with the intent not to sell them as advertised in violation of New York law.

~~1070.~~1078. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

~~1071.~~1079. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing

the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of New York law.

~~1072.~~1080. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~1073.~~1081. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~1074.~~1082. Mercedes knew or should have known that its conduct violated New York law.

~~1075.~~1083. Mercedes owed Plaintiff and Class Members a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~1076.~~1084. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~1077.~~1085. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiff and Class Members been aware of the Rear Subframe Defect in the Class Vehicles, which renders the vehicles dangerous to drive and necessitates a large

expenditure to return the vehicles to a safe condition, Plaintiff and Class Members either would have paid less for his vehicle or would not have purchased them at all. Plaintiff and Class Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~1078.~~1086. Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchased in the used market, thereby further diminishing the Class Vehicles' value.

~~1079.~~1087. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~1080.~~1088. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of New York law, and these violations present a continuing risk to Plaintiff, Class Members, and the general

public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~1081.~~1089. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~1082.~~1090. Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and any other relief permitted under New York law.

**THIRTY-SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**N.Y. U.C.C. § 2-314**

~~1083.~~1091. Plaintiff Samuel Ortiz ("Plaintiff," for purposes of the New York Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1084.~~1092. Plaintiff brings this claim individually and on behalf of the other members of the New York Subclass (the "Class," for purposes of this Count).

~~1085.~~1093. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1086.~~1094. Mercedes is and was at all relevant times a "seller" of motor vehicles under N.Y. U.C.C. § 2-103(1)(d) and a "merchant" with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

~~1087.~~1095. Plaintiff and Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under N.Y. U.C.C. § 2-103(1)(a).

~~1088.~~1096. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. § 2-105.

~~1089.~~1097. Under N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and Class Members purchased their Class Vehicles from Mercedes.

~~1090.~~1098. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1091.~~1099. Additionally, there is privity because Plaintiff's and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~1092.~~1100. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time

thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1093.~~1101. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~1094.~~1102. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

~~1095.~~1103. As a direct and proximate result of the Rear Subframe Defect, Plaintiff and Class Members have not received the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## THIRTY-EIGHTH CAUSE OF ACTION
## FRAUDULENT OMISSION

~~1096.~~1104. Plaintiff Samuel Ortiz ("Plaintiff," for purposes of the New York Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1097.~~1105. Plaintiff brings this claim individually and on behalf of the other members of the New York Subclass (the "Class," for purposes of this Count).

~~1098.~~1106. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1099.~~1107. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1100.~~1108. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their

defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1101.~~1109. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1102.~~1110. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class

Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1103.~~1111. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~1104.~~1112. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding

their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1105.~~1113. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1106.~~1114. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~1107.~~1115. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on

February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1108.~~1116. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~1109.~~1117. Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1110.~~1118. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1111.~~1119. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes.

~~1112.~~1120. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

## O. Claims Brought on Behalf of the Ohio Subclass

**THIRTY-NINTH CAUSE OF ACTION**
**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code Ann. §§ 1345.01 *et seq.***

~~1113.~~1121. Plaintiffs Brian Laakso, Jack Simpson, and Edward and Courtney Bourne ("Plaintiffs," for purposes of the Ohio Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1114.~~1122. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Subclass (the "Class," for purposes of this Count).

~~1115.~~1123. Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of Ohio Rev. Code Ann. § 1345.01(B).

~~1116.~~1124. The sales of Class Vehicles from Mercedes to Plaintiffs and the other Class Members are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

~~1117.~~1125. The Ohio Consumer Sales Practices Act ("Ohio CSPA") declares unlawful "an unfair or deceptive act or practice in connection with a consumer transaction," including any representation that a product "has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have," or that the product "is of a particular standard, quality,

grade, style, prescription, or model, if it is not . . . .” Ohio Rev. Code Ann. § 1345.02(A) & (B)(1)–(2)

~~1118.~~1126. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes’ misrepresentations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as “safe,” “the best or nothing,” “state-of-the-art,” and “sophisticated,” despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. These material statements had the capacity, tendency, or effect of misleading consumers in violation of the Ohio CSPA.

~~1119.~~1127. Mercedes advertised the Class Vehicles (*i.e.*, as safe, high-quality, reliable, etc.) with the intent not to sell them as advertised in violation of the Ohio CSPA.

~~1120.~~1128. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles’ rear subframes to experience severe, premature corrosion.

~~1121.~~1129. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to

cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect, continuing violation of the Ohio CSPA.

~~1122.~~1130. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiffs, about the true safety, longevity, and reliability of Class Vehicles equipped with the defective rear subframes, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~1123.~~1131. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and the other Class Members.

~~1124.~~1132. Mercedes knew or should have known that its conduct violated the Ohio CSPA.

~~1125.~~1133. Mercedes owed Plaintiffs and the other Class Members a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~1126.~~1134. Mercedes' failure to disclose and active concealment of the problems and risks posed by the defective rear subframes in Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable manufacturer of safe, quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, poor-quality vehicles that conceals defects rather than promptly remedying them.

~~1127.~~1135. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had Plaintiffs and Class Members been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs and Class Members either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs and the other Class Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~1128.~~1136. Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchased in the used market, thereby further diminishing the Class Vehicles' value.

~~1129.~~1137. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and the other Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to

serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~1130.~~1138. Plaintiffs and the other Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Ohio CSPA, and these violations present a continuing risk to Plaintiffs, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~1131.~~1139. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiffs and the other Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale in an amount to be determined at trial.

~~1132.~~1140. Plaintiffs seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and any other relief permitted under Ohio law.

**FORTIETH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY IN TORT**

~~1133.~~1141. Plaintiffs Brian Laakso, Jack Simpson, and Edward and Courtney Bourne ("Plaintiffs," for purposes of the Ohio Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1134.~~1142. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Subclass (the "Class," for purposes of this Count).

