**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Alexander Sowa, *et al.*, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Mercedes-Benz Group AG;<br>Mercedes-Benz USA, LLC,<br><br>Defendants. | Case No. 1:23-cv-00636-SEG |

**PLAINTIFFS' OPPOSITION TO MERCEDES-BENZ USA, LLC'S AND MERCEDES-BENZ GROUP AG'S MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........1

BACKGROUND ..........3

I. The 2023 CAC Alleged Corrosion in Component Parts. ..........3

II. Mercedes Resists Discovery, Loses Motion at Discovery Conference, and Files Its Motion to Dismiss. ..........7

ARGUMENT ..........9

I. Plaintiffs Plausibly Plead the Defect in Component Parts. ..........9

II. Plaintiffs Plead with Particularity Mercedes's Knowledge of the Defect in Component Parts. ..........12

A. Mercedes Had Pre-Sale Knowledge of Premature Component Part Corrosion. ..........12

B. Plaintiffs Allege Facts Sufficient to Establish Duties of Disclosure. ..........16

III. Manifestation Is Not an Element of Plaintiffs' Georgia Law Claims. ..........18

IV. Plaintiff Harris Adequately Pleads Breach of Implied Warranty Under Florida Law. ..........22

CONCLUSION ..........25

# TABLE OF AUTHORITIES

**Cases** **Page**

*Amin v. Mercedes-Benz USA, LLC*,
301 F. Supp. 3d 1277 (N.D. Ga. 2018)....20, 21, 22

*Beeney v. FCA US LLC*,
2023 WL 6962116 (D. Del. Oct. 20, 2023)....20

*Bolling v. Mercedes-Benz USA, LLC*,
2024 WL 3972987 (N.D. Ga. Aug. 27, 2024)....14, 15, 22

*Campbell v. Beak*,
568 S.E.2d 801 (Ga. Ct. App. 2002)....19

*Farrales v. Ford Motor Co.*,
2022 WL 1239347 (N.D. Cal. Apr. 27, 2022)....10

*Feldman v. BRP U.S., Inc.*,
2018 WL 8300534 (S.D. Fla. Mar. 28, 2018)....23

*Francis v. General Motors, LLC*,
504 F. Supp. 3d 659 (E.D. Mich. 2020)....10

*In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*,
406 F. Supp. 3d 618 (E.D. Mich. 2019)....22

*Gregorio v. Ford Motor Co., McQueen*
522 F. Supp. 3d 264 (E.D. Mich. 2021).....11

*Hall v. Gen. Motors, LLC*,
2020 WL 1285636 (E.D. Mich. Mar. 18, 2020)....17

*Hardt v. Chrysler Grp. LLC*,
2015 WL 12683965 (C.D. Cal. June 15, 2015)....11

*Hardy v. Mitsubishi Motors N. Am., Inc.*,
2023 WL 4067408 (C.D. Cal. Mar. 30, 2023)....25

*Johnson v. Jaguar Cars, Inc.*,
2006 WL 1627125 (N.D. Ga. June 6, 2006)....18

*Leon v. Cont'l AG*,
301 F. Supp. 3d 1203 (S.D. Fla. 2017) .......... 24

*Ludwig v. FCA US LLC*,
795 F. Supp. 3d 525 (D.N.J. 2025) .......... 3, 23, 25

*McCabe v. Daimler AG*,
948 F. Supp. 2d 1347 (N.D. Ga. 2013) .......... 25

*McDonald v. Mazda Motors of Am., Inc.*,
603 S.E.2d 456 (Ga. Ct. App. 2004) .......... 18

*McIntosh v. Samsung Electronics Co.*,
2021 WL 9595602 (N.D. Ga. Feb. 19, 2021) .......... 19

*McQueen v. BMW of North America, LLC*,
2013 WL 4607353 (D.N.J. Aug. 29, 2013) .......... 10

*Monilaw v. Mercedes Benz Grp. AG*,
2025 WL 2163761 (N.D. Ga. July 30, 2025) .......... 22

*Monopoli v. Mercedes-Benz USA, LLC*,
2022 WL 409484 (N.D. Ga. Feb. 10, 2022) .......... 15

*Nalley v. Gen. Motors LLC*,
2022 WL 18459646 (N.D. Ga. Aug. 30, 2022) .......... 19, 22

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) .......... 18

*Norman v. Xytex Corp.*,
848 S.E.2d 835 (Ga. 2020) .......... 20

*O'Connor v. Ford Motor Co.*,
567 F. Supp. 3d 915 (N.D. Ill. 2021) .......... 23

*Ohio State Troopers Ass'n v. Point Blank Enters.*,
2018 WL 3109632 (S.D. Fla. Apr. 5, 2018) .......... 23

*Padilla v. Porsche Cars N. Am., Inc.*,
391 F. Supp. 3d 1108 (S.D. Fla. 2019) .......... 24

*Pegasus Aviation IV, Inc. v. Aircraft Composite Techs., Inc.*,
2016 WL 3390122 (S.D. Fla. June 17, 2016)....................................................23

*Rollolazo v. BMW of N. Am., LLC*,
2017 WL 1536456 (C.D. Cal. Feb. 3, 2017) ....................................................23

*Rose v. Ferrari N. Am., Inc.*,
2024 WL 1209185 (D.N.J. Mar. 20, 2024) .......................................................21

*Sanchez-Knutson v. Ford Motor Co.*,
52 F. Supp. 3d 1223 (S.D. Fla. 2014)..........................................................23, 25

*Shelor v. Jaguar Land Rover North America LLC*,
2025 WL 1580834 (M.D. Fla. Jan. 31, 2025) ..................................................25

*Sowa v. Mercedes-Benz Grp. AG*,
764 F. Supp. 3d 1233 (N.D. Ga. 2024)......................................................*passim*

*Terrill v. Electrolux Home Products, Inc.*,
753 F. Supp. 2d 1272 (S.D. Ga. 2010) ............................................................22

*Toca v. Tutco, LLC*,
430 F. Supp. 3d 1313 (S.D. Fla. 2020)............................................................24

*Valiente v. Unilever United States, Inc.*,
2022 WL 18587887 (S.D. Fla. Dec. 8, 2022)..............................................24, 25

*Weiss v. Gen. Motors LLC*,
418 F. Supp. 3d 1173 (S.D. Fla. 2019)........................................................23, 24

## INTRODUCTION

Plaintiffs respectfully file this memorandum in opposition to the Motion to Dismiss Second Amended Consolidated Class Action Complaint, Dkt. 133, filed by Mercedes-Benz USA, LLC and Mercedes-Benz Group AG (together, "Mercedes").