~~1135.~~1143. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1136.~~1144. Mercedes manufactured and sold the defective Class Vehicles to Plaintiffs and the other Class Members.

~~1137.~~1145. The Class Vehicles are defective because they have rear subframes installed in them that are susceptible to premature corrosion, which can cause the vehicles to become unreasonably dangerous to operate.

~~1138.~~1146. The Rear Subframe Defect existed at the time the Class Vehicles left Mercedes' control.

~~1139.~~1147. Based on these defects, Mercedes has failed to meet the expectations of a reasonably consumer. The Class Vehicles have failed in their ordinary, intended use because they have the Rear Subframe Defect.

~~1140.~~1148. The Rear Subframe Defect in the Class Vehicles was the direct and proximate cause of economic damages to Plaintiffs and the other Class Members.

**FORTY-FIRST CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~1141.~~1149. Plaintiffs Brian Laakso, Jack Simpson, and Edward and Courtney Bourne("Plaintiffs," for purposes of the Ohio Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1142.~~1150. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Subclass (the "Class," for purposes of this Count).

~~1143.~~1151. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1144.~~1152. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior

of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1145.~~1153. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1146.~~1154. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers,

both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1147.~~1155. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1148.~~1156. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes

knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1149.~~1157. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1150.~~1158. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1151.~~1159. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1152.~~1160. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1153.~~1161. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1154.~~1162. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1155.~~1163. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1156.~~1164. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1157.~~1165. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**P. Claims Brought on Behalf of the Pennsylvania Subclass**

**FORTY-SECOND CAUSE OF ACTION**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 Pa. Cons. Stat. §§ 201-1 *et seq.***

~~1158.~~1166. Plaintiffs Anthony Russell and Giuseppe Garofalo ("Plaintiffs," for purposes of the Pennsylvania Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1159.~~1167. Plaintiffs bring this Count individually and on behalf of the other members of the Pennsylvania Subclass (the "Class," for purposes of this Count).

~~1160.~~1168. Plaintiffs, Class Members, MBUSA, and MBG are "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"). *See* 73 Pa. Cons. Stat. § 201-2(2).

~~1161.~~1169. Mercedes engaged in "trade" or "commerce" in the State of Pennsylvania within the meaning of the Pennsylvania UTPCPL. *See* 73 Pa. Cons. Stat. Ann. § 201-2(3).

~~1162.~~1170. The Pennsylvania UTPCPL makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 Pa. Cons. Stat. § 201-3(a).

~~1163.~~1171. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. These material statements had the capacity, tendency, or effect of misleading consumers in violation of the Pennsylvania UTPCPL. *See* 73 Pa. Cons. Stat. § 201-2(4)(v), (vii).

~~1164.~~1172. Mercedes advertised the Class Vehicles as safe and high-quality with the intent not to sell them as advertised. *See* 73 Pa. Cons. Stat. 201-2(4)(ix).

~~1165.~~1173. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

~~1166.~~1174. As detailed above, the Rear Subframe Defect manifests during the warranty period. Mercedes failed to remedy or prevent the Rear Subframe Defect through measures taken within the Class Vehicles' warranty periods and failed to partially or fully reimburse Plaintiffs and the other Class Members for costs related to the Rear Subframe Defect. Mercedes therefore failed to comply with the terms of the warranties it provided to Plaintiffs and the other Class Members upon the purchase of the Class Vehicles. *See* 73 Pa. Cons. Stat. § 201-2(4)(xiv).

~~1167.~~1175. Mercedes failed to inform Plaintiffs and the other Class Members who purchased their vehicles new that the Class Vehicles had been rustproofed (if at all) and the nature and extent, if any, of the warranty applicable to such rustproofing. *See* 73 Pa. Cons. Stat. § 201-2(4)(xx)(b).

~~1168.~~1176. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiffs, about the true

safety, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles. *See* 73 Pa. Cons. Stat. § 201-2(4)(xxi).

~~1169.~~1177. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and the other Class Members.

~~1170.~~1178. Mercedes knew or should have known that its conduct violated the Pennsylvania UTPCPL.

~~1171.~~1179. Mercedes owed Plaintiffs a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~1172.~~1180. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in the Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than properly remedying them.

~~1173.~~1181. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs and Class Members either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs and Class Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~1174.~~1182. Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class Vehicles has greatly

diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing the Class Vehicles' value.

~~1175.~~1183. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and the other Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~1176.~~1184. Plaintiffs and the other Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Pennsylvania UTPCPL, and these violations present a continuing risk to Plaintiffs, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~1177.~~1185. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiffs and the other Class Members have suffered incidental, consequential, and other damages, including

unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~1178.~~1186. Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, along with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. *See* 73 Pa. Cons. Stat. § 201-9.2(a). In addition, Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**FORTY-THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**13 Pa. Cons. Stat. § 2314**

~~1179.~~1187. Plaintiffs Anthony Russell and Giuseppe Garofalo ("Plaintiffs," for purposes of the Pennsylvania Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1180.~~1188. Plaintiffs bring this Count individually and on behalf of the other members of the Pennsylvania Subclass (the "Class," for purposes of this Count).

~~1181.~~1189. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1182.~~1190. Mercedes is and was at all relevant times a "seller" under 13 Pa. Cons. Stat. § 2103(a) and a "merchant" under 13 Pa. Cons. Stat. § 2104.

~~1183.~~1191. Plaintiffs and the other Class Members were "buyers" under 13 Pa. Cons. Stat. § 2103(a).

~~1184.~~1192. The Class Vehicles are "goods" under 13 Pa. Cons. Stat. § 2105(a).

~~1185.~~1193. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 13 Pa. Cons. Stat. § 2314.