While presented as a broad-based motion to dismiss the Second Amended Consolidated Class Action Complaint, Dkt. 123 ("SAC"), Mercedes's motion is little more than an elaborate request for the Court to reconsider its recent discovery order mandating Mercedes to produce documents relating to corrosion in component parts near the rear subframe, even where that corrosion is not expressly linked to corrosion of the subframe. Dec. 12, 2025 Hr'g Tr. at 13:12–15:8. As the Court ruled, Mercedes is reading the case "too [narrowly]," *id.* at 26:11–13, and discovery must continue regarding the full corrosion problem on the rear undercarriage of the Class Vehicles. The allegations regarding corrosion in the SAC are *identical* to those in the complaint filed nearly three years ago that this Court sustained in its December 31, 2024 Order. *See* Dkt. 70. Respectfully, the Court should decline to narrow a case that remains in the early stages of discovery due to Mercedes's much delayed commencement of, and ongoing failure to fully participate in, discovery.

Plaintiffs have specifically alleged *for nearly three years* that "[t]he vehicle components adjacent to the rear subframe that also tend to experience corrosion (*i.e.*, brake lines, rear springs, exhaust system, gas lines, and rear axle), are made of metals

susceptible to corrosion, and are likewise not properly coated and designed to resist corrosion and expected use." Consolidated Complaint ("CAC"), Dkt. 25 ¶ 315; First Amended Class Action Complaint ("FAC"), Dkt. 101 ¶ 362; SAC ¶ 363. Plaintiffs have long emphasized that Mercedes "has certainly been aware of the possibility of premature corrosion in the Class Vehicles *generally* since at least 1999, when it began offering a 30-year anti-corrosion warranty on its vehicles in many European countries," CAC ¶ 12; FAC ¶ 12; SAC ¶ 12 (emphasis added), and that Class Vehicle owners repeatedly experienced corrosion throughout the back undercarriage of their cars, including parts like rear brake lines, *see*, *e.g.*, CAC ¶ 9.[1] Mercedes is, of course, correct that Plaintiffs always alleged that the subframes corrode, but ignores that Plaintiffs also always alleged the parts next to the subframe corrode *as well*—either from the subframe corrosion or, as alleged in CAC ¶¶ 312-315, because those parts are, like the subframe, improperly coated and made of metals subject to corrosion.

There is no cause for this Court, as Mercedes asks, to preemptively dismiss claims premised on the corrosion of "component parts independent of the rear

---

[1] *See id.* (summarizing that vehicles owners "also experience corrosion of the rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle, all of which are located near the rear subframe in the back of the vehicle," causing "serious mechanical issues in Class Vehicles such as, for example, leaking in the rear brake lines, which compromises the Vehicle's brakes"); FAC ¶ 9 (same); SAC ¶ 9 (same); CAC ¶¶ 134, 225–30 (describing class representatives' complaints regarding component parts in addition to subframes); FAC ¶¶ 169, 272–77 (same); SAC ¶¶ 174, 277–82 (same).

subframe." Mot. at 1. Plaintiffs always stated a claim with respect to corrosion of those parts, and did not amend their prior complaints in the SAC with respect to any of those allegations. Mercedes's motion to dismiss these claims should be denied.

Mercedes's arguments to dismiss both the Georgia and Florida claims are also unavailing. Mercedes premises its argument that the Georgia claims should be dismissed on the notion that manifestation of a defect is required to state claims under Georgia law. As this Court already held, no such manifestation requirement exists: a person is harmed when they overpay at the point of sale, even if the defect manifests later. *Sowa v. Mercedes-Benz Grp. AG*, 764 F. Supp. 3d 1233, 1255 (N.D. Ga. 2024) ("*Sowa I*") (Plaintiffs claims are ripe because they allege that the Extended Warranty fails to compensate "overpayment at the time of sale."). Likewise, Mercedes's argument for dismissal of the Florida implied warranty claim is premised on a misstatement of Florida law and ignores a recognized third-party beneficiary exception to privity. *See, e.g.*, *Ludwig v. FCA US LLC*, 795 F. Supp. 3d 525, 548-49 (D.N.J. 2025) (applying Florida law).

Plaintiffs respectfully request that the Court deny Mercedes's motion in full.

## <u>BACKGROUND</u>

### I. The 2023 CAC Alleged Corrosion in Component Parts.

Damage to other parts of the Class Vehicles has always been part of this case. The first complaint was filed on February 10, 2023. Dkt. 1. The CAC filed May 1,

2023—and all subsequent amendments—described, in detail, the Class Vehicles' severe corrosion problem in and around the rear subframe, a "dangerous safety defect" that "causes the rear subframes, attached components, and nearby parts to prematurely rust or corrode." CAC ¶ 3; FAC ¶ 3; SAC ¶ 3. As alleged, this Defect results from "a design that allows water and salt to collect on the interior of the subframe, leading to premature corrosion from the inside out, ***and/or*** b) an inadequate type or amount of rust coating to withstand ordinary and expected use. *Id*. (emphasis added). The core allegations regarding this the nature and scope of this Defect remain unchanged since no later than May 1, 2023.