~~1186.~~1194. Plaintiffs purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~1187.~~1195. To the extent that Plaintiffs and the other Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1188.~~1196. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available.

~~1189.~~1197. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1190.~~1198. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile. Nonetheless, Plaintiffs, on behalf of the Pennsylvania Subclass, provided Mercedes with notice of its breaches of implied warranties by a letter to its counsel dated April 28, 2023.

~~1191.~~1199. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~1192.~~1200. Any attempt by Mercedes to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Rear Subframe Defect. The limits contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Class Members. Among other things, Plaintiffs and the other Class Members did

not determine these limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power existed between Mercedes and Class Members, and Mercedes knew or should have known that the Class Vehicles were defective at the time of sale and that the Rear Subframe Defect posed a safety hazard.

~~1193.~~1201. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs did not receive the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**FORTY-FOURTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~1194.~~1202. Plaintiffs Anthony Russell and Giuseppe Garofalo ("Plaintiffs," for purposes of the Pennsylvania Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1195.~~1203. Plaintiffs bring this Count individually and on behalf of the other members of the Pennsylvania Subclass (the "Class," for purposes of this Count).

~~1196.~~1204. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1197.~~1205. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1198.~~1206. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1199.~~1207. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted,

and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1200.~~1208. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on

Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1201.~~1209. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1202.~~1210. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1203.~~1211. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class

Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1204.~~1212. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1205.~~1213. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1206.~~1214. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions

were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1207.~~1215. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1208.~~1216. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future

repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1209.~~1217. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1210.~~1218. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

## Q. Claims Brought on Behalf of the Rhode Island Subclass

### FORTY-FIFTH CAUSE OF ACTION
### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT
### R.I. Gen. L. §§ 6-13.1-1 *et seq.*

~~1211.~~1219. Plaintiffs Alexander Sowa and Raymond Robinson ("Plaintiffs," for purposes of the Rhode Island Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1212.~~1220. Plaintiffs bring this Count individually and on behalf of the other members of the Rhode Island Subclass (the "Class," for purposes of this Count).

~~1213.~~1221. Plaintiffs, Class Members, MBUSA, and MBG are each a "person" within the meaning of Rhode Island's Unfair Trade Practice and Consumer Protection Act ("Rhode Island UTPCPA"). *See* R.I. Gen. L. § 6-13.1-1(3).

~~1214.~~1222. The purchase of Class Vehicles by Plaintiffs and the other Class Members constitutes "trade" and "commerce" within the meaning of the Rhode Island UTPCPA. *See* R.I. Gen. L. § 6-13.1-1(5).

~~1215.~~1223. The Rhode Island UTPCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. L. § 6-13.1-2. Mercedes participated in unfair or deceptive acts or practices that violated the Rhode Island UTPCPA as described herein.

~~1216.~~1224. Mercedes knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009, through sources such as those identified in § VI.B. Mercedes failed to disclose and actively concealed facts such as that the rear subframes installed in Class Vehicles would fail and/or malfunction as described herein, and denied and/or misled as to the tendency of the Class

Vehicles to develop severe, premature corrosion of the rear subframe, which eventually results in the destabilization of a Class Vehicle's entire rear suspension.

~~1217.~~1225. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.

~~1218.~~1226. By failing to disclose and by actively concealing the Rear Subframe Defect in the Class Vehicles and/or the defective rear subframes installed in them, and by marketing them as more fully detailed above in § VI.D., Mercedes engaged in unfair or deceptive business practices in violation of the Rhode Island UTPCPA. *See* R.I. Gen. L. § 6-13.1-1(6)(v), (vii), (ix), & (xii)–(xiv). Mercedes deliberately withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion to ensure that consumers would purchase the Class Vehicles.

~~1219.~~1227. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiffs and the other Class Members.

~~1220.~~1228. Mercedes' conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes frequently blamed Plaintiffs and the other Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." Mercedes also refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective subframes and other components damaged due to the defect.

~~1221.~~1229. Mercedes did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Limited Subframe Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced by independent mechanics or with used or aftermarket parts, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing

the Limited Subframe Warranty, Mercedes still refuses to acknowledge the existence of the Rear Subframe Defect.

~~1222.~~1230. Mercedes knew or should have known that its conduct violated the Rhode Island UTPCPA.

~~1223.~~1231. Mercedes owed Plaintiffs a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiffs; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

~~1224.~~1232. Because Mercedes fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and

failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

~~1225.~~1233. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiffs and the other Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

~~1226.~~1234. Plaintiffs and the other Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and its failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiffs and Class Members either would have paid less for their vehicles or would not have purchased them at all. Plaintiffs and Class Members did not receive the benefit of their bargain as a result of Mercedes' misconduct.

~~1227.~~1235. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiffs and the other Class Members suffered and

will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~1228.~~1236. Plaintiffs and the other Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Rhode Island UTPCPA, and these violations present a continuing risk to Plaintiffs, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~1229.~~1237. As a direct and proximate result of Mercedes' misconduct, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiffs and the other Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~1230.~~1238. Thus, pursuant to the Rhode Island UTPCPA, Plaintiffs seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, declaratory

relief, actual and statutory damages, attorneys' fees and expenses, and treble damages as permitted under Rhode Island law. *See* R.I. Gen. L. § 6-13.1-5-2. In addition, Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

**FORTY-SIXTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**R.I. Gen. L. § 6A-2-314**

~~1231.~~1239. Plaintiffs Alexander Sowa and Raymond Robinson ("Plaintiffs," for purposes of the Rhode Island Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1232.~~1240. Plaintiffs incorporate by reference each allegation as if fully set forth herein.

~~1233.~~1241. Plaintiffs bring this Count individually and on behalf of the other members of the Rhode Island Subclass (the "Class," for purposes of this Count).