The CAC described corrosion in and around the rear subframe of the class vehicles: Rust formation can be "mild ('surface rust') or so extensive that it causes holes to form in the metal ('perforation')." CAC ¶ 310; FAC ¶ 357; SAC ¶ 358. Perforation "compromises the structural integrity of the metal, leading to perforation and breakage in metal vehicle components." *Id*. "Vehicle components, including rear subframes, are typically constructed using high-quality carbon steel, which is inherently susceptible to rust and corrosion." CAC ¶ 312; FAC ¶ 359; SAC ¶ 360. The CAC further alleged these parts—including component parts—must be "adequately coated with a properly applied anti-corrosion agent in order to withstand normal environmental conditions without experiencing corrosion." *Id*. Lest there be any doubt, the CAC explained the "vehicle components adjacent to the rear subframe

that also tend to experience corrosion (*i.e.*, brake lines, rear springs, exhaust system, gas lines, and rear axle), are made of metals susceptible to corrosion, and are likewise not properly coated and designed to resist corrosion in ordinary and expected use." CAC ¶ 315; FAC ¶ 362; SAC ¶ 363.

The CAC went on to describe various ways Mercedes would have known the component parts were subject to corrosion. It described "a wide variety of pre-sale tests" used by vehicle manufacturers "to ensure that both component parts, and the vehicle as a whole, are able to stand up to corrosive road conditions." CAC ¶ 336; FAC ¶ 383; SAC ¶ 334. Those tests were not limited to the rear subframe. They included "[a]n initial 'weathering test' of the anti-corrosion coatings to be used on the subframe ***and adjacent components***, which involves putting a sample of coated metal into a 'weathering chamber' and exposing it to a variety of simulated environmental conditions," CAC ¶ 336(a); FAC ¶ 383(a); SAC ¶ 384(a) (emphasis added); a "corrosion test ***of individual vehicle components***, during which engineers leave an individual component part in an enclosed booth and cycle through the process of exposing the part to a corrosive agent," which "Mercedes did perform or should have performed . . . on the rear subframes ***and adjacent components***," CAC ¶ 336(b); FAC ¶ 383(b); SAC ¶ 384(b) (emphasis added); a "general corrosion test of the entire vehicle," CAC ¶ 336(c); FAC ¶ 383(c); SAC ¶ 384(c); and a "'soap test' in which engineers spray corrosive agent on the exterior of the vehicle," CAC

¶ 336(d); FAC ¶ 383(d); SAC ¶ 384(d). The CAC alleged that a "reasonably prudent vehicle manufacturer should have conducted the above tests, or a substantially similar battery of tests, to ensure that its vehicles rear subframes ***and adjacent components*** were adequately protected against corrosion." CAC ¶ 337; FAC ¶ 384; SAC ¶ 385 (emphasis added).

The CAC also described Mercedes's knowledge of a broad corrosion problem. It described how in its European markets Mercedes acknowledged corrosion problem on parts near the rear subframe, CAC ¶¶ 355–60, FAC ¶¶ 402–07, SAC ¶¶ 403–08, and even offered a 30-year anti-corrosion warranty on its vehicles there, CAC ¶ 12, FAC ¶ 12, SAC ¶ 12. The CAC also described the experiences of many named Plaintiffs with corrosion to component parts.[2]

To be clear, each of the allegations above regarding the component parts has remained *totally unchanged* since May 2023.

[2] *See*, *e.g.*, CAC ¶¶ 225–30 (Plaintiff Robinson's vehicle experienced corrosion that "impacted other areas of the undercarriage in addition to the subframe, including the brake lines" and "[g]iven the extent of the damage to the brake lines, [an] independent mechanic opined that [Plaintiff Robinson] would likely have to pay well above the $6,500 originally quoted by Mercedes…"); FAC ¶¶ 276–81 (same); SAC ¶¶ 277–82 (same); CAC ¶ 134 (Plaintiff Lin's vehicle experienced corrosion in "rear brake lines" and "rear subframe" that rendered her vehicle undrivable); FAC ¶ 169 (same); SAC ¶ 170 (same).

## II. Mercedes Resists Discovery, Loses Motion at Discovery Conference, and Files Its Motion to Dismiss.

On December 31, 2024, the Court denied in part Mercedes's motion to dismiss. *Sowa I*, 764 F. Supp. 3d 1233. On April 23, 2025, the Court issued the first scheduling order, providing that fact discovery would open on April 28, 2025, with a substantial completion of document production deadline of December 26, 2025. Dkt. 96 at 4. Plaintiffs served discovery that same day. Mercedes resisted any document production until October 2025, after the Court told Mercedes in a discovery conference to "move with alacrity to start producing documents[.]" Oct. 12, 2025 Hr'g Tr. at 29:22–25.

Following that conference, Mercedes began to take issue with production of documents related to the corrosion of component parts, refusing to agree to any search strings that included the terms "brake lines" or "springs" without "rear subframe." Mercedes's intransigence led to two discovery conferences in quick succession—a conference on November 25, 2025, and a follow-up conference on December 12, 2025—relating to whether Mercedes was appropriately searching its files for documents relating to corrosion of component parts like brake lines, independent of subframe corrosion. At the hearing, the Court found as follows:

> [T]he relevant paragraph states that the vehicle components adjacent to the rear subframe that also tends to experience corrosion, brake lines, rear springs, exhaust system, gas lines and rear axle, are made with metal susceptible to corrosion and are likewise not properly coated and designed to resist corrosion in ordinary and expected uses. It seems to

> me that the difficulty with the defendant's position is that plaintiffs have pled that corrosion to the rear subframe occurs or may occur from the inside out and that corrosion in the rear subframe and component parts may manifest at different times.