~~1234.~~1242. Mercedes is a merchant with respect to the Class Vehicles, as that term is used in RI Gen. L. § 6A-2-104(1).

~~1235.~~1243. The Class Vehicles are goods as that term is used in RI Gen. L. § 6A-2-105(1).

~~1236.~~1244. Plaintiff and Class Members are buyers as that term is used in RI Gen. L. § 6A-2-103(a)(1), and Mercedes is a seller as that term is used in RI Gen. L. § 6A-2-103(a)(4).

~~1237.~~1245. Plaintiffs purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~1238.~~1246. To the extent that Plaintiffs and the other Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1239.~~1247. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~1240.~~1248. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1241.~~1249. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~1242.~~1250. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly,

the implied warranty of merchantability is not limited to the Limited Warranty period.

~~1243.~~1251. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs have not received the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**FORTY-SEVENTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~1244.~~1252. Plaintiffs Alexander Sowa and Raymond Robinson ("Plaintiffs," for purposes of the Rhode Island Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1245.~~1253. Plaintiffs bring this Count individually and on behalf of the other members of the Rhode Island Subclass (the "Class," for purposes of this Count).

~~1246.~~1254. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1247.~~1255. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental

conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1248.~~1256. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1249.~~1257. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their

purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1250.~~1258. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1251.~~1259. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to

Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1252.~~1260. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1253.~~1261. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1254.~~1262. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1255.~~1263. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1256.~~1264. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1257.~~1265. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1258.~~1266. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1259.~~1267. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1260.~~1268. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

## R. Claims Brought on Behalf of the Tennessee Subclass

### FORTY-EIGHTH CAUSE OF ACTION
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### Tenn. Code Ann. §§ 47-18-101 *et seq.*

~~1261.~~1269. Plaintiff Park Thomas ("Plaintiff," for purposes of the Tennessee Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1262.~~1270. Plaintiff brings this count individually and on behalf of the other members of the Tennessee Subclass (the "Class," for purposes of this Count).

~~1263.~~1271. Pursuant to the Tennessee Consumer Protection Act ("Tennessee CPA"), "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce" are unlawful. Tenn. Code Ann. § 47-18-104(a). This includes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," and

"[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another . . . ." Tenn. Code Ann. § 47-18-104(b)(5) & (7).

~~1264.~~1272. As alleged above, Mercedes made material statements about the quality, reliability, and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading. Mercedes' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it. These material statements had the capacity, tendency, or effect of misleading consumers in violation of the Tennessee CPA.

~~1265.~~1273. Mercedes advertised the Class Vehicles as safe and high-quality with the intent not to sell them as advertised. *See* Tenn. Code Ann. § 47-18-104(b)(9).

~~1266.~~1274. Mercedes willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

~~1267.~~1275. As detailed above, the Rear Subframe Defect manifests during the warranty period. Mercedes failed to remedy or prevent the Rear Subframe

Defect through measures taken within the Class Vehicles' warranty periods and failed to partially or fully reimburse Plaintiff and Class Members for costs related to the Rear Subframe Defect. Mercedes therefore failed to comply with the terms of the warranties it provided to Plaintiff and Class Members upon the purchase of the Class Vehicles.

~~1268.~~1276. Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts: (a) had a tendency or capacity to mislead and create a false impression in consumers; and (b) were likely to and did deceive reasonable consumers, including Plaintiff, about the true safety, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes' brands, and the true value of the Class Vehicles.

~~1269.~~1277. Mercedes willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

~~1270.~~1278. Mercedes knew or should have known that its conduct violated the Tennessee CPA.

~~1271.~~1279. Mercedes owed Plaintiff and Class Members a duty to disclose the true quality, safety, and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes:

a. Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy Class Vehicles;

b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff; and/or

d. Made incomplete representations about the quality, safety, and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

~~1272.~~1280. Mercedes' failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in the Class Vehicles were material to Plaintiff and Class Members. A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than properly remedying them.

~~1273.~~1281. Plaintiff and Class Members suffered ascertainable loss caused by Mercedes' misrepresentations and failure to disclose material information. Had they been aware of the Rear Subframe Defect in the Class Vehicles, which renders their vehicles dangerous to drive and necessitates a large expenditure to return their vehicles to a safe condition, Plaintiff and Class Members either would have paid less for his vehicle or would not have purchased them at all. Plaintiff did not receive the benefit of his bargain as a result of Mercedes' misconduct.

~~1274.~~1282. Because Mercedes fraudulently concealed the Rear Subframe Defect in the Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing the Class Vehicles' value.

~~1275.~~1283. As a direct and proximate result of Mercedes' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframes, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs of as much as $7,000 or more.

~~1276.~~1284. Plaintiff and Class Members risk irreparable injury as a result of Mercedes' acts and omissions in violation of the Tennessee CPA, and these violations present a continuing risk to Plaintiff, Class Members, and the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

~~1277.~~1285. As a direct and proximate result of Mercedes' misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value. Plaintiff and Class Members have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicles to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determined at trial.

~~1278.~~1286. Plaintiff seeks an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, attorneys' fees, and any other relief allowed by Tennessee law. In addition, Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

## FORTY-NINTH CAUSE OF ACTION
## FRAUDULENT OMISSION

~~1279.~~1287. Plaintiff Park Thomas ("Plaintiff," for purposes of the Tennessee Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1280.~~1288. Plaintiff brings this count individually and on behalf of the other members of the Tennessee Subclass (the "Class," for purposes of this Count).

~~1281.~~1289. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1282.~~1290. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1283.~~1291. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their

defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1284.~~1292. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1285.~~1293. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class

Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1286.~~1294. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~1287.~~1295. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding

their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1288.~~1296. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1289.~~1297. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~1290.~~1298. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on

February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1291.~~1299. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~1292.~~1300. Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1293.~~1301. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, overpayment at the point of sale, in an amount to be determine at trial.