Dec. 12, 2025 Hr'g Tr. at 14:8–19.

The Court ordered Mercedes to use search terms originally proposed by Plaintiffs and declined Mercedes's request to move for a protective order shielding the production of documents about the corrosion of component parts. *See id.* at 14:20–15:1 (Mercedes's requested limitations would "edit out lots of potentially relevant documents about component part corrosion").

On December 12, 2025, the parties filed a Joint Motion for an Amended Case Scheduling Order, which requested that the Court move the substantial completion of document discovery deadline to April 27, 2026. Dkt. 116. The Court granted the Joint Motion on December 15, 2025. Dkt. 118. On December 16, 2025, Plaintiffs filed an unopposed motion for leave to file the SAC, which substituted plaintiffs for the Texas, Illinois, and Michigan subclasses, and added plaintiff Christos Hines as a Georgia class representative. The Court granted the unopposed motion the next day. Dkt. 122. The SAC contains no new substantive allegations regarding the underlying Defect. At no point did Mercedes move the Court to reconsider its December 12, 2025, discovery order prior to filing the instant motion.

## ARGUMENT

As an initial matter, nothing in Mercedes's briefing alters its obligations pursuant to the Court's December 12, 2025 discovery order. It is past time for Mercedes to make fulsome document productions; the Court mandated that Mercedes use Plaintiffs' search terms, and Mercedes has not sought reconsideration.

### I. Plaintiffs Plausibly Plead the Defect in Component Parts.

As discussed in detail above, the SAC—like all of Plaintiffs' pleadings in this case—is replete with references to corrosion of component parts.[3] It includes specific instances of customer complaints of corrosion to components adjacent to the subframe.[4] While Plaintiffs do allege that rear subframe corrosion can occur at the same time as corrosion in component parts, they also make clear that "[t]he vehicle components adjacent to the rear subframe that also tend to experience corrosion (*i.e.*, brake lines, rear springs, exhaust system, gas lines, and rear axle), are made of metals susceptible to corrosion, and are likewise not properly coated and

[3] *See* SAC ¶ 9 (describing in detail corrosion of component parts including "rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle"; *id.* ¶¶ 315 (describing defect in "components adjacent to the rear subframe that also tend to experience corrosion"), 325 (describing "corrosion of the brake lines), 326 (describing "corrosion of the rear suspension springs"), 327 (describing impacts to the "exhaust systems of Class Vehicles, the gas lines, and/or the rear axle").

[4] *See id.* ¶¶ 353(a) (customer requiring replacement of "brake lines which are also about to fail"), 353(c) (complaining that "brakes failed" and "the extended warranty that MB sold me won't cover the brake lines because of rust").

designed to resist corrosion in ordinary and expected use." *Id.* ¶ 363. The Court acknowledged the improper-coating theory at the December 12, 2025 discovery conference when it rejected Mercedes's attempt to artificially limit discovery into corrosion on adjacent components: "the relevant paragraph states that the vehicle components adjacent to the rear subframe that also tends to experience corrosion, brake lines, rear springs, exhaust system, gas lines and rear axle, are made with metal susceptible to corrosion and are likewise not properly coated and designed to resist corrosion in ordinary and expected uses." Dec. 12, 2025 Tr. 15:8–14.

Plaintiffs identified the Defect—corrosion in components adjacent to the rear subframe—offered examples of its manifestation, and identified the causes—improper design, use of metals susceptible to corrosion, and/or failure to properly treat the components to resist corrosion. Mercedes's suggestion that these pleadings merely "mention[] the corrosion of component parts only in passing" or "allege susceptibility to corrosion," Mot. at 10, is flatly wrong.

The cases Mercedes cites do not help them. In *McQueen v. BMW of North America, LLC*, the complaint gave "no identification as to what precisely the defect is" and instead identified only the effect, namely, the vehicle improperly shifting into neutral. 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013). Similarly, in *Farrales v. Ford Motor Co.*, the plaintiff "merely describes performance problems with the

vehicle" and "does not identify the affected components." 2022 WL 1239347, at *6 (N.D. Cal. Apr. 27, 2022) (citation omitted).

Courts have distinguished cases such as these—and *McQueen* specifically—where plaintiffs identify the affected components and describe a theory of the cause of the defect. In *Francis v. General Motors, LLC*, for example, the court noted that *McQueen* and similar cases "have been distinguished easily by other federal courts from cases like this one, where expansive allegations of specific technical problems identified in TSBs were cataloged, and where the bulletins described the same symptoms of which the plaintiffs complained, and the plaintiffs also advanced at least a preliminary mechanical theory of how the defect caused the problems." 504 F. Supp. 3d 659, 684 (E.D. Mich. 2020). Plaintiffs here identified specific technical problems, including ones documented in the Mercedes TSB, *see* SAC ¶¶ 343–47, identified numerous complaints of the defect, *see id.* ¶¶ 325–27, 348–354, and a causal theory, *see id.* ¶ 315. As the court held in *Gregorio v. Ford Motor Co.*, *McQueen* and cases like it are distinguished where "[t]hese allegations go beyond a conclusory statement that the cars contain a defect and beyond a description of symptoms" 522 F. Supp. 3d 264, 274 (E.D. Mich. 2021).[5]

[5] Other courts have required less, finding a complaint sufficient where it merely alleged a manufacturing and/or design defect and described the defect's symptoms. *See, e.g.*, *Hardt v. Chrysler Grp. LLC*, 2015 WL 12683965, at *5 (C.D. Cal. June

Plaintiffs plead the existence of a corrosion defect in the components adjacent to the rear subframe and advanced a preliminary theory of the cause of that defect. Mercedes identifies no case requiring more at this stage of the litigation.