~~1294.~~1302. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes.

~~1295.~~1303. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

## S. Claims Brought on Behalf of the Texas Subclass

**FIFTIETH CAUSE OF ACTION**
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT**
**Tex. Bus. & Com. Code §§ 17.41 *et seq.***

~~1296.~~1304. Plaintiffs Alma Brown and Curtis Willis ("Plaintiffs," for purposes of the Texas Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1297.~~1305. Plaintiffs bring this count individually and on behalf of the other members of the Texas Subclass (the "Class," for purposes of this Count).

~~1298.~~1306. The Texas Deceptive Trade Practices—Consumer Protection Act ("Texas DTPCPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" Tex. Bus. & Com. Code § 17.46(a) and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code Ann. § 17.45(5); Tex. Bus. & Com. Code Ann. § 17.50(a)(3).

~~1299.~~1307. Mercedes was engaged in "commerce" within the meaning of the Texas DTPCPA. *See* Tex. Bus. & Com. Code § 17.45(6).

~~1300.~~1308. Plaintiffs and the other Class Members are "consumers" within the meaning of the Texas DTPCPA. *See* Tex. Bus. & Com. Code § 17.45(4).

~~1301.~~1309. Mercedes is a "person" within the meaning of the Texas DTPCPA. *See* Tex. Bus. & Com. Code § 17.45(3).

~~1302.~~1310. The Class Vehicles are "goods" within the meaning of the Texas DTPCPA. *See* Tex. Bus. & Com. Code § 17.45(1).

~~1303.~~1311. Mercedes violated Tex. Bus. & Com. Code § 17.46(a) and 17.46(b)(5) by representing that Class Vehicles have characteristics, uses, benefits and/or qualities that they do not possess.

~~1304.~~1312. Mercedes violated Tex. Bus. & Com. Code § 17.46(a) and 17.46(b)(7) by representing that Class Vehicles are of a particular standard, quality or grade, when they are not.

~~1305.~~1313. Mercedes violated Tex. Bus. & Com. Code § 17.46(a) and 17.46(b)(9) by advertising Class Vehicles without intent to sell or lease as advertised.

~~1306.~~1314. Mercedes violated Tex. Bus. & Com. Code § 17.46(a) and 17.46(b)(11) by selling Class Vehicles knowing that a service, replacement or repair was needed and failing to disclose that fact.

~~1307.~~1315. Mercedes violated Tex. Bus. & Com. Code § 17.46(a) and 17.46(b)(24) by failing to disclose the existence of the Rear Subframe Defect with the intent to deceive Plaintiffs and the other Class Members and to induce them into purchasing the Class Vehicles.

~~1308.~~1316. By the conduct described in detail above and incorporated herein, Mercedes also engaged in unfair or deceptive acts in violation of in violation of Tex. Bus. & Com. Code § 17.46(a) and (b).

~~1309.~~1317. Mercedes' misrepresentations and/or omissions regarding the Rear Subframe Defect described above concern material facts that a reasonable person would have considered in deciding whether to purchase (or pay the same price for) a Class Vehicle.

~~1310.~~1318. Mercedes intended for Plaintiffs and the other Class Members to rely on Mercedes' omissions of fact regarding the Rear Subframe Defect.

~~1311.~~1319. Mercedes' misrepresentations and/or omissions regarding the Rear Subframe Defect were likely to mislead consumers acting reasonably under the same circumstances as Plaintiffs and the other Class Members.

~~1312.~~1320. Plaintiffs and the other Class Members justifiably acted or relied to their detriment upon Mercedes' omissions of fact concerning the above-

described Rear Subframe Defect as evidenced by Plaintiffs and the other Class Members' purchases of their Class Vehicles.

~~1313.~~1321. Had Mercedes disclosed all material information regarding the Rear Subframe Defect to Plaintiffs and the other Class Members, they would not have purchased Class Vehicles or would have paid less to do so.

~~1314.~~1322. Mercedes' omissions deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and Class Members.

~~1315.~~1323. In addition to being deceptive, Mercedes' business practices were unfair because Mercedes knowingly sold Plaintiffs and the other Class Members Class Vehicles with defective rear subframes that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and the other Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and the other Class Members or to competition under all of the circumstances. Moreover, in light of Mercedes' exclusive knowledge of the Rear Subframe Defect, the injury is not one that Plaintiffs or Class Members could have reasonably avoided.

~~1316.~~1324. Mercedes owed a duty to disclose the Rear Subframe Defect and its corresponding safety risk to Plaintiffs and the other Class Members because

it possessed superior and exclusive knowledge regarding the defect and the risks associated with the Rear Subframe Defect. Rather than disclose the defect, Mercedes engaged in deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the defective rear subframes to Plaintiffs and the other Class Members.

~~1317.~~1325. Plaintiffs, individually and on behalf of Class Members, notified Mercedes of the Rear Subframe Defect—and Mercedes' corresponding violation of the Texas DTPCPA—through a notice letter dated April 28, 2023. Mercedes was also provided notice of the Subframe Defect through numerous complaints made against it directly and through its dealers as well as its own internal engineering knowledge.

~~1318.~~1326. As a direct and proximate result of Mercedes' unfair and deceptive trade practices, Plaintiffs and the other Class Members have suffered ascertainable loss and actual damages. Plaintiffs and the other Class Members who purchased the Class Vehicles would not have purchased the Class Vehicles or alternatively would have paid less for them had the truth about the Rear Subframe Defect been disclosed. Plaintiffs and the other Class Members also suffered diminished value of their vehicles.