## II. Plaintiffs Plead with Particularity Mercedes's Knowledge of the Defect in Component Parts.

Mercedes's motion largely repeats its similar (unsuccessful) arguments from its motion to dismiss the prior complaint on the same grounds. Its arguments fail again.

### A. Mercedes Had Pre-Sale Knowledge of Premature Component Part Corrosion.

In rejecting Mercedes's prior arguments to dismiss for lack of actual knowledge, the Court noted Mercedes's several sources of knowledge of the rear subframe defect. *Sowa I*, 764 F. Supp. 3d at 1280–82. The Court specifically found that four sources of knowledge—"[1] the allegations of pre-production testing and data, [2] customer complaints about rear subframe corrosion, [3] rear subframe replacement requests, and [4] the issuance of the 2018 TSB"—sufficed to "plausibly allege[] Mercedes's pre-sale knowledge of the Rear Subframe Defect." *Id.* at 1282. As described in detail above, those same sources of knowledge extend to component

15, 2015) (Plaintiffs' description of defect combined with description of defect's impact "provides [defendant] sufficient notice of the defect at issue.").

parts, including extensive corrosion testing of component parts.[6] The Court already found that these same testing allegations—which apply equally to both the subframes and the adjacent components—were "sufficiently detailed" to raise a reasonable inference that Mercedes conducted testing that could have revealed the defect. *Id.* at 1281.

Second, the customer complaints the Court relied upon in *Sowa I* also show Mercedes's knowledge of the defect in component parts. *See, e.g.*, SAC ¶¶ 109–10, 112 (Plaintiff Xie contacting Mercedes six times for reimbursement to repair that included rear springs, and Mercedes specifically refusing to reimburse replacement of rear springs), 132–33 (Plaintiff Russolillo complaining to Mercedes on multiple occasions regarding subframe failure and corrosion of several components of the rear axle), 175–77 (Plaintiff Lin contacting customer service regarding severe corrosion to rear subframe and rear brake lines), 200–02 (service center contacting Mercedes on behalf of Plaintiff Ortiz for failures including corroded gas lines), 256–57 (Mercedes dealership diagnosing failures including corrosion of rear springs and contacting Mercedes on behalf of Plaintiff Russell), 276–83 (Plaintiff Robinson contacting Mercedes regarding issues including brake lines, exhaust, and suspension

[6] *See* SAC ¶¶ 382 (describing Mercedes's knowledge of component part corrosion), 384 (describing "wide variety of pre-sale tests to ensure that both ***component parts***, and the vehicle as a whole, are able to stand up to corrosive road conditions").

springs). And other complaints were raised separately, including in online forums monitored by Mercedes. *See* SAC ¶ 401(a) (noting need for replacement of rear subframe as well as "brake lines which are also about to fail, motor and trans mounts and diff seals"). As with the rear subframe itself, "allegations of consumer complaints . . . further bolster the inference of pre-sale knowledge" regarding defects in adjacent component parts. *Sowa I*, 764 F. Supp. 3d at 1281.[7]

Third, the SAC alleges that "Mercedes service centers use Mercedes replacement parts that they order directly from Mercedes. Therefore, Mercedes would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes." SAC ¶ 397; *see also Sowa I*, 764 F. Supp. 3d at 1282 (noting allegation that "Mercedes likely has detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes" (citation modified)). Indeed, several Plaintiffs had defective component parts serviced at Mercedes dealerships. *See* SAC ¶¶ 112–13 (Plaintiff Xie), 175 (Plaintiff Lin), 256–57 (Plaintiff Russell), 277 (Plaintiff Robinson). While the SAC does not have the same details as to whether

[7] Mercedes suggests that these customer complaints are irrelevant because they also describe failure of the rear subframe. Mot. at 13–14. But Mercedes offers no reason why it is reasonable, let alone necessary, to infer that Mercedes would have disregarded complaints about brake lines and rear springs simply because the complaints also included failure of the rear subframe.

brake lines, rear springs, or other component parts specifically were backordered, that level of detail as to information in Mercedes's exclusive possession is not required. *See Bolling v. Mercedes-Benz USA, LLC*, 2024 WL 3972987, at *16 (N.D. Ga. Aug. 27, 2024) (relying in part on allegation that Mercedes's "customer relations department monitors repair requests at dealerships").

Finally, while the service bulletin *explicitly* addressed only the rear subframe, it supports an inference that Mercedes was aware of the problem of which customers were complaining—corrosion to the rear subframe and adjacent parts. *Cf. Monopoli v. Mercedes-Benz USA, LLC*, 2022 WL 409484, at *9 (N.D. Ga. Feb. 10, 2022) (noting that while single TSB did not address precisely the same defect sufficiently to establish knowledge, it "identified the same issue complained of by [p]laintiffs" and thus weighed in plaintiffs' favor).

As this Court already (correctly) ruled, "the question is not whether each individual allegation, standing alone, establishes Mercedes's knowledge of the defect. Instead, the Court considers whether the allegations, viewed together, support an inference of knowledge." *Sowa I*, 764 F. Supp. 3d at 1280. Plaintiffs' presentation of detailed pre-sale testing, customer complaints, and replacement requests sufficiently alleges that Mercedes knows that it has a corrosion problem on the class vehicles' rear undercarriage. *See, e.g., Bolling*, 2024 WL 3972987, at *15–16.

### B. Plaintiffs Allege Facts Sufficient to Establish Duties of Disclosure.

Mercedes's arguments relating to duties of disclosure are derivative of their knowledge arguments. *See* Mot. at 15 ("without awareness, there can be no duty to disclose"). Thus, as with the rear subframe defect itself, the Court should reject the argument that Mercedes had no duty to disclose the defects in component parts.