**FIFTY-FIRST CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Tex. Bus. & Com. Code Ann. § 2.314**

~~1319.~~1327. Plaintiffs Alma Brown and Curtis Willis ("Plaintiffs," for purposes of the Texas Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1320.~~1328. Plaintiffs bring this count individually and on behalf of the other members of the Texas Subclass (the "Class," for purposes of this Count).

~~1321.~~1329. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1322.~~1330. Mercedes is and was at all relevant time a "seller" of motor vehicles under Tex. Bus. & Com. Code § 2.103(a)(4) and a "merchant" with respect to motor vehicles within the meaning of Tex. Bus. & Com. Code § 2.104(1).

~~1323.~~1331. Plaintiffs and the other Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under Tex. Bus. & Com. Code § 2.313(a).

~~1324.~~1332. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code § 2.105(a).

~~1325.~~1333. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Tex. Bus. & Com. Code § 2.314, 2.315.

~~1326.~~1334. Plaintiffs purchased their Class Vehicles from Mercedes, and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

~~1327.~~1335. To the extent that Plaintiffs and the other Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiffs and the other Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1328.~~1336. Additionally, there is privity because Plaintiffs' and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available.

~~1329.~~1337. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1330.~~1338. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile. Nonetheless, Plaintiffs, on behalf of the Texas Subclass, provided Mercedes with notice of its breaches of implied warranties by a letter to its counsel dated April 28, 2023.

~~1331.~~1339. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

~~1332.~~1340. Any attempt by Mercedes to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Rear Subframe Defect. The limits contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Class Members. Among other things, Plaintiffs and the other Class Members did not determine these limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power existed between Mercedes and Class Members, and Mercedes knew or should have known that the Class Vehicles were defective at the time of sale and that the Rear Subframe Defect posed a safety hazard.

~~1333.~~1341. As a direct and proximate result of the Rear Subframe Defect, Plaintiffs did not receive the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## FIFTY-SECOND CAUSE OF ACTION
## FRAUDULENT OMISSION

~~1334.~~1342. Plaintiffs Alma Brown and Curtis Willis ("Plaintiffs," for purposes of the Texas Subclass's claims) repeat and reallege paragraphs 1-412 as if fully set forth herein.

~~1335.~~1343. Plaintiffs bring this count individually and on behalf of the other members of the Texas Subclass (the "Class," for purposes of this Count).

~~1336.~~1344. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1337.~~1345. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiffs and the other Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1338.~~1346. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their

defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and the other Class Members. When Plaintiffs and the other Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1339.~~1347. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1340.~~1348. Plaintiffs and the other Class Members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class

Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiffs and the other Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiffs and the other Class Members would have seen those disclosures. Indeed, Plaintiffs and the other Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1341.~~1349. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the other Class Members.

~~1342.~~1350. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding

their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1343.~~1351. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiffs and the other Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1344.~~1352. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiffs and the other Class Members.

~~1345.~~1353. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the Rear Subframe Defect in

the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiffs and the other Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1346.~~1354. Plaintiffs and the other Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiffs' and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

~~1347.~~1355. Because of the concealment and/or suppression of the facts, Plaintiffs and the other Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes failed to disclose and/or paid out-of-pocket to replace the defective rear subframe and adjacent components and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles,

Plaintiffs and the other Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1348.~~1356. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determine at trial.

~~1349.~~1357. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Class Members' rights and well-being to enrich Mercedes.

~~1350.~~1358. Plaintiffs and the other Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to

treble damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members seek an award of punitive damages as to MBUSA only.

## T. Claims Brought on Behalf of the Virginia Subclass

### FIFTY-THIRD CAUSE OF ACTION
### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### Va. Code Ann. §§ 59.1-196 *et seq.*

~~1351.~~1359. Plaintiff Owen Licht ("Plaintiff," for purposes of the Virginia Subclass's claims) repeats and realleges paragraphs 1-412464 as if fully set forth herein.

~~1352.~~1360. Plaintiff brings this count individually and on behalf of all members of the Virginia Subclass (the "Class," for purposes of this Count).

~~1353.~~1361. The Virginia Consumer Protection Act ("Virginia CPA") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce in Virginia. Va. Code Ann. § 59.1-200.

~~1354.~~1362. Mercedes, Plaintiff, and Class Members are "persons" within the meaning of Va. Code § 59.1-198.

~~1355.~~1363. Mercedes is a "supplier" within the meaning of Va. Code § 59.1-198.

~~1356.~~1364. Mercedes' sales of the Class Vehicles to Plaintiff and Class Members are "consumer transactions" primarily for personal, family, or household purposes within the meaning of Va. Code Ann. § 59.1-198.

~~1357.~~1365. The Virginia CPA specifically prohibits, among other things, the following fraudulent acts or practices committed by a supplier with regard to a consumer transaction: "misrepresenting that goods or services have certain qualities, characteristics, ingredients, uses, or benefits," "misrepresenting that goods or services are of a particular standard, quality, grade, style, or model," "advertising goods or services with intent not to sell them as advertised," and "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction . . . ." Va. Code Ann. § 59.1-200(A)(5), (6), (8), & (14).

~~1358.~~1366. Mercedes' engaged in the deceptive acts and practices described herein in violation of the Virginia CPA.

~~1359.~~1367. Mercedes' misrepresentations and/or omissions regarding the Rear Subframe Defect described above concern material facts that a reasonable person would have considered in deciding whether to purchase (or pay the same price for) a Class Vehicle.

~~1360.~~1368. Mercedes intended for Plaintiff and Class Members to rely on Mercedes' omissions of fact regarding the Rear Subframe Defect.

~~1361.~~1369. Mercedes' misrepresentations and/or omissions regarding the Rear Subframe Defect were likely to mislead consumers acting reasonably under the same circumstances as Plaintiff and Class Members.