As this Court held in *Sowa I*,

> Here, Plaintiffs allege that Defendants (1) knew about the Rear Subframe Defect (Doc. 25 ¶ 333), (2) failed to disclose the defect in the Extended Warranty and other communications with customers (*id.* ¶¶ 374–76, 388–89), (3) actively concealed the defect (*id.* ¶¶ 388–89, 392), and (4) denied the existence of the defect (*id.* ¶¶ 389(a), 394, 533). Plaintiffs further allege that the Rear Subframe Defect is "difficult to see, . . . even by a trained mechanic" and that they could not have discovered the existence of the Rear Subframe Defect despite their exercise of due diligence. (*Id.* ¶¶ 317, 394.) In light of these allegations, the Court concludes, as other judges in this district have on similar facts, that Plaintiffs plausibly allege that Defendants have concealed "intrinsic qualities" of the Class Vehicles which Plaintiffs could not have discovered through the exercise of ordinary prudence.

764 F. Supp. 3d at 1283. This holding applies with equal force to Mercedes's duty to disclose the defects in component parts.

*First*, as discussed *supra*, Mercedes knew about the component part defects based upon pre-sale testing, customer complaints, and dealership replacement requests. *Second*, Mercedes failed to disclose component part defects in its Extended Warranty and other communications with customers. *See* SAC ¶¶ 410–11, 422. *Third*, Mercedes actively concealed the defects. *Id.* ¶¶ 425–33, 437. *Fourth*,

Mercedes denied the existence of the defects. *Id.* ¶¶ 433, 437. And *fifth*, the defects in component parts such as brake lines, rear suspension springs, rear axles, and exhaust systems are difficult to discover by the exercise of due diligence. Such components, like the rear subframe to which they are adjacent, are "mounted underneath the vehicle, making it difficult to see unless specifically inspected," *id.* ¶ 365, and, in many instances, are obscured from sight by other components.

Mercedes's numerous citations to cases in which courts rejected a duty to disclose are thus inapposite because they uniformly involve complaints in which plaintiffs failed to plead either knowledge or concealment. *See* Mot. at 15–16 (citing, *inter alia*, *Hall v. Gen. Motors, LLC*, 2020 WL 1285636, at *3 (E.D. Mich. Mar. 18, 2020) ("[T]o prevail on this type of fraudulent omission claim in the defective product context, a plaintiff must plead, among other things, that a manufacturer knew of [the] defect before sale." (citation omitted)).

The Court should also, once again, reject Mercedes's suggestion that Plaintiffs are required to plead that Mercedes had *exclusive* knowledge of the defects. *See* Mot. at 16 (arguing that Plaintiffs had access to complaints that help establish knowledge). As this Court previously held, there is no requirement under Georgia law "that imposes such a requirement in the common law fraud context." *Sowa I*, 764 F. Supp. 3d at 1283 n.40. And the Court similarly rejected this argument in the context of state statutory claims, concluding "that Plaintiffs may therefore show a duty of

disclosure under the consumer protection laws of all relevant states by alleging . . . the Rear Subframe Defect implicates product safety and that Defendants had superior and exclusive knowledge of the defect relative to Plaintiffs." *Id.* at 1287. Given the obvious safety implications of failing components such as axles, brake lines, and gas lines, and Mercedes's superior knowledge of the defect via sources such as dealership communications and pre-sale testing, the Court should similarly find an adequately pleaded duty to disclose the component part defects.

## III. Manifestation Is Not an Element of Plaintiffs' Georgia Law Claims.

***Implied Warranty:*** To prevail on a claim for implied warranty of merchantability under Georgia law, a plaintiff must show that a "product is defective" because it is not "fit for the ordinary purposes for which such goods are used." *McDonald v. Mazda Motors of Am., Inc.*, 603 S.E.2d 456, 462 (Ga. Ct. App. 2004) (citation omitted). An "essential element" of such a claim is whether a "latent defect" existed "at the time that the vehicle was sold." *Id. Manifestation* is not an element of the claim, as "the sale of the vehicle with [a] known defect is the liability-triggering event, not when the [defect] manifests." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 820 (9th Cir. 2019) (compiling cases) (citation omitted); *Johnson v. Jaguar Cars, Inc.*, 2006 WL 1627125, at *4 (N.D. Ga. June 6, 2006) (breach of implied warranty sufficiently alleged where vehicle was "defective when it was sold" and of "insufficient quality").

This Court already held as much, finding that Plaintiffs alleged the Defect was "present at the time of sale" and that "the fact that the alleged defect is not immediately discoverable does not preclude a finding of unmerchantability." *Sowa I*, 764 F. Supp. 3d at 1267.[8]

***Georgia Fair Business Practices Act ("FBPA"):*** The elements of the FBPA are coextensive with common law fraud, but the statute "eliminates two of the five required elements of fraud: scienter and intent to deceive." *Campbell v. Beak*, 568 S.E.2d 801, 807 (Ga. Ct. App. 2002). The Court already held Plaintiffs' fraudulent omission claim under Georgia law is viable on behalf of all Plaintiffs, including those who have not yet experienced failure due to the Defect. *See Sowa I*, 764 F. Supp. 3d at 1285. The Court's ruling on Plaintiffs' common law claim necessarily encompasses their less demanding statutory one.

Plaintiffs Clay, New, and Hines all plausibly allege that had Mercedes not engaged in practices prohibited under the FBPA, they would have paid less for their vehicles or declined to purchase them. SAC ¶¶ 55, 61. These allegations state an injury under the Georgia FBPA, regardless of defect manifestation. *See, e.g., Nalley v. Gen. Motors LLC*, 2022 WL 18459646, at *7 (N.D. Ga. Aug. 30, 2022)

---

[8] For this reason, Mercedes's reliance on *McIntosh v. Samsung Electronics Co.*, 2021 WL 9595602 (N.D. Ga. Feb. 19, 2021), is misplaced. There the court granted summary judgment because plaintiff presented no evidence that the product at issue was defective *at the time of sale*. *Id*. at *4.