~~1362.~~1370. Plaintiff and Class Members justifiably acted or relied to their detriment upon Mercedes' omissions of fact concerning the above-described Rear Subframe Defect as evidenced by Plaintiff and Class Members' purchases of their Class Vehicles.

~~1363.~~1371. Had Mercedes disclosed all material information regarding the Rear Subframe Defect to Plaintiff and Class Members, they would not have purchased Class Vehicles or would have paid less to do so.

~~1364.~~1372. Mercedes' omissions deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and Class Members.

~~1365.~~1373. In addition to being deceptive, Mercedes' business practices were unfair because Mercedes knowingly sold Plaintiff and Class Members Class Vehicles with defective rear subframes that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are

substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of Mercedes' exclusive knowledge of the Rear Subframe Defect, the injury is not one that Plaintiff or Class Members could have reasonably avoided.

~~1366.~~1374. Mercedes owed a duty to disclose the Rear Subframe Defect and its corresponding safety risk to Plaintiff and Class Members because it possessed superior and exclusive knowledge regarding the defect and the risks associated with the Rear Subframe Defect. Rather than disclose the defect, Mercedes engaged in deceptive trade practices to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the defective rear subframes to Plaintiff and Class Members.

~~1367.~~1375. Plaintiff, individually and on behalf of Class Members, notified Mercedes of the Rear Subframe Defect—and Mercedes' corresponding violation of the Virginia CPA—through a notice letter dated April 28, 2023. Mercedes was also provided notice of the Subframe Defect through numerous complaints made against it directly and through its dealers as well as its own internal engineering knowledge.

~~1368.~~1376. As a direct and proximate result of Mercedes' unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable

loss and actual damages. Plaintiff and Class Members who purchased the Class Vehicles would not have purchased the Class Vehicles or alternatively would have paid less for them had the truth about the Rear Subframe Defect been disclosed. Plaintiff and Class Members also suffered diminished value of their vehicles.

~~1369.~~1377. Because Mercedes' violations of the Virginia CPA were knowing and willful, Plaintiff and Class Members are entitled to recover the greater of treble damages or $1,000 each.

~~1370.~~1378. Plaintiff and Class Members also seek an order enjoining Mercedes' fraudulent, unfair, and/or deceptive acts or practices, attorneys' fees and expenses, and any other just and proper relief available under the Virginia General Business Law, Va. Code Ann. §§ 59.1-203 *et seq.* Plaintiff and Class Members additionally seek an award of punitive damages against MBUSA only.

**FIFTY-FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Va. Code Ann. § 8.2-314**

~~1371.~~1379. Plaintiff Owen Licht ("Plaintiff," for purposes of the Virginia Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1372.~~1380. Plaintiff brings this count individually and on behalf of all members of the Virginia Subclass (the "Class," for purposes of this Count).

~~1373.~~1381. Plaintiffs and the other Class Members bought Class Vehicles manufactured and marketed to them by MBUSA and that MBUSA intended to be purchased by consumers such as them.

~~1374.~~1382. Mercedes is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code Ann. § 8.2-104 and a "seller" of the Class Vehicles under § 8.2-103(1)(d). The Class Vehicles are "goods" as defined in Va. Code Ann. § 8.2-105(1).

~~1375.~~1383. Pursuant to Va. Code Ann. § 8.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law when Plaintiff and Class Members bought their Class Vehicles.

~~1376.~~1384. To the extent that Plaintiff and Class Members lack privity of contract with Mercedes, no privity is required because:

a. By extending express written warranties to end-user purchasers, MBUSA brought itself into privity with all Plaintiffs and Class members;

b. Plaintiff and Class Members were intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers. Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles; and

c. The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, passengers, and other drivers on the road and therefore renders the Class Vehicles unreasonably dangerous to many people.

~~1377.~~1385. Additionally, there is privity because Plaintiff's and Class Members' dealerships were agents of Mercedes. Namely, upon information and belief, Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

~~1378.~~1386. Mercedes breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

~~1379.~~1387. Mercedes has actual knowledge of the Rear Subframe Defect as alleged herein, satisfying any notice requirement. Moreover, due to Mercedes' failure to remedy the Rear Subframe Defect, any notice requirement is futile.

~~1380.~~1388. The limited warranties fail in their essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and Class Members whole and because Mercedes has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

~~1381.~~1389. As a direct and proximate result of the Rear Subframe Defect, Plaintiff and Class Members have not received the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**FIFTY-FIFTH CAUSE OF ACTION**
**FRAUDULENT OMISSION**

~~1382.~~1390. Plaintiff Owen Licht ("Plaintiff," for purposes of the Virginia Subclass's claims) repeats and realleges paragraphs 1-412 as if fully set forth herein.

~~1383.~~1391. Plaintiff brings this count individually and on behalf of all members of the Virginia Subclass (the "Class," for purposes of this Count).

~~1384.~~1392. Mercedes is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

~~1385.~~1393. Mercedes concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions. The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing. Mercedes knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.

~~1386.~~1394. Mercedes furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

~~1387.~~1395. Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted,

and reliable vehicles, and concealed the information in order to prevent harm to Mercedes' and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

~~1388.~~1396. Plaintiff and Class members, directly or indirectly, were exposed to Mercedes' advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion free, as well as Mercedes' omission of the truth about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase Class Vehicles. If Mercedes had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes chose to disclose it, including at dealerships, on Mercedes' website, in

radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

~~1389.~~1397. Mercedes had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

~~1390.~~1398. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their subframes to Mercedes.