(allegations that plaintiff "would not have purchased the vehicle (or would have paid less for it) had he known about the defect" sufficient to state a FBPA claim); *see also Norman v. Xytex Corp.*, 848 S.E.2d 835, 843 (Ga. 2020) (similar).

Mercedes relies on *Beeney v. FCA US LLC*, 2023 WL 6962116 (D. Del. Oct. 20, 2023), to assert Georgia law requires manifestation of a defect to sustain a FBPA claim. But *Beeney* says nothing about defect manifestation. Instead, it holds only that a plaintiff must pled "sufficient facts showing that a defendant's practices were the cause of an injury." *Id*. at *6. *Beeney* involved "destination charges" that plaintiff failed to sufficiently allege actually increased the price of the vehicles at point of sale. *Id*. at *7. Here, to the contrary, Plaintiffs plausibly allege that Mercedes's omissions caused them to overpay for their vehicles at the point of sale. *See* SAC ¶ 432. The Court already found that allegations of overpayment at the point of sale are sufficient under a parallel California consumer protection statute. *See Sowa I*, 764 F. Supp. 3d at 1290–91 (Plaintiff Neil alleged injury under California's consumer protection statute without having alleged defect manifestation).

***Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"):*** Under GUDTPA, "[a] person likely to be damaged by a deceptive trade practice" may seek injunctive relief by showing "a likelihood of future harm by a deceptive trade practice." *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1292–93 (N.D. Ga. 2018). Plaintiffs make such a showing: they allege that Mercedes (1) failed to

notify Class Vehicle owners of the existence and extent of the Defect, SAC ¶¶ 15, 418, 422; (2) failed to "establish an inspection program which would allow Class Members to have their Class Vehicles checked for corrosion at an authorized Mercedes dealership free of cost," *id.* ¶ 422; (3) failed to "reimburse Class Members for the replacement of their rear subframes before they pose a serious safety risk," *id.*; and (4) failed to "offer a program that allows Class Vehicle owners to have their non-corroded subframes coated with an anti-corrosion compound free of charge," *id.* Further, Mercedes's totally inadequate Extended Warranty extension does *nothing* to address corrosion in component parts.

As this Court previously found, these allegations are adequate to show a high likelihood of future harm to Class Members as a result of the Defect, even absent failures caused by the Defect. *See Sowa I*, 764 F. Supp. 3d at 1252–53. Indeed, Plaintiffs New, Clay, and Hines—whose subframes have not yet failed and who are unable to receive any benefit from the Extended Warranty—are especially likely to suffer future harm as a result of Mercedes's deceptive practices. *See Rose v. Ferrari N. Am., Inc.*, 2024 WL 1209185, at *7 (D.N.J. Mar. 20, 2024) (Georgia UDTPA claim regarding vehicle sustained where a purported fix "fails to repair the [d]efect"); *Amin*, 301 F. Supp. 3d at 1294–95 (allegations of future harm supported by vehicle manufacturer's ongoing denial of defect's existence and provision of

ineffective fixes).[9] This is particularly so given Plaintiffs' allegations that corrosion is a progressive process that, in the case of the subframe, occurs from "the inside out" making it difficult to diagnose until the vehicle is close to failure. *See* SAC ¶¶ 365, 442; *Monilaw v. Mercedes Benz Grp. AG*, 2025 WL 2163761, at *4 (N.D. Ga. July 30, 2025) (allegations that wood trim would manifest cracking defect in the future sufficient to seek injunctive relief and collecting cases).

Mercedes cites *Terrill v. Electrolux Home Products, Inc.*, 753 F. Supp. 2d 1272 (S.D. Ga. 2010), for the proposition that injunctive relief is unavailable absent defect manifestation. But *Terrill* held only that the plaintiffs failed to allege that the defendants' *advertising* would "damage[] [them] in the future." *Id.* at 1291. Here, the injunctive relief Plaintiffs seek is not related to advertising; rather, the injunction would force Mercedes to take action to identify corrosion in the rear undercarriage of the vehicles and prevent future vehicle failures due to that dangerous safety defect. *See Amin*, 301 F. Supp. 3d at 1292–93 (distinguishing *Terrill*).

## IV. Plaintiff Harris Adequately Pleads Breach of Implied Warranty Under Florida Law.

Mercedes's argument to dismiss the Florida breach of implied warranty claim for lack of privity fares no better. Florida courts recognize a third-party beneficiary

---

[9] *See also In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 645 (E.D. Mich. 2019); *Nalley*, 2022 WL 18459646, at *8; *Bolling*, 2024 WL 3972987, at *20.

exception to privity "where the plaintiff purchased a vehicle from an authorized dealer who was an agent of the manufacturer, the plaintiff was the intended consumer of the vehicle, the dealership was not the intended consumer, and the warranty was intended to benefit the consumer, not the dealership." *Ludwig*, 795 F. Supp. 3d at 548 (citations omitted). That is exactly the situation here: Plaintiff Harris purchased her vehicle from an authorized dealer who was an agent of the manufacturer, and the warranty was intended to benefit her, not the dealership. *See* SAC ¶ 40.

Courts regularly hold that a third-party beneficiary exception applies in such circumstances. *See, e.g.*, *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233–34 (S.D. Fla. 2014); *Rollolazo v. BMW of N. Am., LLC*, 2017 WL 1536456, at *14 (C.D. Cal. Feb. 3, 2017).[10] This line of cases exists for good reason: without a third-party beneficiary exception that applies to vehicle purchasers, "a manufacturer would always be able to shield itself from implied warranty claims even though it knows that its intended consumer is not the dealership." *O'Connor v. Ford Motor*

---

[10] *See also Ohio State Troopers Ass'n v. Point Blank Enters.*, 2018 WL 3109632, at *7 (S.D. Fla. Apr. 5, 2018); *Pegasus Aviation IV, Inc. v. Aircraft Composite Techs., Inc.*, 2016 WL 3390122, at *5 (S.D. Fla. June 17, 2016); *Feldman v. BRP U.S., Inc.*, 2018 WL 8300534, at *8 (S.D. Fla. Mar. 28, 2018).