~~1391.~~1399. The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class

Vehicles purchased by Plaintiff and Class Members. Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

~~1392.~~1400. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

~~1393.~~1401. On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles. Although MBUSA released the Limited Subframe Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

~~1394.~~1402. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them. Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were

susceptible to severe, premature corrosion of the rear subframe and nearby components. Rather, Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

~~1395.~~1403. Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect and/or paid out-of-pocket to replace the defective rear subframe and adjacent components. Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

~~1396.~~1404. As a direct and proximate result of Mercedes' concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of as much as $7,000 or more required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determine at trial.

~~1397.~~1405. Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes.

~~1398.~~1406. Plaintiff and Class Members seek an order enjoining Mercedes' unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

## X. RELIEF REQUESTED

~~1399.~~1407. Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Mercedes, as follows:

a. an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned Interim Class Counsel as Class Counsel;

b. a declaration that the rear subframes in Class Vehicles have a Defect that causes severe, premature corrosion and that poses a serious safety risk to consumers, and that this defect requires disclosure;

c. a declaration that Mercedes must, at its own expense, notify owners of Class Vehicles of the Rear Subframe Defect;

d. a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Rear Subframe Defect is void;

e. an order enjoining Mercedes to reassess all prior claims, both in and out of warranty, related to rear subframe rust and corrosion and to reimburse Class Members for money spend out of pocket for replacement of their defective rear subframes and associated costs, regardless of whether those costs fall within the limitations of the Limited Subframe Warranty;

f. an order enjoining Mercedes, upon a Class Member's request, to pay the cost of regular inspections to determine whether the Rear Subframe Defect is present, whether rust has compromised the safety of any other components in the rear underbody of the vehicle, with any coverage disputes adjudicated by a special master;

g. an order enjoining Mercedes from further deceptive distribution and sales practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the Rear Subframe Defect;

h. an award to Plaintiffs and the other Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount

to be proven at trial against both MBUSA and MBG, and punitive damages as to MBUSA only;

i. an order requiring Mercedes to disgorge, for the benefit of Plaintiffs and the other Class Members, all or part of the ill-gotten revenue it received from the sale of the Class Vehicles, or make full restitution thereof to Plaintiffs and the other Class Members;

j. an award of attorneys' fees and costs, as allowed by law;

k. an award of pre-judgment and post-judgment interest, as provided by law;

l. leave to amend this Amended Complaint to conform to the evidence obtained in discovery or produced at trial; and

m. such other relief as may be appropriate under the circumstances.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

## XI. DEMAND FOR JURY TRIAL

~~1400.~~1408. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED: ~~February 7, 2025~~ ___________________

Respectfully submitted,

*/s/ Jonathan D. Selbin*
Jonathan D. Selbin (*pro hac vice*)
Andrew Kaufman (*pro hac vice*)
Muriel Kenfield-Kelleher (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, Eighth Floor
New York, New York 10013
Telephone: 212-355-9500
jselbin@lchb.com
akaufman@lchb.com
mkenfieldkelleher@lchb.com

***Plaintiffs' Interim Class Counsel***

*/s/ Adam J. Levitt*
Adam J. Levitt (*pro hac vice*)
John E. Tangren (*pro hac vice*)
Daniel R. Ferri (*pro hac vice*)
Daniel R. Schwartz (*pro hac vice*)
Elijah G. Savage (*pro hac vice*)
**DICELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com
dschwartz@dicellolevitt.com
esavage@dicellolevitt.com

***Plaintiffs' Interim Class Counsel***

*/s/ Ketan A. Patel*
Ketan A. Patel (Ga. Bar No. 121099)
**CORPUS LAW PATEL, LLC**
P.O. Box 724713
Atlanta, Georgia 31139
Telephone: 678-597-8020
kp@corpus-law.com

***Plaintiffs' Interim Liaison Counsel***

Alan M. Feldman (*pro hac vice*)
Edward S. Goldis (*pro hac vice*)
Zachary Arbitman (*pro hac vice*)
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19103
Telephone: 215-567-8300
afeldman@feldmanshepherd.com
egoldis@feldmanshepherd.com
zarbitman@feldmanshepherd.com

Ariana J. Tadler (*pro hac vice*)
**KAPLAN FOX**
800 Third Avenue
38th Floor
New York, NY 10022
(800) 290-1952
ATadler@kaplanfox.com

A.J. de Bartolomeo (*pro hac vice*)
**KAPLAN FOX**
1999 Harrison Street
Suite 1501
Oakland, CA 94612
(415) 772-4700
ajd@kaplanfox.com

Troy M. Frederick (*pro hac vice*)
Beth A. Frederick (*pro hac vice*)
**FREDERICK LAW GROUP, PLLC**
Indiana, Pennsylvania 15701
Telephone: 724-801-8555

Kimberly A. Justice (*pro hac vice*)
**FREED KANNER LONDON & MILLEN LLLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Telephone: 610-234-6487
kjustice@fklmlaw.com

Jonathan R. Chally (Ga. Bar No. 141392)
Stephen D. Councill
(Ga. Bar No. 190358)
Joshua P. Gunnemann
(Ga. Bar No. 152250)
**COUNCILL, GUNNEMANN & CHALLY, LLC**
1210 West Peachtree St. NW, Ste. 2613
Atlanta, Georgia 30309
Telephone: (404) 407-5250
jchally@cgc-law.com
scouncill@cgc-law.com
jgunnemann@cgc-law.com

William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
Telephone: 215-496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com

Jonathan Shub (*pro hac vice*)
Benjamin Johns (*pro hac vice*)
**SHUB & JOHNS LLC**
Four Tower Bridge, 200 Barr Harbor Drive, Suite 400
West Conshohocken, Pennsylvania 19428
Telephone: 610-477-8380
jshub@shublawyers.com
bjohns@shublawyers.com

Bryan Aylstock (*pro hac vice forthcoming*)
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
BAylstock@awkolaw.com

***Additional Plaintiffs' Counsel***