*Co.*, 567 F. Supp. 3d 915, 943 (N.D. Ill. 2021) (finding third-party beneficiary exception to privity applied under Florida law) (citation omitted).

This Court's prior holding that Plaintiffs sufficiently alleged "the existence of an agency relationship between Mercedes and its dealers," *Sowa I*, 764 F. Supp. 3d at 1272–73, supports Plaintiff Harris's claim here. As does the Court's analysis upholding Plaintiff Ortiz's claims under New York law, which contains a similar exception to privity for implied warranty claims. *Id.* at 1271–72. Here, too, Plaintiff Harris alleges that she purchased her certified, pre-owned vehicle directly from an authorized dealership that was an agent of MBUSA, the vehicle's warrantor.[11] SAC ¶ 40. Those warranties, whether express or implied, were intended to benefit only Plaintiff Harris as the end consumer, not the dealership. *Weiss*, 418 F. Supp. 3d at 1183. Plaintiff Harris was therefore a third-party beneficiary for purposes of an implied warranty claim against MBUSA.

Several of the cases Mercedes cites for the proposition that there is no third-party beneficiary exception under Florida law say the opposite.[12] In *Toca v. Tutco,*

---

[11] The cases cited by Mercedes addressing "conclusory" allegations of third-party beneficiary status did not contain the detailed allegations present here. *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1224 (S.D. Fla. 2017) ("Plaintiffs offer no facts about the persons or entities from whom they obtained their Mercedes Benz vehicles . . . ."); *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1119 (S.D. Fla. 2019) (plaintiffs purchased from used car dealerships rather than "directly from Porsche").

[12] While *Valiente v. Unilever United States, Inc.*, 2022 WL 18587887 (S.D. Fla. Dec. 8, 2022), a case involving the sale of antiperspirant, found no third-party beneficiary

*LLC*, 430 F. Supp. 3d 1313 (S.D. Fla. 2020), the court noted that agency and third-party beneficiary exceptions are "two recognized *exceptions* to the bright-line privity rule under Florida case law." *Id.* at 1325–26. The Court in *Shelor v. Jaguar Land Rover North America LLC,* 2025 WL 1580834 (M.D. Fla. Jan. 31, 2025), recognized there is a third-party beneficiary exception to privity in Florida law such that "[i]f ordinary privity is lacking, privity may be established through agency." *Id.* at *25.[13] Because Plaintiff Harris *has* stated a claim under the third-party beneficiary exception, the Court should deny Mercedes's motion to dismiss this claim.

**<u>CONCLUSION</u>**

For these reasons, Plaintiffs respectfully request that the Court deny Mercedes' motion to dismiss.

---

exception under Florida law, *id.* at *14, courts have declined to apply that ruling in the context of vehicle defect cases. *See, e.g.*, *Ludwig*, 795 F. Supp. 3d at 548 (declining to apply *Valiente* and finding "decisions in the motor vehicle context more instructive" as to a third-party beneficiary exception). In *McCabe v. Daimler AG*, the plaintiffs failed to properly oppose defendant's motion, citing "no authority" for a third-party beneficiary exception. 948 F. Supp. 2d 1347, 1362 (N.D. Ga. 2013).

[13] To the extent that the court in *Shelor* rejected the application of a third-party beneficiary exception in the dealership context, it took an overly narrow view. In the context of claims regarding vehicle sales through authorized dealerships, the line of cases beginning with *Sanchez-Knutson* is most appropriately followed. *See* 52 F. Supp. 3d at 1233–34; *see also Hardy v. Mitsubishi Motors N. Am., Inc.*, 2023 WL 4067408, at *7-8 (C.D. Cal. Mar. 30, 2023) (finding "persuasive the line of Florida district court cases recognizing a third-party exception" for "transaction[s] between a manufacturer and its agent dealers").

Dated: February 4, 2026

Respectfully submitted,

/s/ *Jonathan D. Selbin*
Jonathan D. Selbin (pro hac vice)
Kenneth Byrd (pro hac vice)
Lucas Issacharoff (pro hac vice)
Muriel Kenfield-Kelleher (pro hac vice)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, Eighth Floor
New York, New York 10013
Telephone: 212-355-9500
jselbin@lchb.com
kbyrd@lchb.com
lissacharoff@lchb.com
mkenfieldkelleher@lchb.com

/s/ *Adam J. Levitt*
Adam J. Levitt (pro hac vice)
John E. Tangren (pro hac vice)
Daniel R. Schwartz (pro hac vice)
Elijah G. Savage (pro hac vice)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dschwartz@dicellolevitt.com
esavage@dicellolevitt.com

***Plaintiffs' Interim Class Counsel***

/s/ *Ketan A. Patel*
Ketan A. Patel (Ga. Bar No. 121099)
**CORPUS LAW PATEL, LLC**
P.O. Box 724713
Atlanta, Georgia 31139
Telephone: 678-597-8020
kp@corpus-law.com

***Plaintiffs' Interim Liaison Counsel***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

*/s/ Ketan A. Patel*
Ketan A. Patel

# CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.1(D), I certify that this brief has been prepared pursuant to the requirements of Local Rule 5.1(C) and (D). Specifically, the text is double-spaced, the font is Times New Roman in 14-point size, and margins are one inch.

*/s/ Ketan A. Patel*
Ketan A. Patel